**GUST ROSENFELD P.L.C.**
201 E. Washington Street
Suite 800
Phoenix, Arizona 85004
Telephone: (602) 257-7460
Telecopier: (602) 340-1538
Sean P. O'Brien, Bar No. 010540
E-mail: spobrien@gustlaw.com

**LACKEY HERSHMAN, L.L.P.**
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Telephone: (214) 560-2201
Telecopier: (214) 560-2203
Jamie R. Welton, TX State Bar No. 24013732
E-mail: jrw@lhlaw.net

**COUNSEL FOR LARRY LATTIG,**
**LITIGATION TRUSTEE FOR THE**
**FIRST MAGNUS LITIGATION TRUST**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>FIRST MAGNUS FINANCIAL<br><br>CORPORATION,<br><br>　　　　Debtor. | Case No. 4:07-bk-01578-JMM<br><br>(Chapter 11)<br><br>Adversary No. 4:09-ap-00211-JMM |
| LARRY LATTIG, LITIGATION TRUSTEE<br>FOR THE FIRST MAGNUS LITIGATION<br>TRUST,<br><br>　　　　Plaintiff,<br><br>v.<br><br>STONEWATER MORTGAGE<br>CORPORATION; GFORCE 1, LLC;<br>GURPREET S. JAGGI; THOMAS W.<br>SULLIVAN, SR.; THOMAS W. SULLIVAN, | |

1

JR.; CLINTON W. GAYLORD; GARY K. MALIS; DOMINICK MARCHETTI; KARL F.W. YOUNG; THOMAS W. SULLIVAN, SR. REVOCABLE TRUST; ECLOSER, INC.; ECLOSER SERVICES, INC.; FIRST MAGNUS CAPITAL, INC.; FIRST MAGNUS REALTY, LLC; FM EQUITY XI, LLC; INDUS HOLDINGS LLC; INDUS VENTURES, LLC; MAGNUS CORPORATION; MAGNUS SETTLEMENT SERVICES, LLC; STONEWATER BPO LLC; STONEWATER HOLDING CORPORATION; STONEWATER INSURANCE GROUP LLC; STONEWATER LENDER SERVICES, LLC; STONEWATER TECHNOLOGY LLC; SULLIVAN TITLE INVESTMENT, LLC; SULLIVAN TITLE MANAGEMENT, INC.;  TITLE SECURITY AGENCY OF ARIZONA; WRIGHT & YONAN, PLLC; JEFF ARNOLD; BILL BIRDSALL; JASJIT CHOPRA; AMIT GUJRAL; JOEL HERK; BRETT JOHNSON; DOUGLAS G. LEMKE; ARVIND SHARMA; VIVEK SHIVPURI; PHILLIP SHOEMAKER; MATTHEW THRASHER; MARTIN W. THOMAS; JAMES WARNER; NATHAN C. WRIGHT; AND MARK E. YONAN,

Defendants.

## COMPLAINT

Larry Lattig, Litigation Trustee for the First Magnus Litigation Trust (the "Litigation Trustee"), by and through his undersigned counsel, brings the Estate Tort and Other Claims against the entities and persons set forth below, as follows:

2

# PRELIMINARY STATEMENT

1.  "The truth is incontrovertible. . . . Malice may attack it; ignorance may deride it; but in the end, there it is." The incontrovertible truth is that First Magnus was not the victim of the "credit crisis" or the "collapse of the secondary market." It was, however, along with the rest of America, victimized by the avarice and greed of seven men — Gurpreet Jaggi, Thomas Sullivan, Sr., Thomas Sullivan, Jr., Bill Gaylord, Gary Malis, Dominick Marchetti and Karl Young — its Directors and Officers. On behalf of their victims, including the thousands of employees and other creditors they left unpaid, the Litigation Trust brings this suit to recover the more than $300,000,000 these seven men stripped from First Magnus.

2.  Instead of properly reserving against the repurchase and indemnification obligations arising from the terms on which First Magnus financed and sold its loans, these seven men paid themselves hundreds of millions of dollars based on completely fictitious profits. Broke and unable to honor its repurchase and indemnification obligations to the commercial banks and Wall Street firms that financed and purchased the loans First Magnus originated, the Directors and Officers threw First Magnus into bankruptcy and started new mortgage companies — ones that, in their words, were not "limited by the financial burdens of the past." Forced to write-down the collateral and account for their losses, the commercial banks (*e.g.,* WaMu, Merrill Lynch, *etc.*) and Wall Street firms (*e.g.*, Lehman Brothers, Bear Stearns, CitiMortgage, *etc.*) had to retain exorbitant amounts of cash, which restricted lending, tightened the credit markets, and spiraled into a financial crisis of global proportion.

3.  Sadly, while taxpayers are now forced to fund bailouts and stimulus packages in a desperate attempt to treat the systemic effects caused by the excesses of the Directors and Officers, their "new" mortgage companies are built on the very capital taken from First Magnus. What is even more troubling, their "new" companies were jump-started by the theft of Debtor's proprietary materials during the course of the bankruptcy. The modus operandi of the Directors and Officers has not changed; they remain at their customized building paid for by First

Magnus, secluded in the rich wood and marble of the Sullivan Wing, surrounded by $170,000 waterfalls and $16,000 fish tanks, their luxury vehicles safely tucked away in an air-conditioned garage ready to whisk them to their private planes for exotic vacations.

4.     In addition to recovering the more than $300,000,000 stripped from First Magnus, this suit also seeks to right the wrongs related to the misappropriation of Debtor's proprietary assets during the bankruptcy.  When the treble and punitive damages being sought are awarded, the liability of the Directors and Officers is nearly $1,000,000,000 — a pittance relative to the havoc they wreaked on the global economy.

## JURISDICTION & VENUE

5.     On August 21, 2007, First Magnus Financial Corporation ("First Magnus" "FMFC," or the "Debtor") filed a voluntary petition for relief under Chapter 11 of the BANKRUPTCY CODE, in the United States Bankruptcy Court for the District of Arizona ("Bankruptcy Court"), Case No. 4-BK-07-01578-PHX-JMM ("Bankruptcy Case").   Debtor continued with the management and operation of its business and property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

6.     An official Committee of Unsecured Creditors (the "Committee") was appointed on August 30, 2007.

7.     On February 28, 2008, the Bankruptcy Court confirmed the Second Amended Plan of Liquidation, dated January 4, 2008 (the "Plan" and "Confirmation Order", respectively). Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Plan and Confirmation Order.  The Plan became effective on May 1, 2008 (the "Effective Date") [Doc. No. 2438].

8.     Pursuant to the Plan and Confirmation Order, upon the Effective Date:  (a) the Committee was dissolved; (b) the Litigation Trust was deemed established and the Litigation Trustee was deemed appointed; and (c) Estate Tort and Other Claims were transferred to the Litigation Trust, subject to the terms of the Plan and the Litigation Trust Agreement.   The

Litigation Trustee has the power to prosecute, settle, or abandon Estate Tort and Other Claims, among other powers specified in §§ 7.14.5 and 7.14.6 of the Plan.

9.  This adversary proceeding is commenced by the Litigation Trustee pursuant to Rule 1001, FED.R.BANKR.P. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), (M), (N), and (O).

10. This Court has jurisdiction over this adversary proceeding and the parties to the proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

12. Unless stated otherwise, the factual allegations set forth herein have been pled based on information and belief. Further, the factual allegations set forth herein have been pled in the alterative pursuant to Rule 8(d)(2), FED.R.CIV.P.

## THE PARTIES

### I. The Corporate Defendants (in alphabetical order).

13. Ecloser, Inc. ("ECI") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711. ECI is engaged in business in Arizona, but has not designated an agent for service of process. This suit arises out of and is related to ECI's misappropriation of FMFC's confidential and proprietary information in Arizona. As such, ECI may be served with process via its registered agent in the State of Delaware, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

14. Ecloser Services, Inc. ("ECSI") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711. ECSI is engaged in business in Arizona and this suit arises out of and is related to its misappropriation of FMFC's confidential and proprietary information in Arizona. ECSI may be served with process via its registered agent, Wright & Yonan PLLC, Attention: Mark Yonan, 1050 E. River Road #202, Tucson, AZ 85718.

15.     Collectively, ECI and ECSI are referred to as the "New Ecloser Entities."

16.     First Magnus Capital, Inc. ("FMCI") is a corporation organized under the laws of the State of Arizona, with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  FMCI may be served with process via its registered agent, CT Corporation System, 2394 E. Camelback Road, Phoenix, AZ 85016.  Pursuant to the terms of an Exchange Agreement dated June 21, 2006, FMCI became the parent company of FMFC.  On February 15, 2008, FMCI filed a voluntary petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Arizona, Case No. 2:08-BK-01494-GBN ("FMCI Bankruptcy Case").  On July 14, 2008, FMCI filed its First Amended Disclosure Statement in Support of [FMCI's] Plan of Reorganization dated May 29, 2008 ("FMCI's Amended Disclosure Statement").  On July 29, 2008, the Bankruptcy Court in the FMCI Bankruptcy Case approved FMCI's Amended Disclosure Statement.  On September 12, 2008, FMCI filed its First Amended Plan of Reorganization ("FMCI's Amended Plan").  On September 25, 2008, the Bankruptcy Court in the FMCI Bankruptcy Case confirmed FMCI's Amended Plan ("FMCI Confirmation Order").  Pursuant to the FMCI Confirmation Order, the automatic stay in the FMCI Bankruptcy Case terminated as of the Effective Date of FMCI's Amended Plan. Thereafter, the FMCI Amended Plan became effective in accordance with § 2.26, thereby terminating the automatic stay.

17.     First Magnus Realty, LLC ("FM Realty") is a limited liability company organized under the laws of the State of Arizona.  FM Realty owns 603 N. Wilmot Road, Tucson, AZ 85711, FMFC's former headquarters, now occupied by StoneWater ("Headquarters Facility").  The members of FM Realty include Sullivan, Sr. and Indus Holdings.  FM Realty is managed by Magnus Corporation.  FM Realty maintains its principal place of business at 6390 E. Tanque Verde Road, Tucson, AZ 85715, and may be served with process via its registered agent, Magnus Corporation, 6390 E. Tanque Verde Road, Tucson, AZ 85715.

18.     FM Equity XI, LLC ("FM Equity XI") is a limited liability company organized under the laws of the State of Arizona.  FM Equity XI was formed on August 8, 2007, approximately 8 days before FMFC announced that it would be filing for bankruptcy.  The members of FM Equity XI include Jaggi and Malis.  FM Equity XI maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711, and may be served with process via its registered agent, Jasjit Chopra, 6280 N. Placita de Tia Road, Tucson, AZ 85750.

19.     G Force 1, LLC ("G Force") is a limited liability company organized under the laws of the State of Arizona.  Members of G Force include Sullivan, Jr., Jaggi, Malis, Marchetti, Young, Lemke, Gujral, Johnson, and Shoemaker.  G Force is managed by Jaggi and Young.  G Force maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711, and may be served with process via its registered agent, Matthew Thrasher, 603 N. Wilmot Road, Tucson, AZ 85711.

20.     Indus Holdings LLC ("Indus Holdings") is a limited liability company organized under the laws of the State of Arizona.  Members of Indus Holdings include Jaggi and his wife, Reema Sawhney.  Indus Holdings is managed by Jaggi.  Indus Holdings holds ownership interests in, *inter alia*, FM Realty, FM Consulting, and SW Holding.  Indus Holdings maintains its principal place of business at 6040 N. Paseo Valdear, Tucson, AZ 85750, and may be served with process via its registered agent, Douglas G. Lemke, Esq., 603 N. Wilmot Road, Tucson, AZ 85711.

21.     Indus Ventures, LLC ("Indus Ventures") is a limited liability company organized under the laws of the State of Arizona.  Indus Ventures is managed by Jaggi.  Indus Ventures holds ownership interests in, *inter alia*, SW Holding.  Indus Ventures maintains its principal place of business at 6040 N. Paseo Valdear, Tucson, AZ 85750, and may be served with process via its registered agent, Douglas G. Lemke, Esq., 603 N. Wilmot Road, Tucson, AZ 85711.

22.     Magnus Corporation ("Magnus Corp.") is a corporation organized under the laws of the State of Arizona. Magnus Corp. is owned by Sullivan, Sr. (President), Sullivan, Jr. (Vice

23.     Magnus Settlement Services, LLC ("Magnus Settlement Services" or "MSS LLC") is a limited liability company organized under the laws of the State of Arizona. Members of MSS LLC include Birdsall, Sullivan, Sr., and Sullivan, Jr.  MSS LLC is managed by Birdsall.  MSS LLC maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711, and may be served with process via its registered agent, Munger Chadwick PLC, 333 N. Wilmot Rd., No. 300, Tucson, AZ 85711.

24.     Collectively, Magnus Corp. and Magnus Settlement Services are referred to herein as the "Magnus Entities."

25.     StoneWater BPO LLC ("SW BPO") is a limited liability company organized under the laws of the State of Arizona and maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW BPO is managed by SW Holding and may be served with process via its registered agent, Matthew Thrasher, 603 N. Wilmot Road, Tucson, AZ 85711.

26.     StoneWater Holding Corporation ("SW Holding") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW Holding is owned by, *inter alia*, G Force, Indus Holdings, Indus Ventures, Sullivan Sr. Revocable Trust, Arnold, Gujral, Shivpuri, Sullivan, Jr., Warner, and Young.  Through G Force, Indus Holdings, Indus Ventures, and the Sullivan, Sr. Revocable Trust, SW Holding is also owned by Jaggi, Sullivan, Sr., Malis, Marchetti, Lemke, Johnson and Shoemaker.  SW Holding is engaged in business in Arizona, but has not designated an agent for service of process.  This suit arises out of and is related to the misappropriation of FMFC's confidential and proprietary information by SW Holding in Arizona.  As such, SW

8

Holding may be served via its registered agent in the State of Delaware, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

27.    StoneWater Insurance Group LLC ("SW Ins.") is a limited liability company organized under the laws of the State of Arizona with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW Ins. is managed by SW Holding.  SW Ins. may be served with process via its registered agent, Matthew Thrasher, 603 N. Wilmot Road, Tucson, AZ 85711.

28.    StoneWater Lender Services, LLC ("SW Lender Services") is a limited liability company organized under the laws of the State of Arizona with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW Lender Services is managed by SW Holding. SW Lender Services may be served with process via its registered agent, Matthew Thrasher, 603 N. Wilmot Road, Tucson, AZ 85711.

29.    StoneWater Mortgage Corporation ("SW Mortgage") is a corporation organized under the laws of the State of Delaware with its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW Mortgage is a wholly owned subsidiary of SW Holding.  SW Mortgage's directors and officers include:  Gujral (Managing Director of Operations); Lemke (Chief Administrative Officer); Malis (Managing Director of Capital Markets); Marchetti (Managing Director of Loan Production); Thrasher (Secretary); and Young (President and Chief Executive Officer).   SW Mortgage may be served with process via its registered agent, CT Corporation System, 2394 E. Camelback Road, Phoenix, AZ 85016.

30.    StoneWater Technology LLC ("SW Tech") is a limited liability company organized under the laws of the State of Arizona.  SW Tech is managed by SW Holding.  SW Tech maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711.  SW Tech may be served with process via its registered agent, Matthew Thrasher, 603 N. Wilmot Road, Tucson, AZ 85711.

31. Collectively, SW BPO, SW Holding, SW Ins., SW Lender Services, SW Mortgage, and SW Tech shall be referred to as "StoneWater" or the "StoneWater Entities."

32. Sullivan Title Investment, LLC ("Sullivan Title Investment") is a limited liability company organized under the laws of the State of Arizona. Members of Sullivan Title Investment include Sullivan Title Management and FMCI. Sullivan Title Investment is managed by Sullivan Title Management. Sullivan Title Investment maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711, and may be served with process via its registered agent, Gary Fletcher, 2970 N. Swan Road, Suite 221, Tucson, AZ 85712.

33. Sullivan Title Management, Inc. ("Sullivan Title Management") is a corporation organized under the laws of the State of Arizona. The Sullivans are the directors and officers of Sullivan Title Management. Sullivan Title Management maintains its principal place of business at 603 N. Wilmot Road, Tucson, AZ 85711, and may be served with process via its registered agent, Fletcher, 2970 N. Swan Road, Suite 221, Tucson, AZ 85712.

34. Collectively, Sullivan Title Investment and Sullivan Title Management shall be referred to as "Sullivan Title." Thomas W. Sullivan, Sr. Revocable Trust ("Sullivan, Sr. Revocable Trust"), is an alleged revocable trust created under an agreement dated July 9, 2002. The Sullivan, Sr. Revocable Trust is a shareholder of FMFC, FMCI, and SW Holding. At all relevant times, Sullivan, Sr. was the sole trustee, the sole grantor, and the sole beneficiary of the Sullivan, Sr. Revocable Trust. The Sullivan, Sr. Revocable Trust may be served with process via its trustee, Sullivan, Sr., at his residence, 7100 E. Stone Canyon Drive, Tucson, AZ 85750.

35. Title Security Agency of Arizona ("TSAA") is a corporation organized under the laws of the State of Arizona, with its principal place of business at 6390 E. Tanque Verde, Tucson, AZ 85732. Along with FMFC, TSAA is a member of Ecloser, LLC ("Ecloser"). TSAA may be served with process via its registered agent, Robert L. Gugino, 4564 E. Camp Lowell Drive, Tucson AZ 85712.

36.     Wright & Yonan, PLLC ("Wright & Yonan"), is a professional limited liability company organized under the laws of the State of Arizona. Members of Wright & Yonan include Wright, his wife Sarah L. Wright, and Yonan. Wright & Yonan maintains its principal place of business at 6860 N. Oracle Rd., No. 140, Tucson, AZ 85704, and may be served with process via its registered agent, Sarah L. Wright, at 4378 W. Tombolo Tr., Tucson, AZ 85745.

## II.     The Individual Defendants (in alphabetical order).

37.     Jeff Arnold ("Arnold") is the former President of Charter Insurance Group ("CIG"), which was a wholly owned subsidiary of First Magnus Lender Services, LLC ("FMLS"). Arnold is currently the owner and operator of Jeff Arnold Companies, Inc. ("JACI"), an entity formed to acquire CIG from Debtor's parent company FMCI. Arnold is also shareholder of SW Holding. Arnold is an Arizona resident and may be served with process at his residence, 1001 E. Magee Road, Tucson, AZ 85718.

38.     Bill Birdsall ("Birdsall") is a member and manager of Magnus Settlement Services. Birdsall is an Arizona resident, and may be served with process at his residence, 3131 N. Deer Track Rd., Tucson, AZ.

39.     Jasjit Chopra ("Chopra") is Debtor's former Controller. Chopra is also a member of FM Consulting LLC ("FM Consulting"), and is currently the Controller of StoneWater. Chopra is an Arizona resident, and may be served with process at his residence, 6280 N. Placita de Tia Ro, Tucson, AZ 85750.

40.     Clinton W. Gaylord ("Gaylord") is a former officer and shareholder of FMFC and FMCI. Gaylord is an Arizona resident, and may be served with process at his residence, 1980 W. Ashbrook Drive, Tucson, AZ 85704.

41.     Amit Gujral ("Gujral") is the Managing Director of Operations for SW Mortgage, a shareholder of SW Holding, and member of G Force. Gujral was a Founder and Vice President of Delivery for Trinity Partners, Inc. d/b/a Trinity Business Process Management

("Trinity"). Gujral is an Arizona resident, and may be served with process at his residence, 7563 E. Placita de la Vina, Tucson, AZ 85750.

42. Joel Herk ("Herk") is Debtor's former Deputy General Counsel and was subsequently employed by the First Magnus Liquidation Trust ("Liquidation Trust"). Herk is also employed by StoneWater. Herk is an Arizona resident, and may be served with process at his residence, 5036 N. Hillcrest Drive, Tucson, AZ 85704.

43. Gurpreet S. Jaggi ("Jaggi") is the former President and Chief Executive Officer of FMFC and FMCI, and shareholder of FMFC and FMCI. Currently, Jaggi is, *inter alia*, the Chief Executive Officer of SW Holding. Jaggi is also a managing member of, *inter alia*, FM Consulting, FM Equity I-XI, LLCs (collectively, "FM Equity Entities"), G Force, Indus Holdings, and Indus Ventures. Through Indus Holdings, Jaggi is also a member of FM Realty. Through G Force, Indus Holdings, and Indus Ventures, Jaggi is also a shareholder of SW Holding. Jaggi is an Arizona resident, and may be served with process at his residence, 6040 N. Paseo Valdear, Tucson, AZ 85750.

44. Brett Johnson ("Johnson") is Debtor's former Director of Software Engineering. Johnson is a member of FM Consulting and G Force, and, through G Force, is a shareholder of SW Holding. Johnson is currently employed by StoneWater. Johnson is an Arizona resident, and may be served with process at his residence, 286 W. Azmataz Road, Oro Valley, AZ 85737.

45. Douglas G. Lemke, Esq. ("Lemke") is Debtor's former General Counsel. Lemke is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Currently, Lemke is the Chief Administrative Officer of SW Mortgage. Lemke is an Arizona resident, and may be served with process at his residence, 3032 W. Desert Glory Drive, Tucson, AZ 85745.

46. Gary K. Malis ("Malis") is Debtor's former Chief Financial Officer, and shareholder of FMFC and FMCI. Malis is a member of FM Consulting, FM Equity XI, and G Force. Through G Force, Malis is a shareholder of SW Holding. Currently, Malis is the

Managing Director of Capital Markets of SW Mortgage. Malis is an Arizona resident, and may be served with process at his residence, 6491 N. Lightning A Drive, Tucson, AZ 85749.

47.     Dominick Marchetti ("Marchetti") is Debtor's former Chief Technology Officer, and shareholder of FMFC and FMCI. Marchetti is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Currently, Marchetti is the Managing Director of Loan Production of SW Mortgage. Marchetti is an Arizona resident, and may be served with process at his residence, 4930 N. Melpomene Way, Tucson, AZ 85749.

48.     Arvind Sharma ("Sharma") is Debtor's former Chief Operating Officer of Banking. Sharma is currently employed by SW Mortgage. Sharma is an Arizona resident and may be served with process at his residence, 6795 E. Calle La Paz #15204, Tucson, AZ 85715.

49.     Vivek Shivpuri ("Shivpuri") is a shareholder of SW Holding and a Director of ECSI. Shivpuri is also the former President and Chief Executive Officer of Trinity. Shivpuri is an Arizona resident and may be served with process at his residence, 7520 E. Placita Ventana Hayes, Tucson, AZ 85750.

50.     Phillip Shoemaker ("Shoemaker") is Debtor's former Director of Application Design. Shoemaker is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Shoemaker is currently employed by StoneWater. Shoemaker is an Arizona resident, and may be served with process at his residence, 7141 E. River Canyon Road, Tucson, AZ 85750.

51.     Thomas W. Sullivan, Jr. ("Sullivan, Jr.") is the former Vice President, Secretary, and Treasurer of FMFC and FMCI, and shareholder of FMFC and FMCI. Sullivan, Jr. is a member of FM Consulting, G Force, and Magnus Settlement Services, and a shareholder of SW Holding, individually and through G Force. Sullivan, Jr. is also the President of TSAA. Sullivan, Jr. is an Arizona resident, and may be served with process at his residence, 3747 N. Placita Vergel, Tucson, AZ 85719.

52. Thomas W. Sullivan, Sr. ("Sullivan, Sr.") is the former Chairman of the Board of FMFC and FMCI. Sullivan, Sr. is member of FM Consulting, FM Realty, and Magnus Settlement Services, and shareholder of Magnus Corp. Sullivan, Sr. is also Trustee for the Sullivan, Sr. Revocable Trust, through which, he is a shareholder of FMFC, FMCI, and SW Holding. Sullivan, Sr. was also a Director of CIG and President of TSAA. Sullivan, Sr. is an Arizona resident and may be served with process at his residence, 7100 E. Stone Canyon Drive, Tucson, AZ 85750.

53. Collectively, Sullivan, Sr. and Sullivan, Jr. are referred to as the "Sullivans."

54. Matthew Thrasher ("Thrasher") is Debtor's former Deputy General Counsel. Currently, Thrasher is employed by StoneWater. Thrasher is an Arizona resident, and may be served with process at his place of employment, 603 N. Wilmot Road, Tucson, AZ 85711.

55. Martin W. Thomas ("Thomas") is a former shareholder of FMFC. Thomas is an Arizona resident, and may be served with process at 6390 E. Tanque Verde, Tucson, AZ 85715.

56. James (Jim) Warner ("Warner") is Debtor's former Deputy General Counsel. Warner is also a Director of ECSI and a shareholder of SW Holding. Currently, Warner is employed by StoneWater and the New Ecloser Entities. Warner is an Arizona resident and may be served with process at his at his place of employment, 603 N. Wilmot Road, Tucson, AZ 85711.

57. Nathan C. Wright ("Wright") is Debtor's former Deputy General Counsel. Wright is an Arizona resident and may be served with process at his at his place of employment, Wright & Yonan, PLLC, 1050 East River Road, Suite 202, Tucson, AZ 85718.

58. Mark E. Yonan ("Yonan") is Debtor's former Deputy General Counsel. Yonan is an Arizona resident and may be served with process at his at his place of employment, Wright & Yonan, PLLC, 1050 East River Road, Suite 202, Tucson, AZ 85718.

59. Karl F. W. Young ("Young") is Debtor's former Chief Operating Officer, and shareholder of FMFC and FMCI. Young is also a member of FM Consulting and G Force, and

a shareholder of SW Holding, individually and through G Force. Currently, Young is the President and Chief Executive Officer of SW Mortgage. Young is an Arizona resident, and may be served with process at his residence, 6549 N. Calle de la Lluvia, Tucson, AZ 85750.

60. Collectively, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, are referred to as the "Directors and Officers."

61. Collectively, the Directors and Officers (excluding Gaylord), FM Realty, G Force 1, Indus Holdings, Indus Ventures, the Magnus Entities, the New Ecloser Entities, the StoneWater Entities, the Sullivan, Sr. Revocable Trust, Sullivan Title, TSAA, Wright & Yonan, Lemke, Herk, Thrasher, Warner, Wright, Yonan, Chopra, Johnson, Shoemaker, Sharma, Shivpuri, Gujral, Arnold, and Birdsall are referred to as the "RICO Defendants."

## THE FACTS

**I.** **Getting In The Game: FMFC Developed State-Of-The-Art Technology And Became A Leading Originator Of Non-Conforming Alt-A Loans For Wall Street Firms.**

### A. The History: First Magnus Commandeered Mitchell Financial.

62. First Magnus was formed in July 1996 by, among others, Jaggi and the Sullivans. Prior to forming First Magnus, the Sullivans owned and operated TSAA, a local title company that did a significant amount of business with Mitchell Financial Services ("Mitchell"), a local mortgage company. In addition to the title work, Sullivan, Sr. funded loans originated by Mitchell. Sullivan, Sr. held the loans he funded for Mitchell as collateral until the loans were sold by Mitchell and he was subsequently repaid. In the interim, Sullivan, Sr. charged Mitchell various fees and collected interest payments. As a condition to funding the loans, Sullivan, Sr. received monthly financial statements from Mitchell, where he discovered the vast amount of money to be made leveraging other people's risks.

63. According to a manuscript being written by Sullivan, Sr. (the "Sullivan, Sr. Manuscript"), Mitchell's financial statements left him thoroughly "impressed by the profit potential in the business." As Sullivan, Sr. learned, the "key to the mortgage banking business

15

lies in the so called back room where packaging, managing the portfolios and selling into the aftermarket is crucial." According to Sullivan, Sr., the "vehicle that allows this to happen smoothly and efficiently lies with the IT department."

64. Mitchell was owned by an acquaintance of Sullivan, Sr., and a good friend of Martin Thomas, an Executive Vice President at TSAA. Jaggi was the President of Mitchell and one of its four directors, along with Malis, who served as its Vice President. At the time, Mitchell's retail lending operations were headed by Young. When Sullivan, Sr.'s acquaintance later sold Mitchell to Cynthia Early and James Tiscione, the Sullivans approached Jaggi about starting a new mortgage company and moving the business. "After a couple of meetings," according to the Sullivan, Sr. Manuscript, Jaggi and the Sullivans "became serious" and entered into a "preincorporation agreement" on July 15, 1996 to form First Magnus.

65. On the following day, July 16, 1996, First Magnus was incorporated. Shortly thereafter Jaggi, Malis, Young, and other key employees of Mitchell, resigned. Mitchell promptly sued First Magnus, Jaggi, Malis, Young, and others, in a case styled *Mitchell Financial Services, Inc. v. First Magnus Financial Corp., et al.*, Cause No. C 317671, in the Superior Court of the State of Arizona, in and for the County of Pima (the "Mitchell Litigation"), which First Magnus later settled. With the Mitchell *coup d'etat* behind them, the Directors and Officers focused their attention on developing state-of-the-art technology and infrastructure to grow First Magnus into one of the largest mortgage originators in the country.

### B. First Magnus made Technology the Core of its Business.

66. First Magnus' original shareholders were Jaggi, the Sullivans, Thomas, Charles Y. Kaneshiro, and First Hawaii Title Corporation ("First Hawaii"), a title company owned and operated by Sullivan, Sr. First Hawaii was used by Sullivan, Sr. to fund the start-up costs for First Magnus, which it did in the form of a subordinated promissory note. The original shareholders of First Magnus later entered into a Restatement of Preincorporation Agreement for First Magnus effective July 15, 1996 (the "Preincorporation Agreement"), for the purpose of

16

including three additional shareholders: Young, Bill Gaylord (a life-long friend of the Sullivans), and Precis Consulting, Inc. Defined Benefit Plan FBO Thomas Sullivan, Sr. ("Precis").

67. The "key employees," according to Sullivan, Sr., "realized that their model for growth would center around the wholesale operations which would only be competitive with Internet software." Accordingly, FMFC built its business model around the development of technology and other proprietary programs designed to streamline the loan origination process and efficiently allocate workflow to expedite the origination and sale of loans.

68. FMFC's information technology infrastructure was largely proprietary. All primary systems relating to the mortgage process, with the exception of document generation software, were designed, built, and maintained in-house. The architects of FMFC's technology were Marchetti (Chief Technology Officer), Brett Johnson (Director of Software Development), Phil Shoemaker (Director of Application Design), and Tom Comparato (Director of Program Management) ("Comparato"). By 2006, FMFC was deploying 35 software enhancements per week and was working on the development of 300 different products or enhancements at any given time. FMFC's development of proprietary technology led many to boast that FMFC was first and foremost a technology company, as opposed to a mortgage company.

69. FMFC's foray into technology led FMFC's Directors and Officers, along with key technology personnel and other high-ranking FMFC executives, to form FM Consulting, LLC ("FM Consulting"), to assist FMFC in its software development and in "off-shoring" back-office processes. Members of FM Consulting included Jaggi and the Sullivans, who were the managing members, and Malis, Marchetti, Young, Chopra, Johnson, Shoemaker, Faisal Adil ("Adil"), Randy Hutchison ("Hutchison"), and Isabel Bustamante ("Bustamante"). In 2003, FMFC, FM Consulting, and others, including Gujral, Shivpuri, and Arvind Srivastava ("Srivastava"), formed Trinity Partners, Inc. ("Trinity"), which was based in Gurgaon, India, to provide First Magnus with business outsourcing services and technical personnel. In November

2005, WNS Holdings Ltd. ("WNS") acquired Trinity for a combination of cash and stock ("Trinity Sale"), and, as part of the transaction, First Magnus entered into a long-term service agreement with WNS.

70. As Marchetti summarized in an April 2007 interview, technology was the "core" of First Magnus' business. In all, FMFC maintained a technology staff of approximately 400, approximately 25% in Tucson and the remainder in India. FMFC's program to engineer technology was more than a decade in development and was the key to FMFC's success, as it permitted FMFC to respond quickly to market conditions, reduce operational costs through paperless loan processing and underwriting, and maintain a litany of other competitive advantages. Due in large part to FMFC's proprietary programs and technological know-how, FMFC ranked as the one of the largest Alt-A lenders in the country by 2006.

### C. First Magnus Originated, Purchased, and Sold Predominantly Alt-A Loan Products In The Most Volatile Housing Markets.

71. As of 2007, First Magnus had grown to over 5,500 employees, with a total of 335 branches, comprised of approximately 277 retail and 58 wholesale locations in all 50 states. From January 2005 through the Petition Date, FMFC originated and sold more than $70 billion in mortgage loans.

72. More than 50% of loans originated by First Magnus were "Alt-A" products. First Magnus originated, purchased, and sold predominantly Alt-A mortgage loans secured by one-to-four unit residences. An "Alt-A" mortgage is short for Alternative A-paper, which is a type of mortgage that is considered riskier than prime mortgages and is alternative to "conforming" or "agency" mortgages often guaranteed by the government-sponsored enterprises Fannie Mae ("Fannie") and Freddie Mac ("Freddie") (collectively, "GSEs").

73. Alt-A mortgages like those originated, purchased, and sold by First Magnus, have a variety of characteristics that make them too risky for the GSEs. For example, First Magnus' Alt-A loans included "stated income" or "no income verification" loans, where income

documentation for the borrower was either reduced, and, in many instances, not required at all, to qualify for a loan.  Internally, First Magnus underwriting personnel referred to these types of loans as "liar loans" because a borrower can state their income and assets, and First Magnus would approve the loan without any further documentation.

74.     First Magnus' Alt-A loans also contained borrower debt-to-income ratios above what Fannie or Freddie would allow for a borrower to qualify to purchase a particular asset. The higher the debt-to-income ratio, the greater the risk the borrower will have cash-flow problems and miss mortgage payments.  Alt-A mortgages are also characterized by borrowers with poor credit histories and low FICO scores, and borrowers that may have serious delinquencies, but no recent charge-offs or bankruptcy filings that would otherwise characterize subprime borrowers.

75.     Alt-A mortgages are also characterized by loan-to-value ratios above agency limits.  As a result, Alt-A loans like those originated by First Magnus were often the financing of choice for non-owner occupied or investment properties because borrowers could carry "interest only" loans ("IO" loans), loans with payment options that allowed for negative amortization (by adding deferred interest payments to the loan balance), or "adjustable rate mortgages" ("ARMs") that limited the amount of principal required from the borrower.  Non-owner occupied and investment properties present a far greater likelihood of a borrower default than conventional loans, since people are more likely to abandon a property in which they do not live or have a significant amount of principal invested.

76.     First Magnus underwriting personnel acknowledged that "there were people getting into houses where no way under the normal lending practices could they get a loan."  It was not uncommon for some First Magnus employees to intentionally overstate incomes or assets on Alt-A applications to qualify borrowers for loans.

77.     In many instances, the loans originated, purchased, and sold by First Magnus were layered with risk, *i.e.*, the loans contained multiple features associated with a greater risk

of delinquency. Not surprisingly, more than 20% of all securitized Alt-A loans issued since January 2006 have become seriously delinquent. In sum, Alt-A mortgages, like those originated, purchased, and sold by First Magnus, were not subprime *per se*, but they were risky products and represent some of the most toxic asset-backed securities currently plaguing the financial markets.

