1  **GUST ROSENFELD P.L.C.**
   201 E. Washington Street
2  Suite 800
   Phoenix, Arizona 85004
3  Telephone: (602) 257-7460
   Telecopier: (602) 340-1538
4  Sean P. O'Brien, Bar No. 010540
   E-mail: spobrien@gustlaw.com
5  Jeremy M. Goodman, Bar No. 025859
   jgoodman@gustlaw.com
6
   **LACKEY HERSHMAN, L.L.P.**
7  3102 Oak Lawn Avenue, Suite 777
   Dallas, TX 75219
8  Telephone: (214) 560-2201
   Telecopier: (214) 560-2203
9  Jamie R. Welton, TX State Bar No. 24013732
   E-mail: jrw@lhlaw.net
10
   **COUNSEL FOR LARRY LATTIG,**
11 **LITIGATION TRUSTEE FOR THE**
   **FIRST MAGNUS LITIGATION TRUST**
12

13                    IN THE UNITED STATES BANKRUPTCY COURT

14                          FOR THE DISTRICT OF ARIZONA

15

16 | In re:                                  | Case No. 4:07-bk-01578-JMM |

17 | FIRST MAGNUS FINANCIAL                  | (Chapter 11)               |
18 | CORPORATION,
   |              Debtor.

19 |                                         | Adversary No. 4:09-ap-00211-JMM |

20 | LARRY LATTIG, LITIGATION TRUSTEE
   | FOR THE FIRST MAGNUS LITIGATION
21 | TRUST,

22

23 |                 Plaintiff,
   | v.
24
   | GURPREET S. JAGGI; THOMAS W.
25 | SULLIVAN, SR.; THOMAS W. SULLIVAN,

JR.; CLINTON W. GAYLORD; GARY K.
MALIS; DOMINICK MARCHETTI; KARL
F.W. YOUNG; THOMAS W. SULLIVAN,
SR. REVOCABLE TRUST; ECLOSER, INC.;
ECLOSER SERVICES, INC.; FIRST
MAGNUS CAPITAL, INC.; FIRST
MAGNUS REALTY, LLC; INDUS
HOLDINGS LLC; INDUS VENTURES,
LLC; MAGNUS CORPORATION;
MAGNUS SETTLEMENT SERVICES, LLC;
SULLIVAN TITLE INVESTMENT, LLC;
SULLIVAN TITLE MANAGEMENT, INC.;
TITLE SECURITY AGENCY OF ARIZONA;
WRIGHT & YONAN, PLLC; JEFF
ARNOLD; ARVIND SHARMA; VIVEK
SHIVPURI; MARTIN W. THOMAS; JAMES
WARNER; NATHAN C. WRIGHT; AND
MARK E. YONAN,

Defendants.

## SECOND AMENDED COMPLAINT

Larry Lattig, Litigation Trustee for the First Magnus Litigation Trust (the "Litigation Trustee"), by and through his undersigned counsel, states and alleges for his Complaint against the above-captioned persons and entities, as follows:

## JURISDICTION & VENUE

1.    On August 21, 2007, First Magnus Financial Corporation ("First Magnus," "FMFC," or the "Debtor") filed a Voluntary Petition for relief under Chapter 11 of the BANKRUPTCY CODE, in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"), Case No. 4-BK-07-01578-PHX-JMM (the "Bankruptcy Case"). Debtor continued with the management and operation of its business and property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. An official Committee of Unsecured Creditors (the "Committee") was appointed on August 30, 2007.

2.      On February 28, 2008, the Bankruptcy Court confirmed the Second Amended Plan of Liquidation, dated January 4, 2008 (the "Plan" and the "Confirmation Order," respectively). The Plan became effective on May 1, 2008 (the "Effective Date") [Bk, Dkt. No. 2438].

3.      This adversary proceeding is commenced by the Litigation Trustee pursuant to Rule 1001, FED. R. BANKR. P.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), (M), (N), and (O).

4.      This Court has jurisdiction over this adversary proceeding and the parties to the proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

5.      The factual allegations set forth herein have been pled in the alterative pursuant to Rule 8(d)(2), FED. R. CIV. P.

## THE PARTIES

**I.      The Corporate Defendants (In Alphabetical Order).**

6.      Ecloser, Inc. is a Delaware corporation with its principal place of business at 603 N. Wilmot Road, Tucson, AZ.  The paragraphs in the facts section that are applicable to the claims against Ecloser, Inc. are ¶¶ 40-43, 111-12, 147-54.  The Counts applicable to Ecloser, Inc. are Counts 34-35, 49-50, 53-57, and 60.

7.      Ecloser Services, Inc. ("ECSI") is a Delaware corporation with its principal place of business at 603 N. Wilmot Road, Tucson, AZ.  The paragraphs in the facts section that are applicable to the claims against ECSI are ¶¶ 40-43, 111-12, 147-54.  The Counts applicable to ECSI are Counts 34-35, 49-50, 53-57, and 60.

8.      First Magnus Capital, Inc., which subsequently filed for bankruptcy protection and is in the process of liquidating through the First Magnus Capital, Inc. Liquidating Trust, was an Arizona corporation with its principal place of business at 603 N. Wilmot Road,

Tucson, AZ (collectively "FMCI"). The paragraphs in the facts section that are applicable to the claims against FMCI are ¶¶ 40-112. The Counts applicable to FMCI are Counts 2-7, 16-18, 22-33, 36-38, and 58-60.

9. First Magnus Realty, LLC ("FM Realty") is an Arizona limited liability company with its principal place of business at 6390 E. Tanque Verde Road, Tucson, AZ 85715. FM Realty owns 603 N. Wilmot Road, Tucson, AZ, FMFC's former headquarters (the "Headquarters"). The members of FM Realty include Sullivan, Sr. and Indus Holdings. FM Realty is managed by Magnus Corp. The paragraphs in the facts section that are applicable to the claims against FM Realty are ¶¶ 40-67, 109-46. The Counts applicable to FM Realty are Counts 34-42, 45-48, and 60.

10. Indus Holdings LLC ("Indus Holdings") is an Arizona limited liability company with its principal place of business at 6040 N. Paseo Valdear, Tucson, AZ. Members of Indus Holdings include Jaggi and his wife, Reema Sawhney. Jaggi manages Indus Holdings. The paragraphs in the facts section that are applicable to the claims against Indus Holdings are ¶¶ 40-43, 113-46. The Counts applicable to Indus Holdings are Counts 39-42, 45-48, and 60.

11. Indus Ventures, LLC ("Indus Ventures") is an Arizona limited liability company with its principal place of business at 6040 N. Paseo Valdear, Tucson, AZ. Jaggi manages Indus Ventures. The paragraphs in the facts section that are applicable to the claims against Indus Ventures are ¶¶ 40-43, 113-46. The Counts applicable to Indus Ventures are Counts 39-42, 45-48, and 60.

12. Magnus Corporation ("Magnus Corp.") is an Arizona corporation with its principal place of business at 6390 E. Tanque Verde, Tucson, AZ. Magnus Corp. is owned and operated by Sullivan, Sr., Sullivan, Jr., and Sabina Sullivan. The paragraphs in the facts section that are applicable to the claims against Magnus Corp. are ¶¶ 40-67, 101-08, 147-54.

1   The Counts applicable to Magnus Corp. are Counts 27-29, 36-38, 49-50, 53-57, and 60.

2          13.     Magnus Settlement Services, LLC ("Magnus Settlement Services" or "MSS")

3   is an Arizona limited liability with its principal place of business at 603 N. Wilmot Road,

4   Tucson, AZ. The members of MSS are Sullivan, Sr., and Sullivan, Jr. The paragraphs in the

5   facts section that are applicable to the claims against MSS are ¶¶ 40-43, 147-54. The Counts

6   applicable to MSS are Counts 49-50, 53-57, and 60.

7          14.     Sullivan Title Investment, LLC ("Sullivan Title Investment") is an Arizona

8   limited liability company with its principal place of business at 603 N. Wilmot Road, Tucson,

9   AZ. Members of Sullivan Title Investment include TSA and FMCI. Sullivan Title Investment

10  is managed by Sullivan Title Management. The paragraphs in the facts section that are

11  applicable to the claims against Sullivan Title Investment are ¶¶ 40-43, 111-112, 147-54. The

12  Counts applicable to Sullivan Title Investment are Counts 34-35, 49-50, 53-57, and 60.

13         15.     Sullivan Title Management, Inc. ("Sullivan Title Management") is an Arizona

14  corporation with its principal place of business at 603 N. Wilmot Road, Tucson, AZ. Sullivan

15  Title Management is owned and operated by Sullivan, Sr. and Sullivan, Jr. The paragraphs in

16  the facts section that are applicable to the claims against Sullivan Title Management are ¶¶ 40-

17  43, 111-112, 147-54. The Counts applicable to Sullivan Title Management are Counts 34-35,

18  49-50, 53-57, and 60.

19         16.     Collectively, Sullivan Title Investment and Sullivan Title Management shall be

20  referred to as "Sullivan Title."

21         17.     Thomas W. Sullivan, Sr. Revocable Trust ("The Sullivan, Sr. Revocable

22  Trust"), is an alleged revocable trust created under an agreement dated July 9, 2002. Sullivan,

23  Sr. was the sole trustee, the sole grantor, and the sole beneficiary of The Sullivan, Sr.

24  Revocable Trust. The paragraphs in the facts section that are applicable to the claims against

25  The Sullivan, Sr. Revocable Trust are ¶¶ 40-69, 88-90, 113-46. The Counts applicable to The

Sullivan, Sr. Revocable Trust are Counts 2-4, 19-21, 36, 39-42, 45-48, and 60.

18.     Title Security Agency of Arizona ("TSA") is an Arizona corporation with its principal place of business at 6390 E. Tanque Verde, Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against TSA are ¶¶ 40-43, 147-54. The Counts applicable to TSA are Counts 49-50, 53-57, and 60.

19.     Wright & Yonan, PLLC ("Wright & Yonan") is an Arizona professional limited liability company with its principal place of business at 6860 N. Oracle Rd., No. 140, Tucson, AZ. Members of Wright & Yonan include Wright and Yonan. The paragraphs in the facts section that are applicable to the claims against Wright & Yonan are ¶¶ 40-43, 127, 130-31, 147-54. The Counts applicable to Wright & Yonan are Counts 41, 45-49, 56-57, and 60.

## II.     The Individual Defendants (In Alphabetical Order).

20.     Jeff Arnold ("Arnold") is the former President of Charter Insurance Group ("CIG"), which was a wholly owned subsidiary of First Magnus Lender Services, LLC ("FMLS"). Arnold is currently the owner and operator of Jeff Arnold Companies, Inc. ("JACI"), an entity formed to acquire CIG from Debtor's parent company FMCI. Arnold is also a shareholder of SW Holding. Arnold is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Arnold are ¶¶ 40-43, 95-98, 113-46. The Counts applicable to Arnold are Counts 39-42, 45-48, and 60.

21.     Clinton W. Gaylord ("Gaylord") is the former Senior Vice-President of Corporate Retail of FMFC, and former shareholder of FMFC and FMCI. Gaylord is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Gaylord are ¶¶ 40-112. The Counts applicable to Gaylord are Counts 1, 5-7, 10-15, 18, 23, 25, 27, 29, 31-38, and 60.

22.     Gurpreet S. Jaggi ("Jaggi") is the former President and Chief Executive Officer of FMFC and FMCI, and a shareholder of FMFC and FMCI. Jaggi is also a managing

member of FM Consulting, G Force, Indus Holdings, and Indus Ventures. Through Indus Holdings, Jaggi is a member of FM Realty. Through G Force, Indus Holdings, and Indus Ventures, Jaggi is a shareholder of SW Holding. Jaggi is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Jaggi are ¶¶ 40-146. The Counts applicable to Jaggi are Counts 1, 10-15, 18, 23, 25, 27, 29, 31-48, and 60.

23.     Gary K. Malis ("Malis") is the Debtor's former Chief Financial Officer and shareholder of FMFC and FMCI. Malis is a member of FM Consulting and G Force. Through G Force, Malis is a shareholder of SW Holding. Malis was the Managing Director of Capital Markets for SW Mortgage. Malis is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Malis are ¶¶ 40-146. The Counts applicable to Malis are Counts 1, 10-15, 18, 23, 25, 27, 29, 31-48, and 60.

24.     Dominick Marchetti ("Marchetti") is the Debtor's former Chief Technology Officer, and a shareholder of FMFC and FMCI. Marchetti is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Marchetti was the Managing Director of Loan Production for SW Mortgage. Marchetti is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Marchetti are ¶¶ 40-146. The Counts applicable to Marchetti are Counts 1, 10-15, 18, 23, 25, 27, 29, 31-48, and 60.

25.     Arvind Sharma ("Sharma") is Debtor's former Chief Operating Officer of Banking and is employed by SW Mortgage. Sharma is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Sharma are ¶¶ 40-43, 113-46. The Counts applicable to Sharma are Counts 43 and 60.

26.     Vivek Shivpuri ("Shivpuri") is a shareholder of SW Holding and a Director of ECSI. Shivpuri is the former President and Chief Executive Officer of Trinity. Shivpuri is an

Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Shivpuri are ¶¶ 40-43, 113-54. The Counts applicable to Shivpuri are Counts 39-42, 45-50, 53-54, 56-57, and 60.

27. Thomas W. Sullivan, Jr. ("Sullivan, Jr.") is the former Vice President, Secretary, and Treasurer of FMFC and FMCI, and a shareholder of FMFC and FMCI. Sullivan, Jr. is a member of FM Consulting, G Force, and MSS, a shareholder of SW Holding, individually and through G Force, and a director, officer, and shareholder of Magnus Corp. Sullivan, Jr. is the President of TSA. Sullivan, Jr. is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Sullivan, Jr. are ¶¶ 40-154. The Counts applicable to Sullivan, Jr. are Counts 1, 10-15, 18, 23, 25, 27, 29, 31-57, and 60.

28. Thomas W. Sullivan, Sr. ("Sullivan, Sr.") is the former Chairman of the Board of FMFC and FMCI, and a shareholder of FMFC and FMCI. Sullivan, Sr. is a member of FM Consulting, FM Realty, MSS, and Sullivan Title Investment, a director, officer, and shareholder of Magnus Corp. and Sullivan Title Management, and a director, shareholder, and former President of TSA. Sullivan, Sr. is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Sullivan, Sr. are ¶¶ 40-154. The Counts applicable to Sullivan, Sr. are Counts 1-4, 10-15, 18-21, 23, 25, 27, 29, 31-57, and 60.

29. Martin W. Thomas ("Thomas") is a former shareholder of FMFC and Executive Vice President for TSA. Thomas is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Thomas are ¶¶ 40-73. The Counts applicable to Thomas are Counts 8-9, 36, and 60.

30. James (Jim) Warner ("Warner") is Debtor's former Deputy General Counsel, a Director of ECSI, and an employee and shareholder of SW Holding. Warner is an Arizona

resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Warner are ¶¶ 40-43, 113-54. The Counts applicable to Warner are Counts 39-54, 56-57, and 60.

31.   Nathan C. Wright ("Wright") is Debtor's former Deputy General Counsel. Wright is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Wright are ¶¶ 40-43, 127, 130-31, 147-54. The Counts applicable to Wright are Counts 41, 43-52, 56-57, and 60.

32.   Mark E. Yonan ("Yonan") is Debtor's former Deputy General Counsel. Yonan is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Yonan are ¶¶ 40-43, 113-46. The Counts applicable to Yonan are Counts 39-41, 43-48, and 60.

33.   Karl F. W. Young ("Young") is Debtor's former Chief Operating Officer, and shareholder of FMFC and FMCI. Young is a member of FM Consulting and G Force, a shareholder of SW Holding, individually and through G Force, and was the President and Chief Executive Officer of SW Mortgage. Young is an Arizona resident and resides in Tucson, AZ. The paragraphs in the facts section that are applicable to the claims against Young are ¶¶ 40-146. The Counts applicable to Young are Counts 1, 10-15, 18, 23, 25, 27, 29, 31-48, and 60.

**OTHER PLAYERS**

34.   G Force 1, LLC ("G Force") is an Arizona limited liability company with its principal place of business at 603 N. Wilmot Road, Tucson, AZ.

35.   StoneWater Holding Corporation ("SW Holding") and its subsidiaries, StoneWater Mortgage Corporation ("SW Mortgage"), StoneWater BPO LLC ("SW BPO"), StoneWater Insurance Group LLC ("SW Ins."), StoneWater Lender Services, LLC ("SW Lender Services"), and StoneWater Technology LLC ("SW Tech"), are collectively referred to

as "StoneWater." StoneWater principally engaged in the same business as FMFC, namely, the origination of residential mortgage loans on a wholesale and retail basis that were subsequently sold to investors or financial institutions as part of a collateralized investment package. SW Mortgage maintained its headquarters at Debtor's former Headquarters, was licensed to conduct business in approximately 26 states, and operated sales offices in Illinois, Texas, Georgia, California, Pennsylvania, and New Jersey.

36. Amit Gujral ("Gujral") is the Managing Director of Operations for SW Mortgage, a shareholder of SW Holding, and member of G Force. Gujral was a Founder and Vice President of Delivery for Trinity Partners, Inc. d/b/a Trinity Business Process Management ("Trinity") and an employee of Debtor.

37. Brett Johnson ("Johnson") is Debtor's former Director of Software Engineering. Johnson is a member of FM Consulting and G Force, and, through G Force, is a shareholder of SW Holding. Johnson is employed by StoneWater.

38. Douglas G. Lemke ("Lemke") is Debtor's former General Counsel and Chief Administrative Officer. Lemke is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Lemke is SW Mortgage's former Chief Administrative Officer and current President.

39. Phillip Shoemaker ("Shoemaker") is Debtor's former Director of Application Design. Shoemaker is a member of FM Consulting and G Force, and through G Force, is a shareholder of SW Holding. Shoemaker is employed by StoneWater.

# THE FACTS

## I.  FMFC Developed State-Of-The-Art Technology And Became A Leading Originator Of Non-Conforming Alt-A Loans.

### A.  First Magnus Made Technology The Core Of Its Business.

40.    First Magnus was incorporated on July 16, 1996.  First Magnus' original shareholders included Jaggi, Sullivan, Sr., Sullivan, Jr., and Thomas.  The original shareholders of First Magnus later entered into a Restatement of Preincorporation Agreement for First Magnus effective July 15, 1996 (the "Preincorporation Agreement"), for the purpose of including additional shareholders, including Gaylord and Young.

41.    FMFC built its business model around the development of technology and other proprietary programs designed to streamline the loan origination process and efficiently allocate workflow to expedite the origination and sale of loans.  FMFC's foray into technology led FMFC's Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, along with key technology personnel and other high-ranking FMFC executives, to form FM Consulting, LLC ("FM Consulting") to assist FMFC in "off-shoring" its back-office processes and software development.  Members of FM Consulting included Jaggi, Sullivan, Sr., and Sullivan, Jr., who were the managing members, and Malis, Marchetti, Young, Jasjit Chopra, Johnson, and Shoemaker.

42.    In 2003, FMFC, FM Consulting, and others, including Gujral, Shivpuri, and Arvind Srivastava ("Srivastava"), formed Trinity Partners, Inc. ("Trinity"), which was based in Gurgaon, India, to continue providing FMFC with business outsourcing services and technical personnel.  In November 2005, WNS Holdings Ltd. ("WNS") acquired Trinity for a combination of cash and stock ("Trinity Sale"), and, as part of the transaction, First Magnus entered into a long-term service agreement with WNS.  In all, FMFC maintained a technology staff of approximately 400, approximately 25% in Tucson and the remainder in India.