78. No less than 50% of all loans originated, purchased, and sold by First Magnus from January 2005 through the Petition Date were "Alt-A" paper or below. From the first quarter of 2004 through the fourth quarter of 2006, FMFC increased its Alt-A originations by 692%. FMFC issued more than $10 billion in Alt-A loans in the fourth quarter of 2006. By 2007, FMFC was the 8th largest originator of Alt-A loans and represented 2.36% of all Alt-A mortgages originated in the United States.

79. <u>Approximately 14% of First Magnus' loans were made to subprime borrowers</u>. First Magnus also engaged in classic subprime lending. Subprime borrowers have a heightened risk of default, as they have a history of loan delinquencies or defaults, foreclosures, adverse judgments, bankruptcy filings, or have little to no debt experience. Although there is no standardized definition, subprime borrowers are usually classified as those where the borrower has a FICO score below 680.

80. The Directors and Officers avoided the word "subprime" and classified any borrower with a FICO score above 620 as an "Alt-A borrower." Over 46% of all loans originated by First Magnus in 2006 had borrowers with FICO scores below 700, of which 32% had FICO scores between 650 and 700. Approximately 14% of all loans originated by First Magnus in 2006 had borrowers with FICO scores that were less than 650.

81. Many industry experts classify interest only and stated income loans to be "subprime" paper, regardless of the FICO score of the borrower, given the inherent risk in these types of loans. Despite originating, purchasing, and selling such products, First Magnus classified these products as Alt-A in an effort to avoid the stigma associated with subprime.

82.     <u>First Magnus made construction loan commitments in Arizona and California in excess of $130MM</u>.  In 2004, FMFC established a retail-only residential construction lending department (the "CLD"), which focused on financing the construction of residential homes.  In 2005, First Magnus funded approximately 187 units for $114 million in commitments with an average loan size of $612,000, although individual loans often exceeded $1,000,000.  In 2006, First Magnus had approximately $131 million in commitments with an average loan size of $614,000, again with individual loans often exceeding $1,000,000.

83.     FMFC's construction lending was limited to three markets – Arizona, California and Nevada.  Approximately 90% of FMFC's construction lending, however, was in the Phoenix-area.  More than 25% of FMFC's construction loans were for non-owner occupied properties, or investment properties.

84.     Until the fourth quarter of 2006, the minimum qualifying FICO score for a construction loan from First Magnus was 620.  First Magnus moved the minimum qualifying FICO score for construction loans from 620 to 680 in the fourth quarter of 2006 and first quarter of 2007.  First Magnus permitted "stated income loans" on new home construction until the fourth quarter of 2006 and the first quarter of 2007.

85.     The CLD was headed by Don Stremme ("Stremme"), Debtor's National Construction Manager.  Based out of Scottsdale, Stremme was responsible for originating construction loans and received a bonus or commission based on his originations.  Stremme was also responsible for underwriting the very loans he had originated.

86.     Stremme also approved the builders.  According to Stremme, he had "no hard and fast" rules when it came to approving a builder.  From mid-2005 through the Petition Date, one half of the CLD's loans were on projects being built by just two builders: Sonoran Family Communities ("Sonoran") (representing 35% of the CLD's outstanding construction loan commitments) and C.O.B.S. Homes (representing 17%).

87. <u>More than half of First Magnus' volume was in the most volatile housing markets</u>. The loans First Magnus originated, purchased, and sold, were predominantly in areas of the country hardest hit by the housing crisis, namely, Arizona, California, and Florida. In 2006, those states made up 52% of First Magnus' volume – Arizona (24%), California (19%), and Florida (9%). No other state contributed more than 5%.

88. *Wholesale*. From January 2005 through the Petition Date, approximately 60-65% of the loans First Magnus originated, purchased, and sold were wholesale originations, *i.e.*, First Magnus did not employ the loan broker that originated the loan, but instead, paid the broker a fee once the mortgage closed. First Magnus maintained 58 wholesale branches, the largest concentrations of which were in Arizona, California, Nevada, and Florida.

89. In 2005, approximately 37% of the wholesale loans originated by First Magnus were in the southwest, and approximately 24% were in the southeast (collectively, 61%). In total, FMFC originated approximately $16.4 billion in wholesale loans in 2005.

90. In 2006, approximately 50% of the wholesale loans originated by First Magnus were in the southwest, and approximately 30% were in the southeast (collectively, 80%). In total, FMFC originated more than $19 billion in wholesale loans in 2006, and another $5.2 billion in the first quarter of 2007.

91. *Retail*. Approximately 35-40% of the loans First Magnus originated, purchased, and sold from January 2005 through the Petition Date were retail originations, *i.e.*, First Magnus made the loan directly to a borrower with no intermediary (broker) involved. First Magnus maintained 277 retail branches, the largest concentrations of which were in Arizona (80), California (55), Nevada (18), Colorado (17), and Georgia (11) (collectively, 65%). Approximately 49% of all of First Magnus' retail branches were located in Arizona and California.

92. FMFC originated more than $25 billion in retail loans from January 2005 through the first quarter of 2007, approximately $11.7 billion in 2005, $11 billion in 2006, and

$2.5 billion in the first quarter of 2007. When wholesale and retail loan production is combined, FMFC originated approximately $27.1 billion in 2005, $30 billion in 2006, and $7.8 billion in the first quarter of 2007.

**D. First Magnus Borrowed The Money To Originate Its Loans From Lenders Now Synonymous With The Global Financial Crisis.**

93. To finance its mortgage loan production business, FMFC used several warehouse financing agreements that primarily took the form of master repurchase agreements (collectively, the "Repurchase Agreements") with certain lenders (collectively, the "Warehouse Lenders"). The Warehouse Lenders are some of the lenders now synonymous with the global financial crisis, *e.g.*, Washington Mutual ("WaMu"), Countrywide, Merrill Lynch, and UBS.

94. In the mortgage industry, a "warehouse" line of credit is a loan extended by a large bank or Wall Street firm to a non-bank, which uses the funds to originate wholesale or retail mortgages. First Magnus was a non-bank lender in that it financed its residential loan originations by borrowing money from Wall Street firms or commercial banks. Because First Magnus was not a bank, it was not regulated by a federal bank or Savings & Loan regulator.

95. Through the Repurchase Agreements, the Warehouse Lenders advanced First Magnus the funds to originate mortgage loans by agreeing to purchase the loans from First Magnus, which, in turn, simultaneously agreed to "repurchase" the mortgage loans from the Warehouse Lenders at a price equal to the original sale price, plus an interest component, within a fixed number of days (typically thirty days) ("Warehouse Repurchase Obligations"). During the time period in which loans were "in the warehouse," First Magnus was also obligated to service the loans, and, under specified circumstances, make advance repurchase payments. Warehouse Lenders could also require First Magnus to fund margin calls in addition to, or in lieu of, repurchasing a loan if the Warehouse Lender deemed the fair market value of a loan to be less than the Warehouse Repurchase Obligation.

96. The Repurchase Agreements contained a plethora of eligibility requirements that restricted the mortgage loans that could be held in the warehouse ("Warehouse Eligibility Requirements"). If a loan failed, at any time, to meet the Warehouse Eligibility Requirements, First Magnus was obligated to immediately satisfy its Warehouse Repurchase Obligations upon request.

97. Whether a loan met the Warehouse Eligibility Requirements was generally within the sole discretion of the Warehouse Lenders. Warehouse Eligibility Requirements included, but were not limited to, the market value of the loan, whether the loan was current or had ever experienced a default, the occupancy of the property by the mortgagor, whether the underwriting criteria and conditions used in the origination of the loan were satisfactory to the Warehouse Lender, the quality and reliability of the appraisal, whether all the information and documentation related to the mortgage was completed to the satisfaction of the Warehouse Lender, the credit standing of the borrower, and whether the loan met the requirements of subsequent purchasers. These are but a few of the Warehouse Eligibility Requirements, which were not limited in duration and could be invoked at any time.

98. The Repurchase Agreements also required that First Magnus maintain a requisite financial condition and certify periodically that those conditions continued to be met ("Warehouse Financial Covenants"). The failure to meet any of the Warehouse Financial Covenants required First Magnus to immediately satisfy its Warehouse Repurchase Obligations upon request. The Warehouse Financial Covenants imposed on First Magnus included, but were not limited to, compliance with generally accepted accounting principles, compliance with all of its other Repurchase Agreements and Loan Purchase Agreements (a/k/a a cross-default provision), maintaining a minimum tangible net worth, and maintaining a maximum debt-to-equity ratio of 10:1.

99. The Repurchase Agreements also obligated First Magnus to indemnify the Warehouse Lenders for virtually everything imaginable related to the Repurchase Agreements

("Warehouse Indemnity Obligations"). The Repurchase Agreements generally specified that the Warehouse Repurchase Obligations and Warehouse Indemnity Obligations "shall be full recourse obligations" of First Magnus.

100. The failure to satisfy a Warehouse Repurchase Obligation, a Warehouse Financial Covenant, a Warehouse Indemnity Obligation, or any other specified obligation in the Repurchase Agreements, constituted an Event of Default, which permitted to the Warehouse Lenders to exercise a variety of remedies draconian to First Magnus, including, but not limited to, making all Warehouse Repurchase Obligations immediately due and payable, taking immediate possession of the loans, and exercising all rights related thereto. Because a default under a Repurchase Agreement or Loan Purchase Agreement provided such significant recourse against First Magnus, cross-default provisions provided a "me too" ability for Warehouse Lenders and Take-Out Investors to declare a default and exercise their remedies in the event any other Repurchase Agreement or Loan Purchase Agreement was breached.

**E.      First Magnus Sold Its Loans To Wall Street Firms Now Synonymous With The Global Financial Crisis.**

101. First Magnus attempted to sell the loans it originated to subsequent purchasers, sometimes referred to as take-out investors ("Take-Out Investors" or "Purchasers"), for a price over the amount First Magnus owed to the Warehouse Lenders. The Take-Out Investors are some of the Wall Street firms now synonymous with the global financial crisis, *e.g.*, Lehman Brothers, Bear Stearns, Morgan Stanley, Bank of America, and CitiMortgage. The two largest Take-Out Investors for First Magnus were Lehman Brothers Bank, FSB (and its wholly-owned subsidiary, Aurora Loan Services, LLC ("Aurora")) (collectively "Lehman"), and Countrywide. More than 70% of the loans originated by First Magnus from January 2005 through the Petition Date were purchased by Lehman and Countrywide.

102. The Take-Out Investors that purchased loans from First Magnus would pool the loans together with other loans, and collateralize or securitize the loans by issuing a bond

backed by the pool of mortgages. A bond backed by mortgages like those sold by First Magnus was considered an asset-backed security ("ABS") because the bond was backed by subprime, Alt-A, or other types of non-conforming loans, as opposed to a bond backed by "A" paper or conforming loans guaranteed by Fannie and Freddie, which was generally referred to as a mortgage-backed security ("MBS").

103. The Take-Out Investors made enormous sums of money by packaging ABSs into collateralized debt obligations ("CDO"). A CDO is an ABS created from tranches of other bonds, diversifying the cash flow and risks from a pool of different asset-backed securities, which allowed for the issuance of securities with higher credit ratings than the securities used to back the CDO. Wall Street firms like the Take-Out Investors usually formed special purpose entities ("SPVs") offshore in places that do not tax corporations (*e.g.*, the Cayman Islands) to hold the assets and issue different classes of securities to CDO investors. As a result of this diversification (and improved rating), the value of the CDO was generally higher than the costs of all the bonds that went into it and the Take-Out Investors made a profit on the sale of interests in the CDO.

104. The Take-Out Investors were some of the largest sponsors and managers of structured-finance CDOs, which were based on ABSs made up of mortgage loans like those sold by First Magnus. CDO sponsors typically made a commission at the time of issuing a CDO and earned management fees for managing the portfolio over the life of the CDO. Loan volume drove the structured-finance CDO business; the more loans collateralized, the more diversified the risk and higher the credit rating; the higher the credit rating and yield on the loans (higher coupons were typically associated with subprime and Alt-A products), the greater the spread between the cost of the loans and the sale of interests in the CDO; the larger the loan amounts, the bigger the commission and management fee. To keep the CDO machine running, the Take-Out Investors purchased large blocks of mortgage loans from mortgage originators like First Magnus without conducting any due diligence.

105.    Take-Out Investors, or their affiliates, typically retained an interest in the CDOs they were originating.  Like other CDO investors, Take-Out Investors purchased credit default swaps to hedge against the risk of losses associated with the interests retained in the CDOs.  Credit default swaps ("CDS") are instruments used to hedge against losses, or, in some cases, to speculate on the value of bonds (whether the bonds are an asset-backed security or any other type of bond).  In the structured-finance CDO market, credit default swaps act like a form of insurance, where one party must pay another party in the event a default occurs on the CDO.  The premiums paid for particular credit default swaps gauge the market's perceived risk associated with a particular bond and its underlying assets.  To fund their purchase of credit default swaps, Take-Out Investors, and their affiliates, also sold credit default swaps on CDOs in which they were not invested.

106.    First Magnus sold its mortgage loans to the Take-Out Investors pursuant to the terms of loan purchase agreements ("Loan Purchase Agreements").  Each Loan Purchase Agreement typically incorporated the terms of a "seller's guide" or "client guide" set forth by the Take-Out Investor (a "Seller's Guide").  Unless otherwise stated, reference to "Loan Purchase Agreements" in the Complaint shall include the terms incorporated therein by the applicable Seller's Guides.

107.    The Loan Purchase Agreements contained a litany of absolute, subjective, discretionary, and indefinite rights that allowed the Take-Out Investors, or their subsequent assignees, to return any and all loans sold to them and required First Magnus to refund the purchase in its entirety, by wire transfer, and from all immediately available funds ("LPA Repurchase Obligations").  In addition to the LPA Repurchase Obligations, the Loan Purchase Agreements also contained a litany of other absolute, subjective, discretionary, and indefinite rights that required First Magnus to indemnify the Take-Out Investors and subsequent assignees for any losses and costs incurred related to the loan (including lost cash flows over the life of the loan), and make immediate cash payments as determined by the purchaser or subsequent

assignees to satisfy the obligations ("LPA Indemnity Obligations").  The Take-Out Investors, and their subsequent assignees, could exercise any combination of remedies (*e.g.*, repurchase, indemnity payment, retained control over repurchased collateral, *etc.*) in their "sole discretion." Accordingly, the LPA Repurchase Obligations and LPA Indemnity Obligations are used interchangeably herein and sometimes referred to collectively as "representation and warranty obligations," "repurchase and indemnification obligations," or "repurchase and indemnification remedies."

108.    The representation and warranty obligations in the Loan Purchase Agreements extended to any party to whom the Take-Out Investors elected to assign them, such as the SPVs and other entities that may have held the mortgage loans securitized through a CDO.  For example, Lehman's Loan Purchase Agreements provide that it is free to assign "any or all representations, warranties, or covenants made by Seller to Purchaser in the Seller's Guide and Loan Purchase Agreement, along with any remedies available against Seller for Seller's breach of any representation, warranty or covenant, including, without limitation, the repurchase and indemnification remedies."

109.    As a result, the LPA Indemnity Obligations were not subject to extinguishment during the maturity of the loan.  Further, the failure of a Purchaser to review or discover any deficiency or error in a mortgage loan file would not prevent or inhibit a Purchaser's exercise of its remedies at any time.  Moreover, the repurchase and indemnification obligations typically extended beyond the termination of the Loan Purchase Agreements, which contained provisions providing that "any termination of the Loan Purchase Agreement shall not affect Seller's obligations with respect to the Mortgage Loans previously sold or delivered."

110.    The Take-Out Investors, like Lehman, also made FMFC acknowledge that they had not pre-screened any loans or determined whether they met the Purchaser's eligibility requirements, and reserved the right to reject a loan for any reason at any time and demand repurchase and/or indemnity payments.  By way of example, Lehman's Loan Purchase

Agreements permitted the Purchaser to exercise its repurchase and indemnification remedies if "determined at Purchaser's sole discretion," a loan did not meet Purchaser's guidelines, or if, "in Purchaser's sole discretion," any loan failed to conform to applicable underwriting guidelines. The eligibility requirements for loans under the Loan Purchase Agreements were similar to those under the Repurchase Agreements, and included, but were not limited to, the market value of the loan, whether the loan was current or had ever experienced a default, the occupancy of the property by the mortgagor, whether the underwriting criteria and conditions used in the origination of the loan were satisfactory to the Take-Out Investor, the quality and reliability of the appraisal, whether all the information and documentation related to the mortgage was completed to the satisfaction of the Take-Out Investor, the credit standing of the borrower, and whether the loan meets the requirements of subsequent purchasers. These are but a few of the eligibility requirements under the Loan Purchase Agreements, which were not limited in duration and could be invoked at any time.

111. The Loan Purchase Agreements also contained financial covenants and cross-default provisions similar to those contained in the Repurchase Agreements, which, if triggered, permitted the Take-Out Investors, or their assignees, to exercise their repurchase and indemnification remedies on any and all loans previously purchased. Here too, the Loan Purchase Agreements provided that if "in Purchaser's sole discretion, any material adverse change occurs in the financial condition of the Seller," the Take-Out Investors, or their assignees, could compel FMFC to fulfill its repurchase and indemnification obligations on any and all loans sold.

112. The Loan Purchase Agreements also contained other events that could trigger the repurchase and indemnity obligations. Early Payment Defaults ("EPDs"), where a borrower missed the first or second monthly payment due to Purchaser, or Early Payoffs ("EPOs"), where a loan was paid in full within the first 90 days following the purchase by the Take-Out Investor, also triggered repurchase and indemnity obligations.

113.   Not surprisingly, Lehman asserted LPA Indemnity Obligations in the Bankruptcy Case in excess of $395,000,000.   Countrywide asserted LPA Indemnity Obligations in the Bankruptcy Case in excess of $100,000,000.   Collectively, the LPA Indemnity Obligations asserted by the Take-Out Investors in the Bankruptcy Case exceeded half a billion dollars.

## II.   Stacking The Deck:   Rather Than Reserve Or Account For Known Contingencies, FMFC Artificially Accelerated Revenue Recognition And Overstated The Value Of Its Assets.

114.   Given the scope of the repurchase and indemnification obligations to Warehouse Lenders and Take-Out Investors, generally accepted accounting principles required First Magnus to maintain adequate reserves, recognize revenue over time, and account for the contingencies related to the terms on which it financed and sold its loans.   The Directors and Officers failed to do this, thereby overstating profits so radically that they siphoned hundreds of millions of dollars to themselves, and left a global financial crisis in their wake.

115.   According to the United States Government Accountability Office ("GAO"), a significant contributor to the global financial crisis was that "some ***originators, particularly independent mortgage companies, lacked sufficient capital to make good on representations and warranties*** designed to protect investors from imprudent and fraudulent lending practices." As the self-proclaimed "largest privately-held mortgage company," it was imperative that the Directors and Officers reserve and account properly for repurchase and indemnity obligations FMFC owed to its Warehouse Lenders and Take-Out Investors, which would undoubtedly spike as the housing bubble burst.

116.   Amazingly, the Directors and Officers kept a reserve of only .02%, or .0002, on all mortgage loans held for sale — approximately $400,000 (less than the price of one middle-class California home) on $2 billion in loans held for sale.   The Directors and Officers reserved *nothing* on the more than $70 billion in loans sold between January 2005 and the Petition Date, and *never* adjusted FMFC's reserves as the housing bubble burst and loan delinquencies pushed record levels.   Through these and other stark violations of generally accepted accounting

principles, the Directors and Officers intentionally inflated the stated "equity" and "profit" in FMFC to funnel more than $160,000,000 directly to themselves in the form of stock redemptions, bonuses, and distributions.

117.    As defaults and foreclosures skyrocketed in First Magnus' primary markets, so did the repurchase and indemnification claims made by the Take-Out Investors.  When First Magnus failed to honor its repurchase and indemnity obligations, the Wall Street firms and commercial banks that did business with First Magnus had to write-down the collateral they held, pay the heightened premiums for CDS contracts, and honor the CDS contracts they sold, and horde cash reserves to account for losses.  The "credit crisis" resulted and spiraled into an unprecedented global financial crisis.  First Magnus was not the victim of the "credit crisis" or "collapse of the secondary market" . . . it was a significant cause.

118.    <u>FMFC Helped Burst The Housing Bubble</u>.  The Directors and Officers knew that the housing bubble was bursting in 2005. As Sullivan, Sr. explained in the Sullivan, Sr. Manuscript, "***In 2005 I was feeling uncomfortable with the real estate boom*** . . . . Just about everyone I knew saw that a real estate [bubble] was forming but they couldn't foresee when it would collapse . . . . The underwriting guidelines relaxed so more people could qualify for home ownership even though their financial condition made it a risky move.  Subprime mortgages with generous returns for the lender became the hot ticket."

119.    The GAO reported in October 2007 that "the number and percentage of mortgages in default or foreclosure rose sharply from the second quarter of 2005 through the second quarter of 2007 to levels at or near historical highs."  According to the GAO, several Sun Belt states "such as Arizona, California, Florida, and Nevada experienced some of the largest increases in the number and percentage of defaults and foreclosures," which began to spike "in the second quarter of 2005."

120.    The GAO cited "more aggressive lending practices" and, specifically, the type of "Alt-A" products being sold by First Magnus, such as "limited or no documentation of borrower

income or assets, and deferred payment of principal and interest," as one of the primary factors causing the spike in defaults and foreclosures. Another factor identified by the GAO was that as defaults and foreclosures increased, housing prices began to decelerate significantly and, in some markets, decline in 2005, like Arizona, California, Colorado, Florida, and Nevada — FMFC's primary markets. According to research from Global Insight and National City Corp., in the Phoenix-area alone, the housing market went from 16% to 45% overvaluation in 2005. This is an area where First Magnus had one of, it not the, greatest concentration of loans originated, and more than 90% of its construction loan commitments. Assessments by Standard and Poor's confirm that more than 13% of all 2005 Alt-A mortgages experienced serious delinquencies — a percentage that rose considerably and reached record levels over the course of 2006 and first half of 2007, as more than 20% of 2006 Alt-A mortgages and more than 25% of 2007 Alt-A mortgages experienced serious delinquencies.

121. <u>The GAAP Violations</u>. The Financial Accounting Standards Board ("FASB") is a private, non-for-profit organization whose primary purpose is to develop generally accepted accounting principles ("GAAP") within the United States in the public's interest. The Securities and Exchange Commission designated the FASB as the organization responsible for setting such accounting standards. FMFC's accounting personnel, specifically, FMFC's Chief Financial Officer, Gary Malis, and Controller, Jasjit Chopra, had a responsibility to review professional standards and make determinations as the propriety of FMFC's accounting policy and any changes or adjustments that needed to be made to FMFC's internal control processes. Debtor's records reveal that the Directors and Officers, and specifically, Malis and Chopra, abandoned GAAP entirely in favor of an ends-justify-the-means approach to accounting.

122. <u>Inadequate Reserves</u>. FMFC failed to account properly for a loss reserve required to be established under GAAP for probable losses and expenses to be incurred under the Repurchase Agreements with the Warehouse Lenders and the Loan Purchase Agreements with the Take-Out Investors (collectively, the "Reserves"). In sum, First Magnus kept **a**

**reserve of only .02%, or .0002, on** the repurchase and indemnity obligations associated with approximately **$2 billion in loans held for sale**, and kept **a reserve of 0%, or .0**, for the repurchase and indemnity obligations associated with the more than **$70 billion in loans sold** to Take-Out Investors between January 2005 and the Petition Date.

123.    FAS 140 required First Magnus to recognize all assets obtained and liabilities incurred upon completion of a transfer of financial assets, such as mortgage loans, that qualified as a sale. Such liabilities consisted of, among other things, the expenses and losses estimated to be incurred in connection with the sold loans, *e.g.*, the repurchase and indemnity obligations under the Repurchase Agreements and the Loan Purchase Agreements.

124.    First Magnus was also required to account for other contingent liabilities based on FAS 5, *Accounting for Contingencies*. FAS 5 required that a liability for a loss contingency be recorded on FMFC's balance sheet if it was deemed to be probable and could be reasonably estimated. First Magnus was therefore required to record, as part of a loss estimate, any amounts that were expected to be repaid to the Purchaser.

125.    When First Magnus originated loans purchased by the Warehouse Lenders, it knew that *some* of those loans may be rejected under the Warehouse Eligibility Requirements and that other loans may default before they could be sold to Take-Out Investors. This risk increased exponentially from January 2005 through the Petition Date due to the product mix originated by First Magnus, declining home values and rising default rates in its primary markets, and the increase in the percentage loans held for sale that were more than 60 days old. According to Doug Duncan, Chief Economist for the Mortgage Bankers Association, "the increase in delinquencies [was] not surprising" during this time frame. First Magnus, however, never adjusted its reserve rate for mortgage loans held for sale, keeping it static from January 2005 through the Petition Date at the historically low rate of .02%.

126.    This was a significant GAAP violation. Applying GAAP, First Magnus should have reserved 2% or more on its mortgage loans held for sale from January 2005 through the

33

Petition Date. Failing to do so resulted in an 8-15% overstatement of Debtor's mortgage loans held for sale. At their highest point between January 2005 and the Petition Date, if FMFC's mortgage loans held for sale are overstated by as little as 5.39%, Debtor had no shareholder equity, its debts greatly exceeded its assets at a fair valuation, and it was insolvent at all times.

127. When First Magnus sold loans to Take-Out Investors it knew that *some* of the those loans would be returned by the Purchaser for failing to meet eligibility requirements, and that others would need to be repurchased or would otherwise give rise to representation and warranty obligations because it knew that *some* of its borrowers would default after the loans were sold. In fact, internal allowance memoranda and email confirm that "in the normal course of business FMFC regularly receives requests to repurchase loans from their investors" and that FMFC "usually had about 2m in losses a month not reserved for."

128. The Directors and Officers represented to Grant Thornton that FMFC "maintains a reserve for the representation and warranty liabilities related to sold loans, . . . which is charged to gain on sale of loans, . . . at a level which, *in management's judgment*, is adequate to absorb losses inherent in mortgage loans sold." The Directors and Officers lied. First Magnus *never* kept *any* reserve for the more than $70 billion in loans sold.

129. This was a significant GAAP violation. Failure to reserve for the repurchase and indemnity obligations radically overstated FMFC's gains on sale.

130. The Directors and Officers represented to Grant Thornton "that such claims, if any, would not have a materially adverse impact on the financial position of the Company" and that "loans sold are sold without recourse." The Directors and Officers lied. This is particularly troubling given the explosive rise in delinquency rates and corresponding spike in repurchase and indemnity obligations from January 2005 through the Petition Date.

131. Only *after* a Take-Out Investor made a repurchase or indemnity claim did the Directors and Officers account for any loss contingencies related to those specific repurchase claims, referred to as "open repurchases." Even then, First Magnus only accounted for

repurchase requests made by Take-Out Investors, not payment requests related to its indemnity obligations, and accounted for only 17% of the face amount of the claim — a fatal and intentional accounting error that allowed a material underestimation of the quantity of repurchase and indemnity obligations. As Malis explained in a March 19, 2007 email to Jaggi, this "does not leave any cushion for any undiscovered stuff or signed indems [indemnity agreements with Take-Out Investors regarding outstanding repurchase and indemnity requests] where losses have not been billed."

132. Applying GAAP, First Magnus should have reserved 1% or more from January 2005 through the Petition Date on the $70 billion in mortgage loans sold, which would have resulted in an adjustment of no less than $300,000,000 (and closer to $700,000,000). At its highest point between January 2005 and the Petition Date, FMFC's alleged shareholder equity was approximately $200,000,000 (assuming no adjustments for the GAAP Violations). Had FMFC accounted properly for the Reserves and contingencies, FMFC had no shareholder equity, its debts exceeded its assets at fair valuation, and it was at all times insolvent.

133. <u>Premature Revenue Recognition</u>. The Directors and Officers also artificially accelerated gains on sale by recognizing 100% of the revenue from the sale of a loan the moment FMFC committed the loan to a Take-Out Investor. This was a significant GAAP violation. As a result, the Directors and Officers inflated materially the stated value of FMFC's shareholder equity.

134. FAS 48 required that if a Buyer had a right to return a product, a Seller cannot recognize revenue on the sale until the return privilege had substantially expired. Because the LPA Repurchase Obligations were not limited in duration and extended through the maturity of the loan sold, GAAP required that FMFC only recognize revenue on the sale of a mortgage loan over time as the risk of return decreased.

135.    Pursuant to FAS 48, sales revenue and cost of sales reported in the income statement should also be reduced to reflect estimated returns. FMFC never reflected any estimated returns when sales were made and recognized 100% of sales revenue.

136.    According to FAS 48, the extent sales revenue should be reduced to reflect estimated returns depends on the ability to make a reasonable estimate of the amount of future returns. Greater reductions in revenue recognition are warranted when the product is susceptible to significant external factors that may impair the ability to make a reasonable estimate, such as relatively long periods of time in which a particular product may be returned. Because the Take-Out Investors could require FMFC to repurchase a loan at any time over the life of the loan, the sales revenue recognized on the sale should have been spread over the life of the loan. Because market factors also affected whether a loan would default and thus, be subject to return by the Take-Out Investor, external factors such as higher gas prices and unemployment rates, and lower home values, also required FMFC to spread revenue recognition over the life of the loan. The Directors and Officers never adjusted the amount of revenue recognition – applying 100% of sales revenue to gains on sale upon a commitment from a Take-Out Investor.

137.    Under the terms of the Loan Purchase Agreements, FMFC continued to assume the risk of ownership on the loans it sold, which could be returned "in the sole discretion" of the Take-Out Investor. According to Staff Accounting Bulletin 104, if a Buyer had a right to return, a Seller cannot recognize revenue if it continued to assume any risk of ownership (even though title had passed). In such situations, if a Buyer had a right to return for subjective reasons or if acceptance included a right of return for seller-specific objective criteria, a Seller must account for contingencies pursuant to FAS 5.

138.    Applying GAAP, FMFC should not have artificially accelerated the recognition of revenue on the $70 billion in loans sold, which resulted in falsely inflated pre-tax net income and the alleged shareholder equity on which the Directors and Officers paid themselves stock

redemptions, bonuses, and distributions. Had the Directors and Officers applied GAAP to revenue recognition, FMFC's debts greatly exceeded its assets at fair valuation, it had no "equity," and was at all times insolvent.

139. <u>Overstated Value of Loans Held for Sale</u>. As FMFC held more and more troubled assets for sale, it failed to value the mortgage loans at the "lower of cost or fair market value" ("LOCOM"). This was a significant GAAP violation and lead to a material overstatement of FMFC's assets.

140. FAS 65, entitled *Accounting for Certain Mortgage Banking Activities*, provides that mortgage loans held for sale "shall be reported at the lower of cost or market value." Under FAS 65, the proper application of LOCOM required FMFC to determine if the market value of mortgage loans held for sale was lower than the carrying amount of the loans. If it was, then a valuation adjustment was required with an offsetting charge to current earnings, generally as a component of gain on sale on loans.

141. *Seasoned Loans*. From January 2005 through the Petition Date, FMFC booked seasoned loans (loans more than 60 days old) at or above cost ("Seasoned Loans"). From January 2005 through the Petition Date, Seasoned Loans made up between 12-40% of all mortgage loans held for sale by FMFC. In March and April 2006, Seasoned Loans made up approximately 25% of FMFC's mortgage loans held for sale. In June of 2007, Seasoned Loans made up approximately 40% of all mortgage loans held for sale by First Magnus. This grossly overstated the value of the Seasoned Loans, which sold at steep discounts because of higher default rates and lower cash flows.

142. *Bid Loans*. From January 2005 through the Petition Date, FMFC also booked loans that had already experienced a defect or default that made the loan ineligible under applicable Repurchase Agreements and Loan Purchase Agreements ("Scratch & Dent" loans or "Bid Loans") at 92.5% of cost. This grossly overstated the value of the Scratch & Dent loans,

which internal email acknowledged were "moving slowly because of the environment right now."

143. *Foreclosures and REOs.* From January 2005 through the Petition Date, FMFC booked real estate owned properties ("REOs") and loans in the process of foreclosure at 75% of cost. This grossly overstated the value of the assets, as the majority of the properties at issue were in housing markets that were experiencing extreme declines in property values and sales.

144. *Portfolio Loans.* From January 2005 through the Petition Date, FMFC booked loans with low loan-to-value ratios at 95% of cost ("Portfolio Loans" or "Low LTV Loans"). The lower the loan-to-value ratio, the more risk the lender associates with the property type or borrower. This grossly overstated the value of the Portfolio Loans, as many of the loans failed to meet requisite eligibility requirements of Warehouse Lenders and Take-Out Investors, and experienced significant default rates between January 2005 and the Petition Date.

145. By not applying a proper LOCOM analysis consistent with industry practice, FMFC overvalued its loans held for sale from January 2005 through the Petition Date by no less than 25%. At their highest point between January 2005 and the Petition Date, if FMFC's mortgage loans held for sale are overstated by as little as 5.39%, Debtor had no shareholder equity, its debts greatly exceeded the value of its assets at fair valuation, and it was insolvent at all times.

146. In sum, from January 2005 through the Petition Date, FMFC was, at all times, insolvent, had no shareholder equity, and had debts that greatly exceeded the value of its assets at fair valuation, because the Directors and Officers: (1) failed to maintain an adequate reserve for the approximately $2 billion in loans held for sale at any given time; (2) failed to reserve anything against the $70 billion in loans sold with significant repurchase and indemnity obligations; (3) prematurely recognized 100% of revenue on the sale of loans upon a commitment from a Purchaser; and (4) significantly overvalued the loans held for sale (collectively, the "GAAP Violations"). Any one of the GAAP Violations rendered Debtor

38

insolvent from January 2005 through the Petition Date. When taken together, the GAAP Violations reveal a scheme that permitted the "the rich" to "get richer" while FMFC was stripped of desperately needed capital.

### III. Cashing Out: As the Housing Bubble Burst, The Directors And Officers Stripped FMFC Of Approximately $300MM In Desperately Needed Capital.

147. "Capital is the life blood of our organization." Truer words cannot be found in the Sullivan, Sr. Manuscript. As the housing bubble burst in 2005, the Directors and Officers stripped FMFC of approximately $300,000,000 in desperately needed capital for their own personal benefit.

148. Having failed to adequately reserve or account for contingencies, the Directors and Officers devised an exit strategy *for themselves* — make as many loans as possible with other people's money and cash-out before the house of cards comes tumbling down. According to the Sullivan, Sr. Manuscript, "Realizing that we had one repayment option [on the debt owed to the warehouse lines], *i.e.*, selling loans, we embarked on a strategy to form a holding company with a national bank being the other arm . . . . We were also exploring the sale of part of our company []. All of these strategies relied on the normal assumption that there would be a time horizon for us to readjust our model and expenses to meet the new realities of the mortgage business . . . . and complete the transfer of our model business to government agency."

149. Towards that end, the Directors and Officers incorporated FMCI on June 15, 2005 for the ostensible purpose of establishing a federally chartered savings and loan institution (the "Bank"). Given the impending collapse of the residential mortgage market, the Directors and Officers intended to use deposits from the newly chartered bank to acquire loans from FMFC when it needed to move loans from its warehouse lines or otherwise satisfy its repurchase and indemnity obligations to Take-Out Investors. Fortunately for the would-be Bank's depositors, the Office of Thrift Supervision ("OTS") thwarted the effort to form the

Bank.  The OTS, however, could not prevent the Directors and Officers from using FMCI to loot FMFC.