43.     FMFC's proprietary program to engineer technology — known as FMFC's Dev-IT Program — was more than a decade in development and was a key to FMFC's success, as it permitted FMFC to respond quickly to market conditions, to reduce operational costs through paperless loan processing and underwriting, and to maintain a litany of other competitive advantages. Through FMFC's Dev-IT Program, FMFC delivered software developments in a variety of areas, including, but not limited to, accounting, closing, funding, compliance, human resources, marketing, customer service, pricing, production, product development, risk management, underwriting, and shipping. FMFC also expanded its Dev-IT Program outside its core competencies, taking on more strategic projects that fused best of breed technology and practices to fuel the future growth of First Magnus.

**B.     First Magnus Originated, Purchased, And Sold Predominantly Alt-A Loans.**

44.     Due in large part to FMFC's proprietary programs and technological know-how, FMFC was the one of the largest Alt-A lenders in the country by 2006. From January 2005 through the Petition Date, FMFC originated and sold more than $70 billion in mortgage loans. No less than 50% of all loans originated, purchased, and sold by FMFC from January 2005 through the Petition Date were "Alt-A" paper or below. From the first quarter of 2004 through the fourth quarter of 2006, FMFC increased its Alt-A originations by 692%.

45.     FMFC also engaged in classic subprime lending. Subprime borrowers have a heightened risk of default, as they have a history of loan delinquencies or defaults, foreclosures, adverse judgments, bankruptcy filings, or have little to no debt experience. Over 46% of all loans originated by First Magnus in 2006 had borrowers with FICO scores below 700, of which 32% had FICO scores between 650 and 700. Approximately 14% of all loans originated by First Magnus in 2006 had borrowers with FICO scores that were less than 650.

46.     FMFC also financed the construction of residential homes. FMFC's

construction lending was limited to three markets — Arizona, California, and Nevada. Approximately 90% of FMFC's construction lending, however, was in the Phoenix-area. By April 2006, Sonoran Family Communities — the builder with whom FMFC had more than 35% of its outstanding commitments — had abandoned construction on all of its projects.

47. Collectively, the loans First Magnus originated, purchased, and sold were predominantly in areas of the country hardest hit by the housing crisis, namely, Arizona, California, and Florida. In 2006, those states made up 52% of First Magnus' volume – Arizona (24%), California (19%), and Florida (9%). No other state contributed more than 5%.

**C.   First Magnus Borrowed The Funds Used To Originate Its Loans.**

48. To finance its mortgage loan production business, FMFC used several warehouse financing agreements that primarily took the form of master repurchase agreements (collectively, the "Repurchase Agreements") with certain lenders (collectively, the "Warehouse Lenders"). Through the Repurchase Agreements, the Warehouse Lenders advanced First Magnus the funds to originate mortgage loans by agreeing to purchase the loans from First Magnus, which, in turn, simultaneously agreed to "repurchase" the mortgage loans from the Warehouse Lenders at a price equal to the original sale price, plus an interest component, within a fixed number of days ("Warehouse Repurchase Obligations").

49. The Repurchase Agreements set forth eligibility requirements that restricted the mortgage loans that could be held in the warehouse ("Warehouse Eligibility Requirements"). If a loan failed to meet the Warehouse Eligibility Requirements at any time, First Magnus was obligated to immediately satisfy its Warehouse Repurchase Obligations upon request. Whether a loan met the Warehouse Eligibility Requirements was generally within the sole discretion of the Warehouse Lenders. The Warehouse Eligibility Requirements were not limited in duration and could be invoked at any time.

50. The Repurchase Agreements also required that First Magnus maintain a

requisite financial condition and certify periodically that those conditions continued to be met ("Warehouse Financial Covenants"). The failure to meet any of the Warehouse Financial Covenants required First Magnus to immediately satisfy its Warehouse Repurchase Obligations upon request.

51.     The Repurchase Agreements also obligated First Magnus to indemnify the Warehouse Lenders for matters related to the Repurchase Agreements ("Warehouse Indemnity Obligations"). The Repurchase Agreements generally specified that the Warehouse Repurchase Obligations and Warehouse Indemnity Obligations "shall be full recourse obligations" of First Magnus.

52.     The failure to satisfy a Warehouse Repurchase Obligation, a Warehouse Financial Covenant, a Warehouse Indemnity Obligation, or any other specified obligation in the Repurchase Agreements, constituted an Event of Default, which permitted the Warehouse Lenders to exercise a variety of remedies, including, but not limited to, making all Warehouse Repurchase Obligations immediately due and payable, taking immediate possession of the loans, and exercising all rights related thereto. Because a default under a Repurchase Agreement or Loan Purchase Agreement provided such significant recourse against First Magnus, cross-default provisions provided a "me too" ability for Warehouse Lenders and Take-Out Investors to declare a default and exercise their remedies in the event any other Repurchase Agreement or Loan Purchase Agreement was breached.

**D.     First Magnus Sold Its Loans To Wall Street Firms.**

53.     First Magnus attempted to sell the loans it originated to subsequent purchasers, sometimes referred to as take-out investors ("Take-Out Investors" or "Purchasers"), for a price over the amount First Magnus owed to the Warehouse Lenders. Take-Out Investors included Lehman Brothers, Bear Stearns, Morgan Stanley, Bank of America, and CitiMortgage. The largest Take-Out Investor for First Magnus was Lehman Brothers Bank, FSB (and its wholly-

owned subsidiary, Aurora Loan Services, LLC ("Aurora")) (collectively "Lehman").

54.     First Magnus sold its mortgage loans to the Take-Out Investors pursuant to the terms of loan purchase agreements ("Loan Purchase Agreements"). The Loan Purchase Agreements contained provisions that allowed the Take-Out Investors, or their subsequent assignees, to return any and all loans sold to them and required FMFC to immediately refund the purchase in its entirety ("LPA Repurchase Obligations"). The Loan Purchase Agreements also contained other provisions that required FMFC to indemnify the Take-Out Investors or their subsequent assignees for any losses and costs incurred related to the loan (including lost cash flows over the life of the loan) and to make immediate cash payments as determined by the purchaser or subsequent assignees to satisfy the obligations ("LPA Indemnity Obligations"). The Loan Purchase Agreements also contained financial covenants and cross-default provisions similar to those contained in the Repurchase Agreements, which, if triggered, permitted the Take-Out Investors, or their assignees, to exercise their repurchase and indemnification remedies on any and all loans previously purchased. Collectively, the LPA Indemnity Obligations asserted by the Take-Out Investors in the Bankruptcy Case exceeded half a billion dollars.

## II.     Rather Than Reserve Or Account For Known Contingencies, FMFC Artificially Accelerated Revenue Recognition And Overstated The Value Of Its Assets.

55.     Given the scope of the repurchase and indemnification obligations to Warehouse Lenders and Take-Out Investors, generally accepted accounting principles ("GAAP") required First Magnus to maintain adequate reserves, recognize revenue over time, and account for the contingencies related to the terms on which it financed and sold its loans. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young failed to do this. Through these and other GAAP violations, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young inflated the stated "equity" and "profit" in FMFC and transferred more

than $160,000,000 directly to themselves in the form of stock redemptions, bonuses, and distributions.

56.     The GAAP Violations.  FMFC's accounting personnel, specifically, FMFC's Chief Financial Officer, Gary Malis, and Controller, Jasjit Chopra, had a responsibility to review professional standards and make determinations as the propriety of FMFC's accounting policies and any changes or adjustments that needed to be made to FMFC's internal control processes.  Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and specifically, Malis and Chopra, failed to do this.

57.     Inadequate Reserves.  FMFC failed to account properly for a loss reserve required to be established under GAAP for probable losses and expenses to be incurred under the Repurchase Agreements with the Warehouse Lenders and the Loan Purchase Agreements with the Take-Out Investors (collectively, the "Reserves").  In sum, First Magnus kept **a reserve of only .02%, or .0002**, on the repurchase and indemnity obligations associated with approximately **$2 billion in loans held for sale** and kept **a reserve of 0%, or .0,** for the repurchase and indemnity obligations associated with the more than **$70 billion in loans sold** to Take-Out Investors between January 2005 and the Petition Date.  This was a significant GAAP violation.

58.     Applying GAAP, First Magnus should have reserved 2% or more on its mortgage loans held for sale from January 2005 through the Petition Date.  Failing to do so resulted in an 8-15% overstatement of Debtor's mortgage loans held for sale.  At their highest point between January 2005 and the Petition Date, if FMFC's mortgage loans held for sale were overstated by as little as 5.39%, Debtor had no shareholder equity, its debts greatly exceeded its assets at a fair valuation, and it was insolvent at all times.

59.     The failure to reserve for the repurchase and indemnity obligations overstated FMFC's gains on sale.  Only *after* a Take-Out Investor made a repurchase or indemnity claim

did Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young account for any loss contingencies related to those specific repurchase claims, referred to as "open repurchases." Even then, First Magnus only accounted for repurchase requests made by Take-Out Investors, not payment requests related to its indemnity obligations, and accounted for only 17% of the face amount of the claim. This practice allowed a material underestimation of the quantity and magnitude of repurchase and indemnity obligations.

60. First Magnus should have reserved 1% or more from January 2005 through the Petition Date on the $70 billion in mortgage loans sold, which would have resulted in an adjustment of no less than $300,000,000 (and closer to $700,000,000). At its highest point between January 2005 and the Petition Date, FMFC's alleged shareholder equity was approximately $200,000,000 (assuming no adjustments for the GAAP Violations). Had FMFC accounted properly for the Reserves and contingencies, FMFC had no shareholder equity, its debts exceeded its assets at fair valuation, and it was at all times insolvent.

61. <u>Premature Revenue Recognition</u>. Jaggi, Sullivan Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young also artificially accelerated gains on sale by recognizing 100% of the revenue from the sale of a loan the moment FMFC committed the loan to a Take-Out Investor. FMFC never reflected any estimated returns when reporting the sales revenue and costs of sale in its income statements. This was a significant GAAP violation.

62. FMFC should not have artificially accelerated the recognition of revenue on the $70 billion in loans sold, which resulted in inflated pre-tax net income and the alleged shareholder equity on which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid themselves stock redemptions, bonuses, and distributions. Had Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young applied GAAP to revenue recognition, FMFC's debts greatly exceeded its assets at fair valuation, it had no "equity," and was at all times insolvent.

63.   <u>Overstated Value of Loans Held for Sale</u>.  FMFC failed to value its mortgage loans held for sale at the "lower of cost or fair market value" ("LOCOM").   This was a significant GAAP violation and led to a material overstatement of FMFC's assets.

64.   By not applying a proper LOCOM analysis consistent with industry practice, FMFC overvalued its loans held for sale from January 2005 through the Petition Date by no less than 25%.  At their highest point between January 2005 and the Petition Date, if FMFC's mortgage loans held for sale were overstated by as little as 5.39%, Debtor had no shareholder equity, its debts greatly exceeded the value of its assets at fair valuation, and it was insolvent at all times.

65.   In sum, from January 2005 through the Petition Date, FMFC was, at all times, insolvent, had no shareholder equity, and had debts that greatly exceeded the value of its assets at fair valuation because Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young: (1) failed to maintain an adequate reserve for the approximately $2 billion in loans held for sale at any given time; (2) failed to reserve anything against the $70 billion in loans sold with significant repurchase and indemnity obligations; (3) prematurely recognized 100% of revenue on the sale of loans upon a commitment from a Purchaser; and (4) overvalued the loans held for sale (collectively, the "GAAP Violations").  Any one of the GAAP Violations rendered Debtor insolvent from January 2005 through the Petition Date.

**III.   Insiders Stripped FMFC Of Approximately $300MM In Capital.**

66.   Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young incorporated FMCI on June 15, 2005 for the ostensible purpose of establishing a federally chartered savings and loan institution (the "Bank").  Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young intended to use deposits from the newly-chartered Bank to acquire loans from FMFC when it needed to move loans from its warehouse lines or otherwise satisfy its repurchase and indemnity obligations to Take-Out Investors.  The Office of Thrift

1   Supervision never approved the formation of the Bank.

2         67.     In March and April 2006, more than 25% of the mortgage loans held for sale by

3   FMFC were greater than 60 days old.  On June 21, 2006, Jaggi, Sullivan, Sr., Sullivan, Jr.,

4   Gaylord, Malis, Marchetti, and Young exchanged all of their shares of capital stock of FMFC

5   for capital shares of FMCI (the "Exchange Agreement") and entered into a shareholders'

6   agreement ("FMCI Shareholders' Agreement").  This share exchange resulted in Jaggi,

7   Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young owning 100% of FMCI, and

8   FMCI owning 100% of FMFC.  Jaggi, Sullivan, Sr., and Sullivan, Jr. were named directors of

9   FMCI and appointed its officers, which mirrored those of FMFC.

10   **A.     The Stock Redemptions: $70MM.**

11         **1.     The Sullivan, Sr. Redemption: $55MM.**

12         68.     Through a Stock Purchase Agreement dated August 24, 2006, between FMCI

13   and Sullivan, Sr., as the "trustee" on behalf of The Sullivan, Sr. Revocable Trust, FMCI

14   agreed to redeem approximately 950,000 shares from Sullivan, Sr. for approximately

15   $54,224,793, or $57.08 per share (the "Sullivan, Sr. Redemption").  Jaggi, Sullivan, Sr., and

16   Sullivan, Jr. authorized the transaction.  The funds used to pay the Sullivan, Sr. Redemption

17   came directly from FMFC, which received no consideration for the transaction.

18         69.     The price per share for the Sullivan, Sr. Redemption was based on the "book

19   value" of FMFC as of June 30, 2006, not the "net asset value" as defined in the

20   Preincorporation Agreement.  As outlined in the Preincorporation Agreement, the Sullivan, Sr.

21   Redemption should have been based on the "net asset value," "subject to the availability of

22   funds," and resulted in the payment of only 25% of the outstanding obligation prior to the

23   Petition Date.  Instead, the Sullivan, Sr. Redemption was based on a "book value" that was not

24   determined in accordance with GAAP.

25

### 2. The Gaylord Redemption: $5.8MM.

70.    Bill Gaylord, and his father Clint, were life-long friends of the Sullivans. Gaylord's father had been a close friend and neighbor of the Sullivans in Boulder, Colorado, and Sullivan, Jr. and Gaylord had grown up together.

71.    In January 2007, Gaylord redeemed approximately 49,000 of his shares in FMCI for $5,778,570 — $117.93 per share (the "Gaylord Redemption"). FMCI and Gaylord memorialized the redemption in a Stock Repurchase Agreement, dated January 5, 2007. Two days later, on January 7, 2007, Gaylord received approximately $5,528,570, having previously received an advance of $250,000 on the redemption. The funds used to pay the Gaylord Redemption came directly from FMFC, which received no consideration for the transaction.

72.    The Written Consent of the Board of Directors of FMCI, which authorized the transaction, was signed by Sullivan, Sr., Sullivan, Jr., and Gaylord on January 5, 2007. The Gaylord Redemption was not based on the "net asset value" or the "book value" of the shares, made in accordance with the terms of the Preincorporation Agreement, the FMCI Shareholders' Agreement, or GAAP.

### 3. The Thomas Redemption: $9MM.

73.    Thomas served as an Executive Vice President for TSA and had been a business associate of Sullivan, Sr. for more than twenty years. On January 3, 2006, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to pay Thomas approximately $9,000,000 for his 2,000 shares in FMFC —$4,500 per share (the "Thomas Redemption"). The Thomas Redemption followed none of the protocols set forth in the Preincorporation Agreement for the valuation and redemption of stock, or GAAP.

### B. Officer Bonuses: $50MM+.

74.    From January 2005 through the Petition Date, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid themselves in excess of $50,000,000 in bonuses

(the "Officer Bonuses"). In 2005, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid themselves more than $25,000,000 in Officer Bonuses. Of the $25,000,000 in Officer Bonuses paid over the course of 2005, Jaggi received more than $10,500,000, Sullivan, Sr. and Sullivan, Jr. each received more than $5,200,000, Gaylord received more than $250,000, Malis received more than $1,400,000, Marchetti received more than $800,000, and Young received more than $2,000,000.

75. In the first and second quarters of 2006, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid themselves approximately $11,000,000 in Officer Bonuses. Of the $11,000,000 in Officer Bonuses paid over the course of the first and second quarters of 2006, Jaggi received approximately $4,300,000, Sullivan, Sr. and Sullivan, Jr. each received approximately $2,100,000, Gaylord received more than $100,000, Malis received more than $700,000, Marchetti received more than $350,000, and Young received more than $900,000.

76. During the one year period prior to the Petition Date, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid themselves approximately $19,494,863 in Officer Bonuses. The Officer Bonuses paid to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young within the one year period prior to the Petition Date were as follows:

| Directors and Officers | Bonus | Directors and Officers | Bonus |
|---|---|---|---|
| Gurpreet Jaggi | 8,130,967 | Thomas Sullivan, Sr. | 4,065,483 |
| Thomas Sullivan, Jr. | 4,219,681 | Clinton W. Gaylord | 163,953 |
| Gary Malis | 1,003,327 | Dominick Marchetti | 566,683 |
| Karl Young | 1,344,769 | **TOTAL** | **$19,494,863** |

77. Because the Officer Bonuses were purportedly based on the pre-tax net profits of FMFC, the Officer Bonuses were overstated. Had FMFC adhered to GAAP, FMFC would not have had any pre-tax net profits on which to pay any of the Officer Bonuses.

78. Because the Officer Bonuses were paid quarterly, the actual amounts paid were

1  based on estimates and had to be reconciled with the actual pre-tax net profits. This

2  reconciliation process or "true-up" resulted in offsets having to be applied to future bonus

3  payments to correct for prior overpayments.

4      79.    Over $4,000,000 in Officer Bonuses were paid in the first and second quarters

5  of 2007. According to accounting records prepared shortly before the bankruptcy filing in

6  August 2007, the second quarter 2007 Officer Bonuses alone were known to be overstated by

7  no less than $1,770,768.49, even based on the inflated financials being used internally.

8      80.    In addition to the Officer Bonuses, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord,

9  Malis, Marchetti, and Young paid themselves another $1,405,078 in "other" self-interested

10 transactions within the one year period prior to the Petition Date (the "Other Self-Interested

11 Transactions"). The Other Self-Interested Transactions were paid as follows:

| Directors and Officers | Other Payment | Directors and Officers | Other Payment |
|---|---|---|---|
| Gurpreet Jaggi | 131,960 | Thomas Sullivan, Sr. | 911,440 |
| Thomas Sullivan, Jr. | 238,635 | Clinton W. Gaylord | 58,290 |
| Gary Malis | 33 | Dominick Marchetti | 4,800 |
| Karl Young | 59,920 | **TOTAL** | **$1,405,078** |

16 The Officer Bonuses and Other Self-Interested Transactions were all paid to Jaggi, Sullivan,

17 Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young when FMFC's debts greatly exceeded

18 its assets at fair valuation.

19     **C.    Shareholder Distributions: $37MM.**

20     81.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young paid

21 themselves approximately $36,500,000 in Shareholder Distributions from January 2006

22 through the Petition Date, including approximately $25,000,000 within the one year period

23 prior to bankruptcy and $3,445,548.00 in Shareholder Distributions a mere two months before

24 they announced FMFC's collapse. Specifically, between April 13, 2006 and June 13, 2007:

25 Jaggi received distributions totaling $9,408,183.23; Sullivan, Sr. received distributions totaling

$8,756,273.90; Sullivan, Jr. received distributions totaling $9,498,673.55; Gaylord received distributions totaling $3,671,678.81; Malis received distributions totaling $618,601.55; Marchetti received distributions totaling $112,647.96; and Young received distributions totaling $3,588,659.72. Collectively, these distributions are referred to as the "Shareholder Distributions."

**D.  The Revolver: $48.3MM.**

82.   Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMCI to extend FMFC a revolving line of credit on August 30, 2006 — approximately one week after FMFC funded the Sullivan, Sr. Redemption. The revolving line of credit took the form of a Loan Agreement between FMCI and FMFC, dated August 30, 2006, in the amount of $40,000,000 (the "Loan Agreement").