150.    In March and April 2006, when more than 25% of the mortgage loans held for sale by FMFC were greater than 60 days old, the Directors and Officers thrust FMCI into action.  Shortly thereafter, on June 21, 2006, the Directors and Officers exchanged all of their shares of capital stock of FMFC for capital shares of FMCI (the "Exchange Agreement") and entered into a shareholders' agreement ("FMCI Shareholders' Agreement").  This share exchange resulted in the Directors and Officers owning 100% of the issued and outstanding shares of FMCI, and FMCI owning 100% of FMFC.  The Directors and Officers also adopted the Articles of Incorporation for FMCI on June 21, 2006, adopted its Bylaws, and executed the FMCI Shareholders' Agreement.  Like FMFC, Jaggi and the Sullivans were named directors of FMCI, and appointed the officers, which mirrored FMFC.

151.    Beginning in 2005 when the housing bubble began to burst, and continuing through the Petition Date, the Directors and Officers stripped approximately $300,000,000 in capital from FMFC for their personal benefit.  Of this $300,000,000, the Directors and Officers transferred more than $200,000,000 within the one year period prior to the Petition Date, including more than $28,000,000 on or after June 30, 2007 — when approximately 40% of FMFC's mortgage loans held for sale were Seasoned Loans and repurchase and indemnity obligations exceeded $80,000,000.

### A.    The Stock Redemptions:  $70MM.

#### 1.    The Sullivan, Sr. Redemption:  $55MM.

152.    On August 26, 2006, the Directors and Officers caused FMFC to transfer approximately $55,000,000 directly to Sullivan, Sr., individually and/or behalf of the Sullivan, Sr. Revocable Trust (the "Sullivan, Sr. Redemption").  FMFC received no consideration for the Sullivan, Sr. Redemption, which was approved expressly by Jaggi and the Sullivans on August 24, 2006.  The financial effect of the Sullivan, Sr. Redemption on FMFC was devastating.  In

addition to draining FMFC of what little capital it had to cope with its repurchase and indemnity obligations, the transaction caused FMFC to breach its financial covenants with its warehouse lenders and triggered additional repurchase obligations that further doomed the company.

153. According to FMCI's Amended Disclosure Statement, however, the Sullivan, Sr. Redemption was a "mutual obligation of FMFC and Mr. Sullivan, as set forth in a Preincorporation Agreement dated July 15, 1996," which "required FMFC to repurchase, and Mr. Sullivan to sell, the shares from within one hundred (180) days of the tenth anniversary of the Preincorporation Agreement, for a price based upon FMFC's book value." This representation in FMCI's Amended Disclosure Statement is false. The Preincorporation Agreement not only specified a valuation methodology that would have substantially reduced the price per share paid by the Sullivan, Sr. Redemption, it limited the conditions and terms on which it could be paid out. The Directors and Officers abandoned the protocols of the Preincorporation Agreement for the benefit of Sullivan, Sr., and the other Directors and Officers, and elected not to enforce the limitations on the payout to the detriment of FMFC's creditors.

154. Through a Stock Purchase Agreement dated August 24, 2006, between FMCI and Sullivan, Sr., as the "trustee" on behalf of the Sullivan, Sr. Revocable Trust, FMCI agreed to redeem approximately 950,000 shares from Sullivan, Sr. for approximately $54,224,793, or $57.08 per share. The Directors and Officers based the price per share for the Sullivan, Sr. Redemption on the "book value" of FMFC as of June 30, 2006, not the "net asset value" as defined in the Preincorporation Agreement.

155. The "net asset value," as defined in the Preincorporation Agreement, and the "book value" defined in the FMCI Shareholders' Agreement, are materially different methods of valuation. Indeed, the FMCI Shareholders' Agreement fundamentally altered the valuation terms set forth in the Preincorporation Agreement, which, without any additional consideration, led to a substantially larger payout on the Sullivan, Sr. Redemption.

156.     The FMCI Shareholders' Agreement changed the valuation method used to determine the price per share on a redemption request from "net asset value" to "book value." The determination of "net asset value" in § 15.7 of the Preincorporation Agreement required the use of a "certified public accounting firm, or other designated qualified appraiser," and required that, *inter alia*:  (a) the company's machinery, equipment, furnishings and fixtures be valued at "the lower of replacement cost or fair market value;" (b) real property be valued as "fair market value;" (c) the face amount of the company's accounts receivable as of the valuation date be "adjusted for uncollectible accounts by an amount representing the average collection percentage as experienced in the year preceding the valuation date;" (d) loan portfolios be valued "using standard criteria for the industry," which is the <u>lower</u> of cost or fair market value; (e) marketable securities be valued at the market price within 5 days of closing; (f) assets not otherwise referenced be valued at "book value;" (g) "extraordinary factors" that may "adversely or favorably affect the value" be taken into consideration; (h) liabilities as of the valuation date be determined in accordance with GAAP; and that the cumulative total "shall be reduced by all existing and accrued liabilities and such result divided by the number of shares outstanding to determine the per share price based on net asset value."   The criteria set forth in the Preincorporation Agreement to determine "net asset value" were <u>never</u> applied to calculate the price per share for the Sullivan, Sr. Redemption, and no such valuation effort resembling the "net asset value" determination was performed.

157.     The "book value," on the other hand, as defined by the FMCI Shareholders' Agreement, is whatever the Controller said it was, so long as it was in accordance with generally accepted accounting principles.  Due in part to the GAAP Violations described *infra*, the "book value" of FMFC as of June 30, 2006, upon which the purchase price for Sullivan, Sr.'s shares was based, exceeded greatly the "net asset value" as defined in the Preincorporation Agreement and resulted in a grossly overstated price per share.  Moreover, in addition to the

GAAP Violations, no discount in value was attributed to volume of shares redeemed by Sullivan, Sr., even though the 950,000 shares constituted approximately 27% of the company.

158.    In addition to using the "book value" to determine the price per share of the Sullivan, Sr. Redemption, the Directors and Officers also elected not to enforce the limitations on the payout terms of the redemption.  According to § 19 of the Preincorporation Agreement, FMFC had no obligation to pay the Sullivan, Sr. Redemption indefeasibly in cash as a lump sum.  To the contrary, in addition to being "subject to the availability of funds," the Sullivan, Sr. Redemption was to be paid over time in the form of a 25% cash down payment and a 3-year promissory note with payments in three equal installments that were not to begin until one year following the offer to sell the shares was accepted.  Had the payment limitations alone been enforced on the "book value" that was used, FMFC would have paid only $13.75 million on the Sullivan, Sr. Redemption prior to the Petition Date.

159.    In short, but for the FMCI Shareholders' Agreement, the Sullivan, Sr. Redemption should have been based on the "net asset value," "subject to the availability of funds," and resulted in the payment of only 25% of the outstanding obligation prior to the Petition Date.  The FMCI Shareholders' Agreement favorably altered the payout rights of each of the Directors and Officers and was based on a "book value" that was not determined in accordance with generally accepted accounting principles.

## 2.    The Gaylord Redemption:  $5.5MM.

160.    Bill Gaylord, and his father Clint, were life-long friends of the Sullivans. According to the Sullivan, Sr. Manuscript, "Bill's father, Clint, had been a close friend and neighbor in Boulder, Colorado, and Tom, Jr. and Bill had grown up together."  As a result, Gaylord received special treatment when he requested in January 2007 to redeem approximately 49,000 of his shares in FMCI for $5,778,570 — a whopping $117.93 per share.  FMCI and Gaylord memorialized the redemption in a Stock Repurchase Agreement, dated January 5, 2007.  Two days later, on January 7, 2007, the Directors and Officers caused FMFC to transfer

approximately $5,528,570 directly to Gaylord, having previously caused FMFC to advance Gaylord $250,000 on the redemption (in total, the "Gaylord Redemption").

161.    The Written Consent of the Board of Directors of FMCI, which authorized the transaction, was signed by the Sullivans and Gaylord on January 5, 2007.  No written request for the redemption was made by Gaylord, as required by the FMCI Shareholders' Agreement.  Similarly, FMCI did not utilize the 90-day period to determine the price per share for the Gaylord Redemption, as provided by the FMCI Shareholders' Agreement.

162.    Like the Sullivan, Sr. Redemption, the Gaylord Redemption was enhanced significantly by the FMCI Shareholders' Agreement, without any additional consideration from Gaylord.  However, unlike the Sullivan, Sr. Redemption, which was based on the alleged "book value" of FMCI, the repurchase of Gaylord's stock was allegedly based on a 2004 valuation of FMFC prepared by the Financial Strategy Group (the "FSG Valuation").  The method used to determine the price per share for the Gaylord Redemption greatly enhanced the payout to Gaylord (above and beyond the effect of the FMCI Shareholders' Agreement).

163.    Section 4.3 of the Shareholders' Agreement required that any stock redemption be based on "book value."  The inflated "book value" utilized in the Sullivan, Sr. Redemption was approximately $57.08 per share as of June 30, 2006.  The price per share for the Gaylord Redemption more than doubled that "book value," despite the occurrence of numerous events adverse to the financial condition of FMFC and FMCI in the interim, including, but not limited to, the $55 million payout with respect to the Sullivan, Sr. Redemption, the failure of FMCI's efforts to organize a federally chartered savings and loan, the rapidly deteriorating financial condition of the industry, and the weight of FMFC's repurchase and indemnity obligations.

164.    The use of the FSG Valuation greatly inflated the price of Gaylord Redemption above and beyond the already inflated "book value."  The FSG Valuation did not apply the "net asset value" methodology set forth in the Preincorporation Agreement or the "book value" methodology of the FMCI Shareholders' Agreement.  Based on the "book value" as of the date

of the Sullivan, Sr. Redemption, the purchase price for the Gaylord Redemption would have been $2,796,920, or $2,731,650 less than what the Directors and Officers caused FMFC to pay in January 2007. The FSG Valuation more than doubled the amount owed to Gaylord under "book value." Moreover, according to the Directors and Officer, the "book value" of FMCI on June 30, 2006 was $199,642,507, while the "book value" of FMCI on December 30, 2006, was $125,108,541 — *approximately $75,000,000 less than June 2006*.

165. The Directors and Officers purposefully manipulated the FSG Valuation, which was designed for use by the Directors and Officers in their marketing efforts to sell FMFC to third-parties. FSG relied exclusively on the representations of the Directors and Officers of the "historical and normalized financial statements" of FMFC, and, states that the "[i]nformation supplied by management has been accepted as correct without further verification." In fact, FSG disclaimed expressly that "[w]e have not audited, reviewed, or compiled these presentations and express no assurance on them." FSG also expressly limited its valuation to December 31, 2004, and stated that "[t]his valuation reflects facts and conditions existing at the valuation date and is valid only for the effective date specified herein [December 31, 2004]." The FSG Valuation also included the valuation of FMFC's interest in Trinity, which was sold in 2005. In sum, the FSG Valuation was never intended to be used to value Gaylord's shares, did not adhere to the methodologies of either the Preincorporation Agreement or the FMCI Shareholders' Agreement, and resulted in a grossly higher price per share than the fair market value of Gaylord's shares as of the date of the Gaylord Redemption.

166. In addition to exaggerating the price per share, the Directors and Officers also elected not to enforce the limitations on the payout as proscribed by the Preincorporation Agreement and the FMCI Shareholders' Agreement. The Gaylord Redemption was supposed to be "subject to availability of funds as determined by the Board of Directors." It was also subject to a 25% down payment, as opposed to the lump sum cash payment made to Gaylord, and was to be paid in three additional installment payments of 25% over a three-year period.

Had the payment limitations been enforced — even at the Sullivan, Sr. "book value" — FMFC would have paid only $699,230 to Gaylord, approximately $4.8 million or 88% less than what was paid.

### 3.  **The Thomas Redemption: $9MM.**

167.  Sullivan, Sr.'s long-time business associate, Martin Thomas, who served as an Executive Vice President at Sullivan's Title Security Agency of Arizona and was a "good friend" of Mitchell's former owner, where the Sullivans were introduced to Jaggi, Malis, Marchetti, and Young, also received special treatment with respect to his redemption.  On January 3, 2006, the Directors and Officers caused FMFC to pay Thomas approximately $9,000,000 for his 2,000 shares in FMFC — *an outrageous $4,500 per share* (the "Thomas Redemption").

168.  The Thomas Redemption followed none of the protocols set forth in the Preincorporation Agreement for the valuation and redemption of stock.  Based on the overstated FSG Valuation, the Thomas Redemption would have been only $235,860.  Based on the inflated "book value" used for the Sullivan, Sr. Redemption in August 2006, the Thomas Redemption would have been only $114,160, and the "book value" of FMFC as of December 31, 2005, was approximately *$12 million less* than that on which the Sullivan, Sr. Redemption was based.  Had the limitations on the payout as described in the Preincorporation Agreement been applied to the Thomas Redemption, only one-half of the redemption, regardless of valuation methodology, would have been paid prior to the Petition Date.

### B.  **Officer Bonuses: $50MM.**

169.  According to an email Karl Young circulated to employees shortly before FMFC's bankruptcy filing, the Directors and Officers "always kept the majority of the money we have made in the company to insure our liquidity position and allow us to take advantage of the very opportunities we are presented with here today."  Young lied.  FMFC's Directors and Officers paid themselves lavishly.  Rather than adhere to generally accepted accounting

principles, the Directors and Officers awarded themselves mind-boggling bonuses based on ephemeral, fictitious, short-term profits at a time when FMFC desperately needed to reserve cash to cover its repurchase and indemnity obligations. In all, from January 2005 through the Petition Date, FMFC's Directors and Officers paid themselves in excess of $50,000,000 in bonuses (the "Officer Bonuses"). The Officer Bonuses were in addition to the salaries paid to the Directors and Officers, the more than $36,500,000 paid to them in Shareholder Distributions for 2006 and 2007, and the millions more in other inside transactions.

170. In 2005, the Directors and Officers paid themselves more than $21,000,000 in Officer Bonuses. Of the $21,000,000 in Officer Bonuses paid over the course of 2005, Jaggi received more than $8,000,000, the Sullivans each received more than $4,000,000, and the remaining Directors and Officers collectively received in excess of $4,000,000.

171. In the first and second quarters of 2006, the Directors and Officers paid themselves approximately $9,000,000 in Officer Bonuses. Of the $9,000,000 in Officer Bonuses paid over the course of the first and second quarters of 2006, Jaggi received approximately $3,500,000, the Sullivans each received approximately $1,800,000, and the other Directors and Officers collectively received approximately $1,800,000.

172. During the one year period prior to the Petition Date, FMFC's Directors and Officers paid themselves approximately $19,494,863 in Officer Bonuses. The Officer Bonuses paid to the Directors and Officer within the one year period prior to the Petition Date were as follows:

| Directors and Officers | Bonus |
|---|---|
| Gurpreet Jaggi | 8,130,967 |
| Thomas Sullivan, Sr. | 4,065,483 |
| Thomas Sullivan, Jr. | 4,219,681 |
| Clinton W. Gaylord | 163,953 |
| Gary Malis | 1,003,327 |
| Dominick Marchetti | 566,683 |
| Karl Young | 1,344,769 |
| **TOTAL** | **$19,495,163** |

173. Jaggi and the Sullivans each had employment agreements with FMFC that provided for some form of bonus. The remaining Directors and Officers had no employment agreements with FMFC that provided for a bonus. However, the Directors and Officers caused FMFC to pay Officer Bonuses to Malis, Marchetti, Gaylord, and Young, which appeared to be calculated in the same fashion as the bonuses paid to Jaggi and the Sullivans, albeit in lesser percentages respectively.

174. Jaggi's employment agreement with FMFC is dated July 15, 1996 ("Jaggi Employment Agreement"). Jaggi's Employment Agreement provided that in addition to his base salary "to the extent there are net before tax profits of Employer, Employee shall be entitled . . . to receive ten percent (10%) of those net profits . . . ."

175. Sullivan, Sr.'s employment agreement with FMFC is dated August 23, 2005 ("Sullivan, Sr. Employment Agreement"). Sullivan, Sr.'s Employment Agreement provided that in addition to his base salary he "shall receive no later than 45 calendar days following every March 31, June 30, September 30, and December 31 . . . an amount equal to five percent (5%) of the consolidated pre-tax net profits of the Company, as calculated pursuant to generally accepted accounting principles . . . for the financial quarter immediately preceding the date of payment of such bonus."

176. Sullivan, Jr.'s employment agreement with FMFC is also dated August 23, 2005 ("Sullivan, Jr. Employment Agreement"). Sullivan, Jr.'s Employment Agreement provided identical terms with respect to the bonus set forth in the Sullivan, Sr. Employment Agreement (5% of pre-tax net profits).

177. Because the Officer Bonuses were supposed to be based on the pre-tax net profits of FMFC, the Officer Bonuses were grossly overstated as a result of the GAAP Violations. Providing for Officer Bonuses based on fictitious, short-term profits when FMFC had, *inter alia*, failed to keep adequate reserves or otherwise account for contingencies related to its repurchase and indemnity obligations was a recipe for financial disaster — and not just for

FMFC and its creditors. As one of the largest originators of Alt-A loans in the country, the Directors and Officers flooded the financial markets with products like interest-only ARMs and stated income loans, only to leave itself in a financial position where it could not possibly honor its repurchase and indemnity obligations related thereto. While the financial institutions that dealt with the Directors and Officers suffered the consequences as a result — *e.g.*, Lehman, Bear Stearns, Merrill Lynch, Countrywide, WaMu, *etc.* — the Directors and Officers made out like bandits, pocketing hundreds of millions of dollars that were never truly earned. Sadly, tax payers are now forced to fund bailouts and stimulus packages in a desperate attempt to treat the systemic effects of the unbridled greed showed by the Directors and Officers. Had FMFC adhered to generally accepted accounting principles, FMFC would not have had any pre-tax net profits on which to pay any of the Officer Bonuses.

178.     In addition, because the Officer Bonuses were paid quarterly, the actual amounts paid were based on estimates and had to be reconciled with the pre-tax net profits as recovered by the Directors and Officers. As a result, a reconciliation or "true-up" process often resulted in offsets having to be applied to future bonus payments to correct for prior overpayments. When this process is applied to the Officer Bonuses, there were no pre-tax net profits of FMFC from January 2005 through the Petition Date, and thus the entirety of the Officer Bonuses are overstated even if based on the "book value" assigned by the Directors and Officers.

179.     In fact, over $4,000,000 in Officer Bonuses were paid in the first and second quarters of 2007 at times when FMFC was in breach of its financial covenants and hemorrhaging from repurchase and indemnity obligations. According to accounting records prepared shortly before the bankruptcy filing in August 2007, the second quarter 2007 Officer Bonuses alone were known to be over-stated by no less than $1,770,768.49, even based on the inflated financials being used internally.

180.     In addition to the Officer Bonuses, the Directors and Officers paid themselves another $1,405,078 in "other" self-interested transactions within the one year period prior to the

49

Petition Date (the "Other Self-Interested Transactions"). The Other Self-Interested Transaction were paid as follows:

| Directors and Officers | Other Payment |
|---|---|
| Gurpreet Jaggi | 131,960 |
| Thomas Sullivan, Sr. | 911,440 |
| Thomas Sullivan, Jr. | 238,635 |
| Clinton W. Gaylord | 58,290 |
| Gary Malis | 33 |
| Dominick Marchetti | 4,800 |
| Karl Young | 59,920 |
| **TOTAL** | **$1,405,078** |

The Directors and Officers engaged in these series of transactions, along with the Officer Bonuses, to strip FMFC's capital for their own personal benefit and to avoid the risk associated with the inevitable and impending obligations owed to FMFC's Warehouse Lenders and Take-Out Investors.

### C. Shareholder Distributions: $37MM.

181.    In his August 3, 2007 email to employees, Karl Young also reported that "First Magnus does not pay dividends to any of its seven shareholders." Young lied. The Directors and Officers paid themselves approximately $36,500,000 in Shareholder Distributions from January 2006 through the Petition Date, including approximately $25,000,000 within the one year period prior to bankruptcy and $3,445,548.00 in Shareholder Distributions a mere two months before they announced FMFC's collapse. The Shareholder Distributions are in addition to the approximately $50,000,000 the Directors and Officers paid themselves in Officer Bonuses from January 2005 through the Petition Date. Collectively, the distributions set forth below are referred to as the "Shareholder Distributions."

182.    Jaggi received the following distributions on the following dates:

| Distributions | Amount |
|---|---|
| 04/13/06 | 1,251,845.00 |
| 06/12/06 | 875,286.00 |
| 09/13/06 | 2,291,265.00 |
| 11/06/06 | 1,334,996.92 |
| 01/11/07 | 1,204,562.00 |

|            |             |
|------------|-------------|
| 04/12/07   | 303,441.72  |
| 04/12/07   | 993,387.14  |
| 06/13/07   | 1,153,399.45 |
| **TOTAL**  | **$9,408,183.23** |

183.    Sullivan, Sr. received the following distributions on the following dates:

| **Distributions** | **Amount** |
|-------------------|------------|
| 03/30/06 | 2,187,972.00 |
| 04/03/06 | 2,373,327.88 |
| 11/06/06 | 723,450.27 |
| 01/11/07 | 1,189,475.00 |
| 04/12/07 | 980,912.38 |
| 04/12/07 | 162,221.35 |
| 06/13/07 | 1,138,915.02 |
| **TOTAL** | **$8,756,273.90** |

184.    Sullivan, Jr. received the following distributions on the following dates:

| **Distributions** | **Amount** |
|-------------------|------------|
| 04/13/06 | 905,904.00 |
| 06/12/06 | 1,295,635.00 |
| 09/13/06 | 2,371,772.00 |
| 11/06/06 | 723,072.31 |
| 01/11/07 | 1,246,904.00 |
| 04/12/07 | 162,221.35 |
| 04/12/07 | 162,221.35 |
| 04/12/07 | 162,221.35 |
| 04/12/07 | 246,323.23 |
| 04/12/07 | 1,028,375.15 |
| 06/13/07 | 1,194,023.81 |
| **TOTAL** | **$9,498,673.55** |

185.    Gaylord the following distributions on the following dates:

| **Distributions** | **Amount** |
|-------------------|------------|
| 04/12/06 | 250,000.00 |
| 04/13/06 | 404,352.00 |
| 06/12/06 | 578,309.00 |
| 09/13/06 | 1,058,178.00 |
| 01/11/07 | 556,289.00 |
| 04/12/07 | 381,843.52 |
| 06/13/07 | 442,707.29 |
| **TOTAL** | **$3,671,678.81** |

186. Malis received the following distributions on the following dates:

| Distributions | Amount |
|---|---|
| 04/13/06 | 69,498.00 |
| 06/12/06 | 99,937.00 |
| 09/13/06 | 182,335.00 |
| 01/11/07 | 95,878.00 |
| 04/12/07 | 79,105.56 |
| 06/13/07 | 91,847.99 |
| **TOTAL** | **$618,601.55** |

187. Marchetti received the following distributions on the following dates:

| Distributions | Amount |
|---|---|
| 04/13/06 | 12,636.00 |
| 06/12/06 | 18,072.00 |
| 09/13/06 | 33,305.00 |
| 01/11/07 | 17,521.00 |
| 04/12/07 | 14,397.63 |
| 06/13/07 | 16,716.33 |
| **TOTAL** | **$112,647.96** |

188. Young, author of the August 3, 2007 email to employees disclaiming any such distributions, received the following distributions on the following dates:

| Distributions | Amount |
|---|---|
| 04/13/06 | 404,352.00 |
| 06/12/06 | 578,309.00 |
| 09/13/06 | 1,058,178.00 |
| 01/11/07 | 556,289.00 |
| 04/12/07 | 458,813.40 |
| 06/13/07 | 532,718.32 |
| **TOTAL** | **$3,588,659.72** |

189. As noted above, on November 6, 2006, the Board of Directors for FMFC, namely Jaggi and the Sullivans, paid themselves supplemental Shareholder Distributions in the amount of approximately $2,800,000, separate and apart from the distributions made to the other Directors and Officers. Collectively, the November 6, 2006, distributions to Jaggi in the amount of $1,334,996, to Sullivan, Sr. in the amount of $723,450, and to Sullivan, Jr. in the amount of $723,072, are referred to herein as the "Board-Only Distributions."

190.     The Directors and Officers did not document any authorization for the Shareholder Distributions that were made.  Although Debtor's Second Amended Disclosure Statement suggests that the Shareholder Distributions were made only to cover certain "imputed income tax liability," this suggestion cannot be reconciled with the personal tax returns of the Directors and Officers.  For example, in 2006, Jaggi received approximately $6,957,954 in Shareholder Distributions on only $14,666,448 in passive K-1 income, which, to be remotely accurate, would require an effective tax rate of approximately 47% to justify shareholder distributions in that amount.  Tax liability related to Jaggi's salary and Officer Bonuses were withheld directly in the form of W-2s, and thus, credited directly to his corresponding tax liability.  Jaggi's 2006 tax return, however, indicates that he had made only $3,804,941 in estimated tax payments for his liability as a shareholder of FMFC, not the $6,957,954 he received in Shareholder Distributions — a difference of $3,153,013.  Jaggi also received a federal tax refund on the year of $944,454, additional tax refunds from every other state he filed in, including Arizona ($242,317), Kentucky ($2,200), California ($2,148), and Massachusetts ($2,277).  In sum, the Shareholder Distributions made to Jaggi in 2006 were far greater than his tax liability thereon and resulted in a net windfall in excess of $3,000,000 in 2006 alone.

191.     Virtually all of the tax returns for FMFC's Directors and Officers were prepared by Ludwig, Schacht and Klewer, PLLC, in Tucson.  Not surprisingly, the other Directors and Officers received similar windfalls with respect to their Shareholder Distributions.  In addition, from January 2005 through the Petition Date, FMFC made millions of dollars worth of payments directly to various taxing authorities on behalf of the Directors and Officers for personal tax liabilities.

192.     FMFC should not have made any of the Shareholder Distributions.  The allegedly "imputed income" was grossly overstated as a result of the GAAP Violations.  Regardless, the Directors and Officers, not FMFC, should be responsible for any personal tax liability.

## D.    The Revolver:  $48.3MM.

193.    The Sullivan, Sr. Redemption, Officer Bonuses, and Shareholder Distributions, decimated FMFC's working capital and left it with woefully inadequate reserves necessary to comply with its repurchase and indemnity obligations.  To keep FMFC afloat while it searched for equity investors, and to control the amount of capital the Directors and Officers put at risk, the Directors and Officers caused FMCI to extend FMFC a revolving line of credit on August 30, 2006 — approximately one week after FMFC funded the Sullivan, Sr. Redemption.  The revolving line of credit took the form of a Loan Agreement between FMCI and FMFC, dated August 30, 2006, in the amount of $40,000,000 (the "Loan Agreement").

194.    Although there was only $28,000,000 outstanding on the Loan Agreement, it was modified on February 1, 2007 to increase the borrowing limit to $52,000,000 ("First Modification").   On May 1, 2007, the Loan Agreement was modified again to increase the borrowing limit to $60,000,000, despite an outstanding balance of only $38,000,000 ("Second Modification").   Collectively, the Loan Agreement, the First Modification, and the Second Modification, are referred to herein as the "Revolver."

195.    Jaggi and Malis executed the Loan Agreement, the First Modification, and the Second Modification, on behalf of FMCI and FMFC, respectively.  Internally, Jaggi and the Sullivans approved the terms of the Loan Agreement, the First Modification, and the Second Modification, on behalf of FMFC, and documented the approval with written consents in lieu of a special meeting of the Board.

196.    Although written requests for advances by FMFC were required under the Revolver, along with scheduled quarterly interest payments beginning October 30, 2006, such protocols were not adhered to by FMFC or FMCI.  To the contrary, the Directors and Officers moved funds between FMFC and FMCI for their own benefit and at their discretion.  In all, the Directors and Officers caused FMFC to fund the following principal and interest payments to FMCI on the Revolver in the one year period prior to the Petition Date:

54

| Date | Total | | Date | Total |
|------|-------|---|------|-------|
| 08/28/06 | 33,021.77 | | 01/11/07 | 1,250.00 |
| 08/31/06 | 143,742.68 | | 01/12/07 | 70,920.30 |
| 09/01/06 | 70,920.30 | | 01/19/07 | 1,708.00 |
| 09/19/06 | 10,343.30 | | 01/25/07 | 70,920.30 |
| 09/23/06 | 18,905.31 | | 01/28/07 | 17,361.11 |
| 09/28/06 | 17,361.11 | | 01/30/07 | 1,924.96 |
| 09/30/06 | 180,767.62 | | 01/31/07 | 5,191,419.22 |
| 10/17/06 | 1,861.25 | | 02/01/07 | 70,920.30 |
| 10/19/06 | 10,306.50 | | 02/07/07 | 7,000.00 |
| 10/26/06 | 81.12 | | 02/14/07 | 10,000,000.00 |
| 10/28/06 | 98,401.73 | | 02/23/07 | 9,080.00 |
| 10/30/06 | 6,904.59 | | 03/16/07 | 31,024.35 |
| 11/07/06 | 65,371.30 | | 03/20/07 | 18,308.26 |
| 11/17/06 | 6,951.71 | | 03/26/07 | 15,000.00 |
| 11/21/06 | 48,939.01 | | 04/10/07 | 4,785.49 |
| 11/22/06 | 483.12 | | 04/12/07 | 3,500.00 |
| 11/26/06 | 4,882.50 | | 04/17/07 | 200,000.00 |
| 11/28/06 | 17,361.11 | | 04/18/07 | 2,097.34 |
| 11/30/06 | 267,035.51 | | 04/20/07 | 24,587.82 |
| 12/08/06 | 7,396.06 | | 04/22/07 | 12,887.32 |
| 12/15/06 | 290,000.00 | | 04/30/07 | 792,872.63 |
| 12/22/06 | 3,899.00 | | 05/16/07 | 700.00 |
| 12/28/06 | 89,261.98 | | 05/17/07 | 6,220.15 |
| 12/31/06 | 700,981.95 | | 05/22/07 | 200,000.00 |
| | | | 06/14/07 | 1,605.00 |
| | | | 06/18/07 | 360,000.00 |
| | | | 06/21/07 | 200.00 |
| | | | 06/22/07 | 1,507.93 |
| | | | 06/30/07 | 24,800,000.00 |
| | | | 07/18/07 | 4,587.15 |
| | | | 07/30/07 | 500,000.00 |
| | | | 08/31/07 | 232,172.64 |
| **TOTAL** | | | | **$44,749,740.80** |

According to the proof of claim FMCI filed in the Bankruptcy Case, the Directors and Officers began funding payments to FMCI on the Revolver before FMCI was even incorporated and more than a year before the Directors and Officers caused FMFC to undertake the Revolver. The transfers the Directors and Officers caused FMFC to fund to or on behalf of FMCI prior to August 21, 2006, are as follows:

| Date | Total | | Date | Total |
|------|-------|---|------|-------|
| 03/08/05 | 6,185.00 | | | |
| 04/30/05 | 151,381.38 | | 05/24/06 | 55,040.00 |
| 05/09/05 | 164.01 | | 05/31/06 | 446,565.91 |
| 06/29/05 | 99.50 | | 06/15/06 | 18,025.60 |
| 10/19/05 | 87,952.39 | | 06/22/06 | 10,000.00 |
| 10/31/05 | 6,618.74 | | 06/29/06 | 771.94 |
| 11/30/05 | 46,685.60 | | 06/30/06 | 263,437.78 |
| 12/31/05 | 248,335.28 | | 07/05/06 | 771.94 |
| 01/31/06 | 198,162.03 | | 07/15/06 | 428.36 |
| 02/24/06 | 32,254.17 | | 07/18/06 | 5,958.00 |
| 02/28/06 | 128,782.13 | | 07/20/06 | 8,083.75 |
| 03/25/06 | 263,305.78 | | 07/24/06 | 2,984.23 |
| 03/26/06 | 11,215.93 | | 07/25/06 | 21,638.92 |
| 03/31/06 | 663,131.68 | | 07/28/06 | 29,577.86 |
| 04/05/06 | 787,078.00 | | 08/14/06 | 18,068.84 |
| 04/24/06 | 9,906.50 | | 08/15/06 | 3,146.12 |
| 04/26/06 | 2,310.56 | | 08/16/06 | 14,482.18 |
| 05/12/06 | 8,223.01 | | 08/17/06 | 2,116.56 |
| **TOTAL** | | | | **$3,552,889.68** |

Notably, the Directors and Officers did not charge FMCI interest for these advances, and were not credited with any interest that accrued thereon.

197.    In total, the Directors and Officers transferred approximately $48,302,630.48 in alleged principal and interest payments to FMCI on the Revolver. During the one year period prior to the Petition Date, the Directors and Officers caused FMFC to fund approximately $44,749,740.80 in principal and interest payments to FMCI on the Revolver, including in excess of $25,500,000 in payments made within 53 days of the bankruptcy filing.

198.    There remained in excess of $22 million available to be drawn on the Revolver from FMCI as of the Petition Date — more than enough to pay the approximately $13 million in would be wage claims in full. Although bankruptcy counsel for the Debtor reported that First Magnus was unable to pay its employees because it lost access to the line of credit it used to fund its loans, the Directors and Officers could have made all outstanding payments to FMFC's employees before filing for bankruptcy had they elected to draw on the Revolver.

## E.    The Sullivan, Sr. Notes:  $26MM.

199.    The Sullivan, Sr. Promissory Note.  On December 11, 2006, FMFC entered into an Unsecured Promissory Note between FMFC and Sullivan, Sr. Revocable Trust in the amount of $25,000,000 (the "Sullivan, Sr. Promissory Note").  On December 12, 2006, Sullivan, Sr., individually, and/or on behalf of the Sullivan, Sr. Revocable Trust, funded the $25,000,000 loan to FMFC.

200.    The loan was designed to show an additional $25,000,000 in cash on Debtor's books so it could be reported to Warehouse Lenders, Take-Out Investors, and auditors, in an attempt to reduce the negative impact the Sullivan, Sr. Redemption, Officer Bonuses, Shareholder Distributions, and asset transfers otherwise had on Debtor's ability to maintain its financial covenants.  Once the Directors and Officers had taken a snapshot of the funds in FMFC's account for reporting purposes, the Directors and Officers caused FMFC to repay the Sullivan, Sr. Promissory Note in full on December 14, 2006 — a  mere two days after funding the loan.

201.    The Sullivan, Sr. Subordinated Note.  On February 28, 2007, FMFC entered into an Unsecured Subordinate Promissory Note between FMFC and the Sullivan, Sr. Revocable Trust in the amount of $20,000,000 ("Sullivan, Sr. Subordinated Note") (collectively, the Sullivan, Sr. Promissory Note and the Sullivan, Sr. Subordinated Note are referred to as the "Sullivan, Sr. Notes").  Like the Sullivan, Sr. Promissory Note, the Sullivan, Sr. Subordinated Note sought to offset the continued impact the Sullivan, Sr. Redemption, Officer Bonuses, Shareholder Distributions, and asset transfers had on Debtor's financial covenants.  The Directors and Officers also needed the funds to make down-payments on the substantial amount of repurchase and indemnity obligations being made by Warehouse Lenders and Take-Out Investors.