83.   Although there was only $28,000,000 outstanding on the Loan Agreement, it was modified on February 1, 2007 to increase the borrowing limit to $52,000,000 ("First Modification"). On May 1, 2007, the Loan Agreement was modified again to increase the borrowing limit to $60,000,000, despite an outstanding balance of only $38,000,000 ("Second Modification"). Collectively, the Loan Agreement, the First Modification, and the Second Modification, are referred to herein as the "Revolver."

84.   Jaggi and Malis executed the Revolver, on behalf of FMCI and FMFC, respectively. Internally, Jaggi, Sullivan, Sr., and Sullivan, Jr. approved the terms of the Revolver, on behalf of FMFC, and documented the approval with written consents in lieu of a special meeting of the Board.

85.   Although written requests for advances by FMFC were required under the Revolver, along with scheduled quarterly interest payments beginning October 30, 2006, such protocols were not adhered to by FMFC or FMCI. According to the proof of claim FMCI filed in the Bankruptcy Case, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and

Young caused FMFC to fund principal and interest payments totaling $44,759,740.80 to FMCI on the Revolver in the one year period prior to the Petition Date.

86.     According to FMCI's proof of claim, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young began recording payments to FMCI on the Revolver before FMCI was even incorporated and more than a year before Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to undertake the Revolver. The transfers Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to fund to or on behalf of FMCI prior to August 21, 2006 totaled $3,552,889.68. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young did not charge FMCI interest for these advances, and were not credited with any interest that accrued thereon.

87.     In total, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young transferred approximately $48,302,630.48 in alleged principal and interest payments to FMCI on the Revolver. During the one year period prior to the Petition Date, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to fund approximately $44,749,740.80 in alleged principal and interest payments to FMCI on the Revolver.

**E.      The Sullivan, Sr. Notes:  $26MM.**

88.     The Sullivan, Sr. Promissory Note. On December 11, 2006, FMFC entered into an Unsecured Promissory Note between FMFC and The Sullivan, Sr. Revocable Trust in the amount of $25,000,000 (the "Sullivan, Sr. Promissory Note"). On December 12, 2006, Sullivan, Sr., individually, and/or on behalf of The Sullivan, Sr. Revocable Trust, funded the $25,000,000 loan to FMFC. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to repay the Sullivan, Sr. Promissory Note in full on December 14, 2006 — two days after funding the loan.

89.     The Sullivan, Sr. Subordinated Note. On February 28, 2007, FMFC entered into an Unsecured Subordinate Promissory Note between FMFC and The Sullivan, Sr.

Revocable Trust in the amount of $20,000,000 ("Sullivan, Sr. Subordinated Note") (collectively, the Sullivan, Sr. Promissory Note and the Sullivan, Sr. Subordinated Note are referred to as the "Sullivan, Sr. Notes").

90.     FMFC made an interest payment on the Sullivan, Sr. Subordinated Note on April 30, 2007, in the form of a shareholder distribution to Sullivan, Sr. in the amount of $320,267.61.  On August 1, 2007, approximately three weeks before Debtor's bankruptcy filing, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to make another interest payment to Sullivan, Sr. on the Sullivan, Sr. Subordinated Note in the form of a shareholder distribution in the amount of $475,812.11.

**F.      The Asset Transfers: $50MM+.**

**1.      FMR: $8MM+.**

91.     First Magnus Reinsurance Ltd. ("FMR") operated as a reinsurer through a 1998 agreement with Mortgage Guarantee Insurance Corporation.  Prior to September 20, 2006, FMR was a wholly-owned subsidiary of FMFC.

92.     FMR received 25% of the mortgage insurance premiums paid on the pool of insured loans FMFC originated in return for assuming a portion of secondary loss liability. The mortgage insurance premiums were paid into a trust account and deemed "earned."  FMR could draw on the trust account to recover its premiums so long as the required reserves amount related to its secondary loss liabilities were adequately maintained.  FMR insured each pool for a ten-year term.  As of December 31, 2004, no losses had been incurred from the secondary loss liabilities assumed, and no premiums had been withdrawn.

93.     On September 20, 2006, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to transfer 100% of its interest in FMR to FMCI.  Malis signed the Transfer and Assignment of Ownership on behalf of FMFC and Jaggi on behalf of FMCI.  The assignment included the reserve account containing all of the premiums that had

been earned by FMR from 1998 onward. FMCI's Amended Disclosure Statement identified "$10 million in restricted funds" that remained in the account.

94. Following the assignment of FMR to FMCI, all of the operating expenses and tax liabilities of FMR continued to be paid directly by FMFC through the Petition Date. The fair market value of FMR on the date of transfer was in excess of $8,000,000.

## 2. FMLS: $2.5MM+.

95. First Magnus Lender Services, LLC ("FMLS") provided credit reporting, appraisal, and other mortgage loan origination services to FMFC and its affiliates. Prior to its transfer to FMCI, FMLS was a wholly-owned subsidiary of FMFC. FMFC transferred 100% of its interest in FMLS to FMCI on September 20, 2006 for no consideration. The transfer was documented in a Transfer and Assignment of Ownership Interest dated September 20, 2006, and was signed by Malis on behalf of FMFC and Jaggi on behalf of FMCI. The estimated fair market value of FMLS as of the date of transfer was in excess of $2,000,000.

96. Charter Insurance Group ("CIG") was a wholly-owned subsidiary of FMLS at the time of its transfer to FMCI. In addition to the transfer of FMLS, a $675,440.34 account receivable owed by CIG to FMFC was transferred to FMCI. Sullivan, Sr. is a Director of CIG.

97. According to FMCI's Amended Disclosure Statement, CIG sold its remaining assets to Jeff Arnold Companies, Inc. on November 27, 2007, in exchange for $800,000 and an assumption of all liabilities "except for [unidentified] inter-company liabilities to FMCI." The "inter-company liabilities" are the account receivable that CIG owed to FMFC that was transferred to FMCI for no consideration.

98. Arnold was the President of CIG and formed Jeff Arnold Companies, Inc. for the purpose of this acquisition. Shortly after the acquisition, Arnold invested in StoneWater and became a shareholder of SW Holding. In all, the transfer of FMLS and the receivable owed by CIG had a fair market value in excess of $2,500,000.

### 3. **Magnus Receivables: $6.5MM+.**

99.     Magnus Corp. is owned and operated by Sullivan, Sr., Sullivan, Jr., and Sabina Sullivan (Sullivan, Sr.'s wife).  According to FMCI's Amended Disclosure Statement, FMFC transferred its interest in "a receivable from Magnus Corporation on December 31, 2006" to FMCI.   The transfer "was accounted for as distributions to FMCI by its subsidiaries." FMFC's accounting records identify two transfers to FMCI for no consideration:   the December 31, 2006 transfer for $108,118.90 stating "Move A/R from Magnus Corp to FM Capital;" and an August 31, 2006 transfer for $5,491,156.35 stating "Move A/R from Magnus Corp to FM Capital" (collectively, the "Magnus Receivables").

100.     FMCI's Amended Disclosure Statement also identifies a "note from Magnus Corporation in the amount of $600,000 (book value)" and "a receivable from Magnus Corp. in the amount of $450,000 for Aircraft usage (book value)" as assets.  Both of these Magnus Receivables represent unpaid aircraft expenses Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused FMFC to incur.

### 4. **Corporate Jets: $13MM+.**

101.     Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young routinely used FMFC's corporate jets for personal use and without adequate remuneration and caused FMFC to pay all of the costs associated with the maintenance, operation, and use of the aircraft.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young also permitted other entities in which the Sullivans or Jaggi owned an interest to use FMFC's corporate jets without adequate remuneration and caused FMFC to pay all of the costs associated with the maintenance, operation, and use of the aircraft.

102.     The Hawker.  FMFC owned a 50% interest in a Hawker 125-700A aircraft (the "Hawker").  The remaining 50% of the Hawker was owned by Magnus Corp.  On August 31, 2006, FMFC recorded the transfer of its 50% interest in the Hawker.  According to FMFC's

Second Amended Disclosure Statement, FMFC transferred the Hawker to FMCI. However, the Aircraft Bill of Sale executed by Jaggi on behalf of FMFC is between FMFC and Magnus Corp. The Aircraft Bill of Sale identifies total consideration for transfer of FMFC's interest in the Hawker as $10.00. Debtor's records do not reflect any consideration for the transfer.

103. The book value for FMFC's interest in the Hawker on the date of transfer was approximately $2,004,750, with an outstanding lease obligation of $1,753,472.27. According to FMCI's Amended Disclosure Statement, FMCI sold its purported interest in the Hawker on February 4, 2008, to Scottsdale West Holdings, LLC for $1.65 million, and "netted approximately $50,000 from the sale." It is estimated that the fair market value of FMFC's interest in the Hawker was approximately $300,000 on the date of transfer.

104. Despite having purported to transfer FMFC's interest in the Hawker, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young continued to cause FMFC to fund the various expenses associated with the maintenance, operation, and usage of the Hawker, including Magnus Corp.'s use of the aircraft and the personal use of the aircraft for Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

105. The Falcon. FMFC also owned a 99% interest in a Dassault-Breguet model Falcon-50 aircraft (the "Falcon"). The remaining 1% interest in the Falcon was owned by Magnus Corp. FMFC transferred its 99% interest in the Falcon to FMCI on August 31, 2006 for no consideration.

106. Book value on the date of transfer was approximately $1,407,210.68. According to FMCI's Amended Disclosure Statement, FMCI sold the Falcon to Walker Aircraft for $8.5 million on November 14, 2007, and "netted approximately $285,000 from the sale."

107. FMFC continued to fund all of the expenses associated with the maintenance, operation, and usage of the Falcon for FMCI and Magnus Corp., which included the personal

1  use of the aircraft by Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

2  108.  <u>Other Expenses</u>.  Before and after the alleged transfers of Debtor's interest in

3  the Hawker and the Falcon, FMFC funded virtually all of the expenses associated with the

4  ownership, maintenance, and operation of the two aircraft.  In all, Debtor paid in excess of

5  $12,000,000 in aircraft expenses incurred by FMCI, Magnus Corp., and other personal use by

6  Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

7  **5.  <u>WNS Shares: $14MM+.</u>**

8  109.  According to FMCI's Amended Disclosure Statement, FMFC transferred

9  approximately 596,154 ordinary shares of stock issued by WNS that were owned by the

10  Debtor to FMCI on or about July 1, 2006.  No transfer or assignment documents evidence the

11  transfer of the WNS stock from FMFC to FMCI, and there was no consideration for the

12  transaction.  FMCI did not exercise control over FMFC's WNS stock until April 2007.  Any

13  alleged transfer of the WNS stock from FMFC to FMCI did not occur any earlier than

14  September 20, 2006.  The fair market value of the WNS shares at the time of transfer was

15  between $24 – $30 per share.

16  **G.  <u>Bank Expenditures: $2.8MM+.</u>**

17  110.  Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused

18  FMFC to bear significant costs associated with FMCI's failed attempt to organize as a

19  federally chartered savings and loan institution.  In all (excluding legal fees), Debtor advanced

20  over $2,800,000.00 reflecting costs attributable to FMCI's failed bank venture — all were for

21  the direct and exclusive benefit of FMCI, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis,

22  Marchetti, and Young, as FMFC was never intended to own any portion of the bank.

23  **H.  <u>The Improvements To 603 N. Wilmot: $5.7MM+.</u>**

24  111.  603 N. Wilmot is a class A office building that was custom-built to suit the

25  unique requirements of a mortgage company with a sophisticated technology platform.

StoneWater boasts that 603 N. Wilmot is a "$20 million state-of-the-art national headquarters and operations facility" that "provides unsurpassed ability to support stable, world-wide technology" and was "designed and built to support a national mortgage operation and world wide [sic.] technology platform."

112.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young caused Debtor to fund the improvements to 603 N. Wilmot.   In total, FMFC funded more than $5,700,000 in improvements to 603 N. Wilmot for the exclusive benefit of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FM Realty, its owners and operators, and now, StoneWater, Sullivan Title Management, Sullivan Title Investment, Ecloser, Inc., ECSI, and MSS, which continue to enjoy the fruits of the Improvements that impoverished Debtor (collectively, the "Improvements to 603 N. Wilmot").

## IV.    FMFC Insiders Usurp Debtor's Assets To Jump-Start Their New Companies.

### A.    G-Force Is Formed Within 15 Days Of The Bankruptcy Filing And Proceeded To Acquire FMFC's Equipment And Proprietary Information.

113.    In anticipation of FMFC's inevitable bankruptcy filing, and with knowledge of the GAAP Violations and FMFC's precarious financial condition, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young, along with Lemke, Gujral, Johnson, and Shoemaker, devised a scheme to acquire FMFC's key equipment and proprietary assets for the purpose of starting a new mortgage company.  By August 13, 2007, Marchetti and Johnson had made personal copies of FMFC's databases, source code, and other critical electronic information of Debtor's on to portable hard drives, which they then took offsite.

114.    Over the course of September 4-6, 2007, Jaggi, Sullivan, Jr., Malis, Marchetti, Young, Lemke, Gujral, Johnson, and Shoemaker formed G Force.  Throughout September and October 2007, Jaggi, Sullivan, Jr., Malis, Marchetti, Young, Lemke, Gujral, Johnson, and Shoemaker directed Warner, Wright, Yonan, and other members of Debtor's legal department

1 | to abandon key equipment so that members of G Force, FM Realty, and other insiders could
2 | acquire equipment for themselves far below value, along with Debtor's confidential
3 | information and proprietary assets that resided thereon.

4 |      115. Jaggi, Sullivan, Jr., Malis, Marchetti, and Young, along with Lemke, Gujral,
5 | Johnson, and Shoemaker, solicited and engaged key personnel from FMFC's technology
6 | department for the purpose of utilizing and continuing the development of Debtor's
7 | proprietary assets by G Force. All of FMFC's employees, and particularly the employees in
8 | the technology department, were subject to strict confidentiality, non-disclosure, and non-
9 | solicitation obligations owed to FMFC pursuant acknowledged company policies, or executed
10 | confidentiality and employment agreements, which extended beyond the terms of their
11 | employment and prohibited the use or disclosure of Debtor's confidential information and
12 | other proprietary assets.

13 |      116. On August 31, 2007, the Debtor filed a motion seeking authority to abandon
14 | property at the Headquarters at the discretion of Debtor's management ("Motion to Abandon
15 | Property") [Bk. Dkt. No. 72]. On September 8, 2007, the Bankruptcy Court ordered that
16 | Debtor's management did not have discretion to abandon any Personal Property at the
17 | Headquarters and required that Debtor file a motion and obtain Bankruptcy Court approval
18 | before doing so (the "Bankruptcy Court Order") [Bk. Dkt. No. 142].

19 |      117. After the Bankruptcy Court Order was entered on September 8, 2007,
20 | Marchetti, Johnson, and Shoemaker proceeded to identify key equipment located at the
21 | Headquarters that G Force sought to acquire for the purposes of utilizing and continuing to
22 | develop FMFC's technological programs, and prepared a spreadsheet itemizing desired
23 | equipment. The equipment identified thereon had an aggregate value in excess of $1,500,000,
24 | which excluded the value of certain software and FMFC's proprietary material contained
25 | thereon.

118.    Beginning no later than September 2007, Gujral and Shivpuri, having overseen the outsourced portion of FMFC's Dev-IT Program, strategized with other members of G Force regarding the equipment necessary for the continued development of various FMFC applications.

119.    Beginning no later than September 2007, Yonan worked with Marchetti, Johnson, and Shoemaker, to orchestrate the acquisition and handled the majority of the negotiations with DoveBid, Inc. ("DoveBid"), the liquidator for a secured lender with rights to some of Debtor's equipment.  Yonan, in particular, was notified in an email from Debtor's counsel no later than September 11, 2007, that the Bankruptcy Court Order required a motion and order before Debtor could abandon any equipment at Headquarters.

120.    While employed by Debtor, Jaggi, Malis, and Young directed G Force's acquisitions, were kept apprised of G Force's efforts to acquire the equipment and the proprietary software contained thereon, and, along with the other members of G Force, participated in its day-to-day operation.

121.    Jaggi, Malis, Marchetti, and Young, along with Johnson, Shoemaker, Lemke and Yonan, sent and received a series of emails to and from one another throughout September 2007 and thereafter in furtherance of the scheme.  The members and employees of G Force also sent and received a series of emails to and from representatives of DoveBid throughout September 2007 and thereafter regarding G Force's efforts to acquire additional property of Debtor.  The members and employees of G Force also communicated telephonically with one another, with representatives of DoveBid, and the secured lender throughout September 2007 and thereafter regarding their efforts to acquire additional property of Debtor for G Force in contravention of the Bankruptcy Court Order.

122.    On September 27, 2007, at the direction of Jaggi, Malis, Marchetti, and Young, Yonan submitted a "final bid list" to DoveBid, and G Force acquired approximately

$1,500,000 in Debtor's equipment for approximately $120,000. DoveBid sent the invoice for this transaction to Young via email, who was still employed by Debtor at that time. Consistent with their scheme, this equipment also contained proprietary assets of Debtor for which G Force did not pay Debtor and included software that Yonan knew was owned free and clear by Debtor.

123.    On October 3, 2007, security personnel at the Headquarters reported to Yonan that Marchetti had requested access to the building to remove some personal items on October 2, 2007, and later appeared with five other men who, along with Marchetti, removed a considerable amount of computer equipment that was not identified on any bill of sale. Yonan did not disclose this report to Debtor's bankruptcy counsel or the Court.

124.    On October 12, 2007 and on December 6, 2007, with the assistance of Malis, Lemke, Yonan, and other employees of Debtor, G Force was used to acquire additional equipment of Debtor's without Bankruptcy Court approval, and Young was invoiced again via email.

125.    Equipment abandoned in violation of the Bankruptcy Court Order and for the benefit of the members of G Force included:  FMFC's back-up tape drive, library and CommVault software; more than 50 individual servers, including servers that hosted and contained LoanTracker, proprietary source code, and documentation regarding FMFC technology projects; UPS units; and a firewall needed to protect and secure Debtor's systems.

126.    In late January 2008, Marchetti and Warner, a Deputy General Counsel for Debtor at that time, identified additional equipment of Debtor's that G Force and StoneWater sought to obtain and utilize.  On February 1, 2008, Warner acquired equipment, office furniture, and fixtures of the Debtor on behalf of FM Realty without obtaining approval from the Bankruptcy Court.  Among other items, Warner caused FM Realty to acquire several network storage arrays and Storage Area Networks (collectively, "SANs").  Virtually all of the

electronic data and files pertaining to Debtor's operation resided on the SANs that were transferred, including: all loan data; all data residing on the desktops of FMFC personnel; all documents on Debtor's WorldDox system; all of the accounting records and data utilized by Epicor, Debtor's general ledger software; all ADP Payroll information; and all email and data from Debtor's Exchange Server.

127.    On November 2, 2007, while still employed by the Debtor, Yonan personally acquired equipment from Debtor without Bankruptcy Court approval. Wright and Yonan resigned as Deputy General Counsel for Debtor on or about December 31, 2007. Prior to resigning, Wright and Yonan copied Debtor's WorldDox system on to a portable hard drive without Bankruptcy Court approval. On or about January 1, 2008, Wright and Yonan formed the law firm of Wright & Yonan. On January 3, 2008, Wright & Yonan acquired additional equipment from Debtor without Bankruptcy Court approval. On or about January 8, 2008, Wright & Yonan, installed Debtor's WorldDox system at the new firm.

128.    In or about December 2007 and January 2008, representatives for G Force and StoneWater employed by the Debtor copied Debtor's WorldDox system and installed it on their systems for the purpose of utilizing those materials.