202.    While no principal payments on the Sullivan, Sr. Subordinated Note were paid, FMFC made an interest payment on April 30, 2007, in the form of a shareholder distribution to

Sullivan, Sr. in the amount of $320,267.61.  On August 1, 2007, approximately three weeks before Debtor's bankruptcy filing, the Directors and Officers caused FMFC to make another interest payment to Sullivan, Sr. in the form of a shareholder distribution in the amount of $475,812.11.

### F.    The Asset Transfers:  $50MM+.

#### 1.    FMR:  $8MM+.

203.    First Magnus Reinsurance Ltd. ("FMR") operated as a reinsurer through a 1998 agreement with Mortgage Guarantee Insurance Corporation.  Prior to September 20, 2006, FMR was a wholly owned subsidiary of FMFC.

204.    FMR received 25% of the mortgage insurance premiums paid on the pool of insured loans FMFC originated in return for assuming a portion of secondary loss liability.  The mortgage insurance premiums were paid into a trust account and deemed "earned."  FMR could draw on the trust account to recover its premiums so long as the required reserves amount related to its secondary loss liabilities were adequately maintained.  FMR insured each pool for a ten-year term.  As of December 31, 2004, no losses had been incurred from the secondary loss liabilities assumed and no premiums had been withdrawn.

205.    On September 20, 2006, the Directors and Officers caused FMFC to transfer 100% of its interest in FMR to FMCI.  The Transfer and Assignment of Ownership Interest was signed by Malis on behalf of FMFC and Jaggi on behalf of FMCI.  The assignment included the reserve account containing all of the premiums that had been earned by FMR from 1998 onward.  FMCI's Amended Disclosure Statement identifies "$10 million in restricted funds" that remain in the account.

206.    Following the assignment of FMR to FMCI, all of the operating expenses and tax liabilities of FMR continued to be paid directly by FMFC through the Petition Date.  The fair market value of FMR on the date of transfer is in excess of $8,000,000.

## 2.  **FMLS: $2.5MM+.**

207.   First Magnus Lender Services, LLC ("FMLS") provided credit reporting, appraisal, and other mortgage loan origination services to FMFC and its affiliates.  Prior to its transfer to FMCI, FMLS was a wholly owned subsidiary of FMFC.  FMFC transferred 100% of its interest in FMLS to FMCI on September 20, 2006 for no consideration.  The transfer was documented in a Transfer and Assignment of Ownership Interest dated September 20, 2006, and was signed by Malis on behalf of FMFC and Jaggi on behalf of FMCI.

208.   According to the FSG Valuation, FMLS was estimated to have a fair market value as of December 31, 2004 of approximately $1,600,000.  The estimated fair market value of FMLS as of the date of transfer was in excess of $2,000,000.

209.   Charter Insurance Group ("CIG") was a wholly owned subsidiary of FMLS at the time of its transfer to FMCI.  In addition to the transfer of FMLS, a $675,440.34 account receivable owed by CIG to FMFC was transferred to FMCI.  Sullivan, Sr. is a Director of CIG.

210.   According to FMCI's Amended Disclosure Statement, CIG sold its remaining assets to Jeff Arnold Companies, Inc. on November 27, 2007, in exchange for $800,000 and an assumption of all liabilities "except for [unidentified] inter-company liabilities to FMCI."  The "inter-company liability" is the accounts receivable that CIG owed to FMFC that was transferred to FMCI for no consideration.

211.   Arnold was the president of CIG and formed Jeff Arnold Companies, Inc. for the purpose of this acquisition.  Arnold is also a StoneWater shareholder.  In all, the transfer of FMLS and the receivable owed by CIG had a fair market value in excess of $2,500,000.

## 3.  **Magnus Receivables:  $6.5MM+.**

212.   Magnus Corporation is owned and operated by Sullivan, Sr., Sullivan, Jr., and Sabina Sullivan (Sullivan, Sr.'s wife).  According to FMCI's Amended Disclosure Statement, FMFC transferred its interest in "a receivable from Magnus Corporation on December 31, 2006" to FMCI.  The transfer "was accounted for as distributions to FMCI by its subsidiaries."

FMFC's accounting records identify two transfers to FMCI for no consideration: the December 31, 2006 transfer for $108,118.90 stating "Move A/R from Magnus Corp to FM Capital;" and an August 31, 2006 transfer for $5,491,156.35 stating "Move A/R from Magnus Corp to FM Capital." The August 31, 2006 receivable related to a construction loan portfolio funded by FMFC.

213.    FMCI's Amended Disclosure Statement also identifies a "note from Magnus Corporation in the amount of $600,000 (book value)" and "a receivable from Magnus Corp. in the amount of $450,000 for Aircraft usage (book value)" as assets. Both of these Magnus Corp. receivables represent unpaid aircraft expenses the Directors and Officers caused FMFC to incur.

### 4.    Corporate Jets:  $13MM+.

214.    Use of FMFC's corporate jets was one of the many perks of being a Director and Officer of FMFC. The Directors and Officers routinely used FMFC's corporate jets for personal use and without adequate remuneration. Sullivan, Sr. described FMFC's philosophy regarding the extravagant use of the corporate jets in the Sullivan, Sr. Manuscript, explaining that while "[m]any people see their jets as executive toys and not economically justified," for Sullivan, Sr., it is only a "question of what is the situation." Like Gaylord said to Andrea Malis, "with our plane, Cabo is a quick trip."

215.    At a time when FMFC was insolvent and facing fatal repurchase and indemnity obligations for which it did not reserve or account for, the Directors and Officers continued to use corporate jets for personal use and caused FMFC to pay all of the costs associated with the maintenance, operation, and use of the aircraft.

216.    The Hawker.  FMFC owned a 50% interest in a Hawker 125-700A aircraft. The remaining 50% of the Hawker was owned by Magnus Corp. On August 31, 2006, FMFC recorded the transfer of its 50% interest in the Hawker. According to FMFC's Second Amended Disclosure Statement, FMFC transferred the Hawker to FMCI. However, the Aircraft Bill of Sale executed by G. Jaggi on behalf of FMFC is between FMFC and Magnus Corp. The

Aircraft Bill of Sale identifies total consideration for transfer of FMFC's interest in the Hawker as $10.00. Debtor's records do not reflect any consideration for the transfer of FMFC's interest in the Hawker — not even the $10.00.

217. The book value for FMFC's interest in the Hawker on the date of transfer was approximately $2,004,750, with an outstanding lease obligation of $1,753,472.27. According to FMCI's Amended Disclosure Statement, FMCI sold its purported interest in the Hawker on February 4, 2008, to Scottsdale West Holdings, LLC for $1.65 million, and "netted approximately $50,000 from the sale." It is estimated that the fair market value of FMFC's interest in the Hawker was approximately $300,000 on the date of transfer.

218. Despite having purported to transfer its interest in the Hawker, the Directors and Officers continued to cause FMFC to fund the various expenses associated with the maintenance, operation, and usage of the Hawker, including Magnus Corp.'s use of the aircraft, and the personal use of the aircraft for the Directors and Officers.

219. The Falcon. FMFC also owned a 99% interest in a Dassault-Breguet model Falcon-50 aircraft. The remaining 1% interest in the Falcon-50 was owned by Magnus Corp. FMFC transferred its 99% interest in the Falcon to FMCI on August 31, 2006 for no consideration.

220. Book value on the date of transfer was approximately $1,407,210.68. According to FMCI's Amended Disclosure Statement, FMCI sold the Falcon to Walker Aircraft for $8.5 million on November 14, 2007, and "netted approximately $285,000 from the sale."

221. Like the Hawker, FMFC continued to fund all of the expenses associated with the maintenance, operation, and usage of the Falcon for FMCI and Magnus Corp., which included the personal use of the aircraft by the Directors and Officers.

222. Other Expenses. Before and after the alleged transfers of Debtor's interest in the Hawker and the Falcon, FMFC funded virtually all of the expenses associated with the ownership, maintenance, and operation of the two aircraft. These expenses included payments

to fixed based operators for executive service and other accommodations. In all, Debtor paid in excess of $12,000,000 in aircraft expenses incurred by FMCI, Magnus Corp., and other personal use by the Directors and Officers, in the one year period prior to the bankruptcy filing, including approximately $6,000,000 paid in 2007.

### 5.    WNS Shares:  $14MM+.

223.    According to FMCI's Amended Disclosure Statement, FMFC transferred approximately 596,154 ordinary shares of stock issued by WNS that were owned by the Debtor to FMCI on or about July 1, 2006. No transfer or assignment documents evidence the transfer of the WNS stock from FMFC to FMCI, and there was no consideration for the transaction. FMCI did not exercise control over the FMFC's WNS stock until April 2007. Any alleged transfer of the WNS stock from FMFC to FMCI did not occur any earlier than September 20, 2006.

224.    FMFC received the WNS stock arising out of the Trinity Sale in November 2005 to WNS. In addition to FMFC, an affiliate — First Magnus Consulting — also received shares arising from the Trinity Sale. FM Consulting is owned by various FMFC directors, officers, and high-level employees, including Jaggi, Sullivan, Sr., Sullivan Jr., Malis, Marchetti, and Young, as well as Hutchison, Adil, Bustamante, Chopra, Lemke, Johnson, and Shoemaker. Each of these individual directors, officers, and high-level employees of FMFC also received shares of WNS arising from the Trinity Sale.

225.    At the time FMCI contends Debtor purportedly transferred its WNS stock to FMCI, WNS was in a quiet period in anticipation of its initial public offering on the NEW YORK STOCK EXCHANGE. On July 24, 2006, the initial public offering of American Depository Shares ("ADS") of WNS stock occurred (each ADS share represents one ordinary share of WNS). The initial public offering was $20.00 per ADS. At the close of the first day of public trading, WNS stock was trading at $24.50 per share. The personal financial statements of Jaggi and his wife, R. Sawney, as of December 31, 2006, which were prepared by Chopra, valued WNS stock at

$30.00 per share. The trading price of WNS stock continued to increase in the three quarters that followed the initial public offering, and was trading at $27 per share as late as April 2007. On August 16, 2007, after WNS' earnings call that morning, but before FMFC announced later that afternoon that FMFC was ceasing operations, WNS stock was trading at approximately $25 per share.

### G. The Freerolls: $8.5MM+.

#### 1. Bank Expenditures: $2.8MM+.

226. The Directors and Officers caused FMFC to bear significant costs associated with FMCI's failed attempt to organize as a federally chartered savings and loan institution. In particular, Debtor paid $848,200.00 to acquire real property and the title to this property went directly to FMCI. Debtor also paid $19,718.34 to Kevin Howard, the architect hired by the Directors and Officers to design the building which was to become FMCI's new headquarters. Although construction was never completed, Debtor paid $37,325.00 to BHF Construction for work done on the initial phases of the project.

227. Significantly, the Directors and Officers hired the firm of LP & G and paid them over $1,500,000.00 to devise and launch an advertising campaign for FMCI. Debtor also footed the bill for the majority of the legal expenses associated with FMCI's failed attempt at becoming a federally chartered savings and loan institution. In all (excluding legal fees), Debtor advanced over $2,800,000.00 reflecting costs attributable to FMCI's failed bank venture – all were for the direct and exclusive benefit of FMCI and the Directors and Officers.

#### 2. The Improvements To 603 N. Wilmot: $5.7MM+.

228. The Directors and Officers also caused Debtor to fund a myriad of improvements to 603 N. Wilmot for the benefit of the Directors and Officers (who continue to work at the premises), FM Realty (which owns the premises), and the StoneWater Entities, New Ecloser Entities, and Magnus Settlement Services (which all operate out of the premises). FM Realty is owned by Sullivan, Sr. and Indus Holdings, which is owned by Jaggi and his wife, Reema

Sawhney. Like the Sullivans, Indus Holdings also holds ownership interests in, *inter alia*, FM Consulting and SW Holding. FM Realty is managed by Magnus Corp., which is owned by Sullivan, Sr. (President), Sullivan, Jr. (Vice President), and Sabina Sullivan (Sullivan, Sr.'s wife).

229. 603 N. Wilmot has been described as "a gorgeous class A office building" which was "custom-built" to suit the unique requirements of a mortgage company with a sophisticated technology platform. The building is roughly 70,000 square feet and has been recognized as providing some of the finest office space Arizona has to offer. Experts have described the building located at 603 N. Wilmot as having a technology infrastructure more sophisticated than that of the Tucson airport.

230. StoneWater boasts that 603 N. Wilmot is a "$20 million state-of-the-art national headquarters and operations facility" that "provides unsurpassed ability to support stable, world-wide technology" and was "designed and built to support a national mortgage operation and world wide [sic.] technology platform." It was FMFC, however, that spent in excess of $5,700,000 to build the technology infrastructure at 603 N. Wilmot.

231. <u>Communication Systems</u>. FMFC funded the communications system installed at 603 N. Wilmot, which is wired to host thousands of communication ports capable of the receipt and transmission of over 14 terra-bytes (over 500,000 bankers' boxes) of loan data. These same communication ports also permitted Debtor's employees, and now, the StoneWater Entities, New Ecloser Entities, and Magnus Settlement Services, to track Debtor's offshore software development in India. Between 2005 and 2007, Debtor spent more than $2,000,000 installing a voice-over IP telecommunication system throughout the building.

232. <u>Security & Data Protection Systems</u>. FMFC also funded the installation of sophisticated security systems at 603 N. Wilmot to protect the equipment and data housed therein. The computer equipment in the server room, for example, is protected by a state-of-the-art fire suppression system manufactured by DuPont, which is designed to remove all of the

oxygen from the server room in the event of a fire (regardless of its occupants). Access to the server room is controlled by finger print scanning technology installed by FMFC. The server room is temperature controlled by five 15 ton APC AC units installed by Debtor that are 6 feet high and 4 feet deep. APC Infrastructure cabinets were affixed in the server room to house more than a hundred servers. To protect and support the equipment, 240 KVA APC UPS (Uninterrupted Power Supply) units were installed, some of which cost approximately $100,000 each. FMFC funded the installation of security cameras throughout the building, along with diesel and natural gas powered generators, totaling approximately $911,000. A number of the building's conference rooms also host retina scanner technology funded by FMFC, controlling who may enter the conference rooms.

233. Air-conditioned parking garage. FMFC also funded the development of an air-conditioned parking for executives at 603 N. Wilmot. Parked in the air-conditioned garage was a liquid-silver 2007 Jaguar XK convertible (the "Jaguar") the Directors and Officers caused Debtor to lease for the benefit of Karl Young (who signed the lease on behalf of FMFC). The Jaguar was leased in May of 2006 and required FMFC to fund monthly payments of $1,841.00. The Jaguar was equipped with a high-end sound system, rain sensing wipers, heated seats, and heated steering wheel, with a sticker price of $82,869.00. Karl Young continued to drive the Jaguar for months following the Debtor's bankruptcy filing until Ford Motor Credit finally obtained permission from the Bankruptcy Court to repossess it in November 2007.

234. The Sullivan Wing. FMFC also funded the development of the prestigious "Sullivan Wing," which Debtor finished with rich wood and marble. The Sullivan Wing is an exclusive area of the building reserved for the Sullivans and their long-time assistant, Marlene Andrews, where they continue to office as of the date of this Complaint.

235. Other luxuries. FMFC also funded large plasma screen televisions that appear throughout the building, including the lobby, the conference rooms, and the offices of the executives. FMFC also funded a two-story waterfall for $170,000 and a $16,000 fish tank, both

of which remain installed at 603 N. Wilmot. The fish tank was one of three, which Debtor collectively spent in excess of $35,000 to acquire and install, all of which remain at the premises. Debtor also funded the cabinetry at the property, which cost in excess of $334,000. Debtor also purchased leather sofas for the offices of Jaggi, Marchetti, and Young, which cost approximately $15,000.

236. In total, FMFC funded more than $5,700,000 in improvements to 603 N. Wilmot for the exclusive benefit of the Directors and Officers, FM Realty, and now, the StoneWater Entities, New Ecloser Entities, and Magnus Settlement Services (collectively, the "Improvements to 603 N. Wilmot"). The Directors and Officers, FM Realty, and now, the StoneWater Entities, New Ecloser Entities, Magnus Settlement Services, and others, continue to enjoy the fruits of the Improvements that impoverished Debtor.

## IV. Caught Bluffing: FMFC Violated The Financial Covenants With Its Warehouse Lenders And Take-Out Investors.

237. Even under the inflated value of FMFC's assets and premature revenue recognition on sales, the Stock Redemptions, Officer Bonuses, Shareholder Distributions, and other asset transfers, caused FMFC to breach virtually all of its Repurchase Agreements and Loan Purchase Agreements. The fiscal impact of a default on any one of FMFC's warehouse lines rendered FMFC woefully insolvent, as it did not have the cash sufficient to repurchase the loans from the Warehouse Lenders and the breach of any one of the Repurchase Agreements triggered cross-defaults and material adverse change provisions with every other FMFC Warehouse Lender and Take-Out Investor.

238. According to FMFC's Second Amended Disclosure Statement:

> **At no time did any of the above transfers impair First Magnus's ability to meet its financial covenants under any Warehouse Agreement** or other Loan Agreement. . . . The repurchases did not have a material effect on the business operations of the Debtor, nor did they impair the Debtor's ability to meet its ordinary course financial obligations.

66

Internal emails from FMFC executives tell a much different, more dire story.

239. <u>Merrill Lynch</u>. On February 16, 2007, shortly after Malis provided Merrill Lynch his Officer's Certification of the Financial Statements for the quarter ending September 30, 2006, Merrill Lynch put FMFC on notice that it was in default of its Tangible Net Worth ("TNW") covenant and that Merrill Lynch was calling the entire line. Specifically, in an email entitled "Covenant Concern," a Merrill Lynch representative emailed Malis on February 16, and stated:

> Following up on my voice mail, we have just this week received your Officer's Certification for 9/30/06 and it appears that **FMC is in violation of the 80% test**. Since you signed the certification, I wanted to post you and see if you disagree with our conclusion. Attached is a brief spreadsheet with our calculations. What will your approximate TNW be at 12/31/06?

Merrill Lynch had only recently received Malis's certification of the financials for the third quarter of 2006, evidencing the breach of the financial covenants that occurred over the course of the first and second quarters of 2006.

240. In response to the notice from Merrill Lynch of the covenant violation, Malis and Chopra exchanged emails on February 16, 2007 identifying the source of the covenant violation. In one such email to Chopra, Malis states the obvious:

> **Hmmm . . . maybe we should not have moved the money back to [C]apital so fast . . . .**

Chopra confirmed to Malis that:

> **Senior's redemption of over 25% of TNW triggered this**. . . . In addition to [S]enior we also moved assets from FMFC to FM Cap.

241. Having stripped FMFC of so much capital, there was simply no way to reconcile the covenant violation. Malis recognized as much in an email to Chopra and Wright, among others, on February 16, 2007:

Not even sure what to do here . . . **we can't make this work with the distribution we made and the holding company assets moved up** . . . they could ask us to pay off the whole construction line [$58MM]. . . .

242.     In a February 16, 2007, email to Paul Cisneros, FMFC's Senior Vice-President of Finance, Malis was concerned that his certification of FMFC's financials may be criminal:

Take a look at the below info from ML . . . they're already coming down on us for cash balances . . ., but with the combination of the distribution and some of the assets moving to the holding company, **I can't hit this** . . . and now I've signed the cert. . . . **can I go to Jail**? . . . **I can't make this right** . . . .

243.     In the same February 16, 2007, email, Malis recognized that FMFC did not have adequate reserves (or cash) to absorb the repurchase obligation to Merrill Lynch and that he would likely be fired if he had to inform the other Directors and Officers that they needed to return the funds they had distributed to themselves:

If they make me pay the construction line off, **we are screwed** . . . if they expect us to be in line, **we would have to move all the cash back** . . . and I will get fired . . .

Independent of the GAAP Violations, FMFC's breach of the TNW covenant caused it to be insolvent.

244.     The default under the Repurchase Agreement with Merrill Lynch triggered cross-defaults in the warehouse lines of Countrywide, WaMu, and UBS, and Loan Purchase Agreements with, *inter alia*, Lehman. The remedies available to Merrill Lynch were the same or similar to the other Warehouse Lenders and Take-Out Investors, including, among other things, the acceleration of the repurchase dates for each transaction, which would require FMFC to repurchase all of the loans within each line (applying a post-default rate upon the failure to do so immediately). FMFC had reserved less than $500,000 on the approximately $2 billion in outstanding repurchase obligations owed to the Warehouse Lenders and was holding only $30,000,000 in cash or equivalents. The default also gave the Warehouse Lenders the right — without notice to FMFC — to immediately repossess the loans, sell them on their own, and

recover any deficiency amount that may be owed, and any other fees and costs incurred in their efforts.

245. <u>Back-dating the transfers of FMR and FMLS</u>. Despite FMFC's efforts, the TNW default under the Repurchase Agreement with Merrill Lynch would, by its nature, re-occur when the fourth quarter 2006 and first quarter 2007 financials were provided to the Warehouse Lenders and compared to the second and third quarters of 2006, respectively. On March 9, 2007, realizing that the first quarter 2007 TNW would continue to breach the TNW covenant to Merrill Lynch, the Directors and Officers back-dated the FMR and FMLS transfers from September 20, 2006, to July, 1, 2006, in order to push the transfers further back in time to lower the historical TNW used to make the TNW comparison. The Written Consent in Lieu of Special Meeting of Board of Directors of FMCI, back-dating the FMR and FMLS transfers was signed by Jaggi and the Sullivans on behalf of FMFC.

246. The back-dating of the transfers of FMR and FMLS to July 1, 2006, corresponds with the date the Directors and Officers allege FMFC transferred the WNS stock to FMCI, which most likely occurred no earlier than September 20, 2006. No back-dating was necessary with respect to the transfer of the WNS stock, as that transaction was never documented in the first instance.

247. The back-dating of asset transfers did not cure the financial covenant violations, but rather, was designed to prevent subsequent covenant violations when the first quarter 2007 certifications were compared with the third quarter of 2006. FMFC never cured the Merrill Lynch default, and would file for bankruptcy protection approximately 6 months later.

**V. The House Of Cards Comes Tumbling Down: Lacking Adequate Capital, FMFC Hemorrhaged With Repurchase and Indemnity Obligations.**

248. According to FMFC's Second Amended Disclosure Statement, "Debtor remained current and in compliance with all of its financial obligations until shortly before closing its doors on August 16, 2007." When asked directly by the U.S. Trustee, Elizabeth

69

Amorosi, about all of the executive compensation paid to the Directors and Officers, Debtor's General Counsel, Doug Lemke, testified that management did not realize the company was headed for trouble until August 2007. The Directors and Officers lied.

249. <u>Sonoran & Other Failed Construction Projects</u>. In addition to the Merrill Lynch defaults, there was a significant amount of ineligible collateral under the Repurchase Agreements related to bad construction loans, which triggered repurchase obligations far in excess of FMFC's reserves (and cash). On construction loans originated by the CLD, FMFC would advance loan proceeds pursuant to draw requests made by the builder. Upon completion of the project and final inspections, FMFC would pay any remaining amounts owed to the builder and refinance the borrower into a permanent mortgage.

250. By April 2006, Sonoran – the builder with whom the CLD had more than 35% of its outstanding commitments — had abandoned construction on all of its projects. The consequences of Sonoran's abandonment were dire for FMFC. Under the applicable Repurchase Agreements, a construction loan was rendered "defective" or "ineligible" if the loan was outstanding for more than 360 days on loans less than $650,000, 450 days on loans more than $650,000, and, if more time was needed to complete construction on loans more than $650,000, 540 days so long as the total outstanding loans over 450 days amounted to less than 25% of outstanding construction loans. The failure to complete the Sonoran projects and refinance the borrower into a permanent mortgage triggered Debtor's obligation to repurchase the defective and ineligible loans from the Warehouse Lenders, and left Debtor with little recourse after doing so other than taking deeds in lieu of foreclosure on the unfinished projects. Unfinished construction projects in and around the Phoenix area made up a significant portion of the REOs FMFC had marked on its books at 75% of cost. Had proper LOCOM analysis been applied to the REOs, the fair value of the assets was less than 30% of cost.

251. In November 2006, FMFC had one particular group of 20 construction loans that had not been timely completed, which the Warehouse Lender required FMFC to repurchase for

approximately $11 million. Having failed to properly reserve for such repurchase obligations, FMFC tried to move the loans from one warehouse line to another in an effort to "buy time" to complete construction and refinance the loan. However, when those efforts failed, Malis grew increasingly concerned over construction loans that were more than 540 days old. When hit with the 20 "ineligible" construction loans for approximately $11 million in November 2006, Malis commented how much he "need[ed] that $11 million" and realized the effect of builders abandoning projects — "that means **we have tons of loans over 540 days.**" As of November 30, 2006, FMFC had only $4,000,000 in cash or cash equivalents.

252. By March 2007, Warehouse Lenders had learned of "$22+ million or $29+ million of ineligible collateral" originated by the CLD and notified FMFC of its default under the applicable Repurchase Agreement. Based on the .02% reserve on mortgage loans held for sale as of December 31, 2006, FMFC had only reserved approximately $425,778 to cover its Warehouse Repurchase Obligations and had only $25,000,000 in cash or cash equivalents in March 2007.

253. <u>FM Equity XI</u>. The Directors and Officers needed to remove the Sonoran loans (and other ineligible loans) from the warehouse lines, but FMFC lacked the capital to do so because it had not properly reserved for its repurchase obligations. In April 2007, Malis informed Cisneros that he was "fully prepared to create an llc and buy all the [ineligible construction] notes," that he had a "phx bank to lend against as ad money," and that he would "not shut don [Stremme] down." To accomplish this objective, FM Equity VI, LLC, FM Equity VII, LLC, FM Equity, VIII, LLC, FM Equity IX, LLC, and FM Equity X, LLC, were all formed by Jaggi on July 20, 2007. FM Equity XI was formed on August 8, 2007.

254. One day after its formation, on August 9, 2007, FM Equity XI and FMFC entered into a "Collateral Repurchase Agreement." Malis executed the Collateral Repurchase Agreement on behalf of the FMFC and FM Equity XI.

255. Pursuant to the Collateral Repurchase Agreement, FM Equity XI purchased construction loans with a face value of $3,810,532.69 for only $2,700,000.00 from FMFC. The Collateral Repurchase Agreement required FMFC "to repurchase the Loans" upon 48 hours notice from FM Equity XI. The Directors and Officers engaged in the FM Equity XI transaction and a series of other similar transactions to transfer assets to themselves for less than the costs incurred by FMFC, and to hide losses FMFC failed to reserve for and that would have otherwise required FMFC to write-down the assets.

256. <u>Lehman</u>. Take-Out Investors were also hitting FMFC with repurchase and indemnity obligations for which FMFC had not kept any reserve. By February 15, 2007 — contemporaneous with the financial covenant default made by Merrill Lynch — Lehman had informed FMFC of more than $75 million in repurchase and indemnity obligations owed to it under its Loan Purchase Agreements. In a February 15, 2007, email, Malis acknowledged that **"Lehman says the repurchase total is closer to 75 million."**

257. The Directors and Officers knew FMFC's reserves and liquidity were such that FMFC could not withstand Lehman's repurchase and indemnity demands. According to a February 15, 2007, email to Cisneros, Malis knew it was only a matter of time before "someone is going to realize the cash at year end was very low . . . we had some cash at the holding company level, but still too low for our size."

258. Cisneros had sought advice from Malis on how to characterize the repurchase and indemnity demands in his discussions with Warehouse Lenders and was "hoping to avoid the question," fearful of their response because "$60MM sounds kinda scary." Malis recognized that "the climate out there [] is flat out ugly," and explained to Cisneros that the Warehouse Lenders' "biggest concern will be liquidity concerns." A month later, in an email entitled "reserve analysis question," Malis and Cisneros continued to struggle with "how to couch the lehman issue" to its Warehouse Lenders, and "all the EPDS [early payment defaults]

to ALS [Aurora Lending Services (Lehman)]," which was the "biggest concern" according to Malis.

259.    To help soften the news, the Directors and Officers requested that Sullivan, Sr., loan funds to FMFC before the end of February 2007 — "before people notice how thin we are." In a February 15, 2007, email to his wife, Andrea Malis (who was pressuring Malis to buy a membership to use "Exclusive Resorts" around the globe, a luxury vacation club that she and Bill Gaylord were discussing), Malis declared that "the problem for me is we have fraud and epds [early payment defaults] all over the place."

260.    On February 15, 2007, Malis also discussed with Jaggi the repurchase and indemnity obligations owed to Lehman and the Warehouse Lenders. The two were strategizing how best to characterize the issue to Sullivan, Sr., to whom they were looking to loan funds in the form of the Sullivan, Sr. Subordinated Note. In a February 15, 2007, email to Jaggi, Malis reported that:

> **Lehman thinks there is a new amount of epds coming that will bring the total to almost 75 million … plus the 25 million from the rest of our lenders**. . . . The bad news is we still have loans we own and have already repurchased so the reserve is still looking light. . . . I wish I could make this go away . . . but **some blood is going to be shed.**

A month later, Malis acknowledged that FMFC never reserved for repurchase and indemnity obligations owed to the Take-Out Investors and only accounted for them *after* the Take-Out Investors made repurchase and indemnity demands. In a March 19, 2007 email, Malis explained to Jaggi that the reserve:

> **does not leave any cushion for any undiscovered stuff or signed indemns** [indemnity agreements with Take-Out Investors regarding outstanding repurchase and indemnity demands] **where losses have not been billed**. . . . Cash is still a bigger issue than overall yearly profits I think, but how to handle the lehman issue from a pl is a discussion we need to have.

261.    FMFC was also struggling to sell its Seasoned Loans and Scratch & Dent loans throughout the first two quarters of 2007 — and stood to receive large influxes of both as FMFC

repurchased loans from Warehouse Lenders and Take-Out Investors.  Malis reported to Jaggi in March 2007 that while FMFC was "dumping loans and aggressively placing scratch and dent . . . that market is just moving slowly because of the environment right now."  The Directors and Officers, however, had yet to mark such loans at LOCOM and were still paying themselves Officer Bonuses and Shareholder Distributions off of the inflated "pre-tax net profit" and alleged "shareholder equity" on FMFC's books.

262.    In a May 1, 2007 email to Cisneros, Malis explained that he "expected 35 to 40m of extraordinary losses for a drop of 90 to 100 exp rev down to 50 to 60."  The "extraordinary losses" anticipated by Malis represented the immediate cash payments FMFC was obligated to make to Warehouse Lenders and Take-Out Investors; it did not include losses FMFC would continue to incur under bulk indemnity agreements between FMFC and Lehman.

263.    Because FMFC did not reserve for any repurchase or indemnity obligations owed to Take-Out Investors and only accounted for them after the actual demands were made, FMFC had no reserve from which to fund the claims made by Lehman and other Take-Out Investors. To address the matter, FMFC and Lehman entered into a series of "bulk indemnity agreements" between March and August 2007 whereby FMFC would make a token cash payment on anticipated losses associated with a list of troubled assets identified on the schedules attached to each bulk indemnity agreement, memorialize its obligations for *all* of Lehman's losses, and provide Lehman control over the defaulted mortgage loans.  Despite cash payments of more than $20 million to Lehman between March and August 2007, the principal amounts (exclusive of costs and premium recapture) owed by FMFC under the Loan Purchase Agreements and bulk indemnity agreements with Lehman exceeded $60 million during that time period — more than twice FMFC's cash (or equivalents).  FMFC's total liabilities to its Take-Out Investors during this time period exceeded $300,000,000.

264.    JPMorgan.  Evidencing FMFC's desperate need for capital, on January 25, 2007, FMFC engaged J.P. Morgan Securities, Inc. ("JPMorgan") to solicit offers for an equity

investment from firms specializing in highly distressed companies. Under the terms of JPMorgan's engagement, FMFC agreed to pay JPMorgan a non-refundable retainer of $100,000.00 and 5% of the gross. FMFC was seeking an equity investment of no less than $200-$250 million given its urgent need for capital.

265. On May 17, and 23, 2007, respectively, TPG Capital and Blackstone Management Partners V — two leveraged buy-out firms specializing in the acquisition of highly distressed companies — executed confidentiality agreements to review Debtor's financial condition. They were the only two firms to do so in response to JPMorgan's efforts and quickly passed on the opportunity shortly thereafter. JPMorgan did not receive any "indications of interest" in response to the private placement.

266. Further evidencing FMFC's desperate need for capital, on May 2, 2007, JPMorgan agreed to loan FMCI, but not FMFC, approximately $5,000,000 ("Grid Time Promissory Note"). According to its terms, JPMorgan insisted that the maturity date on Grid Time Promissory Note be no later than July 9, 2007 — approximately 60 days. JPMorgan also required Jaggi to personally guarantee the Grid Time Promissory Note, which he did, and maintain a balance with JPMorgan of not less than $5,000,000 so JPMorgan could sweep his account in the event of a default.

267. <u>One last trip to Hawaii</u>. Having been hit with more than $100 million in principal repurchase and indemnity obligations by February 2007, FMFC knew all too well that its bankruptcy filing was imminent. In an August 14, 2006, email, Matt Thrasher, Deputy General Counsel for FMFC, explained to bankruptcy counsel at Greenberg Traurig that the Directors and Officers were going to request to Lehman on Wednesday, August 16, that Lehman credit bid for the company, and that if Lehman chose not to, FMFC would file for bankruptcy on the following Monday (which it did).

268. On August 15, 2007, Lehman declared in a letter to Malis that it would no longer be purchasing loans from First Magnus and that "all loans in the pipeline will be returned."

According to Lehman's letter, "over the past year" Lehman had been "extremely patient" in "offering First Magnus considerable latitude to resolve all outstanding repurchase and indemnification claims." Lehman's decision did not appear to be based on the "credit crisis" or "collapse of the secondary market," as reported by the Directors and Officers, but rather, because it was "clear that First Magnus does not have the financial ability to resolve these outstanding repurchase and indemnity claims" and the "significant breaches of its obligations under the Loan Purchase Agreement and Aurora Seller's Guide."

269. Despite the grave financial straits FMFC was in as of August 1, 2007, the Directors and Officers nonetheless navigated one last lavish trip to Hawaii on the company's dime. On August 3-6, 2007, the Sullivans used the corporate jets to fly themselves and others to Hawaii, where the Sullivans hosted an all-expense paid trip at an exclusive resort for the top originators of the very loans that led to the housing crisis. While the Sullivans sipped Cristal and enjoyed the sunshine, spending money in ways that would make even the most pampered and precocious movie star blush, the fate of First Magnus' 5,500 employees was sealed — they would be laid off, without warning or their final paychecks, and become creditors of First Magnus.

270. Shortly after receiving Lehman's August 15, letter, the Directors and Officers informed management that FMFC would be filing for bankruptcy protection, and, on August 16, 2007, after the markets closed, FMFC announced that it was no longer originating loans and would be shutting its doors. When First Magnus filed for bankruptcy, more than 5,500 employees lost their jobs nationwide, including approximately 550 Tusconans.

**VI.** **Tipping The Dealer: With Material Non-Public Information Regarding FMFC's Impending Collapse, Insiders Cashed In More Than $13MM In WNS Stock Before Announcing Publicly That FMFC Was Closing Its Doors.**

271. To take full advantage of a "true global, 24x7 software development lifecycle," FMFC partnered with WNS to outsource much of the technical design of the proprietary

projects developed by Debtor. Once FMFC had developed the requirements for a particular project, it would provide high-level technical designs to an off-shore team in India at WNS. The off-shore team would develop detailed design documents and implement the product following the processes and standards set by FMFC. Although all of the off-shore design, development, and testing activities were performed under the supervision of FMFC, most of the quality control processes were performed off-shore by WNS. In 2006, WNS nearly doubled the personnel devoted to FMFC as a result of the growth of FMFC's portfolio of technology in development.