129.    On December 6, 2007, Sharma acquired equipment of Debtor's without Bankruptcy Court approval.

130.    No efforts were made to protect or preserve the proprietary information of Debtor that was maintained on the systems and equipment acquired by G Force, FM Realty, Yonan, Wright & Yonan, or Sharma.

131.    The secured lender had no rights to Debtor's confidential information, proprietary assets, and certain software contained on the equipment transferred to G Force, FM Realty, Yonan, Wright & Yonan, or Sharma. No consideration was paid to Debtor to transfer any applicable licenses related thereto or for equipment owned free and clear by Debtor.

## B.    FMFC Insiders Formed StoneWater And Moved G Force's Assets To It.

132.    On December 5, 2007, Jaggi, Sullivan, Jr., Malis, Marchetti, Young, Lemke, and others, formed SW Holding. SW Holding and G Force then entered into an Asset Purchase Agreement, whereby SW Holding acquired all of the assets of G Force in consideration for 3,000 shares of common stock in SW Holding. "Assets" were defined to include the intellectual property, contracts, and lease agreements, and other tangible assets, including all the equipment G Force had acquired in violation of the Bankruptcy Court Order. Young signed the Asset Purchase Agreement on behalf of both G Force and StoneWater.

133.    Jaggi, Sullivan, Jr., Malis, Marchetti, Young, G Force, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Gujral, Shivpuri, Arnold, and Warner are all shareholders of SW Holding and provided financial assistance to it knowing that G Force and FM Realty had acquired Debtor's equipment and proprietary materials in violation of the Bankruptcy Court Order, and with the understanding and anticipation that StoneWater intended to utilize them in its new businesses.

134.    Between December 12, 2007 and February 28, 2008, SW Holding formed each of SW Tech, SW Lender Services, SW BOP, SW Ins., and SW Mortgage. Each of these companies is integrated with one another, operates from 603 N. Wilmot, and utilizes the equipment and materials misappropriated from Debtor.

135.    No later than February 2008, StoneWater began operating from 603 N. Wilmot. In July 2008, FM Realty and SW Mortgage entered into a lease agreement with respect to 603 N. Wilmot ("StoneWater Lease"). Sullivan, Sr. executed the Lease Agreement on behalf of FM Realty. Young executed the Lease Agreement on behalf of SW Mortgage. According to the StoneWater Lease, StoneWater controls 97% of the square footage at 603 N. Wilmot for $17 per square foot, including the server room where much of the equipment misappropriated from Debtor resides. The Lease Agreement provides that FM Realty shall convey to SW

Mortgage "title and interest in and to the Office and IT Equipment," which consists of equipment and furniture FM Realty acquired in violation of the Bankruptcy Court Order.

### C. StoneWater Misappropriated Debtor's Confidential Information.

136. H2Online. When SW Mortgage acquired the "assets" and "employees" of G Force in February 2008, it allegedly included the acquisition of H2Online — a software program StoneWater contends G Force developed in the first 120 days it was formed.

137. The work flow, document imaging, loan record, guideline and pricing rules engine, and reports associated with H2Online, as well as the modular aspect of the program, were taken from proprietary programs in development at FMFC prior to the Petition Date.

138. It was not feasible for G Force to develop H2Online from scratch in the 120 days following its formation without utilizing any of Debtor's Confidential Information. G Force and StoneWater, and specifically, Marchetti, Johnson, Shoemaker, Gujral, and Shivpuri, utilized Debtor's know-how, processes, and other proprietary information, to develop and design H2Online and related applications, and otherwise misappropriated confidential and proprietary technology already in development at FMFC prior to its bankruptcy filing.

139. Guardian Integration. StoneWater utilized a Guardian Integration project in conjunction with H2Online. FMFC had undertaken the same Guardian Integration project, which was in development prior to the Petition Date. Proprietary materials related to the development of the Guardian Integration project were located on Debtor's equipment that ultimately was transferred to StoneWater in violation of the Bankruptcy Court Order.

140. CORE LOGIC and MERS. StoneWater marketed that it built "new systems and procedures" that are "built into the new platform" to "further mitigate risk of fraud and to monitor loan quality and broker behavior," and cited to system integration with CORE LOGIC to "maintain a consistent and rigorous control environment relative to broker behavior and loan quality" and MERS — Mortgage Electronic Registration Systems. These two projects

were in the FMFC Dev-IT Program as of the Petition Date. The proprietary materials related to the development of these two projects were located on Debtor's equipment that was transferred to StoneWater in violation of the Bankruptcy Court Order.

141. <u>Mindbox and Mavent</u>. Two technologies Debtor had researched and otherwise undertaken to integrate into the loan process to add greater functionality to their practices were Mindbox, a pricing and product finder utilizing technology found in Fannie's DU and Countrywide's CLUES automated underwriting systems, and Mavent, a compliance management system. Debtor spent significant resources to research and analyze the integration of these two systems, along with competing products, which StoneWater misappropriated in the development of H2Online and other projects.

142. <u>Other Costs Saved</u>. The extent of the misappropriation of Debtor's Confidential Information and proprietary materials is vast and was a continuing endeavor. In addition to the projects themselves, G Force and StoneWater misappropriated the methodologies and know-how Debtor spent years developing, perfecting, and protecting. As a result, G Force and StoneWater saved start-up costs at Debtor's expense and continue to benefit from the use of Debtor's assets.

143. With the technical assistance of Marchetti, Johnson, Shoemaker, and Shivpuri, StoneWater utilized Debtor's assets across a wide spectrum of operations, including, but not limited to, the areas of accounting, loan closing, loan funding, compliance, human resources, marketing, customer service, pricing, production, product development, risk management, underwriting, and shipping. This provided enormous savings to StoneWater for which Debtor has never been compensated, and enabled StoneWater to overcome significant entry barriers to the mortgage business that otherwise exist.

144. <u>Failure to Market LoanTracker and Other Technology</u>. The members of G Force and StoneWater that were employed by Debtor intentionally chose not to protect or

preserve Debtor's proprietary information for the purposes of procuring it for their own accord, utilization, and profits. Once Debtor filed for bankruptcy, the members and employees of G Force that continued to operate Debtor deliberately failed to market the nationally recognized LoanTracker system, or the other programs it had developed.

145. Sharma, in particular, was appointed to market such assets. Sharma had no experience in such matters and engaged in no such efforts. Sharma never attempted to locate the source code for LoanTracker, which resided on the Vault server transferred to G Force and/or StoneWater, and never attempted to locate the source-code repository, which required restoration from Debtor's back-up tapes — a process made more difficult by the transfer of Debtor's back-up tape library and CommVault software. These are the very assets for which Sharma was employed to market, and they were never preserved.

146. On September 10, 2009, it was reported that Caliber Funding LLC agreed to buy certain IT and operational assets from StoneWater. The "plum asset" in this purchase was "StoneWater's mortgage software."

### D. FMFC Insiders And Affiliates Misappropriated The Ecloser System.

147. Ecloser, LLC ("Ecloser") is a limited liability company that was formed in February of 2005 by FMFC and TSA, a title company owned and operated by Sullivan, Sr. and Sullivan, Jr. Ecloser operated from FMFC's Headquarters and was funded by FMFC. Ecloser's primary asset was its web-based software platform for title insurance and settlement services industry (the "Ecloser System").

148. The Ecloser System had been in development by FMFC for more than two years prior to FMFC's bankruptcy filing, and more than a year prior to the creation of FMCI. FMFC outsourced some of its development of the Ecloser System through Trinity, which was overseen by Gujral and Shivpuri.

149. Magnus Corp., MSS, Sullivan Title, TSA, Wright & Yonan, Warner, Wright,

and Shivpuri conspired to form new Ecloser entities and misappropriated the research and development related to the Ecloser System. On February 8, 2008, Ecloser, Inc., was formed, and on May 2, 2008, Ecloser Services, Inc. ("ECSI") was formed.

150. Ecloser, Inc. and ECSI were incorporated by the law firm of Wright & Yonan. Warner and Shivpuri, former FMFC employees, are identified as directors of ECSI.

151. Ecloser, Inc. and ECSI operated from 603 N. Wilmot, shared the server room with StoneWater, and had unfettered access to Debtor's electronic data and systems. According to ECSI, this "new" company provides a web-based "software program to provide an end-to-end turn-key back-office services for title and escrow companies." This is the same Ecloser System developed by FMFC.

152. With the assistance of TSA, Sullivan Title, Wright, and Wright & Yonan – and at the direction of Sullivan Sr., Sullivan, Jr., Warner, Shivpuri, Magnus Corp., and MSS – Ecloser, Inc. and ECSI misappropriated research and development related to the project, data on which the Ecloser System operates, and usurped the Ecloser System for their own benefit without any remuneration to FMFC. Wright, in particular, strategized with Warner (employed by Debtor at the time) and Shivpuri via email to delay notifying the Court or the Committee of the existence of FMFC's interest in the Ecloser System until after confirmation of the Plan. On behalf of Sullivan, Sr., Sullivan, Jr., Warner, Shivpuri, Magnus Corp., MSS, Sullivan Title, and TSA, Wright also solicited Debtor's representatives to assist in transferring FMFC's interest in the Ecloser System once the Bankruptcy Court confirmed the Plan.

153. FMFC contributed no less than $500,000 to the development of the Ecloser System, in addition to the resources and equipment associated with its development and operation. On behalf of MSS, Sullivan, Sr. and Sullivan, Jr. licensed the Ecloser System to, among others, Home Services of America, Inc., and later assigned that license agreement to Magnus Corp.

154.    TSA installed the Ecloser System in its offices throughout Arizona, and, along with FMCI, formed Sullivan Title Investment to launch a national title agency based on the Ecloser System, now marketed by Ecloser, Inc. and ECSI.

**PRE-PETITION CLAIMS**

**Count 1:     Pre-Petition Breaches Of Fiduciary Duty Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, And Young.**

155.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

156.    From January 2005 to the Petition Date, Debtor was insolvent.  Throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

157.    Consequently, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young owed fiduciary duties to Debtor and Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

158.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things:  (a) orchestrating, authorizing, and carrying out the Sullivan, Sr. Redemption, the Gaylord Redemption, the Thomas Redemption, the Officer Bonuses and Other Self-Interested Transactions, and the Shareholder Distributions; (b) transferring Debtor's interest in FMR, FMLS, Magnus Receivables, the Aircraft, and the WNS Shares to FMCI (and/or Magnus Corp.) for no consideration; and (c) making payments on or for the FMCI Revolver, the

Sullivan, Sr. Notes, the expenses of FMCI, FMR, FMLS, Magnus Corp., the personal expenses of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, the Bank Expenditures, and the Improvements to 603 N. Wilmot.

159.    Further, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young breached their fiduciary duties by failing to disclose the transactions described above to the creditors of Debtor on or before the time each transaction occurred.

160.    As a result of these breaches of fiduciary duties, Debtor suffered damages in an amount to be proven at trial. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young's acts and/or omissions were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. These intentional, malicious, conscious and/or deliberate acts and/or omissions resulted in actual harm to Debtor and its creditors.

161.    The Litigation Trustee seeks the following relief from each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, jointly and severally: the actual and consequential damages incurred in an amount to be determined at trial and punitive damages to punish such acts and deter others from similar wrongdoing. The Litigation Trustee contends that the total actual and consequential damages arising from these breaches of fiduciary duties are in excess of $300 million.

**COUNTS 2-4: THE SULLIVAN, SR. REDEMPTION ($55MM)**

**Count 2:**    **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Sullivan, Sr., The Sullivan, Sr. Revocable Trust, And FMCI.**

162.    The Defendants affected by this claim are Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI.

163.    On or about August 24, 2006, Debtor transferred approximately $55 million to

Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and/or FMCI. The Sullivan, Sr. Redemption transferred an interest of Debtor in property.

164. Debtor made the transfer with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. Debtor made the transfer at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was otherwise unreasonably small in relation to the Debtor's business. Through the transfer, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

165. Debtor received less than fair or reasonably equivalent value in exchange for the Sullivan, Sr. Redemption. As a result of the transfer, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer.

166. The Litigation Trustee seeks the following relief from Sullivan, Sr., the Sullivan Sr. Revocable Trust, and/or FMCI, jointly and severally: the avoidance of the transfer and the recovery of approximately $55 million.

**Count 3: 11 U.S.C. § 547(b) Avoidable Preference Against Sullivan, Sr., The Sullivan, Sr. <u>Revocable Trust, And FMCI.</u>**

167. The Defendants affected by this claim are Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI.

168. On or about August 24, 2006, within one year of the Petition Date, Debtor transferred approximately $55 million to Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and/or FMCI. The Sullivan, Sr. Redemption transferred an interest of Debtor in property. Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became

insolvent as a result of the transfer. The transfer was made to satisfy an alleged antecedent debt owed by Debtor to Sullivan, Sr. and/or The Sullivan, Sr. Revocable Trust prior to the date of the transfer.

169. At the time the transfer was made, Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI were "insider(s)" as that term is defined by 11 U.S.C. § 101(31). Debtor's transfer enabled Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and/or FMCI to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfer.

170. The Litigation Trustee seeks the following relief from Sullivan, Sr., the Sullivan Sr. Revocable Trust, and/or FMCI: the avoidance of the transfer and the recovery of approximately $55 million.

**Count 4:** **Unjust Enrichment Against Sullivan, Sr., The Sullivan, Sr. Revocable Trust, And FMCI.**

171. The Defendants affected by this claim are Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI.

172. Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI have obtained and received funds in the form of the Sullivan, Sr. Redemption or otherwise received a benefit that in justice and equity belongs to the Debtor. Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI were each directly enriched by the funds Debtor transferred in the form of the Sullivan, Sr. Redemption, which impoverished Debtor. There is no justification for the enrichment of Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI.

173. Debtor lacks an adequate legal remedy to recover the amounts in which Sullivan, Sr., The Sullivan, Sr. Revocable Trust, and FMCI have been unjustly enriched by the Sullivan, Sr. Redemption and is entitled to recover all amounts in which they have been

1    unjustly enriched, which shall be determined by the trier of fact.

2          174.    The Litigation Trustee the following relief from Sullivan, Sr., The Sullivan, Sr.

3    Revocable Trust, and FMCI jointly and severally:    recovery of the amounts that such

4    Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of

5    $55 million.

6    **COUNTS 5-7: THE GAYLORD REDEMPTION ($5.8MM)**

7    **Count 5:        A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent**
                       **Transfer Against Gaylord And FMCI.**
8

9          175.    The Defendants affected by this claim are Gaylord and FMCI.

10         176.    On or about January 7, 2007, Debtor transferred approximately $5,778,570 to

11   Gaylord and/or FMCI. The Gaylord Redemption transferred an interest of Debtor in property.

12         177.    Debtor made the transfer with the actual intent to hinder, delay, and/or defraud

13   the creditors of Debtor.    Debtor made the transfer at a time when it was insolvent or,

14   alternatively, Debtor became insolvent as a result of the transfer.    The transfer was made at a

15   time when Debtor was engaged (or was about to engage) in a business or transaction for which

16   any property or assets remaining with Debtor after the transfer represented an unreasonably

17   small amount of capital or was otherwise unreasonably small in relation to the Debtor's

18   business.    Through the transfer, Debtor intended to incur, or believed or reasonably believed

19   that it would incur, debts beyond its ability to pay as such debts matured and became due.

20         178.    Debtor received less than fair or reasonably equivalent value in exchange for

21   the Gaylord Redemption.    As a result of the transfer, Debtor and its creditors have been

22   harmed.    Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a),

23   Debtor is entitled to avoid the transfer.

24         179.    Thus, the Litigation Trustee seeks the following relief from Gaylord and FMCI:

25   the avoidance of the transfer and the recovery of approximately $5,778,570.

**Count 6:**     **11 U.S.C. § 547(b) Avoidable Preference Against Gaylord And FMCI.**

180.    The Defendants affected by the claim are Gaylord and FMCI.

181.    On or about January 7, 2007, within one year of the Petition Date, Debtor transferred approximately $5,778,570 to Gaylord and/or FMCI.  The Gaylord Redemption transferred an interest of Debtor in property.  Debtor made the transfer at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.  The Gaylord Redemption was made to satisfy an alleged antecedent debt owed to Gaylord prior to the time the transfer was made.

182.    At the time the transfer was made, Gaylord and FMCI were "insiders" as that term is defined by 11 U.S.C. § 101(31).  Debtor's transfer enabled Gaylord and FMCI to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made.  Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfer.

183.    Thus, the Litigation Trustee seeks the following relief from Gaylord and FMCI: the avoidance of the transfer and the recovery of approximately $5,778,570.

**Count 7:**     **Unjust Enrichment Against Gaylord And FMCI.**

184.    The Defendants affected by the claim are Gaylord and FMCI.

185.    Gaylord and FMCI have obtained and received funds in the form of the Gaylord Redemption or otherwise received a benefit that in justice and equity belongs to the Debtor.  Gaylord and FMCI were each directly enriched by the payment of the Gaylord Redemption, which impoverished Debtor.  There is no justification for the enrichment of Gaylord and FMCI.

186.    Debtor lacks an adequate legal remedy to recover the amounts in which Gaylord and FMCI have been unjustly enriched by the Gaylord Redemption and is entitled to recover all amounts in which they have been unjustly enriched.

187. The Litigation Trustee seeks the recovery of the following relief from Gaylord and FMCI jointly and severally: the recovery of the amounts that such defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $5,778,570.

**COUNTS 8-9: THE THOMAS REDEMPTION ($9MM)**

**Count 8:     A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Thomas.**

188. The Defendant affected by this claim is Thomas.

189. On January 3, 2006, Debtor transferred approximately $9,000,000 to Thomas. The Thomas Redemption transferred an interest of Debtor in property.

190. Debtor made the transfer with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor made the transfer to Thomas at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. The transfer was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business. Through the transfer, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

191. Debtor received less than fair or reasonably equivalent value in exchange for the Thomas Redemption. As a result of the transfer, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer.

192. Thus, the Litigation Trustee seeks the following relief from Thomas: the avoidance of the transfer and the recovery approximately $9,000,000 from Thomas.

**Count 9:     Unjust Enrichment Against Thomas.**

193. The Defendant affected by this claim is Thomas.

194.     Thomas obtained and received funds in the form of the Thomas Redemption that in justice and equity belong to the Debtor.  Thomas was directly enriched by Debtor's payment of the Thomas Redemption, which impoverished Debtor.  There is no justification for the enrichment of Thomas.

195.     Debtor lacks an adequate legal remedy to recover the amounts in which Thomas has been unjustly enriched and is entitled to recover all amounts in which he has been unjustly enriched, which shall be determined by the trier of fact.

196.     The Litigation Trustee seeks the following relief from Thomas:  recovery of the amounts that Thomas has been unjustly enriched, which the Litigation Trustee contends is in excess of $9,000,000.

**COUNTS 10-12:  THE OFFICER BONUSES ($50MM+)**

**Count 10:     A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, And Young.**

197.     The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

198.     From January 2005 to the Petition Date, Debtor transferred in excess of $50,000,000 to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young in the form of bonuses.  Approximately $20,000,000 in bonuses were transferred to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young during the one year period prior to the Petition Date.    More than $42,000,000 in Officer Bonuses and Other Self-Interested Transactions were transferred to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young during the two-year period prior to the Petition Date.

199.     Debtor made the transfers to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.    Debtor made the transfer of the Officer Bonuses and Other Self-Interested

Transactions at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers. The Officer Bonuses and Other Self-Interested Transactions were each made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business. Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

200.    At the times of the transfers, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were "insider[s]" as that term is defined by 11 U.S.C. § 101(31). Debtor's transfer of the Officer Bonuses and Other Self-Interested Transactions was made to or for the benefit of an insider, and what, if any, obligations Debtor incurred to pay such Officer Bonuses were to or for the benefit of an insider, under alleged employment contracts, and not in the ordinary course of business.