272. Beginning in April of 2007, having already been notified that First Magnus was subject to in excess of $100,000,000 in repurchase obligations, FMCI, FM Consulting, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young, along with Chopra, Lemke, Johnson, Shoemaker, and FM Consulting employees Hutchison, Adil, and Bustamante, all began selling WNS stock. Set forth in the paragraphs below is a summary of their respective WNS stock sales prior to the August 16, 2007, announcement that FMFC was closing its doors.

273. The following trades were made on behalf of FMCI:

| Shares Sold | Date | Average Price | Gross Proceeds |
| --- | --- | --- | --- |
| 5,000 | 4/5/2007 | 27.1412 | 135,706.00 |
| 100,000 | 8/9/2007 | 23.8299 | 2,382,990.00 |
| 113,500 | 8/16/2007 | 23.4207 | 2,658,249.45 |
| | | **Total** | **$5,176,945.45** |

274. The managing members of FM Consulting at the time of the sales referenced below were Jaggi, Sullivan, Sr., and Sullivan, Jr. The following trades were made on behalf of FM Consulting:

| Shares Sold | Date | Average Price | Gross Proceeds |
| --- | --- | --- | --- |
| 6,000 | 4/9/2007 | 27.6303 | 166,141.80 |
| 15,000 | 4/10/2007 | 28.1468 | 422,202.20 |

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 22,708 | 4/17/2007 | 27.7419 | 629,963.07 |
| 1,700 | 4/18/2007 | 27.6100 | 46,937.00 |
| 10,130 | 4/27/2007 | 26.4210 | 267,645.74 |
| 3,000 | 6/5/2007 | 27.2737 | 81,821.10 |
| 8,000 | 6/12/2007 | 28.0030 | 224,024.00 |
| 3,000 | 6/19/2007 | 29.3110 | 87,933.00 |
| 3,000 | 6/20/2007 | 29.5557 | 88,667.10 |
| 4,701 | 7/5/2007 | 28.1754 | 132,452.56 |
| 10,000 | 7/13/2007 | 27.9235 | 279,235.00 |
| 10,000 | 7/24/2007 | 25.5428 | 255,428.00 |
| 5,000 | 7/31/2007 | 25.1998 | 125,999.00 |
| 5,000 | 8/1/2007 | 24.2598 | 121,299.00 |
| 4,400 | 8/6/2007 | 23.0014 | 101,206.16 |
| 600 | 8/7/2007 | 23.0000 | 13,800.00 |
| 5,000 | 8/9/2007 | 23.8000 | 119,000.00 |
| 10,000 | 8/10/2007 | 24.4576 | 244,576.00 |
| 15,000 | 8/13/2007 | 23.9958 | 359,937.00 |
| 4,410 | 8/14/2007 | 23.5176 | 103,712.62 |
| 200 | 8/14/2007 | 25.0000 | 5,000.00 |
| 3,300 | 8/14/2007 | 24.7403 | 81,642.99 |
| 2,500 | 8/15/2007 | 23.7084 | 59,271.00 |
| 1,700 | 8/16/2007 | 25.0000 | 42,500.00 |
| 2,800 | 8/16/2007 | 25.0000 | 70,000.00 |
| 5,000 | 8/16/2007 | 24.1076 | 120,538.00 |
| | | **Total** | **$4,250,932.34** |

275. The following trades were made on behalf of Tom Sullivan, Sr.:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 22,708 | 4/17/2007 | 27.7419 | 629,963.07 |
| 1,700 | 4/18/2007 | 27.6100 | 46,937.00 |
| 10,000 | 7/13/2007 | 27.9235 | 279,235.00 |
| 10,000 | 7/24/2007 | 25.5428 | 255,428.00 |
| 5,000 | 7/31/2007 | 25.1998 | 125,999.00 |
| 5,000 | 8/1/2007 | 24.2598 | 121,299.00 |
| 4,400 | 8/6/2007 | 23.0014 | 101,206.16 |
| 600 | 8/7/2007 | 23.0000 | 13,800.00 |
| 5,000 | 8/9/2007 | 23.8000 | 119,000.00 |
| 5,000 | 8/13/2007 | 23.9958 | 119,979.00 |
| 3,300 | 8/14/2007 | 24.7403 | 81,642.99 |
| 1,700 | 8/16/2007 | 25.0000 | 42,500.00 |
| 2,800 | 8/16/2007 | 25.0000 | 70,000.00 |
| 5,000 | 8/16/2007 | 24.1076 | 120,538.00 |
| | | **Total** | **$2,127,527.22** |

276. The following trades were made on behalf of Tom Sullivan, Jr.;

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 10,000 | 8/10/2007 | 24.4576 | 244,576.00 |
| 10,000 | 8/13/2007 | 23.9958 | 239,958.00 |
| | | **Total** | **$484,534.00** |

277. The following trades were made on behalf of Gary Malis:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 3,000 | 6/19/2007 | 29.3110 | 87,933.00 |
| | | **Total** | **$87,933.00** |

79

278. The following trades were made on behalf of Dominick Marchetti:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 4,701 | 7/5/2007 | 28.1754 | 132,452.56 |
| | | **Total** | **$132,452.56** |

279. The following trades were made on behalf of Randy Hutchison:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 15,000 | 4/10/2007 | 28.1468 | 422,202.00 |
| 10,130 | 4/27/2007 | 26.4211 | 267,645.74 |
| | | **Total** | **$689,847.74** |

280. The following trades were made on behalf of Faisal Adil:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 3,000 | 6/5/2007 | 27.2737 | 81,821.10 |
| | | **Total** | **$81,821.10** |

281. The following trades were made on behalf of Isabel Bustamante:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 6,000 | 4/9/2007 | 27.6903 | 166,141.80 |
| 200 | 8/14/2007 | 25.0000 | 5,000.00 |
| | | **Total** | **$171,141.80** |

282. The following trades were made on behalf of Brett Johnson:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 8,000 | 6/12/2007 | 28.0030 | 224,024.00 |
| 4,410 | 8/14/2007 | 23.5176 | 103,712.62 |
| | | **Total** | **$327,736.62** |

283. The following trades were made on behalf of Phil Shoemaker:

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 3,000 | 6/20/2007 | 29.5557 | 88,667.10 |

| Shares Sold | Date | Average Price | Gross Proceeds |
|---|---|---|---|
| 2,500 | 8/15/2007 | 23.7084 | 59,271.00 |
| | | **Total** | **$147,938.10** |

284. In total, between April 5, 2007, and August 16, 2007, FMFC insiders sold 542,798 shares and received approximately $13,678,809.93. Of those trades, FMFC insiders sold 333,320 shares between August 1, 2007, and August 16, 2007, and received approximately $7,926,204.99. In the 48 hours prior to FMFC's announcement that it was closing its doors, FMFC insiders sold 153,320 shares and received $3,623,578.67.

285. Thrasher, Deputy General Counsel for FMFC, orchestrated the sales of WNS stock. In an August 14, 2006 email to bankruptcy counsel, Thrasher explained that:

> We have an entity called First Magnus Consulting LLC. The members are most of the shareholders of First Magnus, as well as some other senior employees . . . .
>
> FM Consulting owns stock in WNS, the NYSE company. Effectively, each member of FM Consulting has an interest in a portion of the WNS shares . . . .
>
> . . . many of the FM Consulting members are employees who have been at First Magnus a long time. Some of them are not necessarily the highest paid First Magnus employees and their share of **the WNS stock may be a significant part of their nest egg. I don't want that to be put at risk** and wold [sic] like to make sure FM Consulting would be treated as a separate entity in the eent [sic] of bk.

Thrasher knew all too well that FMFC's bankruptcy filing was imminent. Indeed, as Thrasher explained in the same August 14, 2006 email thread, First Magnus was going to request to Lehman on Wednesday, August 16, that it credit bid for the company, and that if Lehman chose not to, FMFC would file for bankruptcy on the following Monday (which it did):

> The preview is that our arrangement with WaMu and CW have not materialized. We are ceasing funding of Alt-A loans effective tomorrow (at WaMu's request). We need to start work on the initial bk docs and on setting up DIP financing.

**Aurora (Lehman) is visiting our office on Wed. We are basically going to ask them to take over the company** and continue operations so we do not have to lay people off. If they're not interested, then we anticipate filing the bk docs as early as Monday.

Prior to the close of trading on August 16, 2007, the news that FMFC was shutting down constituted material, non-public information with respect to WNS. On the morning of Thursday, August 16, 2007, WNS conducted its regularly scheduled earnings call and closed up $1.95 at $24.50.

286. After U.S. markets closed that Thursday, WNS announced that following its earnings call "it was verbally advised by First Magnus Financial Corporation . . . that they expect to stop substantially all work WNS does for them." According to WNS, "First Magnus was expected to account for approximately 5% of WNS's revenue less repair payments for the period 1 July 2007 and 31 March 2008." In no uncertain terms, WNS stated that "this event will have a material adverse impact on its financial performance and the guidance it had issued earlier in the day," and proceeded to revise its net income guidance downward by 60%.

287. The news immediately rattled WNS' shares, which fell 17% on Friday, August 17, 2007, to close at $20.45, and another 7% on Monday, August 20, 2007, to close at $19.12. The price of WNS stock never rebounded and is currently trading at a price per share under $6 as of the date of this Complaint.

**VII. The Re-deal: The Directors And Officers Engaged In Mass Piracy Post-Petition To Jump-Start The "Resurrection And Redemption" Part Of Their "Mortgage Odyssey."**

**A. History Repeating: The Directors and Officers Formed G-Force Within 15 Days of the Bankruptcy Filing and Proceeded to Usurp FMFC's Confidential and Proprietary Information.**

288. Like they did when Mitchell changed hands, the Directors and Officers used FMFC's bankruptcy as an opportunity to form new mortgage companies — ones that were not encumbered by the liabilities associated with the toxic loans they had previously originated through FMFC. Towards that end, the Directors and Officers used the capital and assets

stripped from FMFC to form G Force 1, LLC ("G Force") a mere 15 days into the Bankruptcy Case. Weeks later — and in violation of a Bankruptcy Court order — the Directors and Officers began abandoning key components of Debtor's technical infrastructure to a secured lender's liquidator for the purpose of acquiring the assets on behalf of G Force for cents on the dollar. The Directors and Officers also ensured that the abandoned components contained virtually all of Debtor's proprietary materials needed to jump-start their new companies. Sullivan, Sr. aptly described their new business ventures in the Sullivan, Sr. Manuscript as the "resurrection and redemption part of our mortgage odyssey . . . with a clean and substantial balance sheet."

289. <u>FMFC's Development-IT Program</u>. As of April 2007, FMFC maintained a technology staff of approximately 400, divided primarily between software development (Johnson), application design (Shoemaker), and project management (Comparato). FMFC's technology department was headed by Marchetti, FMFC's Chief Technology Officer.

290. All of the primary systems relating to the mortgage process were designed, built, and maintained in-house by FMFC. The Software Development Lifecycle ("SDLC") utilized by FMFC to develop these systems consisted of five major phases: Prioritization, Discovery, Design, Construction, and Transition. The Priority Phase was an ongoing business advocacy process where information was collected, ideas were exchanged, enhancements were requested, and projects and other initiatives were proposed and then prioritized. The Discovery Phase consisted of merging the gathered business requirements and scope into functional requirements, *e.g.*, business process logic, detailed use cases, field definitions and sequence, data tables, field usage, inter-relationships, formulas, dependencies, conditions, restrictions, range limitations, and user access limitations. In other words, the functional requirements formed in the Discovery Phase laid out "what" FMFC was going to build. The Design Phase defined "how" FMFC was going to build it, what it was going to look like, and how it would technically function, and consisted of project planning, functional design, and technical design.

The Construction Phase consisted of the actual development and testing of the software and both onshore and offshore quality assurance cycles. The Transition Phase consisted of testing, training, and deployment, in preparation for rolling out the product.

291. Debtor's SDLC methodology and the know-how associated with its application were confidential and proprietary information that was a decade in development and a competitive advantage for FMFC in the marketplace. Through it, FMFC delivered software developments in a variety of areas, including, but not limited to, accounting, closing, funding, compliance, human resources, marketing, customer service, pricing, production, product development, risk management, underwriting, and shipping. According to FMFC's May 22, 2007 Technology Report, FMFC also began expanding its Development-IT Program outside its core competencies, taking "on more strategic projects that fuse best of breed technology and practices to fuel the future growth of First Magnus."

292. In addition to the SDLC, Debtor developed and instituted various project management methodologies to oversee the development of its technology. Among other things, FMFC utilized Microsoft Share Point as a collaborative, central documentation repository for all projects in development (the "Share Point Servers"). The Share Point Servers allowed Debtor's stateside and offshore resources to collectively manage the projects in development. Like Debtor's SDLC methodology, Debtor spent considerable time and effort developing its project management infrastructure and internal processes.

293. Some of Debtor's proprietary program applications included FM Online, Loan Tracker, Loan Serve (a loan servicing engine), Launch Marketing Platform, Realtor Portal, *etc*. In 2006, both FMFC and WNS increased its personnel on FMFC projects by 40% as a result of FMFC's growth in its technology portfolio. Prior to the Petition Date, FMFC was generating, on average, 35 software enhancements per week to ensure its ability to remain competitive and ahead of industry standards. FMFC programs in development prior to the Petition Date included business paperless office programs or "BPO" programs, paperless loan processing

294. <u>G Force</u>. On September 6, 2007 — a mere 15 days after FMFC's bankruptcy filing — the Directors and Officers formed G Force 1, LLC. The members of G Force included the following: Jaggi, Sullivan, Jr., Malis, Marchetti, Young, Lemke, Gujral, Johnson, and Shoemaker. Jaggi, Malis, Marchetti, Young, Lemke, Johnson, and Shoemaker were all employed by the Debtor at the time.

295. Even prior to the formation of G Force, the Directors and Officers were conspiring with one another to form G Force and devising a plan to acquire all of Debtor's proprietary assets without paying the Estate for them. The Directors and Officers also sought to engage key personnel from FMFC's software development, application design, and project management teams. Towards that end, Doug Lemke (Debtor's General Counsel) and Matthew Thrasher (a Deputy General Counsel), while they were employed and being paid by the Debtor, actively negotiated employment agreements on behalf of G Force with Brett Johnson (FMFC's Director of Software Development) and Phil Shoemaker (FMFC's Director of Application Design) as early as September 5, 2006. In all, G Force proceeded to solicit and engage all of the key employees from FMFC's software development, application design, and project management teams. At least sixteen of FMFC's technology department personnel entered into an "Employee Assignment of Intellectual Property and Confidentiality Agreement" with G Force on September 5, 2007 – the day before G Force was even formed.

296. All of FMFC's employees, and particularly the employees in the Technology department, were subject to strict confidentiality, non-disclosure, and non-solicitation obligations owed to FMFC, which prohibited the use or disclosure of "confidential information" and other proprietary material outside of FMFC. Specifically, Marchetti, Johnson, Shoemaker, and Lemke all entered Confidentiality Agreements with FMFC dated September 5, 2005 (the

"Confidentiality Agreements"). Each of these Confidentiality Agreements contain the following definition of "Confidential Information":

> The term "*Confidential Information*" shall mean any and all confidential and/or proprietary knowledge, data, information or materials related to the business and activities of the Company, its clients, customers, suppliers and any other entities with whom Company does business including, without limitation, (i) information relating to the Inventions or Works Made for Hire (as defined below); (ii) any information regarding plans for research, development, new products, marketing and selling, business plans, business methods, budgets and financial statements, licenses, prices and costs, suppliers and customers; (iii) information about software programs and subroutines, source and object code, databases criteria, user data, ideas, techniques, inventions, processes, improvements (whether patentable or not), modules, features and modes of operation, internal documentation, works of authorship and technical plans; (iv) any information regarding the strengths and weaknesses, skills and compensation of other employees of the Company; and (v) any information about Company's security, including, without limitation, access codes, passwords, security protocols, system architecture, and/or employee or user identification.

297. A very similar definition of "Confidential Information" was contained in the Employment Agreements between FMFC and Jaggi, Sullivan, Sr., and Sullivan, Jr. (the "Employment Agreements"). Like the Confidentiality Agreements, the Employment Agreements contained strict confidentiality, non-disclosure, and non-solicitation obligations that were owed to FMFC, which prohibited the use or disclosure of "Confidential Information" and other proprietary material outside of FMFC. The Employment Agreements also provided expressly that their terms extended beyond termination.

298. In addition to the Confidentiality Agreements and the Employment Agreements, each FMFC employee signed an acknowledgement to abide by the terms of the FMFC Employee Handbook (the "Employment Handbook Acknowledgment"). The Employee Handbook Acknowledgment prohibited each employee from using or disclosing "Confidential Information" and other proprietary material outside of FMFC, and also provided that these obligations extended beyond termination of their employment.

299.    In addition to the Confidentiality Agreements, Employment Agreements, and Employee Handbook Acknowledgment, First Magnus also adopted a Code of Conduct and Ethics, dated April, 2007, which applied to all of FMFC's directors, officers, and employees ("Code of Conduct").  The Code of Conduct contained a similar definition of "Confidential Information," prohibited the use or disclosure of "Confidential Information" and other proprietary material outside of FMFC, and also provided that these obligations extended beyond termination of their employment.

300.    Lemke and Thrasher drafted G Force employment agreements that G Force employees were required to execute and incorporated the same definitions of "Confidential Information" used by FMFC.  In fact, the electronic histories on the documents confirm that G Force simply copied the form used by First Magnus and conformed it.

**B.**    **The Directors and Officers Abandoned Debtor's Personal Property in Violation of a Bankruptcy Court Order to Permit G-Force and FM Realty to Acquire Debtor's Equipment at Fire Sale Prices and Steal Debtor's Intellectual Property.**

301.    On August 31, 2007, the Debtor filed for a Motion for an Order . . . (c) Establishing Procedures for the Rejection, Sale, or Abandonment of Property ("Motion to Abandon Property") [Docket No. 72].  Among other things, the Debtor sought Bankruptcy Court approval to abandon personal property at the Headquarters as the Directors and Officers saw fit.  The Bankruptcy Court rejected the request in that regard and, in its September 8, 2007, Order . . . (c) Authorizing Rejection and Abandonment of Personal Property, the Bankruptcy Court specifically excluded all Personal Property at the Headquarters, defined as 603 N. Wilmot, and required the Directors and Officers to file a motion on behalf of the Debtor and obtain Bankruptcy Court approval before it could abandoned any of the equipment at the property (the "Bankruptcy Court Order") [Docket No. 142].

302.    After the Bankruptcy Court Order was entered, the members and employees of G Force, many of whom were still employed by the Debtor, proceeded to prepare a spreadsheet

87

identifying key equipment located at the Headquarters that G Force sought to acquire for the purposes of continuing the development of FMFC's technological programs and jump-starting G Force's operations. Marchetti, Johnson, and Shoemaker spearheaded the effort to identify the desired equipment, software, and proprietary materials, which resulted in a spreadsheet reflecting equipment with an aggregate value in excess of $1,500,000 — this figure excluded the value of the software and proprietary material contained thereon. Deputy General Counsel for the Debtor, Mark Yonan, worked hand-in-hand with Marchetti, Johnson, and Shoemaker, to strategize the acquisition and handled the majority of the negotiations with DoveBid, Inc. ("DoveBid"), the liquidator for the secured lender with rights to the collateral. Jaggi, Malis, and Young directed the acquisition, were kept apprised of G Force's efforts to acquire the equipment, and personally participated in the endeavor.

303. The members and employees of G Force sent and received a series of emails to and from one another throughout September 2007 and thereafter regarding the scheme. The members and employees of G Force also sent and received a series of emails to and from representatives of DoveBid and the secured lender with rights to the collateral throughout September 2007 and thereafter regarding G Force's efforts to acquire additional property of Debtor. The members and employees of G Force also communicated telephonically with one another, and with representatives of DoveBid and the secured lender throughout September 2007 and thereafter regarding G Force's efforts to acquire additional property of Debtor. In fact, Yonan stressed his desire to discuss the matters "over the phone" on numerous occasions to avoid documenting evidence related to the transactions.

304. Rather than obtain Bankruptcy Court approval as required by the Bankruptcy Court Order, the RICO Defendants secretly caused FMFC to abandon the items identified on the spreadsheet prepared by G Force without Bankruptcy Court approval, having pre-arranged for G Force to acquire the items identified on the spreadsheet directly from DoveBid. After approximately two weeks of negotiations, Yonan submitted a "final bid list" on September 27,

2007 to DoveBid and G Force acquired approximately $1,500,000 in Debtor's equipment for approximately $120,000. Personnel employed by the Debtor and G Force openly bragged that G Force was able to acquire approximately $1,500,000 worth of computer equipment for less than $200,000. Consistent with their scheme and significantly, this equipment also contained Debtor's proprietary assets for which G Force did not pay a cent.

305. Shoemaker forwarded the email DoveBid sent confirming the sale to Yonan and Shoemaker on September 27, 2007, entitled "FMF Tucson, AZ HQ Offer," to Jaggi, Malis, Marchetti, Young, and Johnson, to which Young responded "Awesome! Thanks guys. Great job!" DoveBid invoiced G Force, c/o Karl Young, for the equipment.

306. G Force would make two additional acquisitions of Debtor's equipment from DoveBid. On October 12, 2007, G Force acquired additional equipment of Debtor's from DoveBid without Bankruptcy Court approval, and again invoiced Young. On December 6, 2007, G Force acquired additional equipment of Debtor's from DoveBid without Bankruptcy Court approval, and again invoiced Young.

307. Equipment abandoned by the Directors and Officer in violation of the Bankruptcy Court Order and for the benefit of G Force included the following:

- Back-up tape drive, library and CommVault software, which left Debtor without the ability to access its back-up tapes and continue to back-up information necessary for the operation of Debtor's business;

- More than 50 servers, including:

    The servers that hosted Loan Tracker;

    The Vault Server, which contained the proprietary source code for Loan Tracker;

    The Share Point Servers, which were the central documentation repository for all technology projects in development by FMFC;

- UPS units, which were needed to protect and secure Debtor's systems;

- Firewall, which was needed to protect and secured Debtor's systems; and

- A litany of desktop computers (100), laptops (20), blackberry phones and other PDA devices (120).

308.    In addition to G Force, FM Realty also acquired some of Debtor's equipment at the Headquarters from DoveBid in violation of the Bankruptcy Court Order.  FM Realty is owned by Sullivan, Sr. and Indus Holdings, which is owned by Jaggi and his wife, Reema Sawhney.  Like the Sullivans, Indus Holdings also holds ownership interests in, *inter alia*, FM Consulting and SW Holding.  FM Realty is managed by Magnus Corp., which is owned by Sullivan, Sr. (President), Sullivan, Jr. (Vice President), and Sabina Sullivan (Sullivan, Sr.'s wife).  On February 1, 2008, Jim Warner, a Deputy General Counsel for Debtor at the time, acquired a plethora of Debtor's equipment, office furniture, and fixtures of behalf of FM Realty without obtaining approval from the Bankruptcy Court.  Among other items, Warner caused FM Realty to acquire several network storage arrays and Storage Area Networks (collectively, "SANs").  Virtually all of the electronic data and files pertaining to Debtor's operation resided on the SANs that were transferred, including:

- All loan data;

- All data residing on the desktops of FMFC personnel;

- All documents on Debtor's WorlDox system;

- All of the accounting records and data utilized by Epicor, Debtor's general ledger software;

- All ADP Payroll information; and

- All email and data from Debtor's Exchange Server.

309.    Yonan also made personal acquisitions of Debtor's property located at the Headquarters in violation of the Bankruptcy Court Order.  On November 2, 2007, while still employed by the Debtor, Yonan personally acquired various equipment of Debtor's from DoveBid without Bankruptcy Court approval.  Yonan resigned as Deputy General Counsel for

Debtor on or about December 31, 2007, as did fellow Deputy General Counsel, Nathan Wright. On or about January 1, 2008, Wright and Yonan formed the law firm of Wright & Yonan, PLLC. On January 3, 2008, Wright & Yonan acquired additional equipment from Debtor through DoveBid without Bankruptcy Court approval.

310. Arvind Sharma also made personal acquisitions of Debtor's property located at the Headquarters in violation of the Bankruptcy Court Order. On December 6, 2007, contemporaneously with an acquisition by Young on behalf of G Force, Sharma personally acquired various equipment of Debtor's from DoveBid without Bankruptcy Court approval.

311. No efforts were made to protect or preserve the proprietary information that was maintained on the systems and equipment sold to G Force, FM Realty, Yonan, Wright & Yonan, or Sharma for the benefit of the Estate. The sales receipts from DoveBid only refer to the equipment, and do not convey any proprietary information that resided on the equipment, which was owned by Debtor. Nonetheless, the Directors and Officers knowingly and deliberately permitted Debtor's property to be abandoned in violation of the Bankruptcy Court Order, and transferred, complete with all of the proprietary information thereon, to G Force, FM Realty, Yonan, Wright & Yonan, and Sharma for pennies on the dollar.

312. The Share Point Servers were of particular value because they contained the numerous technological programs in development by FMFC prior to the bankruptcy. There were more than 50 projects in development in 2007, and another 31 projects in the early stages of development for 2008.

313. The secured lender had no rights to any of the software contained on the equipment transferred to G Force, FM Realty, Yonan, Wright & Yonan, and Sharma. When asked directly by FMFC's IT Operations Director in an October 4, 2007, email, Yonan confirmed that all applicable software licenses on the equipment that was transferred were owned by Debtor — not the secured lender. No consideration was paid to Debtor to transfer

any applicable licenses.  In other words, all of the software contained on each piece of the transferred equipment was pirated by the purchasers.

314.  Software on each of the more than 50 servers that were transferred included Windows Server operating systems, MS SQL, MS Office Project Server, Epicor, Kronos, Cisco Voicemail, MS Sharepoint, and RightFax.  Software on each of the approximately 100 desktop computers and 20 laptops that were transferred included Windows XP, MS Office, MS Project, MS Front Page, MS Visio, and Adobe Professional.  Notably, as early as September 12, 2007 — approximately one week after the formation of G Force — Marchetti and Shoemaker, without Bankruptcy Court approval, attempted (unsuccessfully) to transfer all rights to Debtor's Adobe licenses purchased by FMFC to G Force 1 for no consideration.

### C. The Directors and Officers Formed StoneWater and Transferred G-Force's "Assets" To It.

315.  On December 5, 2007, G Force representatives and other insiders of FMFC formed StoneWater Holding Corporation ("SW Holding").  SW Holding and G Force then entered into an Asset Purchase Agreement, whereby SW Holding acquired all of the assets of G Force in consideration for 3,000 shares of common stock in SW Holding.  Young signed the Asset Purchase Agreement on behalf of both G Force and StoneWater.  "Assets" were defined as the intellectual property, contracts, and lease agreements, and other tangible assets, including all the equipment G Force had acquired in violation of the Bankruptcy Court Order.

316.  The owners of SW Holding, and their approximate ownership percentage when an individual interests are combined with their ownership through G Force, are as follows:

G Force (66.76%);                                 Gujral (5.61%);
Sullivan, Jr. (14.69%);                           Arnold (1.34%);
Young (10.68%);                                   Shivpuri (0.67%);
Indus Holdings (6.68%);                           Indus Ventures (0.67%);
Sullivan, Sr. Revocable Trust (6.68%); and        Warner (0.67%).

317. On December 12, 2007, SW Holding formed StoneWater Technology, LLC ("SW Tech"). On January 31, 2008, SW Holding formed StoneWater Lender Services, LLC ("SW Lender Services"). On January 31, 2008, StoneWater also formed StoneWater BPO, LLC ("SW BPO"). On February 25, 2008, SW Holding formed StoneWater Mortgage Corporation ("SW Mortgage"), which is the operating company.

318. In February 2008 — less than 6 months after filing FMFC into bankruptcy — the StoneWater Entities "officially" began operating out of 603 N. Wilmot. Of course, many of the members and employees of G Force and the StoneWater Entities had never left the Headquarters, as they, in theory, were supposedly still working for the Debtor and its creditors. In all, StoneWater had acquired more than 103 former FMFC employees, predominantly from Debtor's technology, legal, and accounting departments.

319. FM Realty did not assess the StoneWater Entities any rent at first. In July 2008, however, shortly after the Litigation Trust began its investigation, FM Realty and SW Mortgage entered into a lease agreement with respect to 603 N. Wilmot ("StoneWater Lease"). Sullivan, Sr. executed the Lease Agreement on behalf of FM Realty, while Young executed the Lease Agreement on behalf of SW Mortgage. According to the StoneWater Lease, the StoneWater Entities control 97% of the square footage at 603 N. Wilmot for $17 per square foot, including the server room where much of the equipment misappropriated from Debtor resides. In addition to the square footage, the Lease Agreement also provides that FM Realty shall convey to SW Mortgage "title and interest in and to the Office and IT Equipment," which consists of the equipment and furniture FM Realty acquired from DoveBid in violation of the Bankruptcy Court Order.

**D.    StoneWater Misappropriated FMFC's Proprietary Information and Became a "Second Magnus" with "a Clean and Substantial Balance Sheet."**

320. StoneWater's website proclaims that even though StoneWater "is a new face in the national mortgage landscape," it is "built upon over a decade of exceptional operating

history with the résumé of a national top 15 leader." StoneWater also highlights that it is "founded by some of the key personnel from one of the nation's former mortgage and technology leaders" and reports that it "is assembling a winning team of former associates." Using the know-how and methodologies developed over decades at First Magnus, StoneWater proffered its intent "to open in over thirty major metropolitan markets within the next several months" and create "a sales force of several hundred wholesale account executives and retail loan officers." Not surprisingly, emails by and between the Directors and Officers routinely refer to G Force and/or StoneWater as "Second Magnus."

321.   Materials used by StoneWater to solicit outside investment confirm the breadth and depth of StoneWater's misappropriation of Debtor's Confidential Information and the extent to which the StoneWater Entities have been unjustly enriched at Debtor's expense. StoneWater openly acknowledges the financial burdens the Directors and Officers saddled Debtor with, boasting that StoneWater has a "clean balance sheet without being limited by the financial burdens of the past." StoneWater brags about the "9 months" it had "to *re-design* and *re-build* an industry leading mortgage platform" and its "veteran mortgage/development team with the ability to *re-build given domain knowledge and best practices learned over the past 10 years.*" StoneWater also highlights the Improvements to 603 N. Wilmot and the benefits associated with a "$20 million state-of-the-art Head Quarters and operations facility *designed and built specifically for us.*" It is the Debtor, however, not StoneWater, that owns the proprietary materials StoneWater so unabashedly usurped, and Debtor that funded the benefits StoneWater has and will continue to reap from 603 N. Wilmot.

322.   H2Online. When SW Mortgage acquired the "assets" and "employees" of G Force in February 2008, it allegedly included the acquisition of H2Online — a software program StoneWater contends G Force developed in the first 120 days it was formed. StoneWater generically describes H2Online as "a new industry-leading technology platform built specifically for the new market environment . . . with an eye toward the new market

environment and a commitment to exceptional customer service, rapid turn times and cost and operational efficiencies." The two G Force members that allegedly "created" H2Online are Brett Johnson and Phil Shoemaker — Debtor's former Director of Software Development and Director of Application Design, respectively.

323. The work flow, document imaging, loan record, guideline and pricing rules engine, and reports associated with H2Online, as well as the modular aspect of the program, were taken from proprietary programs in development at FMFC prior to the Petition Date. It was not feasible for G Force to develop H2Online from scratch in the 120 days following its formation without utilizing any of Debtor's Confidential Information. To build H2Online, G Force and StoneWater utilized Debtor's know-how, processes, and other proprietary information, to develop and design H2Online, and otherwise misappropriated confidential and proprietary technology already in development at First Magnus prior to its bankruptcy filing.

324. Specifically, H2Online misappropriated at least two projects in development by FMFC as of the Petition Date — the Business Paperless Office Initiative ("BPO Initiative") and the Paperless Underwriting Project ("Paperless U/W"). On November 11, 2006, FMFC kicked-off the BPO Initiative and the Paperless U/W projects. The FMFC employees that were involved in the development and design of these two projects were and/or are all employed by G Force/StoneWater, or their affiliates, and include:

| Young; | Emily Vondrak; |
|---|---|
| Marchetti; | Bustamante |
| Comparato; | Nandan |
| Shoemaker; | Adil (FM Consulting); and |
| Chopra; | Dupreet Bohla (FM Consulting) |

325. While employed by FMFC, this group had regular meetings, kept minutes, and project updates, which they marked "Confidential." The BPO Initiative and the Paperless U/W project were both in the Discovery Phase of development as of the Petition Date. All of the materials related to the development of these two projects were kept on Debtor's Share Point

95

Servers, which, in September 2007, the Directors and Officers caused to be transferred to G Force in violation of the Bankruptcy Court Order. Materials used by StoneWater to solicit outside investors describe the components of H2Online in terms virtually identical to the BPO Initiative and Paperless U/W projects.

326. H2Online's imaging platform is designed so that documents can be automatically associated with a loan record through a direct up-load or by the sending of a fax with a bar-coded cover sheet that would allow the system to automatically associate the image to the appropriate loan, package, or folder. The removal of paper from the underwriting process utilizing a bar-coded facsimile is alleged to be a core component of H2Online. Through email attachments (because Debtor does not have access to its Share Point Servers), the Litigation Trustee discovered that FMFC had developed bar-coded cover sheets for facsimiles to accomplish the objectives claimed by H2Online, and were on Version 7 of the development of that particular technology as of July 11, 2007 — approximately one month before FMFC filed for bankruptcy. Debtor's development of the bar-coded fax sheets were in the Construction Phase as of the Petition Date, and is an application that G Force, StoneWater, and their members and employees have misappropriated, in whole or in part, from Debtor.

327. <u>Guardian Integration</u>. In addition to H2Online, StoneWater also announced a Guardian Integration project to use in conjunction with H2Online. In a June 9, 2008 press release entitled "New National Wholesale Lender, StoneWater Mortgage, Selects Guardian Mortgage Documents," StoneWater announced that "H2Online will use web services to leverage seamless data transfer into GMD's system for fully automated loan document generation."

328. FMFC had undertaken the same Guardian Integration project, which was in development prior to the Petition Date. The proprietary materials related to the development of the Guardian Integration project were also located on Debtor's Share Point Servers, which the

Directors and Officers caused to be transferred to G Force and StoneWater in violation of the Bankruptcy Court Order.

329. <u>CORE LOGIC and MERS</u>. Marketing materials for StoneWater claim that StoneWater has built "new systems and procedures" that are "built into the new platform" to "further mitigate risk of fraud and to monitor loan quality and broker behavior," and cite to system integration with CORE LOGIC to "maintain a consistent and rigorous control environment relative to broker behavior and loan quality" and MERS — Electronic Recording Service. Both of these projects were in the SDLC pipeline at FMFC as of the Petition Date. The proprietary materials related to the development of these two projects were also located on Debtor's Share Point Servers, which the Directors and Officers caused to be transferred to G Force and StoneWater in violation of the Bankruptcy Court Order.