201.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of the Officer Bonuses to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young. As a result of Debtor's transfer of over $50,000,000 in Officer Bonuses, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfers to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

202.    The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young:  the avoidance of the transfers and the recovery of approximately $22.9 million from Jaggi, approximately $11.4 million from Sullivan, Sr., approximately $11.5 million from Sullivan, Jr., more than $500,000 to Gaylord, approximately $3.1 million from Malis, approximately $1.7 million from Marchetti, and approximately $4.2 million from Young.

**Count 11:** **11 U.S.C. § 547(b) Avoidable Preference Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.**

203. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

204. During the one year period prior to the Petition Date, Debtor transferred approximately $21,000,000 in Officer Bonuses and Other Self-Interested Transactions to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young. The Officer Bonuses and Other Self-Interested Transactions transferred an interest of Debtor in property to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young. Debtor made the transfers of the Officer Bonuses and Other Self-Interested Transactions at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers. The transfer of the Officer Bonuses and Other Self-Interested Transactions was made to satisfy an alleged antecedent debt owed by Debtor to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young prior to the time the transfer was made.

205. At the time the Officer Bonuses and Other Self-Interested Transactions were transferred by Debtor, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were "insider[s]" as that term is defined by 11 U.S.C. § 101(31). Debtor's transfer of the Officer Bonuses and Other Self-Interested Transactions enabled Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfer had not been made. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers of approximately $21,000,000 in Officer Bonuses and Other Self-Interested Transactions made to them during the one year period prior to the Petition Date.

206. The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young: the avoidance of the transfers and the

recovery of approximately $8.26 million from Jaggi, approximately $4.97 million from Sullivan, Sr., approximately $4.46 million from Sullivan, Jr., approximately $222,000 from Gaylord, approximately $1.00 million from Malis, approximately $571,000 from Marchetti, and approximately $1.40 million from Young.

**Count 12:** **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, And Young.**

207. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

208. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young have obtained and received funds in the form of Officer Bonuses and Other Self-Interested Transactions that in justice and equity belong to the Debtor. Each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were directly enriched by the payment of Officer Bonuses and Other Self-Interested Transactions, which impoverished Debtor. There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

209. The pre-tax net profits on which the Officer Bonuses and Other Self-Interested Transactions were based were grossly overstated. When calculated properly, there were no pre-tax net profits generated by Debtor during the applicable periods in which the Officer Bonuses were paid to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and thus no basis for any of the Officer Bonuses. In addition, the Officer Bonuses were grossly disproportionate to the value of services provided by Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and failed to take into consideration Debtor's need to retain capital. Assuming *arguendo* that the pre-tax net profit calculations prepared by Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were correct, the Officer Bonuses were still excessive because they were never reconciled to account for the losses

suffered by Debtor. In any event, Debtor never had any obligation to pay any of the Officer Bonuses to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

210. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were also enriched by Other Self-Interested Transactions, which impoverished Debtor. There is a direct connection between these payments to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young and the corresponding impoverishment suffered by the Debtor.

211. The Officer Bonuses and the Other Self-Interested Transactions were not made in the ordinary course of business and lack any adequate justification. Debtor lacks an adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young have been unjustly enriched by the Officer Bonuses and Other Self-Interested Transactions and is entitled to recover all amounts in which they have been unjustly enriched, which shall be determined by the trier of fact.

212. The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, jointly and severally: the recovery of the amounts that such Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $50 million.

**COUNTS 13-15: SHAREHOLDER DISTRIBUTIONS ($37MM)**

**Count 13:** **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Jaggi, Sullivan, Sr., Sullivan, Jr. Gaylord, Malis, Marchetti And Young.**

213. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

214. During the two years preceding the Petition Date, Debtor transferred an amount in excess of $36,500,000 in Shareholder Distributions to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young. The Shareholder Distributions transferred to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were an interest of Debtor in

property.

215.     Debtor made the transfers of the Shareholder Distributions to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.  Debtor transferred the Shareholder Distributions at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.

216.     The Shareholder Distributions were each made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business.  Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

217.     At the times of the transfers, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were "insider[s]" as that term is defined by 11 U.S.C. § 101(31).  Debtor's transfer of the Shareholder Distributions were made to or for the benefit of an insider, and what, if any, obligations Debtor incurred to pay such Shareholder Distributions were to or for the benefit of an insider under alleged employment contracts and not in the ordinary course of business.

218.     Debtor received less than fair or reasonably equivalent value in exchange for making the Shareholder Distributions.  As a result of these transfers, Debtor and its creditors have been harmed.  Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer of the Shareholder Distributions and is entitled to recover in excess of $36,500,000.

219.     The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young:  the avoidance of the transfers and the

recovery of approximately $9,408,183.23 from Jaggi, approximately $8,756,273.90 from Sullivan, Sr., approximately $9,498,673.55 from Sullivan, Jr., approximately $3,671,678.81 from Gaylord, approximately $618,601.55 from Malis, approximately $112,647.96 from Marchetti, and approximately $3,588,659.72 from Young.

**Count 14:    11 U.S.C. § 547(b) Avoidable Preference Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, And Young.**

220.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

221.    During the one year period prior to the Petition Date, Debtor transferred approximately $25,000,000 in Shareholder Distributions to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.  The Shareholder Distributions transferred to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were an interest of Debtor in property.  The transfers were made at a time when Debtor was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.  The transfers were made to satisfy an alleged antecedent debt owed by Debtor to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young prior to the time the transfer was made.

222.    At the time the Shareholder Distributions were transferred by Debtor, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were "insider[s]" as that term is defined by 11 U.S.C. § 101(31).  Debtor's transfer of approximately $25,000,000 in Shareholder Distributions during the one year period preceding the Petition Date enabled Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made.  Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid these transfers.

223.    The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr.,

Sullivan, Jr., Gaylord, Malis, Marchetti, and Young: the avoidance of the transfers and the recovery of approximately $9.4 million from Jaggi, approximately $8.75 million from Sullivan, Sr., approximately $9.5 million from Sullivan, Jr., approximately $3.67 million from Gaylord, approximately $618,600 from Malis, approximately $112,600 from Marchetti, and approximately $3.6 million from Young.

**Count 15:**     **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, And Young.**

224. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

225. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young have obtained and received funds in the form of the Shareholder Distributions that in justice and equity belong to the Debtor. Each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young were directly enriched by the payment of the Shareholder Distributions, which impoverished Debtor. There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young.

226. Debtor lacks an adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young have been unjustly enriched by the Shareholder Distributions and is entitled to recover all amounts in which they have been unjustly enriched, which shall be determined by the trier of fact.

227. The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, jointly and severally: the recovery of the amounts by which such Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $36.5 million.

## COUNTS 16-18: THE REVOLVER ($48.3MM)

**Count 16:** **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against FMCI.**

228. The Defendant affected by this claim is FMCI.

229. From March 2005 through August 31, 2007, Debtor transferred approximately $48,302,630 to FMCI in alleged principal and interest payments on the Revolver. The payments to FMCI on the Revolver transferred an interest of the Debtor in property.

230. Debtor made the transfers to FMCI on the Revolver with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor made each of these transfers at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers. The transfers were made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or were unreasonably small in relation to the Debtor's business. Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

231. Debtor received less than fair or reasonably equivalent value in exchange for making the transfers on the Revolver. As a result of the transfers, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the payments on the Revolver and recover in excess of $48,302,630 from FMCI.

232. The Litigation Trustee seeks to recover the following relief from FMCI: the avoidance of the transfer and the recovery of an amount in excess of $48 million.

**Count 17:** **11 U.S.C. § 547(b) Avoidable Preference Against FMCI.**

233. Within one year of the Petition Date and thereafter, Debtor transferred

approximately $44,749,740.80 to FMCI in alleged principal and interest payments on the Revolver. The payments to FMCI on the Revolver transferred an interest of Debtor in property, and were made at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers. The transfers were made to satisfy an alleged antecedent debt owed by Debtor to FMCI prior to the time the transfers were made.

234. At the time the transfers were made, FMCI was an "insider" as that term is defined by 11 U.S.C. § 101(31). Debtor's transfer of approximately $44,749,740.80 on the Revolver to FMCI enabled FMCI to receive more than it would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made. Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers on the Revolver and recover in excess of $44,749,740.80 from FMCI.

235. The Litigation Trustee seeks to recover the following relief from FMCI: the avoidance of the transfer and the recovery of an amount in excess of $44.7 million.

**Count 18:** **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, And FMCI.**

236. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

237. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have obtained and received funds in the form of the Revolver payments or otherwise received a benefit that in justice and equity belong to the Debtor. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI were directly enriched by the payments on the Revolver, which impoverished Debtor. There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

238. Debtor lacks an adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have been unjustly

enriched by the payments on the Revolver and is entitled to recover all amounts in which they have been unjustly enriched, which shall be determined by the trier of fact.

239.     The Litigation Trustee the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, jointly and severally:  the recovery of the amount by which such Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $48 million.

**COUNTS 19-21: THE SULLIVAN, SR. NOTES ($26MM)**

**Count 19:**     **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Sullivan, Sr. And The Sullivan, Sr. Revocable Trust.**

240.     The Defendants affected by this claim are Sullivan, Sr. and The Sullivan, Sr. Revocable Trust.

241.     Within one year of the Petition Date, Debtor transferred approximately $26,000,000 to Sullivan, Sr., individually, and/or as the alleged trustee for The Sullivan, Sr. Revocable Trust, for principal and/or interest payments on the Sullivan, Sr. Notes.  The payments with respect to the Sullivan, Sr. Notes transferred an interest of Debtor in property.

242.     Debtor made the payments on the Sullivan, Sr. Notes with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.  Debtor made payments on the Sullivan, Sr. Notes at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfers.  The transfers were made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or were unreasonably small in relation to the Debtor's business.  Through the transfers, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

243.     Debtor received less than fair or reasonably equivalent value in exchange for

making the transfers of the Sullivan, Sr. Notes.  As a result of the transfers, Debtor and its creditors have been harmed.  Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid these payments.

244.  The Litigation Trustee seeks the following relief from Sullivan, Sr. and The Sullivan, Sr. Revocable Trust:  the avoidance of the payments on the Sullivan, Sr. Notes and the recovery of approximately $26,000,000.

**Count 20:  11 U.S.C. § 547(b) Avoidable Preference Against Sullivan, Sr. And The Sullivan, Sr. Revocable Trust.**

245.  The Defendants affected by this claim are Sullivan, Sr. and The Sullivan, Sr. Revocable Trust.

246.  Within one year of the Petition Date, Debtor transferred approximately $26,000,000 to Sullivan, Sr., individually, and/or as the alleged trustee for The Sullivan, Sr. Revocable Trust, for principal and/or interest payments on the Sullivan, Sr. Notes.  The payments with respect to the Sullivan, Sr. Notes transferred an interest of Debtor in property at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.  The transfers were made to satisfy an alleged antecedent debt owed by Debtor to Sullivan, Sr. and/or The Sullivan, Sr. Revocable Trust prior to the time the transfer was made.

247.  At the time the transfer was made, Sullivan, Sr. and The Sullivan, Sr. Revocable Trust were "insiders" as that term is defined by 11 U.S.C. § 101(31).  Debtor's transfer of approximately $26,000,000 in principal and/or interest payments on the Sullivan, Sr. Notes to Sullivan, Sr. and/or The Sullivan, Sr. Revocable Trust, enabled Sullivan, Sr. and/or The Sullivan, Sr. Revocable Trust to receive more than they would have otherwise received in a Chapter 7 liquidation case if the transfers had not been made.  Pursuant to 11 U.S.C. §§ 547(b) and 550(a), Debtor is entitled to avoid the transfers related to the Sullivan, Sr. Notes and recover approximately $26,000,000 from Sullivan, Sr., and/or The Sullivan, Sr.

1 Revocable Trust.

2      248.    The Litigation Trustee seeks the following relief from Sullivan, Sr. and The
3 Sullivan, Sr. Revocable Trust: the avoidance of the payments on the Sullivan, Sr. Notes and
4 the recovery of approximately $26 million.

5 **Count 21:**      **Unjust Enrichment Against Sullivan, Sr. And The Sullivan, Sr. Revocable**
6                              **Trust.**

7      249.    The Defendants affected by this claim are Sullivan, Sr. and the Sullivan, Sr.,
8 Revocable Trust.

9      250.    Sullivan, Sr. and The Sullivan, Sr. Revocable Trust have obtained and received
10 funds in the form of payments on the Sullivan, Sr. Notes that in justice and equity belong to
11 the Debtor. Sullivan, Sr. and The Sullivan, Sr. Revocable Trust were directly enriched by the
12 payments on the Sullivan, Sr. Notes, which impoverished Debtor. There is no justification for
13 the enrichment of Sullivan, Sr. and The Sullivan, Sr. Revocable Trust.

14      251.    Debtor lacks an adequate legal remedy to recover the amounts in which
15 Sullivan, Sr. and The Sullivan, Sr. Revocable Trust have been unjustly enriched by the
16 payments on the Sullivan, Sr. Notes and is entitled to recover all amounts in which they have
17 been unjustly enriched, which shall be determined by the trier of fact.

18      252.    The Litigation Trustee seeks the following relief from Sullivan, Sr. and The
19 Sullivan, Sr. Revocable Trust, jointly and severally: the recovery of the amounts by which
20 such Defendants were unjustly enriched, which the Litigation Trustee contends is in excess of
21 $26 million.

22

23

24

25

## COUNTS 22-35:   THE ASSET TRANSFERS TO FMCI, MAGNUS CORP., AND FM REALTY ($50MM+)

## COUNTS 22-23:   FMR ($8MM+)

### Count 22:      A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against FMCI.

253.    The Defendant affected by this claim is FMCI.

254.    On September 20, 2006, Debtor transferred its interest in FMR to FMCI for no consideration. Debtor's interest in FMR was an interest of Debtor in property.

255.    Debtor made the transfer of FMR to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor transferred its interest in FMR to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. The transfer of Debtor's interest in FMR to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business. Through the transfer of Debtor's interest in FMR to FMCI, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

256.    Debtor received less than fair or reasonably equivalent value in exchange for transferring its interest in FMR to FMCI. Indeed, Debtor received no consideration for the transfer of its interest in FMR to FMCI. As a result of the transfer of Debtor's interest in FMR to FMCI, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMR to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in FMR at the time of the transfer.

257.    The Litigation Trustee seeks the following recovery from FMCI: the avoidance of the transfer and an amount reflecting a fair valuation of Debtor's interest in FMR at the time

of transfer, which the Litigation Trustee contends is in excess of approximately $8 million.

**Count 23:** **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, And FMCI.**

258. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

259. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have obtained and received funds in the form of the transfer of the Debtor's interest in FMR or otherwise received a benefit that in justice and equity belongs to the Debtor, and each of them was directly enriched by the transfer of the Debtor's interest in FMR, which impoverished Debtor.

260. In addition to the transfer of the Debtor's interest in FMR, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI were also enriched by the Debtor's continued funding of expenses for the operation of FMR. Debtor was impoverished by the payment of FMR expenses, and there is a direct connection between these payments for their benefit and the corresponding impoverishment suffered by the Debtor.

261. There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, and Debtor lacks an adequate legal remedy to recover the amounts in which they have been unjustly enriched.

262. Debtor is entitled to recover all amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have been unjustly enriched.

263. The Litigation Trustee seeks the following recovery from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, jointly and severally: recovery of the amount by which such Defendants have been unjustly enriched by the transfer of the Debtor's interest in FMR and Debtor's funding of FMR's expenses, which the Litigation Trustee contends is in excess of $8 million.

## COUNTS 24-25: FMLS ($2.5MM+)

**Count 24:    A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against FMCI.**

264.    The Defendant affected by this claim is FMCI.

265.    On September 20, 2006, Debtor transferred its interest in FMLS to FMCI. Debtor's interest in FMLS was an interest of Debtor in property.

266.    Debtor made the transfer of FMLS to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor transferred its interest in FMLS to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. The transfer of Debtor's interest in FMLS to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to Debtor's business. Through the transfer of FMLS to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

267.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in FMLS to FMCI. Indeed, Debtor received no consideration for the transfer of its interest in FMLS to FMCI. As a result of the transfer of Debtor's interest in FMLS to FMCI, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in FMLS to FMCI and to recover an amount reflecting a fair valuation of Debtor's interest in FMLS at the time of the transfer.

268.    The Litigation Trustee seeks to following recovery from FMCI: the avoidance of the transfer and the recovery of an amount reflecting a fair valuation of Debtor's interest in FMLS at the time of transfer, which the Litigation Trustee contends is in excess of $2.5

million.

**Count 25:** **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, And FMCI.**

269. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

270. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have obtained and received funds in the form of the transfer of Debtor's interest in FMLS or otherwise received a benefit that in justice and equity belongs to the Debtor. Each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI were directly enriched by the transfer of Debtor's interest in FMLS, which impoverished Debtor.

271. In addition to the transfer of Debtor's interest in FMLS, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI were enriched by the Debtor's continued funding of expenses for the operation of FMLS. Debtor was impoverished by the payment of FMLS expenses and there is a direct connection between these payments for the benefit of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, and the corresponding impoverishment suffered by the Debtor.

272. There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, and Debtor lacks an adequate legal remedy to recover the amounts in which they have been unjustly enriched. Debtor is entitled to recover all amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have been unjustly enriched, which shall be determined by the trier of fact.

273. The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, jointly and severally: the recovery of an amount by which such Defendants have been unjustly enriched by the transfer of Debtor's interest in FMLS and Debtor's funding of FMLS' expenses, which the Litigation

Trustee contends is in excess of $2.5 million.

<u>**COUNTS 26-27: THE MAGNUS RECEIVABLES ($6.5MM)**</u>

**Count 26:    A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against FMCI.**

274.    The Defendant affected by this claim is FMCI.

275.    On August 31, 2006, and December 31, 2006, Debtor transferred its interest in the Magnus Receivables to FMCI. Debtor's interest in the Magnus Receivables transferred to FMCI was an interest of Debtor in property.

276.    Debtor made the transfer of its interest in the Magnus Receivables to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor transferred its interest in the Magnus Receivables to FMCI at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. The transfer of Debtor's interest in the Magnus Receivables to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business. Through the transfer of Debtor's interest in the Magnus Receivables to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

277.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the Magnus Receivables to FMCI. Indeed, Debtor received no consideration for the transfer of its interest in the Magnus Receivables to FMCI. As a result of the transfer of Debtor's interest in the Magnus Receivables to FMCI, Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfer of its interest in the

Magnus Receivables to FMCI and recover an amount reflecting a fair valuation of Debtor's interest in the Magnus Receivables at the time of the transfer.

278.   The Litigation Trustee seeks the following recovery from FMCI:  the avoidance of the transfer and the recovery of an amount reflecting the fair market value of Debtor's interest in the Magnus Receivables at the time of transfer, which the Litigation Trustee contends is approximately $6.5 million.

**Count 27:    Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., And FMCI.**

279.   The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI.

280.   Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp. and FMCI have obtained and received funds in the form of the Magnus Receivables or otherwise received a benefit that in justice and equity belongs to the Debtor.  Each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI were directly enriched by the payments Debtor made when incurring the Magnus Receivables and by the transfer of the Magnus Receivables to FMCI, which impoverished Debtor.  There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI.

281.   Debtor lacks any adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI have been unjustly enriched by the payments Debtor made on the Magnus Receivables and by the transfer of the Magnus Receivables to FMCI, and Debtor is entitled to recover all amounts in which they have been unjustly enriched, which shall be determined by the trier of fact.

282.   The Litigation Trust seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI, jointly and

severally: the recovery of the amount by which such Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $6.5 million.

**COUNTS 28-29: CORPORATE JETS ($13MM+)**

**Count 28:** **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against Magnus Corp. And FMCI.**

283.    The Defendants affected by this claim are Magnus Corp. and FMCI.

284.    On August 31, 2006, within one year of the Petition Date, Debtor transferred its interest in the Falcon and the Hawker (collectively, the "Aircraft") to FMCI and/or Magnus Corp. for no consideration. Debtor's interest in the Aircraft was an interest of Debtor in property.