330. <u>Mindbox and Mavent</u>. FMFC began expanding its Development-IT Program prior to the Petition Date, taking "on more strategic projects that fuse best of breed technology and practices to fuel the future growth of First Magnus." Two "best of breed" technologies Debtor had researched and otherwise undertaken to integrate into the loan process to add greater functionality to their practices were Mindbox, a pricing and product finder utilizing technology found in Fannie's DU and Countrywide's CLUES automated underwriting systems, and Mavent, a compliance management system. Debtor spent significant resources to research and analyze the integration of these two systems, along with competing products, which StoneWater misappropriated in the development of H2Online and other projects.

331. <u>Mass Piracy</u>. The extent of the Directors and Officers misappropriation of Debtor's Confidential Information and proprietary materials is vast and a continuing endeavor. The misappropriation of the BPO Initiative, the Paperless U/W project, the bar-coded facsimile technology, the Guardian Integration project, the CORE LOGIC and MERS projects, and Mindbox and Mavent integration projects, are but a few of the proprietary projects misappropriated by G Force and StoneWater.

332.    In addition to the projects themselves, the Directors and Officers, G Force, StoneWater, and the members and employees identified in this Complaint, have also misappropriated the methodologies and know-how Debtor spent decades developing, perfecting, and protecting, such as the SDLC, application design protocols, and project management processes.  As a result of their misdeeds, G Force and StoneWater have saved enormous start-up costs at Debtor's expense, and continue to unjustly reap the benefits from Debtor's assets.

333.    Moreover, virtually all of Debtor's electronic information, proprietary materials, and software are at StoneWater's fingertips and are being used in its business — for which Debtor has never been compensated.  This provides enormous savings for StoneWater and enables it to overcome significant entry barriers to the mortgage business that otherwise exist.  StoneWater has utilized Debtor's assets across a wide spectrum of operations, including, but not limited to, the areas of accounting, loan closing, loan funding, compliance, human resources, marketing, customer service, pricing, production, product development, risk management, underwriting, and shipping.  By way of example, the G Force Operating Agreement was copied electronically from a July 12, 2004 Operating Agreement for FMFC that Debtor had paid the law firm of Bryan Cave to prepare.  SW Holding's Private Placement Memorandum was taken electronically from a document the law firm of Snell & Wilmer provided to FMFC on April 29, 2004.  All of the G Force Employment and Confidentiality Agreements were copied electronically from those that had been prepared by the law firm of Greenberg Traurig for FMFC.  These are but a few illustrative examples in which Debtor's former Directors and Officers have simply usurped materials of the Debtor without any consideration for use in the operation of StoneWater.

334.    Failure to Market LoanTracker and Other Technology.  Notably, once Debtor filed for bankruptcy, the Directors and Officers deliberately failed to market the nationally recognized LoanTracker system, or the other programs it had developed.  To ensure nothing was done in this regard, the Directors and Officers appointed Arvind Sharma to market such

assets.  Sharma had no experience in such matters and engaged in no such efforts.  Sharma never attempted to locate the source code for LoanTracker, which resided on the Vault server transferred to G Force and/or StoneWater, and never attempted to locate the source-code repository, which required restoration from Debtor's back-up tapes — a process made more difficult by the transfer of Debtor's back-up tape library and CommVault software.  These are the very assets for which Sharma was employed to market, and they were never preserved.

335.    Young initially made an unsolicited offer of $25,000 to acquire LoanTracker. Rather than pursue the offer, the Directors and Officers elected to abandon Debtor's property and permit it to be transferred to their newly formed entities without protecting or preserving any of the information thereon.  The Directors and Officers intentionally chose not to protect or preserve Debtor's proprietary information for the purposes of procuring it for their own accord and continuing their "mortgage odyssey," "with a clean and substantial balance sheet."

**E.    The Directors and Officers Abandoned Ecloser and Assisted in the Misappropriation of its Proprietary Materials.**

336.    Ecloser is a limited liability company that was formed in February of 2005 by FMFC and Sullivan, Sr.'s company, TSAA.  Ecloser operated from the 603 N. Wilmot. Ecloser's primary asset was its "web-based software platform for the title insurance and settlement services industry" (the "Ecloser System").  The Ecloser System had been in development for some time prior to FMFC's bankruptcy filing.  As Sullivan, Sr. explained in the Sullivan, Sr. Manuscript, "for more than a year, we have developed a software program called Ecloser, which, when installed with Loan Tracker, should support our vendor management system."

337.    A group of former FMFC insiders have formed new "Ecloser" entities, and misappropriated the research and development related to the Ecloser System.  On February 8, 2008, Ecloser, Inc., was formed, and on May 2, 2008, Ecloser Services, Inc. ("ECSI") was

formed. ECSI was incorporated by the law firm of Wright & Yonan, both of which were Deputy General Counsel for FMFC as of December 31, 2007.

338. Two directors identified to date for ECS are also former FMFC employees. Jim Warner, a former Deputy General Counsel for FMFC, is identified as the Secretary of ECSI. Vivek Shivpuri is identified as a Director of ECSI.

339. Like Ecloser, the New Ecloser Entities operate from the 603 N. Wilmot. The new Ecloser Entities share the server room with the StoneWater Entities and had unfettered access to Debtor's electronic data and systems. According to ECSI, this "new" company provides a web-based "software program to provide an end-to-end turn-key back-office services for title and escrow companies." This is the very program that FMFC was developing through Ecloser, LLC. The New Ecloser Entities have misappropriated research and development related to the project, and usurped it for its own post-petition purposes.

340. The New Ecloser Entities were formed as part of a strategy to try and insulate Magnus Corp., TSAA, Magnus Settlement Services, LLC, Sullivan Title Investment, LLC, Wright, Yonan, Warner, Shivpuri, Birdsall, and others from claims they believed the Litigation Trust would undoubtedly bring against them related to the misappropriation of the Ecloser System. Specifically, Joel Herk, employed by the Debtor at the time, contacted Wright on or about February 1, 2008, and raised concerns that the Litigation Trust may discover the misappropriation of the Ecloser System. In response, Wright, whose new firm, Wright & Yonan, were representing parties adverse to the Debtor (namely, Magnus Corp., TSAA, or other affiliated persons or entities), informed Herk in a February 1, 2008, email entitled "Title and Escrow Software," that FMFC contributed no less than $500,000 towards the development of the Ecloser System and outlined facts suggesting that Magnus Settlement Services, LLC, which is managed by Birdsall, misappropriated the Ecloser System and licensed it on behalf of MSS to Home Services of America, Inc. Wright also informed Herk that MSS is believed to have later assigned the licensing agreement to Magnus Corporation. In addition to Herk, Wright copied

Shivpuri, Warner, and Yonan on his email. Approximately one week later, Wright & Yonan formed Ecloser, LLC. All of these emails were sent in furtherance of the fraudulent scheme to acquire Debtor's proprietary assets without paying for them.

  **F. While Employed By The Debtor, Herk Actively Assisted In The Misappropriation Of Debtor's Assets And Conspired Against The Litigation Trust.**

  341. Joel Herk was employed by the Debtor as Deputy General Counsel prior to the Petition Date and through April 30, 2008, and, thereafter, was employed in the same capacity by the Liquidation Trust. Herk is currently employed by StoneWater in a similar capacity. In addition to participating in the misappropriation of the Ecloser Software, Herk engaged in a course of conduct throughout the post-petition period that was adverse to the Debtor.

  342. The "Conflict Waiver." On or about March 26, 2008, while actively employed by the Debtor, Herk was contacted by G. Todd Jackson ("Jackson") of McNamara, Goldsmith, Jackson & Macdonald, P.C., which had represented FMFC on numerous matters in the past, including matters that were pending as of the Petition Date. According to Jackson, he had been contacted by some of the Directors and Officers about representing them in response to litigation they anticipated would be brought against them by the Litigation Trust and requested that Herk identify any "adverse" parties to the Directors and Officers. This was not the first time Jackson had been requested to defend the Directors and Officers against allegations that they misappropriated Confidential Information. Jackson was with the law firm of Rusing & Lopez, PLLC, when it defended FMFC against the Mitchell Litigation.

  343. In response to Jackson's request, Herk identified "Larry Lattig: Litigation Trustee," the "Unsecured Creditor Committee," and the "Advisory Board" as "adverse parties." Shortly thereafter, on March 31, 2008, Herk received an email from Jaggi, inquiring how to best defend claims brought against the Directors and Officers by the Litigation Trust. Over the course of the next month, Herk assisted Jaggi, and others, in formulating defenses to claims they believed the Litigation Trust would bring against the Directors and Officers.

344.    On May 1, 2008 — the date the Plan went Effective — Jackson sent a letter to Herk confirming that Herk had advised Jackson that Herk had "conferred with the future trustees" and that they "have agreed to waive the conflict" (the purported "Conflict Waiver"). Herk made no effort to confer with the Litigation Trust regarding Jackson's request for a conflict waiver and the Litigation Trust has never agreed to waive any such conflict.

345.    Jackson knew Herk had not conferred with the Litigation Trust and that Herk lacked the requisite authority to provide consent to the Conflict Waiver, but nonetheless proceeded to undertake the representation of StoneWater, Jaggi, Malis, Marchetti, and Young. Jackson made no effort to contact the Litigation Trustee directly, or through his counsel. As of May 1, 2008, or shortly thereafter, Herk became a full-time employee of StoneWater and continues to work as an attorney in its legal department. Jackson also hired Jessica Hogan, a former paralegal with Debtor who still had access to Debtor's systems, to assist him in his representation of StoneWater and the Directors and Officers. Through Hogan and employees at StoneWater, like Herk, Jackson proceeded to search, copy, analyze, and review Debtor's documents in preparation of his defense of StoneWater and the Directors and Officers without notifying the Litigation Trust.

346.    The Shred Order.  On Tuesday, June 3, 2008, Herk executed a "Shred Order" with Iron Mountain on behalf of Debtor with respect to some of Debtor's files located at 603 N. Wilmot.  The "Shred Order" was executed one business day after a "strategy session" conducted by the Directors and Officers at 603 N. Wilmot, and their outside counsel, regarding the claims they anticipated the Litigation Trust may bring against the Directors and Officers.  Jackson, Herk, Warner, and others participated in the "strategy session" with the Directors and Officers. Documents identified for destruction included accounting records and other files pertinent to the investigation being conducted by the Litigation Trust.

# THE CLAIMS

## PRE-PETITION CLAIMS

### COUNTS 1-6: THE SULLIVAN, SR. REDEMPTION ($55MM)

**Count 1:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI.**

347.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as if fully set forth therein.

348.    On August 24, 2006, within one year of the Petition Date, Debtor transferred approximately $55 million to Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust.

349.    The Sullivan, Sr. Redemption transferred an interest of Debtor in property.

350.    Debtor made the transfer with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

351.    Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $55 million from Sullivan, Sr., the Sullivan Sr. Revocable Trust, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI.

352.    Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 2:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI.**

353.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

354.    On August 24, 2006, within one year of the Petition Date, Debtor transferred approximately $55 million to Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust.

355.    The Sullivan, Sr. Redemption transferred an interest of Debtor in property.

356. Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

357. Debtor made the transfer at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was otherwise unreasonably small in relation to the Debtor's business.

358. Through the transfer, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

359. Debtor received less than fair or reasonably equivalent value in exchange for the Sullivan, Sr. Redemption.

360. As a result of the transfer, Debtor and its creditors have been harmed.

361. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer related to the Sullivan, Sr. Redemption and recover approximately $55 million from Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI.

362. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 3:** **Breach of Fiduciary Duty against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and the other Directors and Officers.**

363. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

364. On August 24, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its

probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

365.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

366.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Sullivan, Sr. Redemption.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Sullivan, Sr. Redemption to the creditors of Debtor on or before the time the transaction occurred.

367.    As a result of the Directors' and Officers' breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

368.    The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 4:**      **11 U.S.C. § 547(b) Avoidable Preference against Sullivan, Sr., the Sullivan, Sr. <u>Revocable Trust, the other Directors and Officers, and FMCI.</u>**

369.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

370. On August 24, 2006, within one year of the Petition Date, Debtor transferred approximately $55 million to Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust.

371. The Sullivan, Sr. Redemption transferred an interest of Debtor in property.

372. Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

373. The transfer was made to satisfy an alleged antecedent debt owed by Debtor to Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust prior to the time the transfer was made.

374. At the time the transfer was made, Sullivan, Sr., and the Sullivan, Sr. Revocable Trust, were "insider(s)" as that term is defined by 11 U.S.C. § 101(31).

375. Debtor's transfer enabled Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made.

376. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $55 million from Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 5: Unjust Enrichment against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI.**

377. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

378. Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI have obtained and received funds in the form of the Sullivan, Sr. Redemption or otherwise received a benefit that in justice and equity belong to the Debtor.

379. Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI, were each enriched by the payment of the Sullivan, Sr. Redemption.

380. The payment of the Sullivan Redemption impoverished Debtor.

381. Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI, were directly enriched by the funds Debtor transferred in the form of the Sullivan, Sr. Redemption.

382. There is no justification for the enrichment of Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI.

383. Debtor lacks an adequate legal remedy to recover the amounts in which Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI have been unjustly enriched by the Sullivan, Sr. Redemption.

384. Debtor is entitled to recover all amounts in which Sullivan, Sr., the Sullivan, Sr. Revocable Trust, the other Directors and Officers, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 6:      Constructive Trust against Sullivan, Sr. and the Sullivan, Sr. Revocable Trust.**

385. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1- 346 as fully set forth therein.

386. On August 24, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

387. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-

107

dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

388.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Sullivan, Sr. Redemption.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Sullivan, Sr. Redemption to the creditors of Debtor on or before the time the transaction occurred.

389.    The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out the Sullivan, Sr. Redemption was unconscionable.  Further, the transfer of the Sullivan, Sr. Redemption was made with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

390.    As such, the $55,000,000 acquired by Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust through the Sullivan, Sr. Redemption was the result of unconscionable conduct and fraud (actual and/or constructive).  It would therefore be inequitable to allow them to retain the benefits of the Sullivan, Sr. Redemption.  Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Sullivan, Sr. Redemption and the immediate return of this property from Sullivan, Sr. and/or the Sullivan, Sr. Revocable Trust.  Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

## COUNTS 7-12: THE GAYLORD REDEMPTION ($5.5MM)

**Count 7:     A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against Gaylord, the other Directors and Officers, and FMCI.**

391.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

392.     On January 7, 2007, within one year of the Petition Date, Debtor transferred approximately $5,500,000 to Gaylord.

393.     The Gaylord Redemption transferred an interest of Debtor in property.

394.     Debtor made the transfer with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

395.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $5,500,000 from Gaylord, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI.

396.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 8:     A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against Gaylord, the other Directors and Officers, and FMCI.**

397.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

398.     On January 7, 2007, within one year of the Petition Date, Debtor transferred approximately $5,500,000 to Gaylord.

399.     The Gaylord Redemption transferred an interest of Debtor in property.

400.     Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

401.     The transfer was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was otherwise unreasonably small in relation to the Debtor's business.

402. Through the transfer, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

403. Debtor received less than fair or reasonably equivalent value in exchange for the Gaylord Redemption.

404. As a result of the transfer, Debtor and its creditors have been harmed.

405. Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $5,500,000 from Gaylord, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI.

406. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 9:** **Breach of Fiduciary Duty against Gaylord and the other Directors and Officers.**

407. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

408. On January 7, 2007, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

409. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

410. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the

Gaylord Redemption. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Gaylord Redemption to the creditors of Debtor on or before the time the transaction occurred.

411. As a result of the Directors' and Officers' breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

412. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial..

**Count 10:    11 U.S.C. § 547(b) Avoidable Preference against Gaylord, the other Directors <u>and Officers, and FMCI.</u>**

413. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

414. On January 7, 2007, within one year of the Petition Date, Debtor transferred approximately $5,500,000 to Gaylord.

415. The Gaylord Redemption transferred an interest of Debtor in property.

416. Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

417. The Gaylord Redemption was made to satisfy an alleged antecedent debt owed by Debtor to Gaylord prior to the time the transfer was made.

418. At the time the transfer was made, Gaylord was an "insider" as that term is defined by 11 U.S.C. § 101(31).

111

419.     Debtor's transfer enabled Gaylord to receive more than he would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made.

420.     Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $5,500,000 from Gaylord, the other Directors and Officers who approved or otherwise permitted or participated in the transfer, and FMCI.  Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 11:     Unjust Enrichment against Gaylord, the other Directors and Officers, and FMCI.**

421.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

422.     Gaylord, the other Directors and Officers, and FMCI have obtained and received funds in the form of the Gaylord Redemption or otherwise received a benefit that in justice and equity belong to the Debtor.

423.     Gaylord, the other Directors and Officers, and FMCI were each enriched by the payment of the Gaylord Redemption.

424.     The payment of the Gaylord Redemption impoverished Debtor.

425.     Gaylord, the other Directors and Officers, and FMCI were directly enriched by the Gaylord Redemption.

426.     There is no justification for the enrichment of Gaylord, the other Directors and Officers, and FMCI.

427.     Debtor lacks an adequate legal remedy to recover the amounts in which Gaylord, the other Directors and Officers, and FMCI, have been unjustly enriched by the Gaylord Redemption.

428.     Debtor is entitled to recover all amounts in which Gaylord, the other Directors and Officers, and FMCI have been unjustly enriched, which shall be determined by the trier of

fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 12:** <u>**Constructive Trust against Gaylord.**</u>

429. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1- 346 as fully set forth therein.

430. On January 7, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

431. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

432. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Gaylord Redemption. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Gaylord Redemption to the creditors of Debtor on or before the time the transaction occurred.

433. The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out the Gaylord Redemption was unconscionable. Further, the transfer of the Gaylord Redemption was made with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

434. As such, the $5,500,000 acquired by Gaylord through the Gaylord Redemption was the result of unconscionable conduct and fraud (actual and/or constructive). It would therefore be inequitable to allow him to retain the benefits of the Gaylord Redemption.

113

Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Gaylord Redemption and the immediate return of this property from Gaylord. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

<u>COUNTS 13-17: THE THOMAS REDEMPTION ($9MM)</u>

**Count 13:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer <u>Against Thomas and the Directors and Officers.</u>**

435. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

436. On January 3, 2006, Debtor transferred approximately $9,000,000 to Thomas.

437. The Thomas Redemption transferred an interest of Debtor in property.

438. Debtor made the transfer with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

439. Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $9,000,000 from Thomas and from the Directors and Officers who approved or otherwise permitted or participated in the transfer.

440. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 14:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer <u>Against Thomas and the Directors and Officers.</u>**

441. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

442. On January 3, 2006, within one year of the Petition Date, Debtor transferred approximately $9,000,000 to Thomas.

443. The Thomas Redemption transferred an interest of Debtor in property.

444. Debtor made the transfer to Thomas at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

445. The transfer was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

446. Through the transfer, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

447. Debtor received less than fair or reasonably equivalent value in exchange for the Thomas Redemption.

448. As a result of the transfer, Debtor and its creditors have been harmed.

449. Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer and recover approximately $9,000,000 from Thomas and from the Directors and Officers who approved or otherwise permitted or participated in the transfer.

450. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 15:**      **Breach of Fiduciary Duty Against Thomas and the Directors and Officers.**

451. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

452. On January 3, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

453. Consequently, Thomas and the other Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of

loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

454.     Thomas and the other Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Thomas Redemption.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Thomas Redemption to the creditors of Debtor on or before the time the transaction occurred.

455.     As a result of the breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

456.     The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 16:     <u>Unjust Enrichment against Thomas.</u>**

457.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

458.     Thomas obtained and received funds in the form of the Thomas Redemption that in justice and equity belong to the Debtor.

459.     Thomas was enriched by the payment of the Taylor Redemption.

460.     The payment of the Thomas Redemption impoverished Debtor.

461. Thomas was directly enriched by the payment of the Thomas Redemption by Debtor to Thomas.

462. There is no justification for the enrichment of Thomas.

463. Debtor lacks an adequate legal remedy to recover the amounts in which Thomas has been unjustly enriched.

464. Debtor is entitled to recover all amounts in which Thomas has been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 17:** **Constructive Trust against Thomas.**

465. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

466. On January 3, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

467. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

468. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Thomas Redemption. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Thomas Redemption to the creditors of Debtor on or before the time the transaction occurred.

469.    The conduct of the Directors and Officers orchestrating, authorizing, and carrying out the Thomas Redemption was unconscionable.  Further, the transfer of the Thomas Redemption was made with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

470.    As such, Thomas acquired the Thomas Redemption as a result of fraud (actual and/or constructive) and unconscionable conduct.  It would therefore be inequitable to allow him to retain the benefits of the Thomas Redemption.  Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Thomas Redemption and the immediate return of this property from Thomas.  Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

## COUNTS 18-23:  THE OFFICER BONUSES ($50MM)

**Count 18:    A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers.**

471.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

472.    From January 2005 to the Petition Date, Debtor transferred approximately $50,000,000 to the Directors and Officers in the form of bonuses.  Approximately $20,000,000 in bonuses were transferred to the Directors and Officers during the one year period prior to the Petition Date.  Approximately $42,000,000 in bonuses were transferred to the Directors and Officers during the two-year period prior to the Petition Date.

473.    The Officer Bonuses transferred an interest of Debtor in property to the Directors and Officers.

474.    Debtor made the transfers to the Directors and Officers with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

475.    Pursuant to A.R.S. §44-1009(A)(1) and 1 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfers to the Directors and Officers and recover approximately $50,000,000 from the Directors and Officers who received, approved or otherwise permitted or participated in the transfers.

476.    Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 19:    A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers.**

477.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

478.    From January 2005 to the Petition Date, Debtor transferred approximately $50,000,000 to the Directors and Officers in the form of bonuses. Approximately $20,000,000 in bonuses were transferred to the Directors and Officers during the one year period prior to the Petition Date. Approximately $42,000,000 in bonuses were transferred to the Directors and Officers during the two-year period prior to the Petition Date.

479.    The Officer Bonuses transferred an interest of Debtor in property to the Directors and Officers.

480.    Debtor made the transfer of the Officer Bonuses at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

481.    At the times of the transfers, the Directors and Officers were "insider[s]" as that term is defined by 11 U.S.C. § 101(31). Debtor's transfer of the Officer Bonuses was made to or for the benefit of an insider, and what, if any, obligations Debtor incurred to pay such Officer Bonuses were to or for the benefit of an insider, under alleged employment contracts, and not in the ordinary course of business.

482.    The Officer Bonuses were each made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining

with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

483.    Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

484.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of the Officer Bonuses to the Directors and Officers.

485.    As a result of Debtor's transfer of over $50,000,000 in Officer Bonuses, Debtor and its creditors have been harmed.

486.    Pursuant to A.R.S. §44-1009(A) and 1 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of the Officer Bonuses to the Directors and Officers and recover approximately $50,000,000 from the Directors and Officers who received, approved, or otherwise permitted or participated in the transfers.

487.    Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 20:**      <u>**Breach of Fiduciary Duty against the Directors and Officers.**</u>

488.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

489.    From January 2005 through the Petition Date, Debtor was, at all times, insolvent. Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

490.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair

and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

491.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of the Officer Bonuses.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of the Officer Bonuses to the creditors of Debtor on or before the time the transactions occurred.

492.    As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

493.    The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 21:       11 U.S.C. § 547(b) Avoidable Preference against the Directors and Officers.**

494.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

495.    During the one year period prior to the Petition Date, Debtor transferred approximately $20,000,000 in Officer Bonuses to the Directors and Officers.

496.    The Officer Bonuses transferred an interest of Debtor in property to the Directors and Officers.

497.    Debtor made the transfers of the Officer Bonuses at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

498. The transfer of the Officer Bonuses was made to satisfy an alleged antecedent debt owed by Debtor to the Directors and Officers prior to the time the transfer was made.

499. At the time the Officer Bonuses were transferred by Debtor, the Directors and Officers were "insider[s]" as that term is defined by 11 U.S.C. § 101(31).

500. Debtor's transfer of the Officer Bonuses enabled the Directors and Officers to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made.

501. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfer of approximately $20,000,000 in Officer Bonuses made to the Directors and Officers during the one year period prior to the Petition Date and recover the same from the Directors and Officers who received, approved, or otherwise permitted or participated in the transfers. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 22:** <u>**Unjust Enrichment against the Directors and Officers.**</u>

502. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

503. The Directors and Officers have obtained and received funds in the form of Officer Bonuses that in justice and equity belong to the Debtor.

504. Each of the Directors and Officers were enriched by the payment of Officer Bonuses.

505. The payment of the Officer Bonuses impoverished Debtor.

506. Each of the Directors and Officers that received the Officer Bonuses were directly enriched by the funds Debtor transferred to them in the form of Officer Bonuses.

507. There is no justification for the enrichment of the Directors and Officers. The pre-tax net profits on which the Officer Bonuses were allegedly based were grossly overstated. When calculated properly, there were no pre-tax net profits generated by Debtor, and thus no

basis for any of the Officer Bonuses paid to the Directors and Officers. In addition, the Officer Bonuses were grossly disproportionate to the value of services provided by the Directors and Officers, and failed to take into consideration Debtor's need to retain capital.

508. Assuming *arguendo* that the pre-tax net profit calculations prepared by the Directors and Officers were correct, the Officer Bonuses were still egregiously excessive because they were never reconciled to account for the enormous losses suffered by Debtor.

509. In any event, Debtor never had any obligation to pay any of the Officer Bonuses to the Directors and Officers.

510. In addition to the Officer Bonuses, the Directors and Officers were also enriched by "other" self-interested transactions. Debtor was impoverished by the "Other" Self-Interested Transactions that were made to the Directors and Officers. There is a direct connection between these payments to the Directors and Officers and the corresponding impoverishment suffered by the Debtor.

511. The Officer Bonuses and the "Other" Self-Interested transactions were not made in the ordinary course of business and lack any adequate justification.

512. Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers have been unjustly enriched by the Officer Bonuses and "Other" Self-Interested Transactions.

513. Debtor is entitled to recover all amounts in which the Directors and Officers have been unjustly enriched, which shall be determined by the trier of fact.

514. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 23:**     **Constructive Trust against the Directors and Officers.**

515. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1- 346 as fully set forth therein.

516.    From January 2005 through the Petition Date, Debtor was insolvent.  Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

517.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

518.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out payment of the Officer Bonuses and "Other" Self-Interested Transactions.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Officer Bonuses and "Other" Self-Interested Transactions to the creditors of Debtor on or before the time the transactions occurred.

519.    The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out payment of the Officer Bonuses and "Other" Self-Interested Transactions was unconscionable.  Further, payments of the Officer Bonuses and "Other" Self-Interested Transactions were made by Debtor with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

520.    As such, the Directors and Officers acquired the Officer Bonuses and "Other" Self-Interested Transactions as a result of unconscionable conduct and fraud (actual and/or constructive).  It would therefore be inequitable to allow them to retain the benefits of the Officer Bonuses and "Other" Self-Interested Transactions.  Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Officer Bonuses and "Other" Self-Interested

Transactions, and the immediate return of this property from the Directors and Officers. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 24-29: SHAREHOLDER DISTRIBUTIONS ($37MM)

**Count 24:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers.**

521. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

522. During the two years preceding the Petition Date, Debtor transferred an amount in excess of $36,500,000 in Shareholder Distributions to the Directors and Officers.

523. The Shareholder Distributions transferred to the Directors and Officers were an interest of Debtor in property.

524. Debtor made the transfers of the Shareholder Distributions to the Directors and Officers with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

525. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of the Shareholder Distributions and is entitled to recover in excess of $36,500,000 in Shareholder Distributions from the Directors and Officers who received, approved, or otherwise permitted or participated in the transfers.

526. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 25:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers.**

527. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

528. During the two years preceding the Petition Date, Debtor transferred in excess of $36,500,000 in Shareholder Distributions.

125

529.     The Shareholder Distributions transferred to the Directors and Officers were an interest of Debtor in property.

530.     Debtor transferred the Shareholder Distributions at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

531.     At the times of the transfers, the Directors and Officers were "insider[s]" as that term is defined by 11 U.S.C. § 101(31).  Debtor's transfer of the Shareholder Distributions were made to or for the benefit of an insider, and what, if any, obligations Debtor incurred to pay such Shareholder Distributions were to or for the benefit of an insider under alleged employment contracts and not in the ordinary course of business.

532.     The Shareholder Distributions were each made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

533.     Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

534.     Debtor received less than fair or reasonably equivalent value in exchange for making the Shareholder Distributions to the Directors and Officers.

535.     As a result of these transfer, Debtor and its creditors have been harmed.

536.     Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of the Shareholder Distributions to the Directors and Officers and recover in excess of $36,500,000 from the Directors and Officers who received, approved, or otherwise permitted or participated in the transfers.

537.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 26:**     <u>**Breach of Fiduciary Duty against the Directors and Officers**</u>.

538.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

539.     From January 2005 through the Petition Date, Debtor was insolvent.  Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

540.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

541.     The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of the Shareholder Distributions.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the payment of the Shareholder Distributions to the creditors of Debtor on or before the time the transactions occurred.

542.     As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

543.     The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter

**Count 27:** **11 U.S.C. § 547(b) Avoidable Preference against the Directors and Officers.**

544. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

545. During the one year period prior to the Petition Date, Debtor transferred approximately $25,000,000 in Shareholder Distributions to the Directors and Officers.

546. The Shareholder Distributions transferred to the Directors and Officers were an interest of Debtor in property.

547. The transfers were made at a time when Debtor was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

548. The transfers were made to satisfy an alleged antecedent debt owed by Debtor to the Directors and Officers prior to the time the transfer was made.

549. At the time the Shareholder Distributions were transferred by Debtor, the Directors and Officers were "insider[s]" as that term is defined by 11 U.S.C. § 101(31).

550. Debtor's transfer of approximately $25,000,000 in Shareholder Distributions during the one year period preceding the Petition Date enabled the Directors and Officers to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made.

551. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers to the Directors and Officers and recover approximately $25,000,000 from the Directors and Officers who received, approved, or others permitted or participated in the transfers. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 28:**     **Unjust Enrichment against the Directors and Officers.**

552. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

553. The Directors and Officers have obtained and received funds in the form of the Shareholder Distributions that in justice and equity belong to the Debtor.

554. Each of the Directors and Officers were enriched by the payment of the Shareholder Distributions.

555. The payment of the Shareholder Distributions impoverished Debtor.

556. Each of the Directors and Officers that received the Shareholder Distributions were directly enriched by the funds Debtor transferred to them in the form of the Shareholder Distributions.

557. There is no justification for the enrichment of the Directors and Officers.

558. Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers have been unjustly enriched by the Shareholder.

559. Debtor is entitled to recover all amounts in which the Directors and Officers have been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 29:**     **Constructive Trust against the Directors and Officers.**

560. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

561. From January 2005 through the Petition Date, Debtor was insolvent. Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

129

562.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

563.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the Shareholder Distributions.  Further, the Directors and Officers breached their fiduciary duties by failing to disclose the Shareholder Distributions to the creditors of Debtor on or before the time the transactions occurred.

564.    The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out the Shareholder Distributions was unconscionable.  Further, the Shareholder Distributions were transferred by Debtor with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

565.    As such, the Directors and Officers acquired the Shareholder Distributions as a result of unconscionable conduct and fraud (actual and/or constructive).  It would therefore be inequitable to allow them to retain the benefits of the Shareholder Distributions.  Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Shareholder Distributions and the immediate return of this property from the Directors and Officers.  Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 30-34: THE REVOLVER ($48.3MM)

**Count 30:**    **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, and FMCI.**

566.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

567.     From March 2005 through August 31, 2007, within one year of the Petition Date and thereafter, Debtor transferred approximately $48,302,630 to FMCI in alleged principal and interest payments on the Revolver.

568.     The payments to FMCI on the Revolver transferred an interest of the Debtor in property.

569.     Debtor made the transfers to FMCI on the Revolver with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

570.     Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the payments on the Revolver and recover in excess of $48,302,630 from FMCI and from the Directors and Officers who approved, permitted, or otherwise participated in the transfers.

571.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 31:     A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, and FMCI.**

572.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

573.     From March 2005 through August 31, 2007, within one year of the Petition Date and thereafter, Debtor transferred approximately $48,302,630 in alleged principal and interest on the Revolver to FMCI.

574.     The payments to FMCI on the Revolver transferred an interest of Debtor in property.

575.     Debtor made each of these transfers at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

576.     The transfers were made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor

131

after the transfer represented an unreasonably small amount of capital or were unreasonably small in relation to the Debtor's business.

577. Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

578. Debtor received less than fair or reasonably equivalent value in exchange for making the transfers on the Revolver.

579. As a result of the transfers, Debtor and its creditors have been harmed.

580. Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfers and recover in excess $48,302,630 from FMCI and from the Directors and Officers who approved, permitted or otherwise participated in the transfers.

581. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 32:** <u>**Breach of Fiduciary Duty against the Directors and Officers.**</u>

582. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

583. From January 2005 through the Petition Date, Debtor was insolvent. Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

584. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

585. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the payments of alleged principal and interest on the Revolver to FMCI. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the payments on the Revolver to the creditors of Debtor on or before the time the transactions occurred.

586. As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

587. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 33:     11 U.S.C. § 547(b) Avoidable Preference against the Directors and Officers, and <u>FMCI.</u>**

588. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

589. Within one year of the Petition Date and thereafter, Debtor transferred approximately $44,749,740.80 to FMCI in alleged principal and interest payments on the Revolver.

590. The payments to FMCI on the Revolver transferred an interest of Debtor in property.

591. Debtor made the transfers to FMCI on the Revolver at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

592. The transfers were made to satisfy an alleged antecedent debt owed by Debtor to FMCI prior to the time the transfers were made.

593. At the time the transfers were made, FMCI was an "insider" as that term is defined by 11 U.S.C. § 101(31).

594. Debtor's transfer of approximately $44,749,740.80 on the Revolver to FMCI enabled FMCI and the Directors and Officers to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made.

595. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers on the Revolver and recover in excess of $44,749,740.80 from FMCI and the Directors and Officers who approved, or otherwise permitted or participated in the transfers. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 34:**       <u>**Unjust Enrichment against the Directors and Officers, and FMCI.**</u>

596. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

597. The Directors and Officers, and FMCI, have obtained and received funds in the form of the Revolver payments or otherwise received a benefit that in justice and equity belong to the Debtor.

598. The Directors and Officers, and FMCI, were enriched by the payments on the Revolver payments.

599. The payments on the Revolver impoverished Debtor.

600. The Directors and Officers, and FMCI, were directly enriched by the payments Debtor made on the Revolver payments.

601. There is no justification for the enrichment of the Directors and Officers, and FMCI.

602. Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, and FMCI, have been unjustly enriched by the payments on the Revolver.

603. Debtor is entitled to recover all amounts in which the Directors and Officers, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 35-40: THE SULLIVAN, SR. NOTES ($26MM)

**Count 35:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and the Directors and Officers.**

604. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

605. Within one year of the Petition Date, Debtor transferred approximately $26,000,000 to Sullivan, Sr., individually and/or as the alleged trustee for the Sullivan, Sr. Revocable Trust, for principal and/or interest payments on the Sullivan Notes.

606. The payments with respect to the Sullivan, Sr. Notes transferred an interest of Debtor in property.

607. Debtor made the payments on the Sullivan, Sr. Notes with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

608. Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the payments on the Sullivan, Sr. Notes and recover approximately $26,000,000 from Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and/or from the Directors and Officers who approved, or otherwise permitted or participated in the transfer.

609. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

135

**Count 36:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and the Directors and Officers.**

610. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

611. Within one year of the Petition Date, Debtor transferred approximately $26,000,000 to Sullivan, Sr., individually and/or as alleged trustee for the Sullivan, Sr. Revocable Trust, for principal and/or interest payments on the Sullivan, Sr. Notes.

612. The payments on the Sullivan, Sr. Notes transferred an interest of Debtor in property.

613. Debtor made payments on the Sullivan, Sr. Notes at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

614. The transfers were made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or were unreasonably small in relation to the Debtor's business.

615. Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

616. Debtor received less than fair or reasonably equivalent value in exchange for making the transfers of the Sullivan, Sr. Notes.

617. As a result of the transfers, Debtor and its creditors have been harmed.

618. Pursuant to A.R.S. §44-1009(A), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfers and recover approximately $26,000,000 from Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and the Directors and Officers who approved, or otherwise permitted or participated in the transfers.

619.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 37:     Breach of Fiduciary Duty against Sullivan, Sr., and the other Directors and Officers.**

620.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

621.     Within one year of the Petition Date, Debtor was insolvent. Indeed, during this time period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

622.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

623.     The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of approximately $26,000,000 in principal and/or interest payments on the Sullivan, Sr. Notes. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of approximately $26,000,000 in principal and/or interest payments on the Sullivan, Sr. Notes to the creditors of Debtor on or before the time the transactions occurred.

624.     As a result of the Directors' and Officers' breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

625.     The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its

137

creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 38:** **11 U.S.C. § 547(b) Avoidable Preference against Sullivan, Sr., the Sullivan, Sr. <u>Revocable Trust, and the other Directors and Officers.</u>**

626. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

627. Within one year of the Petition Date, Debtor transferred approximately $26,000,000 to Sullivan, Sr., individually and/or as the alleged trustee for the Sullivan, Sr. Revocable Trust, for principal and/or interest payments on the Sullivan, Sr. Notes.

628. The payments with respect to the Sullivan, Sr. Notes transferred an interest of Debtor in property.

629. Debtor made the payments on the Sullivan, Sr. Notes at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

630. The transfers were made to satisfy an alleged antecedent debt owed by Debtor to Sullivan, Sr., and/or the Sullivan, Sr. Revocable Trust prior to the time the transfer was made.

631. At the time the transfer was made, Sullivan, Sr. and the Sullivan, Sr. Revocable Trust were "insiders" as that term is defined by 11 U.S.C. § 101(31).

632. Debtor's transfer of approximately $26,000,000 in principal and/or interest payments on the Sullivan, Sr. Notes to Sullivan, Sr., and/or the Sullivan, Sr. Revocable Trust, enabled Sullivan, Sr., and the Sullivan, Sr. Revocable Trust to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made.

633. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers related to the Sullivan, Sr. Notes and recover approximately $26,000,000 from

Sullivan, Sr., the Sullivan, Sr. Revocable Trust, and/or from the Directors and Officers who approved, or otherwise permitted or participated in the transfer. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 39:** **Unjust Enrichment against Sullivan, Sr., and the Sullivan, Sr. Revocable Trust.**

634. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

635. Sullivan, Sr. and the Sullivan, Sr. Revocable Trust have obtained and received funds in the form of payments on the Sullivan, Sr. Notes that in justice and equity belong to the Debtor.

636. Sullivan, Sr. and the Sullivan, Sr. Revocable Trust, were enriched by the payments on the Sullivan, Sr. Notes.

637. The payments on the Sullivan, Sr. Notes impoverished Debtor.

638. Sullivan, Sr. and the Sullivan, Sr. Revocable Trust, were directly enriched by the payments Debtor made on the Sullivan, Sr. Notes.

639. There is no justification for the enrichment of Sullivan, Sr., and the Sullivan, Sr. Revocable Trust.

640. Debtor lacks an adequate legal remedy to recover the amounts in which Sullivan, Sr., and the Sullivan, Sr. Revocable Trust, have been unjustly enriched by the payments on the Sullivan, Sr. Notes.

641. Debtor is entitled to recover all amounts in which Sullivan, Sr., and the Sullivan, Sr. Revocable Trust, have been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 40:**     **Constructive Trust against Sullivan, Sr. Revocable Trust.**

642.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1- 346 as fully set forth therein.

643.     Within one year of the Petition Date, Debtor was insolvent.  Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

644.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

645.     The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of approximately $26,000,000.00. in principal and/or interest on the Sullivan, Sr. Notes. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the payments on the Sullivan, Sr. Notes to the creditors of Debtor on or before the time the transactions occurred.

646.     The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out payments of principal and/or interest on the Sullivan, Sr. Notes was unconscionable.  Further, payments on the Sullivan, Sr. Notes were transferred by Debtor with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

647.     As such, the Sullivan, Sr. Revocable Trust and/or Sullivan, Sr. received payments on the Sullivan, Sr. Notes as a result of unconscionable conduct and fraud (actual and/or constructive).  It would therefore be inequitable to allow them to retain the benefit of payments on the Sullivan, Sr. Notes.  Accordingly, Debtor is entitled to a judgment imposing a

140

constructive trust on the funds representing payments on the Sullivan, Sr. Notes and the immediate return of this property from the Sullivan, Sr. Revocable Trust and/or Sullivan, Sr. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 41-54: THE ASSET TRANSFERS TO FMCI, MAGNUS CORP., AND FM REALTY ($50MM+)

#### COUNTS 41-45: FMR ($8MM+)

**Count 41:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, and FMCI.**

648. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

649. On September 20, 2006, within one year of the Petition Date, Debtor transferred its interest in FMR to FMCI for no consideration.

650. Debtor's interest in FMR was an interest of Debtor in property.

651. Debtor made the transfer of FMR to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

652. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMR to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in FMR at the time of the transfer.

653. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 42:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, and FMCI.**

654. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

655. On September 20, 2006, within one year of the Petition Date, Debtor transferred its interest in FMR to FMCI.

656.     Debtor's interest in FMR was an interest of Debtor in property.

657.     Debtor transferred its interest in FMR to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

658.     The transfer of Debtor's interest in FMR to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

659.     Through the transfer of Debtor's interest in FMR to FMCI, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

660.     Debtor received less than fair or reasonably equivalent value in exchange for transferring its interest in FMR to FMCI.  Indeed, Debtor received no consideration for the transfer of its interest in FMR to FMCI.

661.     As a result of the transfer of Debtor's interest in FMR to FMCI, Debtor and its creditors have been harmed.

662.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMR to FMCI and recover an amount reflecting a fair valuation Debtor's interest in FMR at the time of the transfer.

663.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 43:**     **Breach of Fiduciary Duty against the Directors and Officers.**

664.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

665.     On September 20, 2006 Debtor was insolvent.  Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its

probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

666.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

667.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of Debtor's interest in FMR to FMCI for no consideration.  Further, the Directors and Officers breached their fiduciary duties to the creditors of Debtor by failing to disclose the transfer of Debtor's interest in FMR to FMCI on or before the time the transaction occurred.

668.    As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

669.    The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 44:**    **Accounting.**

670.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

671.     Following the transfer of Debtor's interest in FMR to FMCI, Debtor continued to fund FMR's operation, but retained none of the earnings or profits.  To date, the amount of such earnings and profits, and the extent to which FMCI retained such revenue, is unknown and not readily ascertainable.

672.     At the time Debtor transferred its interest in FMR to FMCI, Debtor was insolvent.  Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

673.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

674.     Accordingly, Debtor is entitled to an accounting of the revenue generated by FMR following Debtor's transfer of its interest in FMR to FMCI, the expenses funded by Debtor, and the earnings and profits obtained by FMCI.

**Count 45:      Unjust Enrichment against the Directors and Officers, and FMCI.**

675.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

676.     The Directors and Officers, and FMCI, have obtained and received funds in the form of the transfer of the Debtor's interest in FMR or otherwise received a benefit that in justice and equity belong to the Debtor.

677.     Each of the Directors and Officers, and FMCI, were enriched by the transfer of the Debtor's interest in FMR.

678.     The transfer of the Debtor's interest in FMR impoverished Debtor.

144

679.    Each of the Directors and Officers, and FMCI, were directly enriched by the transfer of the Debtor's interest in FMR.

680.    In addition to the transfer of the Debtor's interest in FMR, the Directors and Officers, and FMCI, were also enriched by the Debtor's continued funding of expenses for the operation of FMR.  Debtor was impoverished by the payment of FMR expenses and there is a direct connection between these payments for the benefit of the Directors and Officers, and FMCI, and the corresponding impoverishment suffered by the Debtor.

681.    There is no justification for the enrichment of the Directors and Officers, and FMCI.

682.    Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, and FMCI have been unjustly enriched by the transfer of the Debtor's interest in FMR and Debtor's funding of FMR's expenses.

683.    Debtor is entitled to recover all amounts in which the Directors and Officers, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact.  Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 46-50:  FMLS ($2.5MM+)

**Count 46:**    **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, and FMCI.**

684.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

685.    On September 20, 2006, within one year of the Petition Date, Debtor transferred its interest in FMLS to FMCI.

686.    Debtor's interest in FMLS was an interest of Debtor in property.

687.    Debtor made the transfer of FMLS to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

145

688.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMLS to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in FMLS at the time of the transfer.

689.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 47:     A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, and FMCI.**

690.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

691.     On September 20, 2006, within one year of the Petition Date, Debtor transferred its interest in FMLS to FMCI.

692.     Debtor's interest in FMLS was an interest of Debtor in property.

693.     Debtor transferred its interest in FMLS to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

694.     The transfer of Debtor's interest in FMLS to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to Debtor's business.

695.     Through the transfer of Debtor's interest in FMLS to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

696.     Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in FMLS to FMCI.  Indeed, Debtor received no consideration for the transfer of its interest in FMLS to FMCI.

697.     As a result of the transfer of Debtor's interest in FMLS to FMCI, Debtor and its creditors have been harmed.

146

698.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMLS to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in FMLS at the time of the transfer.

699.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 48:**     **Breach of Fiduciary Duty against the Directors and Officers.**

700.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

701.     On September 20, 2006, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

702.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

703.     The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of Debtor's interest in FMLS to FMCI for no consideration. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of Debtor's interest in FMLS to FMCI to the creditors of Debtor on or before the time the transaction occurred.

704.     As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

705.     The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of

147

Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 49:      Accounting.**

706.      The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

707.      Following the transfer of Debtor's interest in FMLS to FMCI, Debtor continued to fund FMLS' operation, but retained none of the earnings or profits. To date, the amount of such earnings and profits, and the extent to which FMCI retained such revenue, is unknown and not readily ascertainable.

708.      At the time Debtor transferred its interest in FMLS to FMCI, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

709.      Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

710.      Accordingly, Debtor is entitled to an accounting of the revenue generated by FMLS following its transfer to FMCI, the expenses funded by Debtor, and the earnings and profits obtained by FMCI.

148

**Count 50:** **Unjust Enrichment against the Directors and Officers, and FMCI.**

711. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

712. The Directors and Officers, and FMCI, have obtained and received funds in the form of the transfer of Debtor's interest in FMLS or otherwise received a benefit that in justice and equity belong to the Debtor.

713. Each of the Directors and Officers, and FMCI, were enriched by the transfer of Debtor's interest in FMLS.

714. The transfer of Debtor's interest in FMLS impoverished Debtor.

715. Each of the Directors and Officers, and FMCI, were directly enriched by the funds Debtor transferred to them in the form of the transfer of Debtor's interest in FMLS.

716. In addition to the transfer of Debtor's interest in FMLS, the Directors and Officers, and FMCI, were also enriched by the Debtor's continued funding of expenses for the operation of FMLS. Debtor was impoverished by the payment of FMLS expenses and there is a direct connection between these payments for the benefit of the Directors and Officers, and FMCI, and the corresponding impoverishment suffered by the Debtor.

717. There is no justification for the enrichment of the Directors and Officers, and FMCI.

718. Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, and FMCI, have been unjustly enriched by the transfer of Debtor's interest in FMLS and Debtor's funding of FMLS' expenses.

719. Debtor is entitled to recover all amounts in which the Directors and Officers, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact. Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

149

## COUNTS 51-54: THE MAGNUS RECEIVABLES ($6.5MM)

**Count 51:** **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, and FMCI.**

720. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

721. On August 31, 2006, and December 31, 2006, Debtor transferred its interest in the Magnus Corp. Receivables to FMCI.

722. Debtor's interest in the Magnus Corp. Receivables transferred to FMCI was an interest of Debtor in property.

723. Debtor made the transfer of its interest in the Magnus Corp. Receivables to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

724. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Magnus Corp. Receivables to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in the Magnus Corp. Receivables at the time of the transfer.

725. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 52:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, and FMCI.**

726. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

727. On August 31, 2006, and December 31, 2006, Debtor transferred its interest in the Magnus Corp. Receivables to FMCI.

728. Debtor's interest in the Magnus Corp. Receivables transferred to FMCI was an interest of Debtor in property.

729. Debtor transferred its interest in the Magnus Corp, Receivables to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

730. The transfer of Debtor's interest in the Magnus Corp. Receivables to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

731. Through the transfer of Debtor's interest in the Magnus Corp. Receivables to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

732. Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the Magnus Corp. Receivables to FMCI. Indeed, Debtor received no consideration for the transfer of its interest in the Magnus Corp. Receivables to FMCI.

733. As a result of the transfer of Debtor's interest in the Magnus Corp. Receivables to FMCI, Debtor and its creditors have been harmed.

734. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Magnus Corp. Receivables to FMCI and recover an amount reflecting a fair valuation Debtor's interest in the Magnus Corp. Receivables at the time of the transfer.

735. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 53:** **Breach of Fiduciary Duty against the Directors and Officers.**

736. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

737. On the date(s) the Magnus Corp. Receivables were incurred and transferred to FMCI, Debtor was insolvent. Indeed, as of the date of the expenditures on behalf of Magnus Corp. and transfers of the Magnus Corp. Receivables to FMCI, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

738. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

739. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the incursion of the Magnus Corp. Receivables and subsequent transfer of Debtor's interest in the Magnus Corp. Receivables to FMCI. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the incursion of Magnus Cor. expenses and subsequent transfer of Debtor's interest in the Magnus Corp. Receivables to FMCI to the creditors of Debtor on or before the time the receivables were incurred and the subsequent transfer took place.

740. As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

741. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers

**Count 54:**     **Unjust Enrichment against the Directors and Officers, Magnus Corp., and <u>FMCI.</u>**

742. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

743. The Directors and Officers, Magnus Corp. and FMCI, have obtained and received funds in the form of the Magnus Corp. Receivables or otherwise received a benefit that in justice and equity belong to the Debtor.

744. Each of the Directors and Officers, Magnus Corp., and FMCI, were enriched by the payments Debtor made when incurring the Magnus Corp. Receivables and by the transfer of the Magnus Corp. receivables to FMCI.

745. The incursion of the Magnus Corp. Receivables and subsequent transfer of Debtor's interest in them to FMCI impoverished Debtor.

746. Each of the Directors and Officers, Magnus Corp., and FMCI, were directly enriched by Debtor's incursion of the Magnus Corp. Receivables and subsequent transfer thereof to FMCI.

747. There is no justification for the enrichment of the Directors and Officers, Magnus Corp., and FMCI.

748. Debtor lacks any adequate legal remedy to recover the amounts in which the Directors and Officers, Magnus Corp., and FMCI, have been unjustly enriched by the payments Debtor made on the Magnus Corp. Receivables and by the transfer of the Magnus Corp. receivables to FMCI.

749. Debtor is entitled to recover all amounts in which the Directors and Officers, Magnus Corp., and FMCI, have been unjustly enriched, which shall be determined by the trier

153

of fact.  Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**COUNTS 55-78:  CORPORATE JETS ($13MM+)**

**COUNTS 55-59:  THE FALCON AIRCRAFT**

**Count 55:**   **A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, Magnus Corp., and FMCI.**

750.   The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

751.   On August 31, 2006, within one year of the Petition Date, Debtor transferred its interest in the Falcon Aircraft to FMCI and/or Magnus Corp. for no consideration.

752.   Debtor's interest in the Falcon Aircraft was an interest of Debtor in property.

753.   Debtor made the transfer of its interest in the Falcon Aircraft to FMCI and/or Magnus Corp. with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

754.   Following the transfer, Debtor continued to pay for all expenses related to the ownership, maintenance, and operation of the Falcon Aircraft, including personal expenses incurred by the Directors and Officers, Magnus Corp., and FMCI.

755.   As a result of the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., and Debtor's continued incursion of costs related to its ownership, maintenance, and operation, Debtor and its creditors have been harmed.

756.   Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Falcon Aircraft to FMCI and/or Magnus Corp., and all expenses Debtor paid related to its ownership, maintenance, an operation, and to recover an amount reflecting a fair valuation of Debtor's interest in the Falcon Aircraft at the time of the transfer and all expenses borne by Debtor after the date of transfer.

757.   Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 56:** **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, Magnus Corp., and FMCI.**

758.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

759.     On August 31, 2006, within one year of the Petition Date, Debtor transferred its interest in the Falcon Aircraft to FMCI and/or Magnus Corp.

760.     Debtor's interest in the Falcon Aircraft was an interest of Debtor in property.

761.     Debtor transferred its interest in the Falcon Aircraft to FMCI and/or Magnus Corp. at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

762.     The transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp. was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

763.     Through the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

764.     Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the Falcon Aircraft to FMCI and/or Magnus Corp.  Indeed, Debtor received no consideration for the transfer of its interest in the Falcon Aircraft to FMCI and/or Magnus Corp.

765.     Following the transfer, Debtor continued to pay for all expenses related to the ownership, maintenance, and operation of the Falcon Aircraft, including personal expenses incurred by the Directors and Officers, Magnus Corp., and FMCI.

155

766. As a result of the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., and Debtor's continued incursion of costs related to its ownership, maintenance, and operation, Debtor and its creditors have been harmed.

767. Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Falcon Aircraft to FMCI and/or Magnus Corp., and all expenses Debtor paid related to its ownership, maintenance, and operation, and to recover an amount reflecting a fair valuation Debtor's interest in the Falcon Aircraft at the time of the transfer and all expenses borne by Debtor after the date of transfer.

768. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 57:** **Breach of Fiduciary Duty against the Directors and Officers.**

769. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

770. On August 31, 2006 Debtor was insolvent. Indeed, from January 2005 through the Petition Date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

771. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

772. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., and continued

payment of expenses related to its ownership, maintenance, and operation, including personal expenses incurred by the Directors and Officers, Magnus Corp., and FMCI. Further, FMCI and the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp. to the creditors of Debtor on or before the time the transaction occurred, and the continued payment of expenses related to its ownership, maintenance, and operation.

773. As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

774. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 58:**  **Accounting.**

775. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

776. Before and after the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., the Directors and Officers caused Debtor to fund their own personal use of the Falcon Aircraft, and that of other parties. At the time Debtor incurred such charges, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

777. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

778. The expenses Debtor incurred related to the ownership, maintenance, and operation of the Falcon Aircraft for the benefit of other parties can only be accurately ascertained by a judicial determination of the details of such payments.

779. Accordingly, Debtor is entitled to an accounting of Debtor's payment of expenses related to the Falcon Aircraft for the benefit of other parties, including, but not limited to, the Directors and Officers, Magnus Corp., and FMCI.

**Count 59: Unjust Enrichment against the Directors and Officers, Magnus Corp., and FMCI.**

780. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

781. The Directors and Officers, Magnus Corp., and FMCI, have been enriched by the transfer of Debtor's interest in the Falcon Aircraft and by Debtor's funding of expenses related to its ownership, maintenance, and operations.

782. The transfer of Debtor's interest in the Falcon Aircraft and Debtor's funding of expenses related to its ownership, maintenance, and operation impoverished Debtor.

783. The Directors and Officers, Magnus Corp., and FMCI, were directly enriched by the transfer of Debtor's interest in the Falcon Aircraft and continued funding of expenses related to its ownership, maintenance, and operation.

784. There is no justification for the enrichment of the Directors and Officers, Magnus Corp., and FMCI.

158

785.    Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, Magnus Corp., and FMCI have been unjustly enriched by the transfer of Debtor's interest in the Falcon Aircraft and funding of expenses related to its ownership, maintenance and operation.

786.    Debtor is entitled to recover all amounts in which the Directors and Officers, Magnus Corp., and FMCI, have been unjustly enriched, which shall be determined by the trier of fact.  Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 60-64: THE HAWKER AIRCRAFT

**Count 60:        A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, Magnus Corp., and FMCI.**

787.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

788.    On August 31, 2006, within one year of the Petition Date, Debtor transferred its interest in the Hawker Aircraft to FMCI and/or Magnus Corp.

789.    Debtor's interest in the Hawker Aircraft transferred to FMCI and/or Magnus Corp. was an interest of Debtor in property.

790.    Debtor made the transfer of the Hawker Aircraft to FMCI and/or Magnus Corp., with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

791.    Following the transfer, Debtor continued to pay for all expenses related to the ownership, maintenance, and operation of the Hawker Aircraft, including personal expenses incurred by the Directors and Officers, Magnus Corp., and FMCI.

792.    As a result of transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp., and Debtor's continued incursion of costs related to its ownership, maintenance, and operation, Debtor and its creditors have been harmed.

793.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Hawker Aircraft to FMCI and/or Magnus Corp., and all expenses Debtor paid related to its ownership, maintenance, and operation, and to recover an amount reflecting a fair valuation Debtor's interest in the Hawker Aircraft at the time of the transfer and all expenses borne by Debtor after the date of transfer.

794.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 61:     A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, Magnus Corp., and FMCI.**

795.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

796.     On August 31, 2006, within one year of the Petition Date, Debtor transferred its interest in the Hawker Aircraft to FMCI and/or Magnus Corp.

797.     Debtor's interest in the Hawker Aircraft transferred to FMCI and/or Magnus Corp. was an interest of Debtor in property.

798.     Debtor transferred its interest in the Hawker Aircraft to FMCI and/or Magnus Corp. at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

799.     The transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp. was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.

800.     Through the transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp., Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

801.     Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the Hawker Aircraft to FMCI and/or Magnus Corp. Indeed, Debtor received no consideration for the transfer of its interest in the Hawker Aircraft to FMCI and/or Magnus Corp.

802.     Following the transfer, Debtor continued to pay for all expenses related to the ownership, maintenance, and operation of the Hawker Aircraft, including personal expenses incurred by the Directors and Officers, Magnus Corp., and FMCI.

803.     As a result of the transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp., and Debtor's continued incursion of costs related to the ownership, maintenance, and operation, Debtor and its creditors have been harmed.

804.     Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in the Hawker Aircraft to FMCI and/or Magnus Corp. and all expenses Debtor paid related to its ownership, maintenance, and operation, and to recover an amount reflecting a fair valuation of Debtor's interest in the Hawker Aircraft at the time of the transfer and all expenses borne by Debtor after the date of the transfer.

805.     Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 62:     Breach of Fiduciary Duty against the Directors and Officers.**

806.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

807.     On August 31, 2006 Debtor was insolvent. Indeed, as of this date and through the Petition Date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

161

808.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

809.     The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp, and continued payment of expenses related to its ownership, maintenance, and operation, including personal expenses incurred by the Directors and Officers, Magnus Corp, and FMCI. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of Debtor's interest in the Hawker Aircraft to FMCI and/or Magnus Corp. to the creditors of Debtor on or before the time the transaction occurred, and the continued payment of expenses related to the ownership, maintenance, and operation.

810.     As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

811.     The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 63:**     **Accounting.**

812.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

813.     Before and after the transfer of Debtor's interest in the Falcon Aircraft to FMCI and/or Magnus Corp., the Directors and Officers caused Debtor to fund their own personal use of the Hawker Aircraft and that of other parties.  At the time Debtor incurred such charges, Debtor was insolvent.  Indeed, from January 2005 through the Petition Date the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

814.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

815.     The expenses Debtor incurred related to the Hawker Aircraft for the benefit of other parties can only be accurately ascertained by a judicial determination of the details of such payments.

816.     Accordingly, Debtor is entitled to an accounting of Debtor's payments of expenses related to the Hawker Aircraft for the benefit of other parties, including, but not limited to the Directors and Officers, Magnus Corp., and FMCI.

**Count 64:**     **Unjust Enrichment against the Directors and Officers, Magnus Corp., and FMCI.**

817.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

163

818.    The Directors and Officers, Magnus Corp, and FMCI, have been enriched by the transfer of Debtor's interest in the Hawker Aircraft and by Debtor's funding of expenses related to its ownership, maintenance, and operation.

819.    The transfer of Debtor's interest in the Hawker Aircraft and Debtor's funding of expenses related to its ownership, maintenance, and operation, impoverished Debtor.

820.    The Directors and Officers, Magnus Corp, and FMCI, were directly enriched by the transfer and funding of expenses related to its ownership, maintenance, and operation of Debtor's interest in the Hawker Aircraft.

821.    There is no justification for the enrichment of the Directors and Officers, Magnus Corp, and FMCI.

822.    Debtor lacks any adequate legal remedy to recover the amounts in which the Directors and Officers, Magnus Corp, and FMCI, have been unjustly enriched by the transfer of Debtor's interest in the Hawker Aircraft and funding of expenses related to its ownership, maintenance, and operation.

823.    Debtor is entitled to recover all amounts in which the Directors and Officers, Magnus Corp, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact.  Debtor is also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 65-69: THE WNS SHARES ($14MM+)

**Count 65:    A.R.S. §44-1009(A)(1) and 11 U.S.C. §548(a)(1)(A) Fraudulent Transfer against the Directors and Officers, and FMCI.**

824.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

825.    Within two years of the Petition Date, Debtor transferred its interest in the WNS Shares to FMCI.

826.    Debtor's interest in the WNS Shares was an interest of Debtor in property.

827.    Debtor made the transfer of the WNS Shares to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.

828.    Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(A) and 550(a), Debtor is entitled to avoid the transfer of its interest in the WNS Shares to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in the WNS Shares at the time of the transfer.

829.    Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 66:**    **A.R.S. §44-1009(A)(2) and 11 U.S.C. §548(a)(1)(B) Fraudulent Transfer against the Directors and Officers, and FMCI.**

830.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

831.    Within two years of the Petition Date, Debtor transferred its interest in the WNS Shares to FMCI.

832.    Debtor's interest in the WNS Shares was an interest of Debtor in property.

833.    Debtor transferred its interest in the WNS Shares to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.

834.    The transfer of Debtor's interest in the WNS Shares to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to Debtor's business.

835.    Through the transfer of Debtor's interest in the WNS Shares to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

836.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the WNS Shares to FMCI.  Indeed, Debtor received no consideration for the transfer of its interest in the WNS Shares to FMCI.

837.    As a result of the transfer of Debtor's interest in the WNS Shares to FMCI, Debtor and its creditors have been harmed.

838.    Pursuant to A.R.S. §44-1009(A)(1), 11 U.S.C. §§ 548(a)(1)(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in the WNS Shares to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in the WNS Shares at the time of the transfer.

839.    Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 67:**    **Breach of Fiduciary Duty against the Directors and Officers.**

840.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

841.    At the time Debtor transferred its interest in the WNS shares to FMCI, Debtor was insolvent.  Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

842.    Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

843.    The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the

166

transfer of Debtor's interest in the WNS Shares to FMCI for no consideration. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the transfer of Debtor's interest in the WNS Shares to FMCI to the creditors of Debtor on or before the time the transaction occurred.

844.    As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

845.    The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 68:**     **Accounting.**

846.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

847.    Following the transfer of Debtor's interest in the WNS Shares to FMCI, the Directors and Officers proceeded to sell the WNS Shares and derived profits from them. To date, the amount of such profits and the extent to which FMCI retained such profits is unknown and not readily ascertainable.

848.    At the time Debtor transferred its interest in the WNS Shares to FMCI, Debtor was insolvent. Indeed, as of this date, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

849.     Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

850.     Accordingly, Debtor is entitled to an accounting of the proceeds generated by the sale of the WNS Shares following their transfer to FMCI.

**Count 69:     Unjust Enrichment against the Directors and Officers, and FMCI.**

851.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

852.     The Directors and Officers, and FMCI, have obtained a benefit from the transfer of Debtor's interest in the WNS Shares that in justice and equity belong to the Debtor.

853.     Each of the Directors and Officers, and FMCI, were enriched by the transfer of Debtor's interest in the WNS Shares.

854.     The transfer of Debtor's interest in the WNS Shares impoverished Debtor.

855.     The Directors and Officers, and FMCI, were directly enriched by Debtor's transfer of the WNS Shares.  In addition to the transfer of Debtor's interest in the WNS Shares, the Directors and Officers, and FMCI, were also enriched by the subsequent sale of the WNS Shares and the proceeds received therefrom.

856.     There is no justification for the enrichment of the Directors and Officers, and FMCI.

857.     Debtor lacks any adequate legal remedy to recover the amounts in which the Directors and Officers, and FMCI, have been unjustly enriched by the transfer of Debtor's interest in the WNS Shares and the proceeds obtained from their subsequent sale.

858.     Debtor is entitled to recover all amounts in which the Directors and Officers, and FMCI, have been unjustly enriched, which shall be determined by the trier of fact.  Debtor is

also entitled to recover its reasonable and necessary and attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### COUNTS 70-72: THE BANK EXPENDITURES ($2.8MM+)

**Count 70:** **Breach of Fiduciary Duty against the Directors and Officers.**

859. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

860. From January 2005 through the Petition Date, Debtor was insolvent. Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

861. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

862. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the payment of the Bank Expenditures on FMCI's behalf. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the payment of the Bank Expenditures to the creditors of Debtor on or before the time the transactions occurred.

863. As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

864. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its

creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 71:** **Unjust Enrichment against the Directors and Officers, and FMCI.**

865. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

866. Debtor is entitled to compensation from the Directors and Officers and FMCI because it conferred a benefit upon them by funding the Bank Expenditures.

867. The Debtor's funding of the Bank Expenditures impoverished Debtor.

868. There is a direct connection between the benefit conferred to the Directors and Officers, and FMCI, by the Debtor's funding of the Bank Expenditures, and the impoverishment suffered by Debtor.

869. There is no justification for the Debtor's funding of the Bank Expenditures on behalf of the Directors and Officers, and FMCI.

870. Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, and FMCI, have been unjustly enriched by Debtor's funding of the Bank Expenditures. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

871. It would be unjust to allow the Directors and Officers and FMCI to retain the benefit of the Bank Expenditures without payment to Debtor. Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the Directors and Officers, and FMCI, including, but not limited to, the dollar amount of the Bank Expenditures and/or the value derived by the Directors and Officers, and from FMCI, from such expenditures.

**Count 72:** <u>**Quantum Meruit against the Directors and Officers, and FMCI.**</u>

872.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

873.     Debtor is entitled to compensation from the Directors and Officers, and FMCI, for the value they derived from the Bank Expenditures.

874.     The Bank Expenditures conferred a benefit on the Directors and Officers, and FMCI.

875.     The Bank Expenditures were made by Debtor with the reasonable expectation that they would be paid by FMCI.

876.     It would be unjust for the Directors and Officers, and FMCI, to retain the benefit of the Bank Expenditures without payment to Debtor.

877.     Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the Directors and Officers, and FMCI, for the dollar amount of such expenditures and/or the value derived therefrom.  Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

<u>COUNTS 73-75: IMPROVEMENTS TO 603 N. WILMOT ($5.7MM+)</u>

**Count 73:** <u>**Breach of Fiduciary Duty against the Directors and Officers.**</u>

878.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

879.     From January 2005 through the Petition Date, Debtor was insolvent.  Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

880. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

881. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the payment of the Improvements to 603 N. Wilmot on behalf and for the benefit of the Directors and Officers, and the RICO Defendants. Further, the Directors and Officers breached their fiduciary duties by failing to disclose the payment of the Improvements to 603 N. Wilmot to the creditors of Debtor on or before the time the transactions occurred.

882. As a result of the breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial.

883. The Directors' and Officers' acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions of the Directors and Officers resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 74:** **Unjust Enrichment against the Directors and Officers, and the RICO Defendants.**

884. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

172

885.     Debtor is entitled to compensation from the Directors and Officers, and the RICO Defendants, because Debtor conferred a benefit upon each of them by funding the Improvements to 603 N. Wilmot.

886.     The Improvements to 603 N. Wilmot impoverished Debtor.

887.     There is a direct connection between the benefit conferred by Debtor's Improvements to 603 N. Wilmot and the impoverishment suffered by Debtor.

888.     Debtor lacks an adequate legal remedy to recover the amounts in which the Directors and Officers, and the RICO Defendants, have been enriched by the Improvements to 603 N. Wilmot funded by Debtor.

889.     The Directors and Officers, and the RICO Defendants, have retained the value of such benefit by virtue of their ownership, occupation and/or beneficial use of the premises located at 603 N. Wilmot and the specialized and custom infrastructure funded by Debtor for no consideration.

890.     In light of the inequitable conduct described in the Complaint, it would be unjust to allow them to retain any benefit related to the Improvements to 603 N. Wilmot without payment to Debtor.

891.     Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the Directors and Officers, and the RICO Defendants, including, but not limited to, the dollar amount of such Improvements and/or the value derived from such improvements. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**Count 75:     Quantum Meruit against the Directors and Officers, and the RICO Defendants.**

892.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

893.     Debtor is entitled to compensation from the Directors and Officers, and the RICO Defendants, for the value they derived from the Improvements to 603 N. Wilmot.

894.     The Improvement to 603 N. Wilmot conferred a benefit on each of them, and it would be unjust for them to retain any of the benefits related to the Improvements to 603 N. Wilmot without compensating Debtor.

895.     Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the Directors and Officers, and the RICO Defendants, for the dollar amount of such Improvements and/or the value derived therefrom.

**COUNTS 76-78:  PRE-PETITION CONSPIRACY AND AIDING AND ABETTING CLAIMS.**

**Count 76:**     **Pre-Petition Civil Conspiracy Against The Directors and Officers, Thomas, FMCI, the Sullivan, Sr. Revocable Trust, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp.**

896.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

897.     FMCI, the Sullivan, Sr. Revocable Trust, Thomas, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp., joined with the Directors and Officers to perpetrate, facilitate, and aid and abet the transfers set forth in paragraphs 147-236, the breaches of fiduciary duty, and the other wrongful acts set forth therein.

898.     The Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp., had a meeting of the minds with the Directors and Officers regarding this course of action.

899.     As described herein, the Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp., undertook substantial wrongful, overt acts in furtherance of this course of action.

900.     As a result of these wrongful acts, Debtor suffered damages in an amount to be proven at trial.

174

901.    The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.    The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 77:     Aiding and Abetting Against The Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust, Thomas, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp.**

902.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

903.    FMCI, the Sullivan, Sr. Revocable Trust, Thomas, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp. knowingly and intentionally provided assistance to the Directors and Officers, and otherwise participated in the conduct that is set forth in Counts 1 through 75.

904.    The assistance of the Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust, Thomas, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp., was a substantial factor in the conduct set forth in paragraphs 1-346.

905.    The conduct alleged in paragraphs 1-346 proximately caused damages to Debtor and Debtor's creditors in an amount to be proven at trial.  Such damages were the reasonable and foreseeable consequence of the conduct of the Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust, Thomas, FM Realty, Indus Holdings, Indus Ventures, and Magnus Corp. Accordingly, they are liable for all the actual and consequential damages resulting from their conduct and way in which they in aided and abetted.

906. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 78:** **Constructive Trust Against the Directors and Officers, Thomas, FMCI, FM Realty, StoneWater, Indus Holdings, Indus Ventures, the New Ecloser Entities, the Magnus Entities, the Sullivan, Sr. Revocable Trust, Sullivan Title, and TSAA.**

907. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

908. From January 2005 to the Petition Date, Debtor was insolvent. Indeed, throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

909. Consequently, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

910. The Directors and Officers breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the asset transfers described in paragraphs 147-236. Further, the Directors and Officers breached their

fiduciary duties by failing to disclose the asset transfers described in paragraphs 147-236 on or before the time the transactions occurred.

911. The conduct of the Directors and Officers in orchestrating, authorizing, and carrying out the asset transfers described in paragraphs 147-236 was unconscionable. Further, the asset transfers described in paragraphs 147-236 were made with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

912. As such, property derived from and/or representing the transfers described in paragraphs 147-236 was acquired by the Directors and Officers, Thomas, FMCI, FM Realty, StoneWater, Indus Holdings, Indus Ventures, the New Ecloser Entities, the Magnus Entities, the Sullivan, Sr. Revocable Trust, Sullivan Title, and TSAA as result of unconscionable conduct and fraud (actual and/or constructive). It would therefore be inequitable to allow the Directors and Officers, Thomas, FMCI, FM Realty, StoneWater, Indus Holdings, Indus Ventures, the New Ecloser Entities, the Magnus Entities, the Sullivan, Sr. Revocable Trust, Sullivan Title, and TSAA to retain the benefits of the asset transfers described in paragraphs 1-346. Accordingly, Debtor is entitled to a judgment imposing a constructive trust upon property derived from and/or representing the asset transfers described in paragraphs 147-236.

913. In particular, Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the Stock Redemptions, Officer Bonuses and Shareholder Distributions against the Directors and Officers and Thomas, as set forth in paragraphs 152-192.

914. Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing payments on the Revolver against the Directors and Officers and FMCI, as set forth in paragraphs 193-198.

915. Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing payments of principal and/or interest on the Sullivan, Sr.

Notes against the Directors and Officers and the Sullivan, Sr. Revocable Trust, as set forth in paragraphs 199-200.

916.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing FMR against the Directors and Officers and FMCI, as set forth in paragraphs 203-206.

917.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing FMLS against the Directors and Officers and FMCI, as set forth in paragraphs 207-211.

918.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the Magnus Receivables against the Directors and Officers, FMCI, the Sullivan, Sr. Revocable Trust and the Magnus Entities, as set forth in paragraphs 212-213.

919.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the Hawker and Falcon against the Directors and Officers, FMCI and the Magnus Entities, as set forth in paragraphs 214-222.

920.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the WNS stock against the Directors and Officers and FMCI, as set forth in paragraphs 223-225.

921.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the Bank Expenditures against the Directors and Officers and FMCI, as set forth in paragraphs 226-227.

922.    Debtor is entitled to a judgment imposing a constructive trust on property derived from and/or representing the Improvements to 603 N. Wilmot against the Directors and Officers, FMCI, FM Realty, StoneWater, Indus Holdings, Indus Ventures, the New Ecloser Entities, the Magnus Entities, the Sullivan, Sr. Revocable Trust, Sullivan Title, and TSAA, as set forth in paragraphs 228-236.

923. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

### POST-PETITION CLAIMS

**Count 79:** **Violations of 18 U.S.C. § 1962(c) Against The RICO Defendants.**

924. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

925. The RICO Defendants are persons as defined in 18 U.S.C. § 1961 (3).

926. During all times relevant to the Complaint, the RICO Defendants were – and remain – an association-in-fact enterprise as defined by 18 U.S.C. § 1961 (4) (the "Enterprise").

927. The Enterprise was engaged in (and continues to engage), and its activities affected (and continue to affect), interstate and foreign commerce.

928. The RICO Defendants agreed to – and conducted and participated in – the conduct of the Enterprise through a pattern of racketeering activity. The pattern of racketeering activity engaged in by the Enterprise was directed toward the unlawful purpose of acquiring Debtor's proprietary assets through repeated violations of the orders of this Court and by means of fraud, misappropriation, and conversion.

929. In furtherance of this unlawful purpose, the Enterprise designed, orchestrated, authorized, and carried out a scheme by which its members knowingly transferred and then acquired Debtor's confidential information and proprietary assets through repeated violations of the orders of this Court and by means of fraud and/or conversion, as set forth in paragraphs 293-346. Furthermore, the scheme designed, orchestrated, authorized, and carried out by the RICO Defendants was clearly evincive of their intent to defraud Debtor's creditors. Specifically, the Enterprise engaged in numerous violations of 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), as set forth in paragraphs 293-346.

930.    The violations of 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) committed by members of the Enterprise (as described in paragraphs 293-346) were numerous and continuous and distinct from the Enterprise itself.  Indeed, the Enterprise has used a structure separate and apart from their acts of obstructing justice, transferring and receiving property acquired by means of fraud and/or conversion, and using the wires in furtherance of their fraudulent scheme.

931.    The violations of 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) committed by members of the Enterprise constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

932.    The RICO Defendants directly (and/or indirectly) have therefore violated 18 U.S.C. § 1962(c) in that they are associated with an enterprise engaged in, or activities of which affect, interstate commerce and/or foreign commerce, and have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

933.    Debtor and Debtor's creditors have been injured in their business or property as a direct and proximate result of the violations of 18 U.S.C. § 1962(c) committed by the RICO Defendants.  Accordingly, the Litigation Trustee is entitled to recover actual and consequential damages in an amount to be proven at trial, treble damages and costs of suit, including reasonable and necessary attorneys' fees.

**Count 80:**     **Violations of 18 U.S.C. § 1962(d) Against The RICO Defendants.**

934.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

935.    The RICO Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).  In particular, as described in paragraphs 293-346, the

members of the Enterprise have agreed to participate in the affairs of the Enterprise through the commission of two or more predicate acts committed by the members of the Enterprise.

936. The RICO Defendants knew that their predicate acts in violation of 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) were part of a pattern of racketeering activity.

937. The RICO Defendants have therefore conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

938. Debtor and Debtor's creditors have been injured in their business or property as a direct and proximate result of the violations of 18 U.S.C. § 1962(c) committed by the RICO Defendants. Accordingly, the Litigation Trustee is entitled to recover actual and consequential damages in an amount to be proven at trial, treble damages and costs of suit, including reasonable and necessary attorneys' fees.

**Count 81:**     **Misappropriation Against The RICO Defendants.**

939. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

940. Debtor, in the course of its business, possessed and acquired trade secrets and other proprietary information, including, but not limited to, the Confidential Information.

941. Debtor derived independent economic value, actual and potential, by virtue of the fact that the Confidential Information was not generally known to (and readily accessible through proper means by) other persons who can obtain economic value from the Confidential Information. Debtor undertook reasonable efforts to maintain the secrecy of the Confidential Information, including, but not limited to, the Confidentiality Agreements, Employment Agreements, the Employment Handbook Acknowledgments, and adoption of the Code of Conduct.

942. The RICO Defendants have acquired the Confidential Information by improper means, including (among other things), (a) fraud; (b) obstruction of justice; (c) breaches of fiduciary duty; (d) breaches of contract; and (e) in the alternative, circumstances giving rise to the duty to maintain the secrecy of the Confidential Information or otherwise limit the use thereof.

943. Debtor and Debtor's creditors have suffered damages a result of the misappropriation of the Confidential Information by the RICO Defendants, including, but not limited to, the loss of a reasonable royalty Debtor should have received for the Confidential Information, the lost economic value of the Confidential Information and/or profits derived therefrom, and other forms of remuneration.

944. Debtor is therefore entitled to recover from the RICO Defendants the damages caused by their theft and misappropriation of the Confidential Information, pursuant to ARIZ. REV. STAT. ANN. § 44-402 and/or any other applicable law or statute, in an amount to be proven at trial.

945. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 82:** <u>**Conversion Against The RICO Defendants.**</u>

946. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

947. At all times after the Petition Date, Debtor has been entitled to possession of its Confidential Information.

948. In August of 2007 and continuing indefinitely thereafter, the RICO Defendants wrongfully exercised dominion and/or control over the Confidential Information which substantially interfered with Debtor's rights to the Confidential Information.

949. Debtor had (and continues to have) an immediate legal right to use (and to possess exclusively) the Confidential Information at the time of the alleged conversion and was in a position to use it and was prevented from such use only by the wrongful detention of the Confidential Information by the RICO Defendants.

950. Debtor is therefore entitled to recover from the RICO Defendants.

951. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 83:** **Breach of Fiduciary Duty Against the Directors and Officers (Excluding Gaylord), Lemke, Herk, Thrasher, Wright, Yonan, Warner, Chopra, Johnson, Shoemaker, and Sharma.**

952. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

953. As of the Petition Date, and through the term of their employment with the Debtor and the Liquidation Trust, the Directors and Officers, Lemke, Herk, Thrasher, Wright, Yonan, Warner, Chopra, Johnson, Shoemaker, and Sharma owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-

dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

954. As described in paragraphs 293-346, these Defendants breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing and carrying out a scheme by which the RICO Defendants knowingly transferred and acquired Debtor's Confidential Information and proprietary assets through repeated violations of the orders of this Court and by means of fraud and/or conversion, by failing to market Debtor's assets, or otherwise failing to maximize their value for the benefit of Debtor's estate, and by engaging in other conduct directly adverse to the interests of the Debtor.

955. As a result of the foregoing breaches of fiduciary duties, Debtor and Debtor's creditors suffered damages in an amount to be proven at trial.

956. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 84:** **Fraud Against the Directors and Officers (Excluding Gaylord), Lemke, Herk, Thrasher, Wright, Yonan, Warner, and Chopra.**

957. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

958. The Directors and Officers, Lemke, Herk, Thrasher, Wright, Yonan, Warner, and Chopra owed Debtor and Debtor's creditors a legal duty to disclose dispositions of Debtor's

184

assets referenced in paragraphs 301-314.  However, they failed to disclose such dispositions to the Court and to creditors of the Debtor.

959.    The facts related to dispositions of Debtor's assets that they failed to disclose to Debtor and Debtor's creditors were material.

960.    Consequently, the Litigation Trustee is entitled to recover actual and consequential damages in an amount to be proven at trial.

961.    The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 85:**     **Unjust Enrichment Against the RICO Defendants.**

962.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

963.    Debtor is entitled to compensation from the RICO Defendants because the acquisition and unauthorized use of the Confidential Information of Debtor has conferred a benefit on them.

964.    The RICO Defendants have retained the value of such benefit by virtue of their beneficial use of the Confidential Information.

965.    In light of the inequitable conduct as described herein, it would be unjust to allow the RICO Defendants to retain the benefit of the Confidential Information without compensating Debtor for the dollar amount of such improvements and/or the value derived from such improvements.

185

966. Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the RICO Defendants, including, but not limited to, reasonable royalties, costs saved, and profits and/or the value derived by them from their possession and beneficial use of the Confidential Information.

**Count 86:** **Quantum Meruit against the RICO Defendants.**

967. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

968. Debtor is entitled to compensation from the RICO Defendants for the value derived from their unauthorized use of the Confidential Information.

969. The Confidential Information conferred a benefit on the RICO Defendants.

970. It would be unjust for the RICO Defendants to retain the benefits of the Confidential Information without compensation to Debtor.

971. Debtor is therefore entitled to restitution of all benefits wrongfully withheld by the RICO Defendants from their possession and beneficial use of the Confidential Information.

**Count 87:** **Accounting.**

972. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

973. Following the fraudulent acquisition and/or conversion of the Confidential Information, RICO Defendants have generated revenue therefrom. To date, the amount of such revenue is unknown and not readily ascertainable by Debtor.

974. As of the Petition Date, and throughout the term of their employment with the Debtor and the Liquidation Trust, the RICO Defendants, individually or through their affiliation with the Directors and Officers, owed fiduciary duties to Debtor and to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

975. Accordingly, based on the foregoing, Debtor is entitled to an accounting of the revenue and profits generated as a result of the misappropriation and use of Debtor's Confidential Information.

**Count 88:** **Post-Petition Civil Conspiracy Against The RICO Defendants.**

976. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

977. Each of the RICO Defendants joined with the Directors and Officers (excluding Gaylord) to perpetrate, facilitate, and aid and abet the fraudulent acquisition and/or conversion of the Confidential Information, and other wrongful acts, as set forth in paragraphs 1-346.

978. Each of the RICO Defendants had a meeting of the minds with the Directors and Officers (excluding Gaylord) regarding this course of action.

979. The RICO Defendants each undertook substantial wrongful, overt acts in furtherance of this course of action.

980. As a result of these wrongful acts, Debtor and Debtor's creditors have suffered damages in an amount to be proven at trial.

981. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 89:**     **Post-Petition Aiding and Abetting Breach of Fiduciary Duty Against The <u>RICO Defendants.</u>**

982.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

983.    As of the Petition Date, and throughout their term of employment with Debtor and the Liquidation Trust, the Directors and Officers owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

984.    The Directors and Officers (excluding Gaylord) breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the fraudulent acquisition and/or conversion of the Confidential Information, and other wrongful acts, as set forth in paragraphs 1-346.

985.    The RICO Defendants knowingly and intentionally provided the Directors and Officers (excluding Gaylord) with assistance with breaching their fiduciary duties by, among other things, orchestrating, authorizing, and participating in the fraudulent acquisition, conversion, or use of the Confidential Information.

986.    The assistance provided by each of the RICO Defendants was a substantial factor in causing the breaches of fiduciary duties committed by the Directors and Officers (excluding Gaylord).

987.    These breaches of fiduciary duty proximately caused damages to Debtor and Debtor's creditors in an amount to be proven at trial. Such damages were the reasonable and foreseeable consequence of the conduct of the RICO Defendants. Accordingly, the RICO Defendants are each liable for all the actual and consequential damages resulting from these breaches of fiduciary duty.

988. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrong doing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

**Count 90:**    **Constructive Trust Against the RICO Defendants.**

989. The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

990. As of the Petition Date, the RICO Defendants owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self dealing and self interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

991. The RICO Defendants breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing and carrying out a scheme by which its members knowingly transferred and acquired Debtor's Confidential Information and proprietary assets through repeated violations of the orders of this Court and by means of fraud and/or conversion.

992. The conduct of the RICO Defendants in orchestrating, authorizing and carrying out a scheme by which they knowingly transferred and acquired Debtor's Confidential Information was unconscionable. Further, scheme by which the Confidential Information was transferred and acquired by the RICO Defendants was made with the actual intent to hinder, delay and/or defraud the creditors of Debtor.

189

993.     As such, the RICO Defendants acquired the Confidential Information as a result of fraud (actual and/or constructive) and unconscionable conduct. It would therefore be inequitable to allow them to retain the benefits of the Confidential Information. Accordingly, Debtor is entitled to a judgment imposing a constructive trust on the Confidential Information and the immediate return of this property from the RICO Defendants. Debtor is also entitled to recover its reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest, and costs to the fullest extent permitted by law.

**EQUITABLE SUBORDINATION AND RECHARACTERIZATION**

**Count 91:**     **Equitable Subordination of Claim No. 4551 against FMCI.**

994.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

995.     FMCI filed a proof of claim in the Bankruptcy Case [Claim No. 4551], which seeks an allowed claim in the amount of $37,482,071.02 for alleged principal and interest payments outstanding on the Revolver ("FMCI Claim").

996.     FMCI, through the Directors and Officers, engaged in wrongdoing and other inequitable conduct outlined in paragraphs 1-346, which resulted in unfairness to creditors and caused substantial harm to the Debtor. Allowing FMCI to share in what, if any, distribution is made to the other unsecured creditors of the Debtor would result in further unfairness to the remaining creditors. Further, the protocols of the Revolver were never followed. As such, funds advanced pursuant to the Revolver by FMFCI were, in fact, capital contributions. Pursuant to 11 U.S.C. § 510(c), the Court should expunge, disallow, or otherwise equitably subordinate the FMCI Claim to the claims of all other unsecured creditors until all other claims against the Debtor have been satisfied in full.

**Count 92:**     **Re-characterization of Claim No. 4551 against FMCI.**

997.     The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

998.    There is an identity of interests on both sides of the transaction giving rise to the FMCI Claim because the Directors and Officers of Debtor and FMCI were identical, and because the Directors and Officers owned 100% of FMCI, which owned 100% of the Debtor. FMCI, through the Directors and Officers, engaged in wrongdoing and other inequitable conduct outlined in paragraphs 1-346, which resulted in unfairness to creditors and caused substantial harm to the Debtor.  The Revolver, in particular, was used as a tool by the Directors and Officers in their scheme to strip Debtor of desperately needed capital for the benefit of themselves and FMCI, "loaning" money back to the Debtor (with interest) that never should have been taken in the first instance.  Pursuant to 11 U.S.C. § 105(a), the Court should re-characterize the FMCI Claim as equity.

**Count 93:**     **Equitable Subordination of Claim No. 4601 against FM Equity XI.**

999.    The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

1000.   FM Equity XI filed a proof of claim in the Bankruptcy Case [Claim No. 4601], which seeks an allowed claim in the amount of $2,707,279.64 for alleged principal and interest owed under the Collateral Repurchase Agreement ("FM Equity XI Claim").

1001.   FM Equity XI, through the Directors and Officers, engaged in wrongdoing and other inequitable conduct outlined in paragraphs 1-346, which resulted in unfairness to creditors and caused substantial harm to the Debtor.  Allowing FM Equity to share in what, if any, distribution is made to the other unsecured creditors of the Debtor would result in further unfairness to the remaining creditors.  Pursuant to 11 U.S.C. § 510(c), the Court should expunge, disallow, or otherwise equitably subordinate the FM Equity XI Claim to the claims of all other unsecured creditors until all other claims against the Debtor have been satisfied in full.

**Count 94:**     **Recharacterization of Claim No. 4601 Against FM Equity XI.**

1002.   The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

1003.   There is an identity of interests on both sides of the transaction giving rise to the FM Equity XI Claim because Malis executed the Collateral Repurchase Agreement on behalf of Debtor and FM Equity XI.  Through Malis and the other Directors and Officers, FM Equity XI engaged in wrongdoing and other inequitable conduct outlined in paragraphs 1-346, which resulted in unfairness to creditors and caused substantial harm to the Debtor.  The Collateral Repurchase Agreement, in particular, was a means to manipulate Debtor's books and records, and was not an arm's length transaction.  As such, funds advanced by FM Equity XI pursuant to the Collateral Repurchase Agreement were, in fact, capital contributions.  As such, funds advanced by FM Equity XI pursuant to the Collateral Repurchase Agreement were, in fact, capital contributions.  Pursuant to 11 U.S.C. § 105(a), the Court should re-characterize the FM Equity XI Claim as equity.

**Count 95:** **Equitable Subordination against the Directors and Officers, Sullivan, Sr. Revocable Trust, TSAA, FMLS, Lemke, Herk, Thrasher, Wright, Yonan, Chopra, Johnson, and Shoemaker.**

1004.   The Litigation Trustee re-adopts and re-alleges the allegations set forth in paragraphs 1-346 as fully set forth therein.

1005.   The Debtor has scheduled the following priority wage claims for the Directors and Officers ("Priority Wage Claims"):

| | | | |
|---|---|---|---|
| Jaggi | $ 8,750,00 | Chopra | $ 6,750.00 |
| Malis | $ 8,250.00 | Lemke | $ 7,500.00 |
| Marchetti | $ 8,200.00 | Johnson | $ 6,500.00 |
| Sullivan, Sr. | $ 4,750.00 | Shoemaker | $ 6,250.00 |
| Sullivan, Jr. | $ 4,750.00 | Thrasher | $ 5,000.00 |
| Young | $ 10,250.00 | Yonan | $ 5,417.00 |
| Herk | $ 10,000.00 | Wright | $ 6,000.00 |

1006. The Debtor has scheduled the following unsecured non-priority claims for the Sullivan, Sr. Revocable Trust, FMLS, TSAA, Malis, Marchetti, Young, and Herk ("Non-Priority Claims"):

| | |
|---|---|
| Sullivan, Sr. Revocable Trust | $ 20,000,000.00 |
| FMLS | $ 1,430,379.75 |
| TSAA | $ 10,250.00 |
| Gary Malis | $ 4,695.65 |
| Domenick Marchetti | $ 359.00 |
| Karl Young | $ 5,212.70 |
| John Herk | $ 24.00 |

1007. The Sullivan, Sr. Revocable Trust claim arises from the Sullivan, Sr. Subordinated Note, which is, on its face, subordinate to the claims of all other creditors of Debtor. Accordingly, the Litigation Trust requests that the Court expunge, disallow, or otherwise equitably subordinate the Non-Priority Claim for the Sullivan, Sr. Revocable Trust to the claims of all other unsecured creditors until all other claims against the Debtor have been satisfied in full pursuant to 11 U.S.C. § 510(c) and the terms of the Sullivan, Sr. Subordinated Note.

1008. The named claimants on the Priority Wage Claims and Non-Priority Claims engaged in wrongdoing and other inequitable conduct outlined in paragraphs 1-346, which resulted in unfairness to creditors and caused substantial harm to the Debtor. Allowing the claimants on the Priority Wage Claims and Non-Priority Claims to share in what, if any, distribution is made to the other unsecured creditors of the Debtor would result in further unfairness to the remaining creditors. Pursuant to 11 U.S.C. § 510(c), the Court should expunge, disallow, or otherwise equitably subordinate the Priority Wage Claims and Non-Priority Claims to the claims of all other unsecured creditors until all other claims against the Debtor have been satisfied in full.

**Count 96:**     <u>Attorneys' Fees.</u>

    1009.   Pursuant to Rule 7008(b), FED.R.BANKR.P. the Litigation Trustee hereby makes a claim to recover all of the Litigation Trust's reasonable and necessary attorneys' fees as set forth in the foregoing counts.

<b><u>REQUEST FOR RELIEF</u></b>

    The Litigation Trust respectfully requests that the Court grant all the relief requested herein and award:

        a.   all actual and consequential damages;

        b.   pre-judgment and post-judgment interest;

        c.   punitive and exemplary damages;

        d.   attorneys' fees and costs;

        e.   all treble and statutory damages; and

        f.   any and all relief the Court deems necessary and just.

DATED this 26th day of February, 2009.

LACKEY HERSHMAN, L.L.P.

By /s/ Jamie R. Welton
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219

GUST ROSENFELD P.L.C.
Sean P. O'Brien
201 E. Washington Street, Suite 800
Phoenix, Arizona 85004

Counsel for Larry Lattig, Litigation
Trustee, First Magnus Litigation Trust

195

 

# Open Adversary Case

## U.S. Bankruptcy Court

## District of Arizona

Notice of Electronic Filing

The following transaction was received from O'BRIEN, SEAN entered on 2/26/2009 at 4:37 PM AZ and filed on 2/26/2009

| | |
|---|---|
| **Case Name:** | LATTIG v. STONEWATER MORTGAGE CORPORATION et al |
| **Case Number:** | [4:09-ap-00211-JMM](#) |
| **Document Number:** | |
| **Case Name:** | FIRST MAGNUS FINANCIAL CORPORATION |
| **Case Number:** | [4:07-bk-01578-JMM](#) |
| **Document Number:** | |

**Docket Text:**
Adversary case 4:09-ap-00211. Adversary Proceeding Opened. (O'BRIEN, SEAN)

The following document(s) are associated with this transaction:

**4:09-ap-00211-JMM Notice will be electronically mailed to:**

SEAN P. O'BRIEN on behalf of LATTIG     spobrien@gustlaw.com, jbresnehan@gustlaw.com

**4:07-bk-01578-JMM Notice will be electronically mailed to:**

CLIFFORD B ALTFELD on behalf of PYRO BRAND DEVELOPMENT LLC     cbaltfeld@abgattorneys.com, lvaubel@abgattorneys.com;etodd@abgattorneys.com

ELIZABETH C. AMOROSI on behalf of U.S. TRUSTEE     Elizabeth.C.Amorosi@usdoj.gov

JAMES B. BALL on behalf of BANK OF AMERICA     ball@poliball.com, garcia@poliball.com,fern@poliball.com

GEORGE H. BARBER on behalf of LARRY LATTIG, LITIGATION TRUSTEE, FIRST MAGNUS LITIGATION TRUST     gbarber@krcl.com

DANIEL I. BARNESS on behalf of Crouse     daniel@spiromoss.com

CHRISTOPHER H. BAYLEY on behalf of FIRST MAGNUS CAPITAL, INC.    CBayley@swlaw.com; docket@swlaw.com;mminnick@swlaw.com

STEVEN N BERGER on behalf of MCA FINANCIAL GROUP, LTD.    snb@engelmanberger.com, cxa@engelmanberger.com

JEREMY T. BERGSTROM on behalf of Countrywide Home Loans    Mbergstrom@mileslegal.com

HILARY B. BONIAL on behalf of CitiMortgage, Inc.    notice@bkcylaw.com

GARLAND ALLEN BROWN on behalf of FIRST MAGNUS FINANCIAL CORPORATION    browng@gtlaw.com, arambulal@gtlaw.com

TODD A. BURGESS on behalf of AARON    burgesst@gtlaw.com

PETER A. CAL on behalf of Qwest Corporation and Qwest Communications Corporation    pcal@shermanhoward.com, dbaros@shermanhoward.com;efiling@shermanhoward.com

ROB CHARLES on behalf of Buyers under the Mortgage Loan Repurchase Agreement dated June 29, 2007    rcharles@lrlaw.com, CJordan@lrlaw.com;stacy_verkayk@azb.uscourts.gov

MICHAEL W. CHEN on behalf of THE COOPER CASTLE LAW FIRM fka THE COOPER CHRISTENSEN LAW FIRM    yvette@ccfirm.com

CHRISTOPHER RYAN CHICOINE on behalf of CHEVY CHASE BANK, FSB, its successors and/or assigns    ecfazb@piteduncan.com

DENNIS J. CLANCY on behalf of BINFORD    dclancy@ravlaw.com, klund@ravlaw.com

JOHN R. CLEMENCY on behalf of AARON    clemencyj@gtlaw.com

JOSEPH M. COLEMAN on behalf of LARRY LATTIG, LITIGATION TRUSTEE, FIRST MAGNUS LITIGATION TRUST    jcoleman@krcl.com

DANIEL P. COLLINS on behalf of Summit Investment Mangement, LLC    dcollins@cmpbglaw.com, cmpbglaw@gmail.com

STEVEN M COX on behalf of BINFORD    amoore@wechv.com;crohlinger@wechv.com

JAMES E. CROSS on behalf of Aaron    jcross@omlaw.com, kstewart@omlaw.com

SALLY M DARCY on behalf of NATIONAL BANK OF ARIZONA    ccarter@mddlaw.com

JOHN P. DILLMAN on behalf of Harris County    houston_bankruptcy@publicans.com

FRANKLIN D. DODGE on behalf of DOCUSAFE OF PHOENIX, INC.    tdodge@rwrplc.com

DAVID WM ENGELMAN on behalf of Dell Marketing, L.P.    dwe@engelmanberger.com, William. Dorsey@kattenlaw.com;Kenneth.Ottaviano@kattenlaw.com;cao@engelmanberger.com;Jeffrey. Chadwick@kattenlaw.com;kac@engelmanberger.com;cks@engelmanberger.com;skr@engelmanberger.

com

GREGORY W. FALLS on behalf of BURKLEY    gfalls@shermanhoward.com, amorrone@shermanhoward.com;info@mhplaw.com

DAVID A. FITZGERALD on behalf of Lutz    dfitzgerald@tbb-law.com, llefebvre@tbb-law.com

SUSAN M. FREEMAN on behalf of Buyers under the Mortgage Loan Repurchase Agreement dated June 29, 2007    SMF@LRLAW.COM, mschoenike@lrlaw.com

JOHN J. FRIES on behalf of Time Warner Telecom of Arizona, LLC    jfries@rcalaw.com, mscott@rcalaw.com;meldridge@rcalaw.com;apalmer@rcalaw.com

CRAIG SOLOMON GANZ on behalf of AARON    elliottd@gtlaw.com

GILL ROBERT GELDREICH on behalf of Tennessee Department of Revenue    agbankcal@ag.tn.gov, gill.geldreich@ag.tn.gov

SCOTT D. GIBSON on behalf of ALLEGRA PRINT & IMAGING    mcalderon@gnglaw.com

WALTER H. GILBERT on behalf of 4530 E. Shea LLC    rbird@almquist.com

JEREMY M. GOODMAN on behalf of FIRST MAGNUS FINANCIAL CORPORATION    jgoodman@gustlaw.com, larmijo@gustlaw.com;caveril@gustlaw.com

CAROLYN J. JOHNSEN on behalf of Merrill Lynch Bank USA    cjjohnsen@jsslaw.com

GARY G. KELTNER on behalf of Morgan Stanley Market Products, Inc    gkeltner@jsslaw.com

STANFORD E. LERCH on behalf of Tran    slerch@ldlawaz.com, ldlaw@ldlawaz.com

JAMES P.S. LESHAW on behalf of FIRST MAGNUS FINANCIAL CORPORATION    leshawj@gtlaw.com

MICHAEL C. MANNING on behalf of AURORA LOAN SERVICES    mmanning@stinson.com, kkaupke@stinson.com

NANCY J MARCH on behalf of WNS North America, Inc.,    nmarch@dmyl.com

BRENDA K. MARTIN on behalf of AARON, CHAPTER 11 LIQUIDATING TRUSTEE    bmartin@omlaw.com, kstewart@omlaw.com

DAVID E. MCALLISTER on behalf of CHEVY CHASE BANK, FSB, its successors and/or assigns    ecfazb@piteduncan.com

JOHN K. MCANDREW on behalf of FUNCTIONS5 TECHNOLOGY GROUP    jmcandrew@woodsoviatt.com

KEVIN 4 MCCOY on behalf of Borter    kmccoy@asbazlaw.com, tholm@asbazlaw.com; asbecf@asbazlaw.com

MICHAEL W. MCGRATH on behalf of Washington Mutual Bank    ecfbk@mcrazlaw.com; delkins@mcrazlaw.com

DAVID S. MCKEAND on behalf of McKeand Law Firm     mac.mckeand@yahoo.com

ROBERT J. MILLER on behalf of Countrywide Bank, Inc.     rjmiller@bryancave.com, sally.erwin@bryancave.com,pxdocket@bryancave.com

ADAM B. NACH on behalf of JOSEPH'S APPRAISAL GROUP ARIZONA, INC.     adam.nach@azbar.org; lnbkcourt@yahoo.com

KASEY C. NYE on behalf of PRINCIPAL LIFE INSURANCE COMPANY     knye@quarles.com

SEAN P. O'BRIEN on behalf of LARRY LATTIG, LITIGATION TRUSTEE, FIRST MAGNUS LITIGATION TRUST     spobrien@gustlaw.com, jbresnehan@gustlaw.com

BRADLEY DAVID PACK on behalf of Dell Marketing, L.P.     bdp@engelmanberger.com, kac@engelmanberger.com;bjc@engelmanberger.com;cks@engelmanberger.com

JOSEPHINE 1 PIRANIO on behalf of Homecomings Financial, LLC     ecfazb@piteduncan.com

JOSEPHINE E PIRANIO on behalf of Homecomings Financial, LLC     ecfazb@piteduncan.com

THOMAS JUSTIN POLIS on behalf of RC Foster Corporation     tom@polis-law.com

JASON J. ROMERO on behalf of AARON, CHAPTER 11 LIQUIDATING TRUSTEE     jromero@omlaw.com, kstewart@omlaw.com;mirons@omlaw.com

RENE S. ROUPINIAN on behalf of BINFORD     rroupinian@outtengolden.com

PHILIP R. RUDD on behalf of Chase Equipment Leasing, Inc.     philip.rudd@kutakrock.com

EDITH I RUDDER on behalf of G&J Development, Inc.     eadie@thompsonkrone.com

JONATHAN M. SAFFER on behalf of FIRST MAGNUS CAPITAL, INC.     jmsaffer@swlaw.com, docket_tux@swlaw.com,bkroth@swlaw.com

DAVID E. SCHLESINGER on behalf of Hart     schlesinger@nka.com

JOHN D. SCHLOTTER on behalf of Countrywide Home Loans, Inc.     BkMail@prommis.com

RENEE SANDLER SHAMBLIN on behalf of U.S. TRUSTEE     renee.s.shamblin@usdoj.gov, rsandlershamblin@cox.net

JASON 1 SHERMAN on behalf of Aurora Loan Services LLC c/o Perry & Shapiro, LLP     ECFNotices@logs.com

JASON 2 SHERMAN on behalf of Aurora Loan Services LLC c/o Perry & Shapiro, LLP     ECFNotices@logs.com

MATTHEW A. SILVERMAN on behalf of JPMorgan Chase Bank, N.A., as Trustee for certificateholders, its assignees and/or successors     matthew.silverman@azbar.org, amolina@mhlevine.com

ERIC SLOCUM SPARKS on behalf of FUSCO     eric@ericslocumsparkspc.com, law@ericslocumsparkspc.com

NICOLA G. SUGLIA on behalf of CANON FINANCIAL SERVICES, INC.     nsuglia@fleischerlaw.com

BRYCE A. SUZUKI on behalf of COUNTRYWIDE HOME LOANS INC     bryce.suzuki@bryancave.com, sally.erwin@bryancave.com,pxdocket@bryancave.com

CHRISTINA M THOMPSON on behalf of Stoltz Management of Delaware, Inc.     CTHOMPSON@CBLH.COM

KIMBERLY A. WALSH on behalf of TEXAS COMPTROLLER OF PUBLIC ACCOUNTS     bk-kwalsh@oag.state.tx.us

MADELEINE 1 WANSLEE on behalf of Arizona Central Credit Union, c/o Madeleine mwanslee@gustlaw.com, rms@gustlaw.com

MADELEINE 2 WANSLEE on behalf of Arizona Central Credit Union, c/o Madeleine mwanslee@gustlaw.com, rms@gustlaw.com

MICHAEL D. WARNER on behalf of OFFICIAL COMMITTE OF UNSSECURED CREDITORS mwarner@warnerstevens.com, robaldo@warnerstevens.com;cnfreid@aconnx.com

SUZANNE M WARREN on behalf of NEVADA DEPARTMENT OF TAXATION     swarren@ag.nv.gov

THEODORE P. WITTHOFT on behalf of REDWOOD MORTGAGE FUNDING, INC.     twitthoft@cmpbglaw.com, cmpbglaw@gmail.com

LIBBY WONG on behalf of LIGHTHOUSE REAL ESTATE SOLUTIONS     lwong@pfeiferlaw.com, nyrivera@pfeiferlaw.com

DONALD A. WORKMAN on behalf of Fidelity National Information Services, Inc.     dworkman@bakerlaw.com

KARON Y. WRIGHT on behalf of Travis County     karon.wright@co.travis.tx.us, bkecf@co.travis.tx.us

GERMAN YUSUFOV on behalf of Pima County, Arizona     pcaocvbk@pcao.pima.gov

GREGORY M. ZARIN on behalf of LARRY LATTIG, LITIGATION TRUSTEE, FIRST MAGNUS LITIGATION TRUST     gzarin@krcl.com

DANIEL B. ZEBELMAN on behalf of Lutz     dzebelman@tbb-law.com