285.    Debtor made the transfer of its interest in the Aircraft to FMCI and/or Magnus Corp. with the actual intent to hinder, delay, and/or defraud the creditors of Debtor. Debtor transferred its interest in the Aircraft to FMCI and/or Magnus Corp. at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer. The transfer of Debtor's interest in the Aircraft to FMCI and/or Magnus Corp. was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to the Debtor's business. Through the transfer of Debtor's interest in the Aircraft to FMCI and/or Magnus Corp., Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

286.    Debtor received less than fair or reasonably equivalent value in exchange for making the transfer of its interest in the Aircraft to FMCI and/or Magnus Corp. Indeed, Debtor received no consideration for these transfers. Following the transfers, Debtor continued to pay for all expenses related to the ownership, maintenance, and operation of the

Aircraft, including personal expenses incurred by Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI.

287.    As a result of the transfer of Debtor's interest in the Aircraft to FMCI and/or Magnus Corp., and Debtor's continued funding of expenses related to its ownership, maintenance, and operation, Debtor and its creditors have been harmed.  Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C. §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid the transfers of its interests in the Aircraft to FMCI and/or Magnus Corp. and all expenses Debtor paid related to its ownership, maintenance, and operation, and to recover an amount reflecting a fair valuation of Debtor's interest in the Aircraft at the time of the transfers and all expenses borne by Debtor after the date of the transfers.

288.    The Litigation Trustee seeks the following recovery from Magnus Corp. and FMCI:  the avoidance of the transfers, the recovery of an amount reflecting a fair market valuation of Debtor's interest in these Aircraft at the time of the transfers, and all expenses borne by Debtor after the transfers, which the Litigation Trustee contends is in excess of $13 million.

**Count 29:    Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., And FMCI.**

289.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI.

290.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI have obtained a benefit and been directly enriched by the transfers of Debtor's interest in the Aircraft and by Debtor's funding of expenses related to the ownership, maintenance, and operations, which impoverished Debtor.  There is no justification for the enrichment of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI.

291.   Debtor lacks an adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI have been unjustly enriched by the transfers of Debtor's interests in the Aircraft and funding of expenses related to its ownership, maintenance and operation, and Debtor is entitled to recover all amounts in which they have been unjustly enriched.

292.   The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Magnus Corp., and FMCI, jointly and severally: the recovery of the amount by which such Defendants have been unjustly enriched, which the Litigation Trustee contends is in excess of $13 million.

## COUNTS 30-31: THE WNS SHARES ($14MM+)

**Count 30:**   **A.R.S. §44-1004(A)(1)-(2) And 11 U.S.C. §548(a)(1)(A)-(B) Fraudulent Transfer Against FMCI.**

293.   The Defendant affected by this claim is FMCI.

294.   Within two years of the Petition Date, Debtor transferred its interest in the WNS Shares to FMCI, which was an interest of Debtor in property.

295.   Debtor made the transfer of the WNS Shares to FMCI with the actual intent to hinder, delay, and/or defraud the creditors of Debtor and at a time when it was insolvent or, alternatively, Debtor became insolvent as a result of the transfer.  The transfer of Debtor's interest in the WNS Shares to FMCI was made at a time when Debtor was engaged (or was about to engage) in a business or transaction for which any property or assets remaining with Debtor after the transfer represented an unreasonably small amount of capital or was unreasonably small in relation to Debtor's business.  Through the transfer of Debtor's interest in the WNS Shares to FMCI, Debtor intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as such debts matured and became due.

296.   Debtor received less than fair or reasonably equivalent value in exchange for

1  making the transfer of its interest in the WNS Shares to FMCI. As a result of this transfer,
2  Debtor and its creditors have been harmed. Pursuant to A.R.S. §44-1004(A)(1)-(2), 11 U.S.C.
3  §§ 548(a)(1)(A)-(B) and 550(a), Debtor is entitled to avoid this transfer and to recover an
4  amount reflecting a fair valuation of Debtor's interest in the WNS Shares at the time of the
5  transfer.

6      297.    The Litigation Trustee seeks the following recovery from FMCI: the avoidance
7  of the transfer and the recovery of an amount in excess of $14 million.

8  **Count 31:**    **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord,**
9                  **Malis, Marchetti, Young, And FMCI.**

10     298.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr.,
11 Gaylord, Malis, Marchetti, Young, and FMCI.

12     299.    Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI
13 have obtained a benefit from the transfer of Debtor's interest in the WNS Shares that in justice
14 and equity belong to the Debtor. Each of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis,
15 Marchetti, Young, and FMCI were directly enriched by the transfer of Debtor's interest in the
16 WNS Shares and their subsequent sale, which impoverished Debtor. There is no justification
17 for their enrichment.

18     300.    Debtor lacks any adequate legal remedy to recover the amounts in which Jaggi,
19 Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have been unjustly
20 enriched by the transfer of Debtor's interest in the WNS Shares and the proceeds obtained
21 from their sale and is entitled to recover all amounts in which they have been unjustly
22 enriched.

23     301.    The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr.,
24 Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, jointly and severally: the recovery
25 of the amounts by which such Defendants have been unjustly enriched as a result of the

transfer and the proceeds from the subsequent sale, which the Litigation Trustee contends is in excess of $14 million.

## COUNTS 32-33: THE BANK EXPENDITURES ($2.8MM+)

**Count 32:**     **Unjust Enrichment Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, And FMCI.**

302.     The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

303.     Debtor is entitled to compensation from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI because it conferred a direct benefit upon them by funding the Bank Expenditures, which impoverished Debtor. There is no justification for the Debtor's funding of the Bank Expenditures on behalf of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

304.     Debtor lacks an adequate legal remedy to recover the amounts in which Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI have been unjustly enriched by Debtor's funding of the Bank Expenditures. It would be unjust to allow Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI to retain the benefit of the Bank Expenditures without payment to Debtor, and Debtor is entitled to restitution of all benefits wrongfully withheld by them including, but not limited to, the dollar amount of the Bank Expenditures and/or the value derived by each such Defendant from such expenditures.

305.     The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young and FMCI, jointly and severally: the recovery of the amounts by which such Defendants were unjustly enriched by the Bank Expenditures, which the Litigation Trustee contends is in excess of $2.8 million.

**Count 33:** **Quantum Meruit Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, And FMCI.**

306.  The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI.

307.  Debtor is entitled to compensation from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI for the value they derived from the Bank Expenditures, which conferred a benefit on them, and were made by Debtor with the reasonable expectation that they would be paid.

308.  It would be unjust for Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI to retain the benefit of the Bank Expenditures without payment to Debtor, and Debtor is entitled to restitution of all benefits wrongfully withheld by them for the dollar amount of such expenditures and/or the value derived therefrom.

309.  The Litigation Trustee seeks to recover the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, and FMCI, jointly and severally: restitution of all benefits wrongfully withheld related to the Bank Expenditures, which the Litigation Trustee contends is in excess of $2.8 million.

**COUNTS 34-35: IMPROVEMENTS TO 603 N. WILMOT ($5.7MM+)**

**Count 34:** **Unjust Enrichment Against FM Realty, Indus Holdings, Ecloser, Inc., ECSI, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti And Young.**

310.  The Defendants affected by this claim are FM Realty, Indus Holdings, Ecloser, Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young.

311.  Debtor is entitled to compensation from FM Realty, Indus Holdings, Ecloser, Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young because Debtor conferred a direct benefit upon each

1    of them by funding the Improvements to 603 N. Wilmot, which impoverished Debtor.

2            312.    Debtor lacks an adequate legal remedy to recover the amounts in which FM

3    Realty, Indus Holdings, Ecloser, Inc., ECSI, Sullivan Title Investment, Sullivan Title

4    Management, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young have been

5    enriched by the Improvements to 603 N. Wilmot funded by Debtor, and who have retained the

6    value of such benefit by virtue of their ownership, occupation and/or beneficial use of the

7    premises.

8            313.    It would be unjust to allow them to retain any benefit related to the

9    Improvements to 603 N. Wilmot without payment to Debtor, and Debtor is entitled to

10   restitution of all benefits wrongfully withheld by them, including, but not limited to, the dollar

11   amount of such Improvements and/or the value derived from such Improvements.

12           314.    The Litigation Trustee seeks the following recovery from FM Realty, Indus

13   Holdings, Ecloser, Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi,

14   Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young, jointly and severally:  restitution of

15   all benefits withheld by such Defendants including, but not limited to, the dollar amount of the

16   Improvements and/or the value derived from the Improvements, which the Litigation Trustee

17   contends is in excess of $5.7 million.

18   **Count 35:**      **Quantum Meruit Against FM Realty, Indus Holdings, Ecloser, Inc., ECSI,**
                     **Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr.,**
19                    **Sullivan, Jr., Malis, Marchetti, And Young.**

20           315.    The Defendants affected by this claim are FM Realty, Indus Holdings, Ecloser,

21   Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr.,

22   Sullivan, Jr., Malis, Marchetti, and Young.

23           316.    Debtor is entitled to compensation from FM Realty, Indus Holdings, Ecloser,

24   Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr.,

25   Sullivan, Jr., Malis, Marchetti, and Young for the value they derived from the Improvements

to 603 N. Wilmot.

317.    The Improvements to 603 N. Wilmot conferred a benefit on each of them, and it would be unjust for them to retain any of the benefits related to the Improvements to 603 N. Wilmot without compensating Debtor.  Debtor is therefore entitled to restitution of all benefits wrongfully withheld by them for the dollar amount of such Improvements and/or the value derived therefrom.

318.    The Litigation Trustee seeks the following relief from FM Realty, Indus Holdings, Ecloser, Inc., ECSI, Sullivan Title Investment, Sullivan Title Management, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, and Young, jointly and severally:  restitution of all benefits withheld by such Defendants including, but not limited to, the dollar amount of the Improvements to 603 N. Wilmot and/or the value derived from the Improvements, which the Litigation Trustee contends is in excess of $5.7 million.

**COUNTS 36-38:    PRE-PETITION CONSTRUCTIVE TRUST, CONSPIRACY, AND AIDING AND ABETTING CLAIMS.**

**Count 36:    Constructive Trust Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Thomas, The Sullivan, Sr. Revocable Trust, FMCI, FM Realty, And Magnus Corp.**

319.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, Thomas, The Sullivan, Sr. Revocable Trust, FMCI, FM Realty, and Magnus Corp.

320.    From January 2005 to the Petition Date, Debtor was insolvent.  Throughout this period, the present fair value of Debtor's assets was less than the amount that would have been required to pay its probable liability on then existing debts as they became absolute and matured, and the sum of Debtor's debts was greater than all of Debtor's assets, at fair valuation.

321.    Consequently, Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and

Young owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

322.     Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things:  (a) orchestrating, authorizing, and carrying out the Sullivan, Sr. Redemption, the Gaylord Redemption, the Thomas Redemption, the Officer Bonuses and Other Self-Interested Transactions, and the Shareholder Distributions; (b) transferring Debtor's interest in FMR, FMLS, Magnus Receivables, the Aircraft, and the WNS Shares to FMCI (and/or Magnus Corp.) for no consideration; and (c) making payments on or for the Revolver, the Sullivan, Sr. Notes, the expenses of FMCI, FMR, FMLS and Magnus Corp., the personal expenses of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, the Bank Expenditures, and the Improvements to 603 N. Wilmot.

323.     The conduct of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young in orchestrating, authorizing, and carrying out the transactions listed above was unconscionable.  Further, each of these transfers was made with the actual intent to hinder, delay, and/or defraud the creditors of Debtor.  As such, it would be inequitable to allow them to retain the benefits.

324.     Accordingly, the Litigation Trustee seeks the following relief:   judgment imposing a constructive trust on the Sullivan, Sr. Redemption, the Gaylord Redemption, the Thomas Redemption, the Officer Bonuses and Other Self-Interested Transactions, the Shareholder Distributions, FMR, FMLS, the Magnus Receivables, the Aircraft, the WNS Shares, payments on the Revolver, the Sullivan, Sr. Notes, the payment of expenses for FMCI, FMR, FMLS, and Magnus Corp., the payment of personal expenses for Jaggi, Sullivan, Sr.,

1 Sullivan, Jr. Gaylord, Malis, Marchetti, and Young, the Bank Expenditures, and the

2 Improvements to 603 N. Wilmot, and the immediate return of this property.

3 **Count 37:** **Pre-Petition Civil Conspiracy Against Jaggi, Sullivan, Sr., Sullivan, Jr.,**
**Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings,**
4 **And Magnus Corp.**

5 325. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr.,

6 Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp.

7 326. FMCI joined with Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti,

8 and Young to perpetrate, facilitate, and aid and abet the Debtor's funding of the Sullivan, Sr.

9 Redemption, Gaylord Redemption, Shareholder Distributions, payments made on the

10 Revolver, the payment of expenses related to and the transfer of its interest in FMR, FMLS,

11 Magnus Receivables, the Aircraft, and WNS Shares, and payments made for the Bank

12 Expenditures and Improvements to 603 N. Wilmot.

13 327. FM Realty, Indus Holdings, and Magnus Corp. joined with FMCI and Jaggi,

14 Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young to perpetrate, facilitate, aid

15 and abet FMFC's payment of the Bank Expenditures and Improvements to 603 N. Wilmot.

16 328. Magnus Corp. also joined with FMCI and Jaggi, Sullivan, Sr., Sullivan, Jr.,

17 Gaylord, Malis, Marchetti, and Young to perpetrate, facilitate, and aid and abet FMFC's

18 payment of expenses related to the transfer of the Magnus Receivables and the Aircraft.

19 329. Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM

20 Realty, Indus Holdings, and Magnus Corp. had a meeting of the minds with one another

21 regarding these courses of action and undertook substantial wrongful, overt acts in furtherance

22 of these courses of action.

23 330. As a result of these wrongful acts, Debtor suffered damages in an amount to be

24 proven at trial. The acts and/or omissions described in this count were committed with an

25 intent to defraud and motivated by a conscious and deliberate disregard of the interests of

Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

331. The Litigation Trustee seeks to following recovery from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp., jointly and severally: the actual and consequential damages incurred and an award of punitive damages, which the Litigation Trustee contends is in excess of $300 million.

**Count 38:** **Aiding And Abetting Against Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, And Magnus Corp.**

332. The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp.

333. FMCI knowingly and intentionally provided assistance to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and otherwise participated in the Sullivan, Sr. Redemption, Gaylord Redemption, Shareholder Distributions, payments made on the Revolver, payment of expenses related to and transfer of FMR, FMLS, Magnus Receivables, the Aircraft, and WNS Shares, and payments made for the Bank Expenditures and Improvements to 603 N. Wilmot.

334. FM Realty, Indus Holdings, and Magnus Corp., knowingly and intentionally provided assistance to Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and otherwise participated in FMFC's payment of the Bank Expenditures and Improvements to 603 N. Wilmot.

335. Magnus Corp. knowingly and intentionally provided assistance to Jaggi,

Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, and otherwise participated in the incursion and transfer of the Magnus Receivables, and expenditures related to the Aircraft.

336.   The assistance of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp. was a substantial factor in these courses of action, which proximately caused damages to Debtor and Debtor's creditors in an amount to be proven at trial.  Such damages were the reasonable and foreseeable consequence of the conduct of Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp.  Accordingly, they are liable for all actual and consequential damages resulting from their conduct.

337.   The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages pursuant to all available statutory and common law rights, in an amount to be proven at trial.

338.   The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, Young, FMCI, FM Realty, Indus Holdings, and Magnus Corp., jointly and severally:   the actual and consequential damages Debtor has incurred and an award of punitive damages, which the Litigation Trustee contends is in excess of $300 million.

## POST-PETITION CLAIMS

### COUNTS 39 – 40:  POST-PETITION RICO CLAIMS

**Count 39:** **Violations Of 18 U.S.C. § 1962(c) Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, <u>Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, And Arnold.</u>**

339.    The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold.

340.    Each of FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold are "persons" as defined by 18 U.S.C. § 1961(3).

341.    During all times relevant to the Complaint, the affected Defendants were – and remain – an association-in-fact enterprise as defined by 18 U.S.C. § 1961 (4) (the "Enterprise").  The Enterprise was engaged in (and continues to engage), and its activities affected (and continue to affect), interstate and foreign commerce.  Furthermore, the Enterprise was an ongoing organization with a common purpose that functioned as a continuing unit.

342.    FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Warner, Young, Yonan, Shivpuri, Warner, and Arnold agreed to – and conducted and participated in – the conduct of the Enterprise through a pattern of racketeering activity.  The pattern of racketeering activity engaged in by the Enterprise was directed toward the unlawful purpose of acquiring Debtor's proprietary assets through violations of the Bankruptcy Court Order and by means of fraud, misappropriation, and conversion.

343.    In furtherance of this unlawful purpose, the Enterprise designed, orchestrated, authorized, and carried out a scheme by which its members knowingly transferred and acquired Debtor's confidential information and proprietary assets through violations of the

Bankruptcy Court Order and by means of fraud, misappropriation, and conversion, as set forth in ¶¶ 113-46. Specifically, each of the affected individuals and entities participated in the Enterprise as follows:

a. FM Realty is managed by Magnus Corp., and its members include Sullivan, Sr., and Indus Holdings. FM Realty participated in identifying and acquiring equipment containing Debtor's confidential information and proprietary assets in contravention of the Bankruptcy Court Order that G Force and StoneWater intended to utilize, which included, *inter alia*, several SANs that contained Debtor's loan data, information residing on the desktops of FMFC personnel, Debtor's WorldDox system, accounting records, general ledger software, and email data from Debtor's Exchange Server. Knowing that G Force and StoneWater had acquired other equipment and confidential information of the Debtor, and with the understanding that G Force and StoneWater intended to utilize them in their new businesses, FM Realty allowed StoneWater to begin operating from Debtor's Headquarters in February 2008 without a lease and to utilize the server room where much of the equipment misappropriated from Debtor resided. In July 2008, FM Realty and SW Mortgage entered into the StoneWater Lease, which required FM Realty to convey to StoneWater the equipment and furniture FM Realty acquired in violation of the Bankruptcy Court Order.

b. Indus Holdings is managed by Jaggi, and it contributed $5,000,000 to capitalize SW Holding knowing that G Force had acquired Debtor's equipment, confidential information, and proprietary assets, and with the understanding that that StoneWater intended to utilize them in their new businesses.

c. Indus Ventures is managed by Jaggi, and it contributed $200,000 to capitalize SW Holding knowing that G Force had acquired Debtor's equipment, confidential information, and proprietary assets, and with the understanding that StoneWater intended to

1   utilize them in their new businesses.

2        d.    The Sullivan, Sr. Revocable Trust made financial contributions to SW

3   Holding sufficient to directly own 6.68% of that entity knowing that G Force had acquired

4   Debtor's equipment, confidential information, and proprietary assets, and with the

5   understanding that StoneWater intended to utilize them in their new businesses.

6        e.    Arnold acquired CIG at a substantial discount from FMCI and FMLS,

7   without assuming a $675,440.34 receivable owed to Debtor or reimbursing Debtor for tax

8   liabilities and other expenses FMFC funded on its behalf. In return, Arnold contributed

9   $1,000,000 to capitalize SW Holding knowing that G Force had acquired Debtor's equipment,

10  confidential information, and proprietary assets, and with the understanding that StoneWater

11  intended to utilize them in their new businesses.

12       f.    Jaggi owns and manages Indus Holdings and Indus Ventures and caused

13  them to make financial contributions to SW Holding totaling $5,200,000. Jaggi also

14  participated in identifying and acquiring the equipment containing Debtor's confidential

15  information and proprietary assets that G Force obtained in contravention of the Bankruptcy

16  Court Order and without consideration. Jaggi further caused G Force to transfer its "assets" to

17  SW Holding in consideration for shares of common stock in SW Holding. Finally, Jaggi

18  utilized the equipment, confidential information, and other proprietary assets of Debtor in

19  operating StoneWater.

20       g.    Malis participated in identifying and acquiring the equipment

21  containing Debtor's confidential information and proprietary assets that G Force obtained in

22  contravention of the Bankruptcy Court Order and without any consideration. Malis further

23  caused G Force to transfer its "assets" to SW Holding in consideration for shares of common

24  stock in SW Holding. Finally, Malis utilized the equipment, confidential information, and

25  proprietary assets of Debtor in operating StoneWater.

1           h.        Marchetti made personal copies of FMFC's databases, source code, and

2   other critical electronic information on to portable hard drives in August 2007, and utilized the

3   materials in the operation of G Force and StoneWater. Marchetti participated in identifying

4   and acquiring the equipment containing Debtor's confidential information and proprietary

5   assets that G Force obtained in contravention of the Bankruptcy Court Order and without

6   consideration. On October 2, 2007, Marchetti accessed the Headquarters under false pretenses

7   and, along with five other men, removed a considerable amount of computer equipment that

8   was not identified on any bill of sale and utilized the materials in the operation of G Force and

9   StoneWater. Marchetti further caused G Force to transfer its "assets" to SW Holding in

10  consideration for shares of common stock in SW Holding. Finally, Marchetti utilized the

11  equipment, confidential information, and proprietary assets of Debtor in operating G Force

12  and StoneWater.

13          i.        Shivpuri participated in identifying the equipment containing Debtor's

14  confidential information and proprietary assets that G Force obtained in contravention of the

15  Bankruptcy Court Order and without consideration. Shivpuri also contributed $500,000 to

16  SW Holding knowing that G Force had acquired Debtor's equipment, confidential

17  information, and proprietary assets, and with the understanding that StoneWater intended to

18  utilize them in their new businesses. Finally, Shivpuri utilized the equipment, the confidential

19  information, and proprietary assets of Debtor in operating StoneWater.

20          j.        Sullivan, Jr. made financial contributions totaling $5,000,000 to SW

21  Holding knowing that G Force had acquired Debtor's equipment, confidential information,

22  and proprietary assets, in contravention of the Bankruptcy Court Order and without

23  consideration, and with the understanding that StoneWater intended to utilize them in their

24  new businesses. Sullivan, Jr. further caused G Force to transfer its "assets" to SW Holding in

25  consideration for shares of common stock in SW Holding, and utilized the equipment,

confidential information, and proprietary assets of Debtor in operating G Force and StoneWater.

        k.     Sullivan, Sr. is the trustee of The Sullivan, Sr. Revocable Trust. Sullivan, Sr., both individually and in his alleged capacity as trustee, made financial contributions to SW Holding in excess of $5,000,000 knowing that G Force had acquired Debtor's equipment, confidential information, and proprietary assets, in contravention of the Bankruptcy Court Order and without consideration, and with the understanding that StoneWater intended to utilize them in their new businesses.

        l.     Warner participated in identifying and acquiring equipment containing Debtor's confidential information and proprietary assets that FM Realty and G Force obtained in contravention of the Bankruptcy Court Order and without consideration. Warner also contributed $500,000 to SW Holding knowing that FM Realty and G Force had acquired Debtor's equipment, confidential information, and proprietary assets, in contravention of the Bankruptcy Court Order and without consideration, and with the understanding that StoneWater intended to utilize them in their new businesses. Finally, Warner utilized the equipment, the confidential information, and proprietary assets in operating StoneWater.

        m.     Yonan participated in identifying and acquiring the equipment containing Debtor's confidential information and proprietary assets that G Force obtained in contravention of the Bankruptcy Court Order and without consideration. Yonan handled the majority of the negotiations with DoveBid on behalf of G Force. Yonan failed to disclose the removal of a considerable amount of computer equipment by Marchetti and others to Debtor's bankruptcy counsel or the Court.

        n.     Young participated in identifying and acquiring the equipment containing Debtor's confidential information and proprietary assets that G Force obtained in contravention of the Bankruptcy Court Order and without consideration. Young also

contributed $500,000 to SW Holding knowing that G Force had acquired Debtor's equipment, confidential information, and proprietary assets, in contravention of the Bankruptcy Court Order and without consideration, and with the understanding that StoneWater intended to utilize them in their new businesses. Young also caused G Force to transfer its "assets" to SW Holding in consideration for shares of common stock in SW Holding. Finally, Young utilized the equipment, the confidential information, and proprietary assets of Debtor in operating G Force and StoneWater.

344. Furthermore, the scheme designed, orchestrated, authorized, and carried out by FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold was clearly evincive of their intent to defraud Debtor's creditors. Specifically, the Enterprise engaged in violations of 18 U.S.C. § 152 (receiving and transferring a material amount of property after the filing of an action under Title 11; made a "racketeering activity" pursuant to 18 U.S.C. § 1961 (1)(D)), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud).

345. The violations of 18 U.S.C. § 152 (transfers and receipt of property intended to defeat Title 11), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) committed by members of the Enterprise were numerous, continuous, and distinct from the Enterprise.

346. The violations of 18 U.S.C. § 152 (transfers and receipt of property intended to defeat Title 11), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) committed by members of the Enterprise constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5). The actions were related in that they had the same or similar purpose, victim, and method of commission – namely the misappropriation and taking of Debtor's

equipment, confidential information, and proprietary assets. Furthermore, these related events extended over a substantial period of time beginning in August 2007 and continuing through the date of this pleading.

347. FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold have therefore violated 18 U.S.C. § 1962(c) in that they are associated with an enterprise engaged in, or activities of which affect, interstate commerce and/or foreign commerce, and have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

348. Debtor and Debtor's creditors have been injured in their business or property as a direct and proximate result of the violations of 18 U.S.C. § 1962(c) committed by FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold.

349. Accordingly, the Litigation Trustee is entitled to recover actual and consequential damages in an amount to be proven at trial, treble damages, and costs of suit, including reasonable and necessary attorneys' fees.

**Count 40:**     **Violations Of 18 U.S.C. § 1962(d) Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, <u>Jr., Malis, Marchetti, Warner, Young, Yonan, Shivpuri, And Arnold.</u>**

350. The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold.

351. FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold agreed and conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. §

1962(d), as described in ¶¶ 113-46 and 342-47. Each of the members of the Enterprise agreed to participate in the affairs of the Enterprise through the commission of two or more predicate acts.

352.    FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold knew that their predicate acts in violation of 18 U.S.C. § 152 (transfers and receipt of property intended to defeat Title 11), 18 U.S.C. § 2314 (transfer of stolen property), 18 U.S.C. § 2315 (receipt of stolen property), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud) were part of a pattern of racketeering activity. Thus, these Defendants have conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

353.    Debtor and Debtor's creditors have been injured in their business or property as a direct and proximate result of the violations of 18 U.S.C. § 1962(c) committed by FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, and Arnold.

354.    The Litigation Trustee seeks the following relief from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Yonan, Shivpuri, Warner, and Arnold, jointly and severally: actual and consequential damages in an amount to be proven at trial, treble damages, and costs of suit, including reasonable and necessary attorneys' fees.

**COUNTS 41-45: CLAIMS RELATING TO POST-PETITION TRANSFER OF DEBTOR'S ASSETS**

**Count 41:    Misappropriation Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, And Arnold.**

355.    The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan,

Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold.

356. Debtor, in the course of its business, created, developed, possessed and acquired trade secrets and other confidential and proprietary information, including, but not limited to: (i) information relating to FMFC's inventions or works made for hire; (ii) information regarding FMFC's plans for research, development, new products, marketing and selling, business plans, business methods, budgets and financial statements, licenses, prices and costs, suppliers and customers; (iii) information about FMFC's software programs and subroutines, source and object code, databases criteria, user data, ideas, techniques, inventions, processes, improvements (whether patentable or not), modules, features and modes of operation, internal documentation, works of authorship and technical plans; (iv) information regarding the strengths and weaknesses, skills and compensation of other employees of the Debtor; and (v) information about Debtor's security, including, without limitation, access codes, passwords, security protocols, system architecture, and/or employee or user identification (collectively, "Confidential Information").

357. Debtor derived independent economic value, actual and potential, by virtue of the fact that the Confidential Information was not generally known to (and readily accessible through proper means by) other persons who can obtain economic value from it. Debtor took reasonable efforts to maintain the secrecy of the Confidential Information.

358. As described in ¶¶ 113-46 and 342-47, FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold have obtained the Confidential Information by improper means, including, *inter alia*, (a) fraud; (b) breaches of fiduciary duty; (c) breaches of contract; (d) conversion; (e) misappropriation; and (f) circumstances giving rise to the duty to maintain the secrecy of the Confidential Information or otherwise limit the use thereof.

359. Debtor and Debtor's creditors have suffered damages as a result of the misappropriation of the Confidential Information, including, but not limited to, the loss of a reasonable royalty Debtor should have received for the Confidential Information, the lost economic value of the Confidential Information and/or profits derived therefrom, and other forms of remuneration.

360. Debtor is therefore entitled to recover the damages caused by their theft and misappropriation of the Confidential Information, pursuant to ARIZ. REV. STAT. ANN. § 44-402 and/or any other applicable law or statute, in an amount to be proven at trial.

361. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

362. The Litigation Trustee seeks the following relief from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold, jointly and severally: its actual and consequential damages caused by the theft and misappropriation of the Confidential Information, any costs saved and profits generated therefrom, and punitive damages in amounts to be proven at trial.

**Count 42:** **Conversion Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Shivpuri, And Arnold.**

363. The Defendants affected by this claim are FM Realty, Indus Holdings, Indus

Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Shivpuri, and Arnold.

364. At all times after the Petition Date, Debtor has been entitled to possession of its Confidential Information. As described in ¶¶ 113-46 and 342-47, no later than September 2007 and continuing indefinitely thereafter, FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Shivpuri, and Arnold wrongfully exercised dominion and/or control over the Confidential Information which substantially interfered with Debtor's rights to the Confidential Information.

365. Debtor had (and continues to have) an immediate legal right to use (and to possess exclusively) the Confidential Information at the time of the alleged conversion and was in a position to use it and was prevented from such use only by the wrongful detention of the Confidential Information by FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Shivpuri, and Arnold and is entitled to recover the value of the Confidential Information from them jointly and severally along with any costs saved and profits generated therefrom, in an amount to be proven at trial.

366. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

367.    The Litigation Trustee seeks the following relief from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Shivpuri, and Arnold, jointly and severally: the value of the Confidential Information, any costs saved and profits generated therefrom, and punitive damages in an amount to be proven at trial.

**Count 43:    Breach Of Fiduciary Duty Against Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, And Sharma.**

368.    The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma.

369.    As of the Petition Date, and through the term of their employment with the Debtor, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

370.    These individuals breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing and carrying out a scheme by which Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma knowingly transferred and acquired Debtor's confidential information and proprietary assets through repeated violations of the Bankruptcy Court Order by means of fraud, misappropriation, and conversion, by failing to market Debtor's assets, or otherwise failing to maximize their value for the benefit of Debtor's estate, and by engaging in other conduct directly adverse to the interests of the Debtor.

371.    As a result of the foregoing breaches of fiduciary duties, Debtor and Debtor's creditors suffered damages in an amount to be proven at trial.   The acts and/or omissions

1  described in this count were committed with an intent to defraud and motivated by a conscious
2  and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an
3  evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such
4  acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or
5  omissions described in this count resulted in actual harm to Debtor and its creditors.
6  Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation
7  Trustee should be awarded punitive damages, pursuant to all available statutory and common
8  law rights, in an amount to be proven at trial.

9       372.  The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr.,
10  Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma, jointly and
11  severally:  its actual and consequential damages resulting from these breaches of fiduciary
12  duties and punitive damages in amounts to be proven at trial.

13  **Count 44:**     **Fraud Against Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young,**
14                    **Wright, Yonan, And Warner.**

15       373.  The Defendants affected by this claim are Jaggi, Sullivan, Sr., Sullivan, Jr.,
16  Malis, Marchetti, Young, Wright, Yonan, and Warner.

17       374.  Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, and
18  Warner owed Debtor and Debtor's creditors a legal duty to disclose the dispositions of
19  Debtor's assets, as described in ¶¶ 113-46.  However, they failed to disclose such dispositions
20  to the Court and to creditors of the Debtor.  The facts related to dispositions of Debtor's assets
21  that they failed to disclose to Debtor and Debtor's creditors were material.

22       375.  Consequently, the Litigation Trustee is entitled to recover actual and
23  consequential damages in an amount to be proven at trial.  The acts and/or omissions
24  described in this count were committed with an intent to defraud and motivated by a conscious
25  and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an

evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

376. The Litigation Trustee seeks the following relief from Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, and Warner, jointly and severally: its actual, consequential, and punitive damages in amounts to be proven at trial.

**Count 45:** **Unjust Enrichment Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, And Arnold.**

377. The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold.

378. Debtor is entitled to compensation from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold because the acquisition and unauthorized use of the Confidential Information of Debtor has conferred a benefit on them, and they have retained the value of such benefit by virtue of their beneficial use of the Confidential Information.

379. In light of the inequitable conduct as described herein, it would be unjust to allow FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold to retain the benefit of the Confidential Information without

compensating Debtor for the dollar amount of such improvements and/or the value derived from such improvements, and Debtor is entitled to restitution of all benefits wrongfully withheld by them, including, but not limited to, reasonable royalties, costs saved, and profits and/or the value derived by them from their possession and beneficial use of the Confidential Information.

380. The Litigation Trustee seeks the following recovery from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold: the restitution of the benefits wrongfully withheld and costs saved by such Defendants in an amount to be proven at trial.

**COUNTS 46-48: POST-PETITION CONSTRUCTIVE TRUST, CONSPIRACY, AND AIDING AND ABETTING CLAIMS**

**Count 46:** **Post-Petition Constructive Trust Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, And Arnold.**

381. The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold.

382. As of the Petition Date and at all relevant times thereafter, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self dealing and self interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

383. Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan,

Warner, and Sharma breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out a scheme by which they knowingly transferred and acquired Debtor's property, including its Confidential Information and other proprietary assets, through repeated violations of the orders of this Court and by means of fraud, misappropriation, and/or conversion.

384. The conduct employed in orchestrating, authorizing and carrying out the scheme was unconscionable. Further, the scheme by which Debtor's property was transferred and acquired was made with the actual intent to hinder, delay and/or defraud Debtor's creditors. It would therefore be inequitable to allow them, and entities that they controlled and utilized in the scheme, to retain any benefits associated with the acquisition or use of Debtor's property, including Debtor's Confidential Information and other proprietary assets.

385. The Litigation Trustee seeks the following recovery from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Wright, Yonan, Warner, and Sharma: a judgment imposing a constructive trust over any of Debtor's property wrongfully transferred, acquired, or utilized by these entities and individuals, respectively.

**Count 47:** **Post-Petition Civil Conspiracy Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, And Arnold.**

386. The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold.

387. Each of these Defendants joined with one another to perpetrate, facilitate, and aid and abet the fraudulent acquisition and/or conversion of the Confidential Information, and other wrongful acts, as set forth in ¶¶ 113-46. Each of these Defendants had a meeting of the

minds with one another regarding this course of action, and each undertook substantial wrongful, overt acts in furtherance of this course of action, as set forth in ¶¶ 113-46.

388.    As a result of these wrongful acts, Debtor and Debtor's creditors have suffered damages in an amount to be proven at trial. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

389.    The Litigation Trustee seeks the following relief from FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold, jointly and severally: actual, consequential, and punitive damages in an amount to be proven at trial.

**Count 48:      Post-Petition Aiding And Abetting Breach Of Fiduciary Duty Against FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, And Arnold.**

390.    The Defendants affected by this claim are FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and Arnold.

391.    As of the Petition Date, and throughout their term of employment with Debtor, Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Sharma,

and Arnold owed fiduciary duties to Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

392.    These individuals breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing, and carrying out the fraudulent acquisition, misappropriation, and conversion of Debtor's Confidential Information, and by failing to market Debtor's assets, or otherwise failing to maximize their value for the benefit of Debtor's estate, and by engaging in other conduct directly adverse to the interests of Debtor, as set forth in ¶¶ 113-46.

393.    FM Realty, Indus Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan knowingly and intentionally provided assistance to Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Sharma, and Arnold in breaching their fiduciary duties by, among other things, orchestrating, authorizing, and participating in the acquisition, conversion, or use of the Confidential Information.

394.    In addition, each of Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Sharma, and Arnold knowingly and intentionally provided assistance to one another in breaching their fiduciary duties by, among other things, orchestrating, authorizing, and participating in the acquisition, conversion, or use of the Confidential Information.   The assistance provided by each such Defendant was a substantial factor in causing the breaches of fiduciary duties committed by these individuals.

395.    These breaches of fiduciary duty proximately caused damages to Debtor and its creditors in an amount to be proven at trial.   Such damages were the reasonable and foreseeable consequence of the conduct of Jaggi, Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Sharma, and Arnold, and they are jointly and severally liable

1   for all the actual and consequential damages resulting from these breaches of fiduciary duty.

2       396.    The acts and/or omissions described in this count were committed with an

3   intent to defraud and motivated by a conscious and deliberate disregard of the interests of

4   Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its

5   creditors were foreseeably subject to harm by such acts and/or omissions. The intentional,

6   malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in

7   actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others

8   from similar wrongdoing, the Litigation Trustee should be awarded punitive damages,

9   pursuant to all available statutory and common law rights, in an amount to be proven at trial.

10       397.    The Litigation Trustee seeks the following relief from FM Realty, Indus

11   Holdings, Indus Ventures, The Sullivan, Sr. Revocable Trust, Wright & Yonan, Jaggi,

12   Sullivan, Sr., Sullivan, Jr., Malis, Marchetti, Young, Warner, Wright, Yonan, Shivpuri, and

13   Arnold, jointly and severally: actual, consequential, and punitive damages in amounts to be

14   proven at trial.

15   **Counts 49–58: Post-Petition Claims Relating to the Ecloser System.**

16   **Count 49:**     **Misappropriation Against TSA, Sullivan Title, Wright, Wright & Yonan,**
17                  **Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri,**
                    **Ecloser, Inc., And ECSI**

18       398.    The Defendants affected by this claim are TSA, Sullivan Title, Wright, Wright

19   & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc.,

20   and ECSI.

21       399.    Debtor, in the course of its business, possessed and acquired trade secrets and

22   other confidential and proprietary information, including, but not limited to the Ecloser

23   System.

24       400.    Debtor derived independent economic value, actual and potential, by virtue of

25   the fact that the Ecloser System was not generally known to (and readily accessible through

proper means by) other persons who can obtain economic value from the Ecloser System. Debtor undertook reasonable efforts to maintain the secrecy of the Ecloser System.

401. TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI have acquired the Ecloser System by improper means, including (among other things), (a) fraud; (b) breaches of fiduciary duty; (c) conversion; and (d) misappropriation.

402. Debtor and Debtor's creditors have suffered damages a result of the misappropriation of the Ecloser System by TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp, MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, including, but not limited to, the loss of a reasonable royalty Debtor should have received for the Ecloser System, the lost economic value of the Ecloser System and/or profits derived therefrom and the licensing of that product, and other forms of remuneration. Debtor is therefore entitled to recover from jointly and severally the damages caused by their theft and misappropriation of the Ecloser System, pursuant to ARIZ. REV. STAT. ANN. § 44-402 and/or any other applicable law or statute, in an amount to be proven at trial.

403. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

404. The Litigation Trustee is seeking the following relief from TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri,

Ecloser, Inc., and ECSI, jointly and severally: actual and consequential damages arising from the misappropriation and punitive damages in an amount to be determined at trial.

**Count 50: Conversion Against TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus, Corp., MSS, Warner, Shivpuri, Ecloser, Inc., And ECSI.**

405.    The Defendants affected by this claim are TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus, Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI.

406.    At all times after the Petition Date, Debtor has been entitled to possession the Ecloser System.  No later than January 2008 and continuing indefinitely thereafter, TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus, Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI wrongfully exercised dominion and/or control over the Ecloser System, which substantially interfered with Debtor's rights to the Ecloser System.

407.    Debtor had (and continues to have) an immediate legal right to use (and to possess) the Ecloser System at the time of the alleged conversion and was in a position to use it and was prevented from such use only by the wrongful detention and taking of the Ecloser System by TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus, Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, and is therefore entitled to recover the value of the Ecloser System from them, along with any costs saved and profits generated therefrom, in an amount to be proven at trial.

408.    The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages,

pursuant to all available statutory and common law rights, in an amount to be proven at trial.

409. The Litigation Trustee is seeking the following relief from TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus, Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, jointly and severally: actual, consequential, and punitive damages in an amount to be determined at trial.

**Count 51:** **Breach Of Fiduciary Duty Against Sullivan, Sr., Sullivan, Jr., Warner, And <u>Wright.</u>**

410. The Defendants affected by this claim are Sullivan, Sr., Sullivan, Jr., Warner, and Wright.

411. As of the Petition Date, and through the term of their employment with the Debtor, Sullivan, Sr., Sullivan, Jr., Warner, and Wright owed fiduciary duties to Debtor and Debtor's creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-dealing and self-interested transactions at the creditors' expense, the duty of due care and fair and honest dealing to act in the best interests of Debtor's creditors, and the duty of full disclosure.

412. Wright, in his capacity as Debtor's counsel and former counsel, owed fiduciary duties to Debtor, including but not limited to, the duty of loyalty, the duty of due care, and the duty of full disclosure.

413. As described in ¶¶ 147-54, these individuals breached their fiduciary duties to Debtor and to Debtor's creditors by, among other things, orchestrating, authorizing and carrying out a scheme by which Sullivan, Sr., Sullivan, Jr., Warner, Wright, and Shivpuri knowingly transferred and acquired the Ecloser System by means of fraud, misappropriation, and conversion, by failing to pay consideration for the Ecloser System, by failing to pay Debtor any royalties or licensing fees for the marketing of the Ecloser System, and by engaging in other conduct directly adverse to the interests of the Debtor.

414. As a result of the foregoing breaches of fiduciary duties, Debtor and Debtor's creditors suffered damages in an amount to be proven at trial. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

415. The Litigation Trustee seeks the following relief from Sullivan, Sr., Sullivan, Jr., Warner, and Wright, jointly and severally: actual, consequential, and punitive damages in an amount to be determined at the time of trial.

**Count 52:**     **Fraud Against Sullivan, Sr., Sullivan, Jr., Warner, And Wright.**

416. The Defendants affected by this claim are Sullivan, Sr., Sullivan, Jr., Warner, and Wright.

417. The Defendants affected by this claim owed Debtor and its creditors a legal duty to disclose dispositions of Debtor's assets, including the Ecloser System. However, they failed to disclose the disposition of the Ecloser System to the Court and to creditors of the Debtor. Their failure to disclose such disposition to Debtor and Debtor's creditors were material.

418. Consequently, the Litigation Trustee is entitled to recover actual and consequential damages in an amount to be proven at trial. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an

1  evil mind.  The interests of Debtor and its creditors were foreseeably subject to harm by such
2  acts and/or omissions.  The intentional, malicious, conscious and/or deliberate acts and/or
3  omissions described in this count resulted in actual harm to Debtor and its creditors.
4  Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation
5  Trustee should be awarded punitive damages, pursuant to all available statutory and common
6  law rights, in an amount to be proven at trial.

7        419.    The Litigation Trustee seeks the following relief from Sullivan, Sr., Sullivan,
8  Jr., Warner, and Wright, jointly and severally:  actual, consequential, and punitive damages in
9  an amount to be proven at trial.

10 **Count 53:    Unjust Enrichment Against TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr.,**
                **Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., And ECSI.**
11

12       420.    The Defendants affected by this claim are TSA, Sullivan Title, Sullivan, Sr.,
13 Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI.

14       421.    Debtor is entitled to compensation from TSA, Sullivan Title, Sullivan, Sr.,
15 Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI because the
16 acquisition and unauthorized use and licensing of the Ecloser System has conferred a benefit
17 on them.  TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner,
18 Shivpuri, Ecloser, Inc., and ECSI have retained the value of such benefit by virtue of their
19 beneficial use and licensing of the Ecloser System.

20       422.    It would be unjust to allow TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr.,
21 Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI to retain the benefit related to
22 the Ecloser System without compensating Debtor.  Debtor is therefore entitled to restitution of
23 all benefits wrongfully withheld, including, but not limited to, reasonable royalties and
24 licensing fees, costs saved, and profits and/or the value derived by them from their possession
25 and beneficial use of the Ecloser System.

423.     The Litigation Trustee seeks the following relief from TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, jointly and severally:  a judgment imposing a constructive trust over the Ecloser System and restitution for any benefits obtained by such Defendants in an amount to be proven at trial.

**Count 54:     Quantum Meruit Against TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., And ECSI.**

424.     The Defendants affected by this claim are TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI.

425.     Debtor is entitled to compensation from the TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI for the value derived from their unauthorized use of the Ecloser System.  The Ecloser System conferred a benefit on TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI.

426.     It would be unjust for TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI to retain the benefits of the Ecloser System without compensation to Debtor, and Debtor is entitled to restitution of all benefits wrongfully withheld by them from their possession and beneficial use of the Ecloser System.

427.     The Litigation Trustee seeks the following relief from TSA, Sullivan Title, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, jointly and severally:  the value of the benefit conferred to such Defendants and punitive damages.

**Count 55:     11 U.S.C. § 549(a) Post-Petition Avoidable Transfer Against Sullivan, Sr., Sullivan, Jr., MSS, Ecloser, Inc., And ECSI.**

428.     The Defendants affected by this claim are Sullivan, Sr., Sullivan, Jr., MSS, Ecloser, Inc., and ECSI.

429.    Upon information and belief, between December 2007 and February 2008, Debtor was caused to transfer research and development related to the Ecloser System, data on which the Ecloser System operates, and the Ecloser System, to Sullivan, Sr., Sullivan, Jr., MSS, Ecloser, Inc., and/or ECSI.  These assets were the property of Debtor.  Ecloser, Inc. and ECSI have marketed and licensed the Ecloser System to third parties, which have resulted in the generation of licensing fees and/or royalties.

430.    Debtor made the transfer after the commencement of the FMFC Bankruptcy. These transfers were not authorized under Title 11 or by the Court.  Pursuant to 11 U.S.C. §§ 549(a) and 550(a), Debtor is entitled to avoid the transfer.

431.    The Litigation Trustee seeks the following relief from Sullivan, Sr., Sullivan, Jr., MSS, Ecloser, Inc., and ECSI, jointly and severally:  the avoidance of the post-petition transfer and the recovery of the value of the Ecloser System, research and development related to the Ecloser System, and the data on which the Ecloser system operates, in an amount to be determined at trial.

**Count 56:    Post-Petition Civil Conspiracy Against TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., And ECSI.**

432.    The Defendants affected by this claim are TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI.

433.    Each of these Defendants joined with one another to perpetrate, facilitate, and aid and abet the fraudulent acquisition and/or conversion of the Ecloser System, and other wrongful acts, as set forth in ¶¶ 147-54.  Each of these Defendants had a meeting of the minds with one another regarding this course of action, and each undertook substantial wrongful, overt acts in furtherance of this course of action, as set forth in ¶¶ 147-54.

434.    As a result of these wrongful acts, Debtor and Debtor's creditors have suffered

1  damages in an amount to be proven at trial. The acts and/or omissions described in this count
2  were committed with an intent to defraud and motivated by a conscious and deliberate
3  disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The
4  interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or
5  omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions
6  described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to
7  punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be
8  awarded punitive damages, pursuant to all available statutory and common law rights, in an
9  amount to be proven at trial.

10         435.   The Litigation Trustee seeks the following relief from TSA, Sullivan Title,
11  Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri,
12  Ecloser, Inc., and ECSI, jointly and severally: actual, consequential, and punitive damages in
13  an amount to be proven at trial.

14  **Count 57:**     **Post-Petition Aiding And Abetting Breach Of Fiduciary Duty Against TSA,**
                      **Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr.,**
15                    **Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., And ECSI.**

16         436.   The Defendants affected by this claim are TSA, Sullivan Title, Wright, Wright
17  & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc.,
18  and ECSI.

19         437.   As of the Petition Date, and throughout their term of employment with Debtor,
20  Wright, Sullivan, Sr., Sullivan, Jr., Warner, and Shivpuri owed fiduciary duties to Debtor's
21  creditors including, but not limited to, the duty of good faith, the duty of loyalty to avoid self-
22  dealing and self-interested transactions at the creditors' expense, the duty of due care and fair
23  and honest dealing to act in the best interests of Debtor's creditors, and the duty of full
24  disclosure.

25         438.   These individuals breached their fiduciary duties to Debtor and to Debtor's

creditors by, among other things, orchestrating, authorizing, and carrying out the fraudulent acquisition, misappropriation, and conversion of the Ecloser System, as set forth in ¶¶ 147-54.

439. TSA, Sullivan Title, Wright & Yonan, Magnus Corp., MSS, Ecloser, Inc., and ECSI knowingly and intentionally provided assistance to Wright, Sullivan, Sr., Sullivan, Jr., Warner, and Shivpuri in breaching their fiduciary duties by, among other things, orchestrating, authorizing, and participating in the acquisition, conversion, or use of the Ecloser System.

440. In addition, each of Wright, Sullivan, Sr., Sullivan, Jr., Warner, and Shivpuri knowingly and intentionally provided assistance to one another in breaching their fiduciary duties by, among other things, orchestrating, authorizing, and participating in the acquisition, conversion, or use of the Ecloser System. The assistance provided by each such Defendant was a substantial factor in causing the breaches of fiduciary duties committed by these individuals.

441. These breaches of fiduciary duty proximately caused damages to Debtor and Debtor's creditors in an amount to be proven at trial. Such damages were the reasonable and foreseeable consequence of the conduct of Wright, Sullivan, Sr., Sullivan, Jr., Warner, and Shivpuri, who are jointly and severally liable for all the actual and consequential damages resulting from these breaches of fiduciary duty.

442. The acts and/or omissions described in this count were committed with an intent to defraud and motivated by a conscious and deliberate disregard of the interests of Debtor and its creditors sufficient to evidence an evil mind. The interests of Debtor and its creditors were foreseeably subject to harm by such acts and/or omissions. The intentional, malicious, conscious and/or deliberate acts and/or omissions described in this count resulted in actual harm to Debtor and its creditors. Accordingly, to punish such acts and deter others from similar wrongdoing, the Litigation Trustee should be awarded punitive damages, pursuant to all available statutory and common law rights, in an amount to be proven at trial.

443.    The Litigation Trustee seeks the following relief from TSA, Sullivan Title, Wright, Wright & Yonan, Sullivan, Sr., Sullivan, Jr., Magnus Corp., MSS, Warner, Shivpuri, Ecloser, Inc., and ECSI, jointly and severally:    actual, consequential, and punitive damages resulting from their breaches of fiduciary duties related to the Ecloser System in an amount to be proven at trial.

### EQUITABLE SUBORDINATION AND RECHARACTERIZATION

**Count 58:    Equitable Subordination Of Claim No. 4551 Against FMCI.**

444.    FMCI filed a proof of claim in the Bankruptcy Case [Claim No. 4551], which seeks an allowed claim in the amount of $37,482,071.02 for alleged principal and interest payments outstanding on the Revolver ("FMCI Claim").

445.    FMCI, through Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young, engaged in wrongdoing and other inequitable conduct outlined in paragraphs 40-112, which resulted in unfairness to creditors and caused substantial harm to the Debtor. Allowing FMCI to share in what, if any, distribution is made to the other unsecured creditors of the Debtor would result in further unfairness to the remaining creditors.    Further, the protocols of the Revolver were never followed.    As such, funds advanced pursuant to the Revolver by FMFCI were, in fact, capital contributions.    Pursuant to 11 U.S.C. § 510(c), the Court should expunge, disallow, or otherwise equitably subordinate the FMCI Claim to the claims of all other unsecured creditors until all other claims against the Debtor have been satisfied in full.

**Count 59:    Re-characterization Of Claim No. 4551 Against FMCI.**

446.    There is an identity of interests on both sides of the transaction giving rise to the FMCI Claim because the directors and officers of Debtor and FMCI were identical, and because Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young owned 100% of FMCI, which owned 100% of the Debtor.    FMCI, through Jaggi, Sullivan, Sr., Sullivan, Jr.,

Gaylord, Malis, Marchetti, and Young, engaged in wrongdoing and other inequitable conduct outlined in paragraphs 40-112, which resulted in unfairness to creditors and caused substantial harm to the Debtor. The Revolver, in particular, was used as a tool by Jaggi, Sullivan, Sr., Sullivan, Jr., Gaylord, Malis, Marchetti, and Young in their scheme to strip Debtor of desperately needed capital for the benefit of themselves and FMCI, "loaning" money back to the Debtor (with interest) that never should have been taken in the first instance. Pursuant to 11 U.S.C. § 105(a), the Court should re-characterize the FMCI Claim as equity.

**Count 60:** **Attorneys' Fees, Pre- And Post-Judgment Interest, And Costs.**

447. Pursuant to Rule 7008(b), FED. R. BANKR. P, the Litigation Trustee hereby makes a claim to recover all of the Litigation Trust's reasonable and necessary attorneys' fees as set forth in the foregoing Counts, as well as pre-judgment and post-judgment interest, and costs, all to the fullest extent allowed by law.

**REQUEST FOR RELIEF**

The Litigation Trust respectfully requests that the Court grant all the relief requested herein and award:

      a. all actual and consequential damages;

      b. pre-judgment and post-judgment interest;

      c. punitive and exemplary damages;

      d. attorneys' fees and costs;

      e. all treble and statutory damages; and

      f. any and all relief the Court deems necessary and just.

DATED this 2nd day of October, 2009.

**LACKEY HERSHMAN, L.L.P.**

By /s/ Jamie R. Welton
Jamie R. Welton, Bar No. 24013732
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219

and

**GUST ROSENFELD P.L.C.**
Sean P. O'Brien, Bar No. 010540

201 E. Washington Street, Suite 800
Phoenix, Arizona  85004

Counsel for Larry Lattig, Litigation Trustee, First Magnus Litigation Trust

| | |
|---|---|
| 1 | ORIGINAL of the foregoing |
| | Electronically filed this |
| 2 | 2nd day of October, 2009, |
| | with: |
| 3 | |
| | United States Bankruptcy Court |
| 4 | 38 S. Scott Avenue, Room 100 |
| | Tucson, AZ 85701-1608 |
| 5 | https://ecf.azb.uscourts.gov |
| 6 | Copy of the foregoing mailed |
| | and/or electronically served October 2, 2009: |
| 7 | |
| 8 | Renee Sandler Shamblin |
| | Office of the U.S. Trustee |
| | 230 North First Avenue, Suite 204 |
| 9 | Phoenix, AZ 85003-1706 |
| | renee.s.shamblin@usdoj.gov |
| 10 | |
| 11 | Michael McGrath |
| | David Hindman |
| 12 | Mesch, Clark & Rothschild, P.C. |
| | Tucson, AZ 85701-1090 |
| 13 | mmcgrath@mcrazlaw.com |
| | dhindman@mcrazlaw.com |
| 14 | **Attorneys for Defendants Thomas W. Sullivan, Sr., Thomas W. Sullivan, Jr.,** |
| | **James Warner, Vivek Shivpuri, Thomas W. Sullivan Sr. Revocable Trust,** |
| 15 | **Sullivan Title Investment LLC, Sullivan Title Management, Inc., ECloser, Inc.,** |
| 16 | **ECloser Services, Inc., First Magnus Realty, LLC, Magnus Corporation, and Magnus** |
| | **Settlement Services, LLC** |
| 17 | |
| 18 | Jeffrey H. Greenberg |
| | Stubbs & Shubart, P.C. |
| 19 | 340 North Main Avenue |
| | Tucson, AZ 85701 |
| 20 | jgreenberg@stubbsschubart.com |
| | **Attorneys for Defendant Clinton W. Gaylord** |
| 21 | |
| 22 | Thomas A. Zlaket |
| | Thomas A. Zlaket, P.L.L.C. |
| 23 | 310 South Williams Boulevard, Suite 170 |
| | Tucson, AZ 85711-4446 |
| 24 | tazlaket@qwestoffice.net |
| | **Attorneys for Defendants Gurpreet Jaggi, Karl F. Young, Gary Malis, Dominick** |
| 25 | **Marchetti, Indus Holdings LLC, and Indus Ventures LLC** |

SPO:lla  1107714.1  10/2/2009

109

| | |
|---|---|
| 1 | Gerald F. Giordano |
| 2 | Feulner Dorris & Giordano PLC<br>2 East Congress Street, Suite 1000 |
| 3 | Tucson, AZ 85701<br>gg@feulnerdorris.com |
| 4 | **Attorneys for Defendant Arvind Sharma** |
| 5 | Michael Rusing<br>Rusing & Lopez, P.L.L.C. |
| 6 | 6262 North Swan Road, Suite 200 |
| 7 | Tucson, AZ 85718<br>mrusing@rusingandlopez.com |
| 8 | **Attorneys for Defendant Title Security Agency of Arizona** |
| 9 | Russell B. Stowers<br>Law Offices of Joel L. Herz |
| 10 | 3573 East Sunrise Drive, Suite 215 |
| 11 | Tucson, AZ  85718<br>rstowers@joelherz.com |
| 12 | **Attorneys for Defendants Messrs. Wright and Yonan**<br>**and Wright & Yonan, PLLC** |
| 13 | |
| 14 | Richard M. Rollman<br>Scott H. Rash |
| 15 | Gabroy, Rollman & Bossé, P.C.<br>3507 North Campbell Avenue, Suite 111 |
| 16 | Tucson, AZ 85719<br>rollman@gabroylaw.com |
| 17 | scottrash@gabroylaw.com |
| | **Attorneys for Defendants Martin W. Thomas and Jeff Arnold** |
| 18 | |
| 19 | Christopher H. Bayley<br>Jonathan M. Saffer |
| 20 | Nathan G. Kanute<br>Snell & Wilmer L.L.P. |
| 21 | One Arizona Center<br>400 E. Van Buren |
| 22 | Phoenix, AZ 85004-2202 |
| 23 | cbayley@swlaw.com<br>jmsaffer@swlaw.com |
| 24 | nkanute@swlaw.com<br>**Attorneys for Grant Lyon, Liquidating Agent of the First** |
| 25 | **Magnus Capital, Inc., Liquidating Trust** |

1

The undersigned hereby also certifies
2 that all counsel of record who are
deemed to have consented to
3 electronic service are being
served with a copy of this document
4 via the Court's CM/ECF system
pursuant to Local Rule 5005-2(k).
5

6

7 By _____
Linda Armijo
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**巛ECF**   **Bankruptcy**   **Adversary**   **Query**   **Reports**   **Utilities**   **Search**   **Logout**

## Complaint/Summons:

4:09-ap-00211-JMM LATTIG v. STONEWATER MORTGAGE CORPORATION et al

Type: ap          Chapter: v                    Office: 4 (Tucson)
Judge: JMM         Lead Case: 4-07-bk-1578

### U.S. Bankruptcy Court

### District of Arizona

Notice of Electronic Filing

The following transaction was received from SEAN P. O'BRIEN entered on 10/2/2009 at 4:29 PM AZ and filed on 10/2/2009

**Case Name:**      LATTIG v. STONEWATER MORTGAGE CORPORATION et al
**Case Number:**    4:09-ap-00211-JMM